# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### BROWARD DIVISION

Case No. 00-6138-CIV-Moore

Magistrate Judge O'Sullivan



MAUREEN LEWINSOHN,

       Plaintiff,

  v.

HUMANA INC.,

       Defendant.

_____/

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
# MOTION TO DISMISS PLAINTIFF'S COMPLAINT



DC1:423373.1

# TABLE OF CONTENTS

Page

Introduction ............................................................................................................ 2

Background and Summary of Argument ................................................................ 4

Argument ............................................................................................................... 7

I.    Ms. Lewinsohn's Claims Are Barred in Their Entirety by the Extensive Array of State and Federal Laws and Regulations that Specifically Permit and Regulate the Challenged Features of Managed Care. .................................... 7

    A.    The Comprehensive State and Federal Laws that Permit and Regulate the Very Cost-Containment Practices at Issue Preclude the Finding of Concealment Essential to Ms. Lewinsohn's Claims. ................................ 9

        1.    The Practices Ms. Lewinsohn Attacks Are Permitted And Regulated By A Complex Web Of State And Federal Law. ............... 9

            a.    State Legal And Regulatory Regimes. ...................................... 9

            b.    Federal Law. ........................................................................... 11

        2.    State And Federal Recognition, And Regulation, Of The Challenged Cost-Containment Practices, Together With State Laws Requiring Regulatory Approval Of The Challenged "Disclosure Documents," Preclude Any Finding Of Concealment As A Matter Of Law. ..................................... 13

    B.    Ms. Lewinsohn's Request for Monetary Relief is Barred by the Filed-Rate Doctrine. ................................................................................... 14

    C.    The Doctrine of Burford Abstention Bars Ms. Lewinsohn's Request for Injunctive Relief. ........................................................................... 18

II.    Ms. Lewinsohn's RICO Claim Is Meritless. ................................................. 19

    A.    As  a Matter of Law, Ms. Lewinsohn's Theory of a Loss in the "Value" of Her Insurance Coverage Does Not Qualify as RICO Injury. ..................... 21

    B.    Ms. Lewinsohn's Failure to Exercise Her Option to Change Health Plans Precludes the Elements of Materiality, Reliance, and Causation Required to Sustain Her RICO Claim. ........................................... 25

    C.    Ms. Lewinsohn Has Failed Properly to Plead the Existence of a RICO Enterprise. ......................................................................................... 28

    D.    Ms. Lewinsohn fails to allege that she has been injured by reason of defendant's use or investment of racketeering income. .......................... 29

III.    Ms. Lewinsohn's Complaint Fails to Allege a Violation of ERISA. .......................... 30

    A.    Ms. Lewinsohn's Failure to Exhaust Available Administrative Remedies Requires Dismissal of All of Her ERISA Counts. ......................... 30

# TABLE OF CONTENTS
## (continued)

Page

B.    Ms. Lewinsohn's Claim for Breach of Statutory Disclosure Responsibilities Is Without any Basis Under ERISA. ..................................... 32

C.    Ms. Lewinsohn's Claims for Breach of Fiduciary Duty Under Are Fatally Defective. .............................................................................................. 35

    1.    Ms. Lewinsohn's Claim In Count III That Operation Of A Managed Care Plan Is Unlawful Per Se Is Baseless. .......................... 35

    2.    Even If Recharacterized As A Nondisclosure Claim, Ms. Lewinsohn's ERISA Claim For Breach Of Fiduciary Duty Must Be Dismissed............................................................................................. 38

D.    The Relief Ms. Lewinsohn Requests To Redress the Asserted Breaches of Fiduciary Duty Is not Available Under ERISA. ......................................... 41

    1.    The Relief Ms. Lewinsohn Seeks Is Not Authorized.......................... 41

    2.    The Relief Ms. Lewinsohn Requests For Her Fiduciary Claims Is Not "Equitable," And Thus Is Not Permitted................................... 44

E.    Ms. Lewinsohn's Erisa Claim for Benefits Is Meritless as Well. ................... 45

Conclusion ................................................................................................................. 47

## INTRODUCTION

This is not a lawsuit. A "lawsuit" is a "proceeding in a court of justice" in which an allegedly injured "individual pursues that remedy . . . which the law affords him." *Weston v. Charleston,* 27 U.S. (2 Pet.) 449, 464 (1829) (Marshall, C.J.). But plaintiff's complaint contains no allegation of injury. It does not allege that the defendant – Humana Inc. ("Humana") – *ever* denied the plaintiff coverage for any medically necessary procedure or otherwise breached a statutory duty in a way that injured her. Further, the complaint does not claim any legal remedy to which the plaintiff is supposedly entitled.

What the complaint does assert is that Maureen Lewinsohn is dissatisfied with the decisions by Congress and state legislatures to encourage the growth of managed care health plans as a way to maintain employer-sponsored health care in an era of spiraling health care costs,[1] and the resulting fact that her employer offers health care benefits exclusively through managed care organizations. Her displeasure is founded on the hypothesis that health maintenance organizations ("HMOs") and other managed care organizations have an incentive to "undertreat" their patients due, in part, to compensation arrangements under which physicians assume part of the HMOs' financial risks. But this supposition suffers from an obvious logical flaw: It ignores the fact that, if HMO members become more seriously ill because of a decision to "undertreat," the HMO (and the treating physician in some cases) must shoulder the financial burden of covering more extensive – and more expensive – medical procedures. Thus, HMOs have an incentive to keep members healthy for as long as possible. *See generally Herdrich v. Pegram*, 170 F.3d 683, 684 (7th Cir. 1999) (Easterbrook, J. dissenting from denial of reh'g en banc). Ms. Lewinsohn's efforts to attack the cost-

containment structure of managed care health plans as undisclosed and contrary to the medical interests of patients cannot obscure the fact that this structure has been understood and approved for many years. *See, e.g., Anderson v. Humana Inc.*, 24 F.3d 889, 890 (7th Cir. 1994) (noting that while "an HMO has an incentive" to minimize health care utilization "in order to save costs," "HMOs also have a reason to deliver excellent preventive medicine. Prevention may reduce the need for costly services later.").

In any event, Ms. Lewinsohn's late-breaking displeasure with managed care's well-understood and legislatively approved cost-containment mechanisms is not the grist from which lawsuits arise. In one sense, what she has filed more closely resembles proposed legislation or a notice of proposed rulemaking.[2] Such proposals, however, are committed to political and administrative processes. They should be directed to Congress, state legislatures, or administrative agencies. "[J]udicial intervention is generally unwarranted no matter how unwisely [a court] may think a political branch has acted." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 314 (1993) (citation omitted). To overturn the solutions that Congress and the states have designed in the managed care arena would be to deny the "basic principles of democratic government" dictating that "[p]olicy choices are for the political branches, and Congress is the supreme branch for making such choices." *Mississippi Poultry Ass'n v. Madigan*, 31 F.3d 293, 299 (5th Cir. 1994).

---

[1] *See* U.S. General Accounting Office, GAO/HEHS-98-154, *Employer-Based Managed Care Plans: ERISA's Effect on Remedies for Benefit Denials and Medical Malpractice* 7 (1998).

[2] Indeed, some commentators have noted that rather than actually being quests to obtain redress for actual injuries, this and other class actions against HMO companies are "part of an ambitious plan to restructure the way health care is delivered in this country." *Who's Afraid of Dickie Scruggs?*, Newsweek, Dec. 6, 1999, at 48 (Doc. App., Tab D). Humana's Document Appendix includes a selection of materials that either (a) are relied upon in plaintiff's complaint, or (b) the existence of which is otherwise subject to judicial notice. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 n.16 (11th Cir. 1999) (reversing district court's decision to strike documents appended to defendant's motion to dismiss).

In another sense, what Ms. Lewinsohn presents here is merely a grievance with her employer – a demand that the health care coverage provided to her be modified. But she is not charging her employer with breaching any promise or duty, and there is no suggestion in the complaint that she has even raised these issues with her employer.[3] And even if she were taking legal aim at her employer in some respect, that would not be a matter appropriately presented to this Court in a lawsuit against Humana.

At bottom, through this purported "lawsuit," Ms. Lewinsohn seeks to obtain from Humana health coverage that is beyond the mandate of the relevant legislative or regulatory regime and beyond what her employer has legally decided to provide. However, such a lawsuit presents no real claims that could appropriately be resolved by this Court. For all of her rhetoric about the perceived evils in the existing health care system and the changes she wishes to make, Ms. Lewinsohn fails to state *any* legally cognizable claim for relief. Her Complaint therefore should be dismissed in its entirety pursuant to Fed. R. Civ. P. 12(b)(6).

## BACKGROUND AND SUMMARY OF ARGUMENT

Ms. Lewinsohn, a Florida resident, is an employee of the Broward County School Board. (Complaint ("Compl.") ¶ 16.) In 1993, her employer offered her a choice between two Humana health plans, an HMO and a PPO, among other choices. (*Id.* ¶¶ 16(a) & (b).) She chose the PPO. (*Id.* ¶ 16(b).) She now brings this action on behalf of a purported class of "*all persons in the United States* who are, or were, enrolled in Humana Inc.'s [HMOs] preferred provider organizations ("PPOs") and/or point of service plans ("POSs"),

---

[3]    Neither has Ms. Lewinsohn chosen to attack her physicians, whom she impliedly accuses of being willing to withhold care for purely economic reasons in violation of their Hippocratic Oath and various state and federal laws. *Cf.* Fla. Stat. Ann. § 641.51(3) (prohibiting professional judgment of physician from being modified by managed care organizations, but expressly permitting utilization review and other cost-containment practices).

operated by . . . Humana Inc. at any time during the period from October 4, 1995 through and after the date" of the Complaint. (*Id.* ¶ 1 (emphasis added).) She also purports to represent a sub-class of *all* such persons, wherever situated in the United States, who obtained Humana coverage "through their employers' ERISA-governed health benefits plans" from October 4, 1993 through the present. (*Id.* ¶¶ 1 & 2.)

Ms. Lewinsohn charges Humana with concealing "accurate information about when health care will be provided, when claims will be approved or disapproved, and what criteria and procedures are actually used to determine the extent and type of coverage." (*Id.* ¶ 3.) While the subject matter of the complaint is clearly health coverage (*see, e.g., id.* ¶ 10), Ms. Lewinsohn herself does not allege that she has ever been denied coverage under her health plan. Instead, she claims that the ways in which Humana *might* have treated a hypothetical request for coverage *in the past* – and how it *might* address a hypothetical request *in the future* – have somehow affected the value of the coverage provided by her employer-sponsored managed care plan. (*Id.* ¶ 52.)

The fact that Ms. Lewinsohn purports to represent millions of others not before the Court only makes her individual claims more spurious, however. Her legal theories of fraudulent nondisclosure cannot be maintained in the face of state and federal laws that expressly authorize (if not promote) the very practices that the claims are unlawful – practices that are by definition a matter of public knowledge. The very cost-containment incentives she attacks have been publicized and judicially recognized for years. *See, e.g., Anderson*, 24 F.3d at 890 (dismissing state-law challenge to HMO incentive structure). Indeed, on the very page of the very securities filing Ms. Lewinsohn cites as fraudulent (*see* Compl. ¶ 35(5)) – as in numerous other regulatory filings and other documents – Humana itself announced to the world the very practices plaintiffs contend have been concealed. (*See* Report of Humana Inc.

DC1:423373.1                                    5

on Form 10-Q for the period ended March 31, 1999, at 11 (Doc. App., Tab B) ("HMOs and

PPOs control health costs by various means, including . . . risk-sharing arrangements with

providers. These providers may share medical cost risk or have other incentives to deliver

quality medical services in a cost-effective manner.").)

Ms. Lewinsohn pitches her nondisclosure theory in four different ways: a

RICO claim predicated on mail and wire fraud (Count I), an ERISA claim for breach of

express disclosure obligations (Count II), an ERISA claim for breach of fiduciary duty (Count

III), and a claim for failure to provide benefits due under an ERISA plan (Count IV).[4] These

claims fail for multiple reasons.

- To the extent she demands monetary relief, the filed rate doctrine bars all four of Ms. Lewinsohn's claims – under RICO and ERISA – because state regulators have already reviewed and approved the reasonableness of Humana's rates. (*See* pp. 13-17 *infra*.)

- The Court must abstain from granting injunctive relief under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), to avoid interfering with a carefully crafted state managed care regulatory regime. (*See* pp. 17-18 *infra*.)

- RICO does not permit recovery for speculative "risk injuries" like Ms. Lewinsohn's claim of injury based on a reduction in the value of her health coverage (Count I). (*See* pp. 20-24 *infra*.)

- Ms. Lewinsohn cannot prove materiality, reliance and causation – essential elements of her RICO claim (Count I) – because although according to the Complaint (Compl. ¶ 16(b)), her employer offered other health care plans, she did not choose a different plan after learning of the allegedly concealed facts. (*See* pp. 24-27 *infra*.)

- Ms. Lewinsohn's ERISA claims (Counts II-IV) are barred because she has not exhausted her administrative remedies. (*See* pp. 29-30 *infra*.)

- The ERISA statutory claim (Count II) fails because Ms. Lewinsohn cannot point to any specific provision requiring disclosure of the Humana practices of which she complains. (*See* pp. 31-33 *infra*.)

---

[4] The counts in Ms. Lewinsohn's Complaint are numbered I-III, but there are two counts numbered II. This memorandum treats the second Count II as Count III and Count III as Count IV.

- Ms. Lewinsohn's claim for failure to provide benefits (Count IV) founders on the fact that she does not allege that she has even been denied benefits to which she was entitled. (*See* pp. 44-46 *infra.*)

The entire complaint must therefore be dismissed.

## ARGUMENT

## I. MS. LEWINSOHN'S CLAIMS ARE BARRED IN THEIR ENTIRETY BY THE EXTENSIVE ARRAY OF STATE AND FEDERAL LAWS AND REGULATIONS THAT SPECIFICALLY PERMIT AND REGULATE THE CHALLENGED FEATURES OF MANAGED CARE.

The four claims Ms. Lewinsohn raises are barred in their entirety because HMOs and other forms of managed care are both specifically permitted and comprehensively regulated by state and federal law. *Each* of the ubiquitous HMO cost-containment practices Ms. Lewinsohn attacks – (1) physician compensation arrangements, such as capitation[5]; (2) utilization review and management processes[6]; and (3) the use of unaffiliated private firms to develop utilization standards and to conduct medical necessity reviews of requested services – is firmly rooted in governing state law. For example, Florida law provides that insurers "may include the following managed care provisions in the[ir] polic[ies] or contract[s] to control costs: . . . a preferred provider arrangement or exclusive provider organizations . . . [a] procedure for utilization review ... [and any] additional managed care and cost containment provisions, subject to the approval of the department" of insurance. Fla. Stat. Ann. § 627.6699(12)(b)(3). The practices challenged by Ms. Lewinsohn similarly are expressly recognized in other states' laws and in federal health care laws and regulations.

---

[5]    "Capitation" is defined by statute in Florida to mean "the fixed amount paid by an HMO to a health care provider under contract with the health maintenance organization in exchange for the rendering of covered medical services." Fla. Stat. § 641.19(3). This definition is echoed in Humana's web site – ironically, one of the alleged sources of misinformation Ms. Lewinsohn identifies in the complaint: Capitation is "[a] monthly payment to providers based on membership rather than services provided. The payment covers contracted services and is paid in advance of care being provide[d]. Capitation is expressed as a 'per member per month' amount." (Attached at Tab C.)

Ms. Lewinsohn apparently hopes this Court will find in the general provisions

of RICO and ERISA the authority to add a new layer of federal disclosure requirements on

top of the state (and federal) regulatory schemes governing the specific cost-containment

practices at issue. But the relevant state insurance laws contain their own unique, carefully

crafted sets of disclosure rules, which would become all but irrelevant if the general

provisions of RICO and ERISA were interpreted to require a substitute set of rules. In similar

circumstances, a growing chorus of courts has rejected efforts to entangle the federal judiciary

in disputes concerning business practices in heavily regulated industries like the insurance

industry. While these courts have rested their holdings on a variety of doctrinal grounds, they

all have relied on the same principle of judicial non-interference with comprehensive state

regulatory regimes. As Judge Highsmith of this Court recently observed:

> The doctrines addressed by the Court – *Burford* abstention and
> the filed rate doctrine – as well as other arguments presented by
> the defendants which the Court did not need to reach, such as
> exhaustion of administrative remedies, are simply variations on
> the same theme. The problems which the plaintiffs have
> presented to this Court are best addressed by state legislative
> and regulatory bodies.

*Morales v. Attorneys' Title Ins. Fund*, 983 F. Supp. 1418, 1429-30 (S.D. Fla. 1997)

(dismissing federal-law claims against regulated insurer under Rule 12(b)(6)). As in these

prior cases, Ms. Lewinsohn's efforts to use federal statutes to fabricate a previously unknown

set of legal constraints for health insurers flies in the face of contrary state and federal law.

The complaint should therefore be dismissed in its entirety.

---

[6]    Utilization review typically is defined to mean "a system for reviewing the medical necessity or appropriateness in the allocation of health care resources . . . given or proposed to be given to a patient or group of patients." Fla. Stat. Ann. § 395.002(31).

A.    THE COMPREHENSIVE STATE AND FEDERAL LAWS THAT PERMIT AND
REGULATE THE VERY COST-CONTAINMENT PRACTICES AT ISSUE
PRECLUDE THE FINDING OF CONCEALMENT ESSENTIAL TO MS.
LEWINSOHN'S CLAIMS.

1.    *The Practices Ms. Lewinsohn Attacks Are Permitted And
Regulated By A Complex Web Of State And Federal Law.*

Ms. Lewinsohn's health plan is subject to regulation by Florida law. In

addition, certain aspects of federal health care statutes and regulations are relevant to her

claims. The laws of these jurisdictions specifically recognize and regulate the practices she

alleges have somehow been concealed.

a.    **State Legal And Regulatory Regimes**.

Ms. Lewinsohn's request for judicial relief, as well as her underlying criticisms

of managed care, contradicts the panoply of laws and regulations governing managed care.

Florida requires health insurers to obtain a license or certificate of authority prior to engaging

in the HMO business. *See* Fla. Stat. Ann. § 641.21(1).[7] Flowing from this certification

requirement are four categories of authority that collectively belie the assertion that managed

care cost-containment practices either are unlawful or were concealed.

***First***, Florida expressly recognizes and regulates each of the cost-containment

practices Ms. Lewinsohn challenges.[8] For example:

- *Florida law specifically recognizes the power of managed care organizations
to capitate providers*. *See* Fla. Stat. Ann. § 641.31(31)(d).

- *Florida law specifically authorizes health insurers to conduct utilization
review*. *See* Fla. Stat. Ann. § 627.6699(12)(b)(3)(b).

---

[7]    Insurers in Florida offering PPO and POS plans must also comply with licensing and filing
requirements for those products. *See* Fla. Stat. Ann. § 627.410 (generally applicable filing requirement).
[8]    In addition to negating the element of concealment, these specific authorizations to conduct the very
activities Ms. Lewinsohn says are criminal preclude any possibility that she can satisfy the criminal intent
element of the alleged RICO predicate act of mail fraud. Specific statutory authorization to do an act, after all,
negates the intent required to justify punishment for the act. *See, e.g., BMW of N. Am., Inc. v. Gore*, 517 U.S.
559, 577 (1996).

- ***Florida law permits health insurers to contract with third parties to conduct utilization review activities.*** Fla. Stat. Ann. § 395.0199(2).

***Second***, Florida has adopted disclosure requirements that comprehensively regulate the content of documents provided to subscribers. Indeed, state regulators are required to approve these documents in advance. For example:

- ***Ms. Lewinsohn's contracts of health coverage were subject to filing and approval requirements.*** Florida law requires that certificates of coverage – the contracts under which insureds receive the health benefits – be filed with and approved by the state Department of Insurance ("DOI"). *See* Fla. Stat. Ann. § 641.21(1)(f).

- ***Other member materials – including the very "Disclosure Documents" on which Ms. Lewinsohn relies on – are subject to regulatory review and approval requirements.*** *See* Fla. Stat. Ann. § 641.31(3) (requiring member handbooks, contracts, and other materials to be filed).

- ***Contracts with physicians and other providers are subject to filing requirements.*** *See* Fla. Stat. Ann. § 641.234(1).

***Third***, Florida requires HMOs to file their rates with the state insurance regulatory agency, which must approve such rates in advance. *See* Fla. Stat. Ann. § 641.31(d).

***Fourth***, Florida has adopted a comprehensive administrative enforcement regime to police the cost-containment practices (and associated disclosures) used by health insurers. The DOI has authority either to suspend or revoke a managed care company's certificate of authority, *see* Fla. Stat. Ann. § 641.23(2), or to impose a specified administrative penalty in lieu of suspension or revocation, *see id.* § 641.25.[9]

---

[9] The Florida legislature is ***currently*** considering the appropriate balance between access to health care and containment of health care costs, as well as the appropriate remedies for any deviation from this balance – a debate that should not be short-circuited by judicial order. *See, e.g.*, S.B. 424 and H.B. 291 (Fla.) (regarding civil remedies for denials of requested health services).

b.    **Federal Law.**

Federal law is relevant to Ms. Lewinsohn's wrongful nondisclosure-based

claims for two reasons. *First*, in the Health Maintenance Organization Act, 42 U.S.C. §§

300e – 300e-17, Congress directly authorized HMOs to share financial risks and rewards with

physicians in order to discourage the unnecessary use of expensive medical treatments.

Indeed, the HMO Act specifically requires managed care companies to assume financial risk

for the care of their subscribers, and authorizes HMOs to place some or all of this risk on

providers – the very incentives Ms. Lewinsohn claims are unlawful. *See* 42 U.S.C. § 300e(c)

(an HMO "may . . . make arrangements with physicians or other health professionals, health

care institutions, or any combination of such individuals or institutions to assume all or part of

the financial risk on a prospective basis for the provision of basic health services by the

physicians or other health professionals or through the institutions."). And Congress, in

enacting the statute, plainly understood – and desired – that effective cost containment, and

"cost consciousness," would result from these financial arrangements. *See Health

Maintenance Organizations: Hearings on H.R. 5615 and H.R. 11728 (and all identical bills)

Before the Subcomm. on Public Health and Environment of the House of Representatives

Comm. on Interstate and Foreign Commerce*, 92nd Cong. 56 (1972) (statement of Secretary,

Department of Health, Education and Welfare).[10] It is ***because of*** these well-recognized

---

[10]    This popular understanding among lawmakers has only strengthened over the years. In 1991, for example, managed care organizations continued to be characterized in terms of their cost-containment capacity. At one congressional hearing, Robert Reischauer, Director of the Congressional Budget Office, stated that managed care was specifically intended to "ferret out unnecessary and inappropriate care by *reviewing and intervening in the decision to provide various services.*" *Options for Health Insurance: Requirements for Health Care Cost Containment: Hearings on Serial 102-48 Before the Subcommittee on Health of the House of Representatives Comm. on Ways and Means*, 102nd Cong. 104 (1991) (emphasis added). Other such statements in the legislative record abound. *See, e.g., Health Care Reform: Hearings Before the Subcomm. on Health and Environment of the House of Representatives Comm. on Energy and Commerce*, 102nd Cong. 23-25, 66-69, 259, 271 (1991).

characteristics of managed care organizations, not in spite of them, that longstanding federal rules required all employers with 25 or more employees to offer a qualified HMO as a benefit option to their employees. *See* 42 C.F.R. § 417.151 (1994). Given such clear congressional intent to foster the growth of managed care as a means of health care delivery, it is clear that Congress – not the courts – must decide whether additional, costly disclosure obligations are to be imposed.

*Second*, rules governing federal Medicare, Medicaid, and other programs – though not directly implicated by Ms. Lewinsohn's complaint – highlight the prevalence, as well as the legitimacy, of the very practices she attacks. In the Medicare context, for example, the federal government *itself* makes capitated payments to HMO entities, *see* 42 C.F.R. § 422.252 (setting forth formula for calculation of capitation rates) – despite Ms. Lewinsohn's assertions that such payments create an inherent conflict of interest. (*See* Compl. ¶ 48(b)(5).) Medicare regulations have consistently *required* health plans serving Medicare beneficiaries to "[d]evelop procedures for utilization review." 42 C.F.R. § 421.200(f)(2)(iv). And the Medicare physician incentive regulation, which expressly permits the use of physician compensation arrangements that create incentives to limit overall utilization of medical services (subject only to regulatory requirements), specifically rejects the notion that the particulars of such incentives must be affirmatively disclosed to Medicare participants – requiring only that they be disclosed on request. *See* 42 C.F.R. § 417.479. The regulation also requires that all physician arrangements be disclosed to the federal Health Care Financing Administration, further negating Ms. Lewinsohn's allegations of concealment. *See id.*

2.    *State And Federal Recognition, And Regulation, Of The Challenged Cost-Containment Practices, Together With State Laws Requiring Regulatory Approval Of The Challenged "Disclosure Documents," Preclude Any Finding Of Concealment As A Matter Of Law.*

In an effort to mask her frontal assault on managed care, Ms. Lewinsohn attempts to cast her legal challenge not as an attack on cost-containment practices *per se*, but merely as a challenge to the alleged wrongful nondisclosure of these practices. This rhetorical sleight-of-hand fails for two reasons: (1) the fact that Humana is required to submit its "disclosure documents" to state regulators, who are statutorily charged with determining whether those documents were misleading, negates any wrongful nondisclosure claim as a matter of law; and (2) the fact that applicable statutes and regulations expressly permit the allegedly concealed practices should, as a matter of law, be deemed to put her on notice of these practices.

Ms. Lewinsohn cannot maintain a concealment-based lawsuit where, as here, the very documents alleged to contain the deceptive omissions were subject to regulatory filing and approval requirements. This point was recently reemphasized in *Marcus v. AT&T Corp.*, 138 F.3d 46 (2d Cir. 1998), where a putative class of AT&T customers challenged the company's practice of billing long-distance telephone services in whole-minute increments without disclosing that practice in its marketing materials. Affirming the dismissal of the class claims, the Second Circuit noted that AT&T's policy was required to be disclosed in its filings with the Federal Communications Commission, and relied on the "presumed knowledge" doctrine, under which "[t]he [customer's] knowledge of the lawful rate" – meaning not only the price itself, but the contents of all associated documents required to be filed with a regulatory agency – "is conclusively presumed." *Id.* at 63. This Court should do likewise.

DC1:423373.1                            13

Independently, that federal and state statutes and regulations describe and permit (subject to regulation) the underlying practices Ms. Lewinsohn challenges – capitation, utilization review, third-party claims analysis – is sufficient to bar their claims of concealment as a factual matter. Every litigant is charged as a matter of law with knowledge of the contents of published statutes and regulations. *See, e.g., Gowland v. Aetna Cas. & Sur. Co.*, 960 F. Supp. 101, 105 (W.D. La. 1997) (dismissing plaintiff's claim because of presumed knowledge of insurance regulations published in Code of Federal Regulations).[11] Thus, for example, Ms. Lewinsohn cannot allege that Humana concealed its use of capitation payments to physicians, given that the federal HMO Act specifically defines HMOs as entities that make capitation payments. *See* 42 U.S.C. § 300e(c). Similarly, the fact that utilization review is a defining practice of HMOs under applicable state laws precludes her allegation that Humana concealed its right to conduct utilization review.

Collectively, the body of federal and state laws governing managed care companies like Humana demonstrates not only that all of the cost-containment practices Ms. Lewinsohn attacks are lawful, but also that they are not susceptible to a back-door "nondisclosure" attack. Accordingly, all of her claims should be dismissed.

### B.    MS. LEWINSOHN'S REQUEST FOR MONETARY RELIEF IS BARRED BY THE FILED-RATE DOCTRINE.

The filed-rate doctrine bars all four of Ms. Lewinsohn's claims to the extent they request monetary relief because Humana's rates have been reviewed and approved by Florida regulators. The complaint speculates that the health coverage actually provided to Ms. Lewinsohn was worth less than the coverage described in the "disclosure documents,"

---

[11]    *See also UGI Corp. v. Watt*, 644 F. Supp. 16, 19-20 (M.D. Pa. 1985) (charging plaintiffs with knowledge of interest-payment provisions published in federal surface mining statute and regulations); *Cohen v.* (cont'd)

and therefore that she should be permitted to recover monetary damages calculated based on the "difference between the value of the coverage benefit purchased and the value of the coverage benefit actually provided." (Compl. ¶ 55.) In other words, she alleges that, in some indeterminate way, Humana charged too much for its health plans.

Under the filed-rate doctrine, where regulated companies are required by federal or state law to file proposed rates or charges with a regulatory agency, any rate approved by the agency "is *per se* reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994); *see also Taffet v. Southern Co.*, 967 F.2d 1483, 1490 (11th Cir. 1992) (*en banc*) ("[T]he filed rate doctrine recognizes that where a legislature has established a scheme for . . . rate-making, the rights of the rate-payer in regard to the rate he pays are defined by that scheme."). Since its first application in 1922 to preclude antitrust damages claims against a common transportation carrier whose rates were regulated by the Interstate Commerce Commission, *see Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 163 (1922), federal courts have applied the doctrine in all cases where plaintiffs challenge agency-approved rates and judicial action would either undermine the agency's authority to determine the reasonableness of rates, or result in regulated entities charging rates other than those the agency has approved or reviewed. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 488 (8th Cir. 1992); *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577-78 (1981).[12] The doctrine has regularly been applied to bar challenges to the reasonableness of filed insurance rates and charges. *See Korte*

---

*Federal Ins. Admin.*, 565 F. Supp. 823, 827 (E.D.N.Y. 1983) (to same effect as *Gowland*).

[12] Because these two interests are implicated regardless of whether a federal or state agency is responsible for the underlying ratemaking, every court to have considered the question has held that the filed rate doctrine precludes federal claims even where the challenged rates or charges have been filed with a state regulatory agency. *See, e.g., Destec Energy, Inc. v. Southern Cal. Gas Co.*, 5 F. Supp. 2d 433, 458-59 (S.D. Tex. 1997); *Wegoland*, 27 F.3d at 20; *Taffet*, 967 F.2d at 1494; *Southwestern Bell Tel. Co. v. Metro-Link Telecom, Inc.*, 919 S.W.2d 687, 693 (Tex. App. 1996).

*v. Allstate Ins. Co.*, 48 F. Supp. 2d 647, 651 (E.D. Tex. 1999); *Allen v. State Farm Fire & Cas. Co.*, 59 F. Supp. 2d 1217, 1228-29 (S.D. Ala. 1999); *Morales v. Attorneys' Title Ins. Fund, Inc.*, 983 F. Supp. 1418, 1428-29 (S.D. Fla. 1997).

As explained in Section I.A.1 above, the regulatory regimes governing Ms. Lewinsohn's managed care plans are comprehensive, including filing, rate calculation, and rate review rules. Inasmuch as HMOs must disclose their so-called "disclosure documents" to the Department of Insurance, moreover, the rates approved by the department fully reflect the value of the coverage as described in those documents, and not an inflated value in any abstract sense. And Florida's ratemaking law provides avenues for administrative rate challenges that are inconsistent with private civil litigation as a means of rate review. Pursuant to the filed-rate doctrine, therefore, any claim that Humana has charged too much for its health plan subscriptions in Florida, must be directed to the Florida Department of Insurance and cannot be pursued collaterally in court.

In a transparent attempt to circumvent the preclusive effect of the filed-rate doctrine, Ms. Lewinsohn couches her complaint in terms of fraud. But as the Eleventh Circuit held in *Taffet*, "[a] regulated entity's alleged fraud does not create a right to a reasonable rate that exists independent of agency action." *Taffet*, 967 F.2d at 1494-95 (affirming dismissal on filed-rate grounds under Rule 12(b)(6)). Indeed, district courts have specifically applied the filed-rate doctrine to preclude fraud-based challenges to insurance rates approved within the insurance regulatory regimes of some of the jurisdictions at issue. In *Morales v. Attorneys' Title Ins. Fund*, for example, the plaintiffs sued several title insurers alleging violations of the federal Real Estate Settlement Practices Act and several state-law fraud doctrines. Despite the plaintiff's assertion that they sought only money damages and not recalculation of the defendants' filed rates, Judge Highsmith of this Court stated that "[i]t is evident . . . that,

16

despite their protestations, the plaintiff's claims are nothing more than a challenge to Florida's rate structure." 983 F. Supp. at 1429. Finding the Florida system of insurance rate regulation to be "comprehensive," *id.* at 1426, Judge Highsmith relied on *Taffet* and dismissed plaintiff's claims pursuant to Rule 12(b)(6). The U.S. District Court for the Eastern District of Texas recently reached an identical result. *See Korte v. Allstate Ins. Co.*, 48 F. Supp. 2d 647, 650 (E.D. Tex. 1999) (dismissing consumer fraud challenge to allegedly fraudulently inflated insurance premium based on filed-rate doctrine).

Courts have applied the filed-rate doctrine to bar claims based on theories of intangible economic injury directly comparable to those asserted by plaintiffs here. For instance, in *Byan v. Prudential Insurance Co. of America*, 662 N.Y.S.2d 44 (N.Y. App. Div. 1997), plaintiff sought to represent a purported nationwide class of individuals who had purchased so-called "medigap" policies from the defendant. Plaintiff's specific claim was that the insurer had failed to disclose that its payments to physicians for covered services were lower than the physicians' usual and customary fees. The relief sought, as in this case, was a refund of the difference between the premiums she had paid and the lower premium she allegedly would have paid had she been privy to the payment arrangements. It was clear that the premium established for the coverage she purchased had been filed with and reviewed by the Superintendent of Insurance. *See id.* Because the complaint alleged that the plaintiff was "damaged by being required to pay the premium rate approved by the Superintendent of Insurance, instead of any lower rate," the filed-rate doctrine was held to preclude the claim. *Id.* at 45.

The common theme in cases applying the filed-rate doctrine is that the doctrine's applicability does not turn on the particular legal theories advanced by the plaintiff. Instead, "the focus for determining whether the filed rate doctrine applies is the impact the

court's decision will have on agency procedures and rate determinations." *H.J. Inc.*, 954 F.2d at 489. Thus, regardless of whether a plaintiff brings her action under a theory of tort, fraud, or breach of contract, a court must refrain from awarding monetary relief – whether under legal or "equitable" theories – that would require the court to measure the difference between the filed-rate and the rate that might have been approved or paid absent the conduct in issue. *See id.* at 488; *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 337 (1998) (holding that, under filed-rate doctrine, plaintiffs "may not seek to recover any money from respondents, whether they label their request one for disgorgement or otherwise").

### C.    THE DOCTRINE OF *BURFORD* ABSTENTION BARS MS. LEWINSOHN'S REQUEST FOR INJUNCTIVE RELIEF.

Closely related to the filed rate doctrine is the doctrine of *Burford* abstention. In *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), the Supreme Court held that where a request for injunctive relief could do violence to a carefully crafted, comprehensive state regulatory scheme, the federal courts should dismiss the case, or "abstain," rather than grant the requested relief. As developed in later cases, the doctrine of *Burford* abstention has increasingly been regarded as the equitable twin of the filed rate doctrine: where the prerequisites of the filed rate doctrine are present but the relief requested is injunctive rather than monetary, the *Burford* doctrine provides the doctrinal basis for dismissal. Thus, in *Morales* (where the plaintiff's request for monetary relief was dismissed on filed-rate grounds), Judge Highsmith invoked *Burford* abstention to dismiss the plaintiff's alternative request for injunctive relief. *See Morales*, 983 F. Supp. at 1424 n.13.[13]

---

[13]    Other courts, including the U.S. Supreme Court, have invoked *Burford* abstention to dismiss claims identical to those at issue here. *See, e.g., Tafflin v. Levitt*, 493 U.S. 455 (1990) (affirming dismissal of RICO claim on grounds of *Burford* abstention); *Chandler v. Omnicare/The HMO, Inc.*, 756 F. Supp. 187 (D.N.J. 1990) (dismissing ERISA claim on grounds of *Burford* abstention).

Here, the case for abstention is particularly strong, given that Ms. Lewinsohn seeks sweeping injunctive relief as to Humana's disclosure practices on the sole basis of her status as a Humana subscriber. She does not seek to compel Humana to pay for specific, medically necessary benefits that she contends are owing under their plan (relief that would, of course, be available under ERISA). (*See infra* pp. 44-46.) Rather, she wants to use the general provisions of federal law – in conjunction with Fed. R. Civ. P. 23 – to compel a nationwide restructuring of Humana's managed care operations, even though those operations are closely scrutinized and subject to prescriptions (and proscriptions) by regulators in Florida and all across the country. Yet as numerous courts have recognized, class litigation cannot be the "superior" means of claims resolution where a dedicated administrative process for reviewing claims is available. *See, e.g., Pattillo v. Schlesinger*, 625 F.2d 262 (9th Cir. 1980) (class action not superior means of resolving back-pay grievance where administrative process was available).[14] "Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand." *Burford*, 319 U.S. at 334.

## II.    MS. LEWINSOHN'S RICO CLAIM IS MERITLESS.

Ms. Lewinsohn's RICO claim proceeds from the startling assumption that it is a "crime" – federal mail fraud (Compl. ¶ 61) – for Humana to operate its managed care plans using well-known cost-containment measures specifically described in state and federal laws and regulations, and that Humana could have had the requisite mens rea for this crime despite having disclosed these measures in countless public documents and regulatory filings. She makes the even more astonishing claim that she has somehow been injured by this "crime" –

---

[14]    *See also Kamm v. California City Dev. Co.*, 509 F.2d 205 (9th Cir. 1975) (class action not superior means of resolving claims already being handled by state Attorney General and Real Estate Commissioner); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 353 (D.N.J. 1997) (class action not superior means of resolving claims because "[t]here are also administrative remedies that are available to (cont'd)

and are thus entitled to a recovery under 18 U.S.C. § 1964(c) – even though she alleges not a single instance in which Humana's use of these measures has ever resulted in her being denied coverage for medically necessary care.

These implausible contentions cannot survive Rule 12. Even if the Court were to suspend disbelief and assume that operation of a managed care plan is somehow contrary to law, Ms. Lewinsohn has altogether failed to allege how Humana's alleged "crimes" have injured her business and property interests in any concrete, non-speculative way. She complains vaguely about the diminished "value" of her managed care policies, but this is simply an artifice designed to obscure the preclusive fact that she does not allege having ever been denied coverage for any "medically necessary" health care. Moreover, the complaint pleads a number of important facts that establish beyond doubt that Humana's alleged conduct legally could not have diminished the "value" of her health coverage at all.

For similar reasons, the only district court to consider parallel RICO class action allegations attacking managed care recently dismissed the case in its entirety under Rule 12(b)(6). *See Maio v. Aetna, Inc.*, No. Civ. A. 99-1969, 1999 WL 800315 (E.D. Pa. Sept. 29, 1999) (dismissing RICO claim on grounds of plaintiff's failure to allege injury-in-fact).[15] Eleventh Circuit precedent requires the same result here. *See Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla.*, 140 F.3d 898, 906 (11th Cir. 1998) (affirming dismissal of RICO claim because plaintiffs failed to allege actual injury that was the "direct result" of cognizable racketeering activity).

---

plaintiffs"); *Ford Motor Co. v. Magill*, 698 So.2d 1244, 1245 (Fla. Dist. Ct. App. 1997) (reversing class certification because of availability of federal administrative remedy).

[15] Another district court, reviewing class allegations of HMO nondisclosure under the Lanham Act, came to a similar conclusion, finding that the speculativeness of plaintiff's fraud theory precluded class certification. *See Ford v. NYLCare Health Plans of the Gulf Coast*, Civ. A. No. 96-1564 (S.D. Tex. Dec. 1, 1999).

**A.    AS A MATTER OF LAW, MS. LEWINSOHN'S THEORY OF A LOSS IN
THE "VALUE" OF HER INSURANCE COVERAGE DOES NOT QUALIFY
AS RICO INJURY.**

Ms. Lewinsohn asks this Court to undertake nation-spanning RICO class

action litigation on a singular (and dubious) theory of economic injury – that alleged "crimes"

by Humana somehow affected the "value" of the managed care benefits she obtained through

her employer. The complaint does not explain the mechanism of causation for this alleged

injury, but it is obviously rooted in rank speculation. Thus, the complaint hypothesizes, *if* Ms.

Lewinsohn had developed a covered medical condition over the previous few years, and *if*

that condition had required a treatment in the form of a covered medical service, she *might*

have been denied treatment, and that denial *might* have been the result of wrongfully

undisclosed cost-containment measures. And, on the theory that *if* she had known of this

possibility she *might* have been able to do something about it (like "request[] that [her]

employer provide another Health Plan or options . . . other than Humana" that *might* have

charged premiums that more accurately reflected their use of cost-containment measures

(Compl. ¶ 74)), the complaint hypothesizes that she suffered economic injury in the form of a

loss in "value" of her coverage "whether or not [she] ever submitted claims for medical

losses." (Compl. ¶ 100.)

This theory of injury is utterly fictional. Because it requires the Court to

speculate about hypotheticals (and patently false hypotheticals at that), it cannot qualify as

RICO injury to "business or property" under the federal racketeering statute. Ms. Lewinsohn

says she purchased insurance coverage for all care that "satisfied the Medical Necessity

Definition set forth in her Humana policy" (Compl. ¶ 16(c)); in short, she claims that she

obtained contract rights to Humana coverage for all "medically necessary" procedures.

Logically, whether these contract rights have been "as valuable" to her as they were allegedly

"represented" to be by Humana (*e.g.*, Compl. ¶ 16(d)) can only be assessed in light of the actual performance rendered to Ms. Lewinsohn under her current and expired policies (*i.e.*, Humana's coverage decisions on her actual claims). Yet, as far as the complaint reveals, she has never been denied coverage by Humana for any "medically necessary" procedures. Thus, as far as her expired policies are concerned, Ms. Lewinsohn's contract rights to insurance coverage have been honored as to every specific claim she has filed.

It is meaningless to suggest that Ms. Lewinsohn suffered a loss in the "value" of her Humana subscription because of the hypothetical possibility of a denial of coverage for "medically necessary" procedures *when she does not claim any such denial.* Any monetary recovery for her on her RICO claims would simply be a windfall. She is like a newspaper subscriber who sues for partial refund of her subscription price on the ground that her home might have been missed on the delivery route once or twice over the last year on account of the negligence of delivery personnel – even though, in actual fact, her own newspapers arrived on time each and every day of the subscription. This fictional plaintiff, like Ms. Lewinsohn, got exactly what she paid for; she has no genuine injury. As the District Court for the Eastern District of Pennsylvania observed in dismissing nearly identical RICO allegations against Aetna, Ms. Lewinsohn's managed care subscriptions "simply [could not have been] 'worth less' unless something [she was] promised was denied them." *Maio*, 1999 WL 800315, at *2.

Nor can RICO injury be found in the mere conjectural possibility that a claim for coverage might not be honored at some time down the road. *Cf., e.g., Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.*, 68 F.3d 409, 415 (11th Cir. 1995) (action for declaration that insurers had duty to defend and indemnify with respect to as-yet-unfiled litigation held not justifiable; "speculation based on the insurance companies' dealings with other insureds does

22

not present a concrete case or controversy"); *Maryland Ins. Co. v. Attorneys' Liab. Assurance Soc'y Ltd.*, 748 F. Supp. 627, 632 (N.D. Ill. 1990) (dismissing action for declaration of rights and liabilities of two insurers concerning settlement of underlying lawsuit where settlement had not occurred and "no actual liability yet exist[ed]"). In the words of the District Court for the Eastern District of Pennsylvania, "[a] vague allegation that 'quality of care' may suffer in the future is too hypothetical an injury to confer standing on plaintiffs . . . ." *Maio*, 1999 WL 800315, at *2; *see also Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (claims involving "contingent future events that may or may not occur as anticipated" cannot be maintained) (citation omitted); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339 (1971) ("[I]t is hornbook law. . . [that] future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable.").[16]

Thus, in *First National Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994), the Second Circuit refused to engage in speculation about a financial institution's claim of injury growing out of loans that, at the time of suit, were being repaid on schedule. In that case, the plaintiff alleged that the defendants misrepresented the value of the collateral to obtain larger loans than would have been made had plaintiff known the true value of the collateral. *Id.* at 766. The plaintiff sought to recover damages for the "risk of loss" of the additional funds it loaned based on the defendants' misrepresentations. *Id.* at 768. The Second Circuit rejected the claim of RICO injury. Because the loans had not yet been

---

[16]    *See also Arabian Am. Oil Co. v. Scarfone*, 713 F. Supp. 1420, 1421 (M.D. Fla. 1989) ("It is well-established that potential exposure or a mere possibility of [a lawsuit] is insufficient to satisfy the requirement of injury necessary to maintain a suit pursuant to 18 U.S.C. § 1964(c)"); *Anitora Travel, Inc. v. Lapian*, 677 F. Supp. 209, 216 (S.D.N.Y. 1988) ("Mere speculation that some injury might occur . . . is insufficient to state a RICO claim."); *Jones v. Baskin, Flaherty, Elliot & Mannino, P.C.*, 670 F. Supp. 597, 599 (W.D. Pa. 1987) (stating that the "hypothetical possibility" of a future injury "will not suffice as an injury to confer [RICO] standing").

foreclosed and the amount of damages was undetermined at that time, the court held that the plaintiff had not suffered any cognizable harm and lacked a cause of action under RICO to pursue fraud-based damages. *Id.* at 769. Similarly, in *Oscar v. University Students Co-Operative Ass'n*, where the plaintiff apartment owners sued their neighbors under RICO to recover the purported reduction in rental values allegedly caused by the neighbors' drug-related activity, the Ninth Circuit held that the plaintiffs' speculation that their neighbors' activities might negatively impact their subletting values was insufficient to satisfy RICO's requirement of a direct "financial loss." 965 F.2d 783, 787 (9th Cir. 1992) (en banc).

The near-universal rejection of unmanifested "lost value" claims under RICO is consistent with the broader legal rule that private civil litigants cannot seek recovery for hypothetical economic injuries that are based on incidents that have not yet occurred. The Eleventh Circuit held as much in *Kane v. Shearson Lehman Hutton, Inc.*, where the court rejected a stock investor's damages theory premised on the "speculative assertion" that he might have sold stock at the stock's maximum price had he not been misled by the defendant's alleged misrepresentations. 916 F.2d 643, 647 (11th Cir. 1990). Similarly, in *Briehl v. General Motors Corp.*, plaintiffs alleged a loss in resale value for their vehicles as a result of allegedly defective anti-lock braking systems, notwithstanding that none of the plaintiffs' brakes had malfunctioned and no plaintiff had actually sold a vehicle at a reduced price. 172 F.3d 623, 628-29 (8th Cir. 1999). Like Ms. Lewinsohn here, the *Briehl* plaintiffs sought damages for the difference between what they expected (vehicles with anti-lock brakes) and what they actually got (vehicles with anti-lock brakes alleged to create the *potential* of an automobile accident), on the theory that this unmanifested risk of injury could be redressed through an economic award. *See id.* at 629. Holding such a claim for damages too speculative as a matter of law, the Eighth Circuit stated that "[w]here . . . a product

performs satisfactorily and never exhibits an alleged defect, no cause of action lies." *Id.* at 628.[17]

In sum, the federal RICO statute, like the common law, does not permit a monetary recovery for risks that have not manifested themselves in the past, and may never manifest themselves in the future. Because Ms. Lewinsohn has not alleged, and presumably cannot allege, that Humana has denied coverage for any medically necessary care, her RICO claim fails for want of any injury.

**B.** **MS. LEWINSOHN'S FAILURE TO EXERCISE HER OPTION TO CHANGE HEALTH PLANS PRECLUDES THE ELEMENTS OF MATERIALITY, RELIANCE, AND CAUSATION REQUIRED TO SUSTAIN HER RICO CLAIM.**

Wholly apart from the fact that Ms. Lewinsohn has not been harmed, it is clear from the complaint that she had alternatives to the Humana plans offered by her employer and that even after learning of the allegedly concealed information, Ms. Lewinsohn did not exercise her option to change her health plan. Ms. Lewinsohn's inaction negates at least three elements – materiality, reliance, and causation – that are absolute prerequisites for any civil RICO claim.

Under the RICO doctrine of materiality, a civil RICO plaintiff cannot recover unless she can demonstrate that she would have acted differently but for the defendant's

---

17      Federal and state cases rejecting attempts to recover for unmanifested injury on a "lost value" theory are legion. *See, e.g., Yost v. General Motors Corp.*, 651 F. Supp. 656, 657 (D.N.J. 1986) (plaintiff cannot state a claim based on allegation that "design defect" in automobile engine is "likely to cause major . . . damage . . . and may create potential safety hazards"); *Pfizer v. Farsian*, 682 So. 2d 405, 407 (Ala. 1996) ("[F]ear that [a product] could fail in the future is not, without more, a legal injury sufficient to support [a product liability or fraud claim]"); *American Suzuki Motor Corp. v. Superior Court*, 44 Cal. Rptr. 2d 526, 531 (Cal. Ct. App. 1995) (tort and contract doctrines do not "contemplate indemnity for a potential injury that [has] never . . . materialized."), *modified on other grounds on denial of reh'g*, 1995 Cal. App. LEXIS 913 (2d Dist. Sept. 21, 1995); *Martin v. Ford Motor Co.*, 914 F. Supp. 1449, 1455 (S.D. Tex. 1996) ("Plaintiffs cannot succeed on any on their claims [including fraud, breach of warranty, and negligent misrepresentation] without demonstrating that they have in fact been injured.") (citing cases); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 602 (cont'd)

alleged racketeering activity. *See, e.g., Aeropulse, Inc. v. Armstrong & Brooks Ltd.*, 740 F.

Supp. 938, 942 (E.D.N.Y. 1990) (summary judgment awarded to defendant where it was

undisputed that the plaintiff would have selected the same insurance product even if he had

been aware of the alleged undisclosed facts).[18] Similarly, civil RICO plaintiffs (like Ms.

Lewinsohn) who rely on a mail or wire fraud theory are required to allege and prove that they

actually relied on the alleged misrepresentations or omissions. *See, e.g., Pelletier v. Zweifel*,

921 F.2d 1465, 1510 (11th Cir. 1991).[19] And in a related vein, controlling Eleventh Circuit

precedent imposes a strict pleading requirement that the alleged misrepresentations or

omissions have been the proximate cause of the alleged injuries. *See Pelletier*, 921 F.2d at

1499 ("[A] plaintiff has standing to sue under Section 1964(c) only if his injury flowed

directly from the commission of the predicate acts."). The common policy uniting the RICO

doctrines of materiality, reliance, and causation is that the civil provisions of RICO provide a

remedy only for injuries that flow foreseeably and directly from the alleged criminal acts.

Ms. Lewinsohn acknowledges in her complaint that she must plead materiality,

reliance, and proximate causation. The complaint contends that she "reasonably relied" on

"Humana's disclosures", and "would have taken corrective measures" had she known of the

allegedly concealed cost-containment practices. (Compl. ¶ 74.) This assertion is completely

at odds, however, with plaintiff's own asserted reality. The two Humana plans offered by Ms.

Lewinsohn's employer were "in addition to other health insurance choices." (Compl. ¶

16(b)). Yet, despite these other choices and seemingly inconsistent with Ms. Lewinsohn's

---

(S.D.N.Y. 1982) ("Plaintiff's bald assertion that a 'common' defect [in their tires] which never manifests itself 'ipso facto caused economic loss' . . . is simply not the law.").

[18]     *See also Wynn ex rel Alabama v. Philip Morris, Inc.*, 51 F. Supp. 2d 1232, 1249 (N.D. Ala. 1999) (holding that the plaintiff did not suffer any injury to compete in the market under RICO or antitrust laws because he never competed or participated in the market, nor did he plan to do so).

purported outrage and dissatisfaction with her Humana plan, Ms. Lewinsohn "continue[s] to enroll in Humana health plans." (Compl. ¶74.)  Thus, according to her own pleadings, she learned of the alleged misrepresentation and yet did not change her health coverage.  Under such circumstances, a RICO injury simply cannot be established.  Ms. Lewinsohn cannot be said to have "relied" on an allegedly concealed fact (and such concealment could not have been "material" or the "cause" of her choice) when disclosure of the allegedly concealed information did not result in her selection of a different health plan.

Even though Ms. Lewinsohn has the opportunity to switch health plans and has not exercised her option, she engages in a number of speculative scenarios as to possible alternative responses in which she may have engaged if she had known earlier of Humana's allegedly concealed practices.  First, Ms. Lewinsohn suggests that she could have "request[ed] that her employer provide another Health Plan or options . . . other than Humana." (Compl. ¶ 74.)  Such an assertion seems far-fetched and irrelevant when her employer already offered alternatives that Ms. Lewinsohn failed to use.

She also implies, almost ludicrously, that she might not have worked as hard for her employers had she known the value of her health care coverage.  (Compl. ¶ 80 (but for alleged misconduct, Ms. Lewinsohn "would not have paid as much for her Health Policies as, in fact, [she] paid in cash, salary deductions *and labor*" (emphasis added).)  These are the very kinds of speculative assertions the courts have consistently rejected in enforcing RICO's requirement that injuries be *directly* related to the alleged predicate acts.  *See, e.g., International Bhd. of Teamsters, Local 734 v. Philip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) (rejecting as "hopelessly speculative" ERISA plan's claim that, with disclosure of

---

[19]  *See also FDIC v. Bayles & Co.*, No. 87-1468-CIV-T-17B, 1992 WL 161055, at *8 (M.D. Fla. June 30, 1992) (entering judgment for defendant and holding that "civil RICO plaintiffs must allege and prove reliance in (cont'd)

allegedly concealed facts, it would have educated its members about the dangers of smoking, which in turn might have decreased the plan's outlays for smoking-related illnesses); *Aeropulse*, 740 F. Supp. at 942 (rejecting plaintiff's RICO attack on an allegedly inflated price based on his assertion that he "would have protested, not paid it," had he known the true facts). Ms. Lewinsohn's claim of RICO injury founders for this independent reason.

### C. MS. LEWINSOHN HAS FAILED PROPERLY TO PLEAD THE EXISTENCE OF A RICO ENTERPRISE.

Ms. Lewinsohn's RICO claim should also be dismissed on the independent ground that the complaint fails to allege a proper RICO "enterprise" pursuant to 18 U.S.C. § 1961(4). She alleges two association-in-fact enterprises – the "National Enterprise" and "State and Local Enterprises" – consisting of "Humana, the Humana Health Plans, primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies, and home health agencies." (Compl. ¶¶ 63-64, 67-68.) This pleading is patently defective, as neither enterprise is alleged to possess the requisite character of ongoing organizations with members who "function as a continuing unit," *United States v. Turkette*, 452 U.S. 576, 583 (1981), as shown by "a hierarchical or consensual decision making structure," *Crowe v. Henry*, 43 F.3d 198, 205 (5th Cir. 1995). Indeed, Ms. Lewinsohn fails to allege that these component actors share any common purpose. Rather, the alleged enterprises here consist of tens of thousands of actors who are entirely independent of Humana and have goals, needs, and agendas that do not resemble those of Humana or other members of either enterprise, and may well be contrary to those interests. Moreover, the law does not favor ungainly, industry-wide "enterprises" like the ones alleged here. *See, e.g., Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990) (rejecting industry-wide "enterprise" consisting of criminal justice

---

cases using the mail and wire fraud statutes").

officials, national and local medical associations, state police, and local and state prosecutors'

offices). *See also Maio v. Aetna Inc.*, No. Civ. A. 99-1969, 1999 WL 800315, at *2 (E.D. Pa.

Sept. 29, 1999) (dismissing virtually identical "enterprise" pleading as insufficient).[20]

**D.    MS. LEWINSOHN FAILS TO ALLEGE THAT SHE HAS BEEN INJURED BY REASON OF DEFENDANT'S USE OR INVESTMENT OF RACKETEERING INCOME.**

Ms. Lewinsohn's alternative RICO theory – that Humana's cost-containment

practices violate 18 U.S.C. § 1962(a) (Compl. ¶ 57) – fails because she does not allege that

she has been injured "by reason" of a violation of § 1962(a).  To recover for a violation of §

1962(a), a plaintiff must allege that she has been injured "by reason of" the use or investment

of racketeering income rather than by reason of the underlying predicate acts from which the

income was derived.  18 U.S.C. § 1964(c); *see, e.g., Crowe v. Henry*, 43 F.3d 198, 205 (5th

Cir. 1995); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 132-33 (6th Cir. 1994); *Nugget*

*Hydroelectric, L.P. v. Pacific Gas and Elec. Co.*, 981 F.2d 429, 437-38 (9th Cir. 1992);

*Brittingham v. Mobil Corp.*, 943 F.2d 297, 303-05 (3d Cir. 1991), *abrogated on other*

*grounds as recognized in Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258 (3d

Cir. 1995); *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1229-30

(D.C. Cir. 1991); *Quaknine v. MacFarlane*, 897 F.2d 75, 82-83 (2d Cir. 1990); *Grider v.*

*Texas Oil & Gas Corp.*, 868 F.2d 1147, 1149-51 (10th Cir. 1989); *In re Sahlen & Assoc., Inc.*

*Sec. Litig.*, 773 F. Supp. 342, 367 (S.D. Fla. 1991).  The mere reinvestment of racketeering

income that allegedly permits an entity to commit more predicate acts is not enough.  *See,*

*e.g., Vemco*, 23 F.3d at 132-33; *Brittingham*, 943 F.2d at 303-305.  And yet that's all Ms.

---

[20]    Additionally, under the majority federal rule holding that a RICO "enterprise" must be adequately distinct from the defendant, plaintiff's RICO claim is legally untenable.  *Compare United States v. Hartley*, 678 F.2d 961, 988 (11th Cir. 1982) (holding that an entity may be both the defendant and the enterprise) *with* (cont'd)

Lewinsohn alleges. The complaint says that Humana used or invested its racketeering income

"to acquire interests in or to operate the aforementioned enterprises" and that the

"aforementioned enterprises" in turn injured Ms. Lewinsohn by engaging in the same

predicate acts from which the racketeering income was allegedly derived. (Compl. ¶ 81.) Her

§ 1962(a) claim must therefore be dismissed.

### III.    MS. LEWINSOHN'S COMPLAINT FAILS TO ALLEGE A VIOLATION OF ERISA.

Even if Ms. Lewinsohn could get past the threshold problems that preclude all

four of her claims, her ERISA claims fail for five independent reasons.

#### A.    MS. LEWINSOHN'S FAILURE TO EXHAUST AVAILABLE ADMINISTRATIVE REMEDIES REQUIRES DISMISSAL OF ALL OF HER ERISA COUNTS.

All three of Ms. Lewinsohn's ERISA claims must be dismissed because she

does not allege that she exhausted the administrative remedies under her plan.[21] *See Byrd v.*

*MacPapers, Inc.*, 961 F.2d 157, 160-61 (11th Cir. 1992). The Eleventh Circuit has repeatedly

held that ERISA requires a plan participant to exhaust administrative remedies prior to

commencing suit under the statute. In its leading case on this issue, the Eleventh Circuit

recognized that:

> Administrative claim-resolution procedures reduce the number
> of frivolous lawsuits under ERISA, minimize the cost of dispute
> resolution, enhance the plan's trustees' ability to carry out their
> fiduciary duties expertly and efficiently by preventing

---

*Odishelidze v. Aetna Life & Casualty Co.*, 853 F.2d 21, 24 (1st Cir. 1998) (holding to the contrary); *Official Publications, Inc. v. Kable News Co.*, 884 F.2d 664, 668 (2d Cir. 1989) (same).

[21]    Ms. Lewinsohn's failure to allege exhaustion further underscores the bizarre "no injury" character of this lawsuit. Humana remains contractually bound to provide all covered services. If Humana had actually violated that obligation, she presumably would have sought to invoke her contract rights rather than pursue a speculative claim of "lost value" by means of this action.

> premature judicial intervention in the decisionmaking process,
> and allow prior fully considered actions by pension plan trustees
> to assist courts if the dispute is eventually litigated.

*Mason v. Continental Group, Inc.*, 763 F.2d 1219, 1227 (11th Cir. 1985). On multiple

occasions since deciding *Mason,* the Eleventh Circuit has reaffirmed this principle by

ordering dismissal of unexhausted ERISA claims.[22] While some circuits have limited the

exhaustion requirement to ERISA claims for benefits, the Eleventh Circuit continues to make

clear that the exhaustion doctrine in this jurisdiction applies to alleged statutory violations of

ERISA (such as claims for breach of fiduciary duties) as well as to simple claims respecting

the denial of benefits. *See Mason*, 763 F.2d at 1227 (applying exhaustion requirement to

claims of breach of fiduciary duty under ERISA §§ 404 and 406, violations of reporting and

disclosure requirements under ERISA §§ 102 and 104, and interference with protected rights

under ERISA § 510); *Counts*, 111 F.3d at 109 ("We have consistently stated that the

exhaustion requirement applies both to actions to enforce a statutory right under ERISA and

to actions brought to recover benefits under a plan.").[23]

Here, Ms. Lewinsohn's complaint contains no suggestion that she pursued her

administrative remedies to conclusion, or that administrative grievances would be futile based

on specific alleged facts. The exhaustion requirement is designed to preclude just such an

end-run around the administrative process. Her failure to plead that she has fulfilled this

---

[22]    *See Counts v. American Gen. Life and Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997); *Variety Children's Hosp., Inc. v. Century Med. Health Plan, Inc.*, 57 F.3d 1040, 1042 (11th Cir. 1995); *Byrd*, 961 F.2d at 160-61; *Harrison v. United Mine Workers of Am. 1974 Benefit Plan & Trust*, 941 F.2d 1190, 1193 (11th Cir. 1991); *Springer v. Wal-Mart Assocs.' Group Health Plan*, 908 F.2d 897, 899 (11th Cir. 1990); *Curry v. Contract Fabricators Inc. Profit Sharing Plan*, 891 F.2d 842, 846 (11th Cir. 1990).

[23]    *See Response Oncology, Inc. v. MetraHealth Ins. Co.*, 978 F. Supp. 1052, 1063 (S.D. Fla. 1997) ("[The exhaustion] requirement applies to both actions based on alleged statutory violations and breach-of-contract actions."); *Variety Children's Hosp. Inc. v. Blue Cross/Blue Shield of Fla.*, 942 F. Supp. 562, 568 (S.D. Fla. 1996) ("The exhaustion requirement applies to breach of contract claims and to actions premised on alleged statutory violations."); *Foster v. Cordis Corp.*, 707 F. Supp. 517, 517-18 (S.D. Fla. 1989) (applying exhaustion requirement to claims for breach of fiduciary duty and other statutory violations).

requirement requires dismissal of each of her ERISA claims. *Byrd*, 961 F.2d at 160-61.

**B.    MS. LEWINSOHN'S CLAIM FOR BREACH OF STATUTORY DISCLOSURE RESPONSIBILITIES IS WITHOUT ANY BASIS UNDER ERISA.**

Ms. Lewinsohn's first ERISA count (Count II) alleges that Humana breached express disclosure obligations under the statute. (Compl. ¶¶ 83-88.) This allegation fails to state a claim because the statute does not include the requirements she asserts.

It is true that one obligation of a plan administrator[24] – as distinct from other fiduciaries to the plan – is to prepare the primary statutory disclosure document known as the summary plan description ("SPD"), *see* ERISA § 102(b), which is intended to be a summary in layman's terms of specified plan provisions. In the Eleventh Circuit's words, "[t]he SPD is Congress's established method for apprising participants [and beneficiaries] of the terms of a particular plan." *Barnes v. Lacy*, 927 F.2d 539, 543 (11th Cir. 1991). Yet the disclosures required to be made in SPDs are limited to specified items, none of which has anything to do with physician compensation arrangements, particularized criteria used to determine the medical necessity of requested services, or any other cost-containment practices Ms. Lewinsohn attacks.

Significantly, Congress has twice amended ERISA § 102 in recent years to

---

[24]    A threshold problem with Count II stems from Ms. Lewinsohn's failure to identify the "administrator" of her plan. The express disclosure obligations found in Part 1 of Title I of ERISA, *see* ERISA §§ 101-111, 29 U.S.C. §§ 1021-1031, fall not on every plan fiduciary but only on a plan's "administrator." *See Harris v. Pullman Standard, Inc.*, 809 F.2d 1495, 1498 (11th Cir. 1987); *Meadows v. Cagle's, Inc.*, 954 F.2d 686, 692 n.5 (11th Cir. 1992). Ms. Lewinsohn does not allege that Humana was the "administrator" with respect to their plans. (*See* Compl. ¶¶ 1, 4, 24.) Accordingly, she has failed to state a claim under ERISA's reporting and disclosure provisions. *See, e.g., Chambers v. Kaleidoscope, Inc. Profit Sharing Plan & Trust*, 650 F. Supp. 359, 367-68 (N.D. Ga. 1986) (holding that a bankruptcy trustee, who is not a plan administrator, has no obligation to provide information under ERISA's reporting and disclosure provisions); *Lee v. Burkhart*, 991 F.2d 1004, 1010 (2d Cir. 1993) (affirming dismissal of complaint alleging disclosure violations because plaintiff failed to allege that defendant was plan administrator); *cf. Rosen v. TRW, Inc.*, 979 F.2d 191, 193-94 (11th Cir. 1992) (allegation that defendant employer was acting as plan administrator, and that official administrator was defunct, stated claim against employer-as-administrator for benefits under ERISA).

require additional disclosures about group health plans.[25] *See* Pub. L. No. 104-191, §

101(c)(2), 110 Stat. 1936, 1951 (1996); Pub. L. No. 104-204 §§ 603(a), 603(b)(3)(C),

100 Stat. 2874, 2935-38 (1996). Yet, despite (and perhaps because of) widespread publicity

about managed care physician compensation arrangements and utilization review practices, no

disclosure requirement relating to those elements of managed care has been enacted. Nor do

the extensive Department of Labor regulations governing SPDs require such disclosures. *See,*

*e.g.*, 29 C.F.R. §§ 2520.101, 2520.102, 2520.103, 2520.104, 2520.104a, 2520.104b (1999).

Although the Department has proposed amendments to these regulations, the proposed

amendments would not require that SPDs include disclosures about physician compensation

arrangements, a managed care plan's contractual relationships with third parties, or how a

managed care organization makes a medical necessity determination.[26] *See* 63 Fed. Reg.

48,376, 48,385 (proposed Sept. 9, 1998); 63 Fed. Reg. 48,372 (proposed Sept. 9, 1998).

    A similar attempt to obtain a judicial enlargement of ERISA's detailed

disclosure scheme was recently considered and rejected by the Tenth Circuit. In *Jones v.*

*Kodak Medical Assistance Plan*, 169 F.3d 1287 (10th Cir. 1999), the plaintiff argued that

ERISA required a plan administrator to publish its medical necessity criteria as part of the

SPD. The court disagreed, observing that § 102 of ERISA does not require "particularized

criteria for determining the medical necessity of treatment for individual illnesses." *Id.* at

---

[25]     These amendments added a disclosure requirement regarding whether a health insurance issuer is
responsible for financing or administration of the plan, and, if so, disclosure of the name and address of the
issuer, *see* Pub. L. No. 104-191, § 101(c)(2), 110 Stat. 1936, 1951 (1996), and a disclosure requirement
regarding changes in standards relating to benefits for mothers and newborns. *See* Pub. L. No. 104-204, §
603(a), 110 Stat. 2874, 2935-37 (1996).

[26]     DOL proposed that the regulations be amended to require that SPDs for welfare benefit plans providing
HMO benefits include the plan's requirement respecting eligibility for participation and for benefits; a
description of the benefits; circumstances which may result in disqualification, ineligibility, loss, or suspension
of benefits; the identity of any funding medium used for accumulation of assets through which benefits are
provided; and procedures to be followed in presenting claims for benefits. 63 Fed. Reg. 48,376, 48,377. DOL
also proposed that the regulations be amended to require disclosures regarding whether the plan is a group health
(cont'd)

1292. The court reasoned that "such a requirement would frustrate the purpose of a summary – to offer a layperson concise information that she can read and digest." *Id.* Judge Kehoe of this Court reached a similar conclusion in another case, writing that the SPD "is not required to list every single exception or qualification to plan provisions." *Williams v. Cordis Corp.*, No. 91-0484-CIV, 1993 WL 373940, at *8 (S.D. Fla. May 13, 1993).

Since § 102 of ERISA says nothing about the arrangements between health plans and physicians, or medical necessity determinations, Ms. Lewinsohn also invokes § 104(b) of ERISA to support her inflationary vision of required disclosures. (Compl. ¶ 87.) But this provision offers no help either. Section 104(b) of ERISA simply requires a ***plan administrator*** to furnish a plain language description of a ***modification*** or ***change*** that is a material reduction in covered services or benefits within 60 days of the date of such change or modification. Her allegations do not square with this provision. Her complaint not only does not identify the administrator of her plan as Humana or one of its subsidiaries, it also fails to pinpoint any ***modification*** or ***change*** in her plans that supposedly would have triggered the plan administrator's obligation. She does allege that Humana did not fully disclose how its plans operated. (*See id.* ¶ 86.) But the mere operation of a plan and application of its provisions do not constitute "change" or "modification" in covered services.[27]

---

plan and what participants' rights and obligations are under the continuing coverage provisions of COBRA. *Id.* at 48,378-79.

[27]    The complaint is facially infirm for another reason. Several courts have indicated that in cases of reporting and disclosure violations, "an aggrieved participant ***must*** sue under Section 502(a)(1)(A) for the relief provided by [Section 502(c)]." (emphasis added; brackets in original). *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1167 (3d Cir. 1990); *Labrache v. American Maritime Officers Pension Plan*, 34 F. Supp. 2d 1335, 1340 (M.D. Fla. 1999) (same); *Mohalley v. Kendall Health Care Prods. Co.*, 903 F. Supp. 1530 (M.D. Ga. 1995) (same); *Welsh v. GTE Serv. Corp.*, 866 F. Supp. 1420 (N.D. Ga. 1994), *aff'd*, 61 F.3d 32 (11th Cir. 1995) (same). Ms. Lewinsohn has failed to invoke § 502(a)(1)(A) or seek remedies under § 502(c), which imposes liability only when a participant requests information from an administrator. Here, there is no allegation that she requested any information from her plan administrators.

C.    **MS. LEWINSOHN'S CLAIMS FOR BREACH OF FIDUCIARY DUTY UNDER ARE FATALLY DEFECTIVE.**

1.    *Ms. Lewinsohn's Claim In Count III That Operation Of A Managed Care Plan Is Unlawful Per Se Is Baseless.*

Perhaps because her nondisclosure claims are unsupportable, Ms. Lewinsohn advances a separate claim apparently not founded upon allegations of wrongful nondisclosure: that the mere operation of a managed care plan including certain cost-containment measures is a violation of the fiduciary duty of loyalty under ERISA. Her allegations in this regard, and their obvious invitation for judicial policymaking, are stark:

> While managed health care need not be provided in a manner that creates a conflict of interest between an ERISA fiduciary and beneficiaries, Humana took purposeful actions, described in detail above, that created a conflict of interest between Humana, as fiduciary, and members of the Sub-Class, as beneficiaries.

(Compl. ¶ 92.) Count III thus unmasks Ms. Lewinsohn's intention of remaking national health policy through Rule 23's class-action device, based on the supposition that ERISA's general fiduciary provisions have the effect of outlawing capitation, utilization review, and other basic elements of managed care that are otherwise permitted by state and federal law.

This supposition has received judicial recognition only once, in a 2-1 decision of the Seventh Circuit which was recently accepted for review by the Supreme Court. *See Herdrich v. Pegram*, 154 F.3d 362 (7th Cir. 1998), *cert. granted*, 120 S. Ct. 10 (1999). Yet *Herdrich* (which, unlike this case, entailed allegations of medical malpractice and personal injury arising out of an actual failure to provide services) is an outlier that is not binding in this jurisdiction and – for reasons explained below – is not likely to survive review by the Supreme Court.

The problem with Ms. Lewinsohn's *Herdrich* theory is that it runs counter to the fundamental principle that ERISA does not create any substantive entitlement to particular kinds of health care benefits – or any health care benefits at all. Those substantive

DC1:423373.1                                          35

entitlements are determined by employers; they are questions of plan design, and ERISA's

fiduciary duty provisions must be construed and applied with respect for employers' choices.

*See Lockheed Corp. v. Spink*, 517 U.S. 882, 889 (1996).[28] Thus, while ERISA provides that a

person is a fiduciary with respect to an employee benefit plan to the extent, *inter alia*, that

such person has discretionary authority or responsibility "in the administration of [the] plan,"

29 U.S.C. § 1002(21)(A), that fiduciary status cannot extend to a health insurer's

implementation of a managed care model where the employer has chosen that model as part

of the plan's design. As Judge Easterbrook explained in his opinion dissenting from the

denial of rehearing en banc in *Herdrich*:

> Perhaps it would be possible to read "in the administration of
> [the] plan" broadly in order to catch all discretionary elements
> of the HMO structure, but why should courts do this? In order
> to wipe out HMOs and foreclose the possibility that plan
> sponsors will choose that structure (or that participants will
> select it from among options the plan offers)? The panel's
> opinion sounds very much like this is the objective: its lengthy
> condemnation of managed care . . . otherwise is hard to
> understand. But ERISA does not tie the plan sponsor's hands
> on issues of plan design. An employer is free to offer an HMO
> as an option without objection on fiduciary-duty grounds.
> *Hughes [Aircraft Co. v. Jacobson*, 119 S. Ct. 755 (1999)] and
> *Lockheed*, which put plan-design issues outside the scope of §
> 1002(21), establish this point. If it is lawful under ERISA for
> an employer to *offer* an HMO as a welfare benefit, then it must
> be lawful for the HMO itself to *administer* a managed-care
> system.

*Herdrich v. Pegram*, 170 F.3d 683, 685 (7th Cir. 1999) (Easterbrook, J., dissenting from

denial of rehearing en banc). For these reasons, Humana's mere act of implementing

---

[28]  *See also Moore v. Reynolds Metals Co. Retirement Program for Salaried Employees*, 740 F.2d 454, 456
(6th Cir. 1984) ("courts have no authority to decide which benefits employers must confer upon their employees;
these are decisions which are more appropriately influenced by forces in the marketplace and, when appropriate,
by federal legislation.").

managed care policies offered through the welfare benefit plans of Ms. Lewinsohn's employer is not subject to the fiduciary provisions of ERISA.

This conclusion is not undermined by the fact that Humana allegedly may have acted as a fiduciary in other unspecified respects. (*See* Compl. ¶¶ 91-92.)  Both Congress and the Supreme Court have recognized that ERISA permits a person both to assume a fiduciary role for one purpose and to pursue his or her self-interest when acting outside that role. *See Hughes Aircraft*, 119 S. Ct. at 763; *Lockheed Corp.*, 517 U.S. at 890; *see also* 29 U.S.C. § 1108(c)(3) (employer may act as plan sponsor (a non-fiduciary role) and plan administrator (a fiduciary role)).  Indeed, this recognition is mandated by ERISA's text, which specifies that a person does not become a fiduciary for all purposes, but only "to the extent" that he or she exercises certain discretionary powers. *See* 29 U.S.C. § 1002(21)(A).  Thus, for example, employers may (and doubtless do) consider the effect on their profitability in deciding what benefits to offer in the design of a welfare benefit plan.  Yet, when those very same employers make coverage, eligibility, and other administrative decisions under their plans, they must act with an "eye single" to the interests of the plan beneficiaries. *See Hughes Aircraft*, 119 S. Ct. at 763 ("an employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties which consist of such actions as the administration of the plan's assets").  By analogy, even assuming that Humana engaged in fiduciary functions with respect to the welfare benefit plan offered by Ms. Lewinsohn's employer, it would not be a breach of fiduciary responsibilities for Humana, acting solely as a provider of health coverage, to protect its financial self-interest through the use of cost-containment measures.[29]

---

[29]     Thus, other district courts recently have dismissed claims similar to Count III.A. *See, e.g., Weiss*, 972 F. Supp. at 753 ("Weiss' contention that CIGNA's compensation package [for physicians] facially violates (cont'd)

If Count III states a claim for which relief may be granted, then "the principal organizational forms through which medical care is delivered today are unlawful. If this conclusion is correct, then the cost-saving achieved by managed care must be abandoned, and the cost of medical care will rise, perhaps substantially." *Herdrich*, 170 F.3d at 686 (Easterbrook, J., dissenting from denial of rehearing en banc). ERISA neither requires nor permits this conclusion.

### 2. Even If Recharacterized As A Nondisclosure Claim, Ms. Lewinsohn's ERISA Claim For Breach Of Fiduciary Duty Must Be Dismissed.

Perhaps sensing the futility of her attempt to persuade this Court to legislate an expansion of ERISA's fiduciary provisions in a way that would ban managed care outright, Ms. Lewinsohn suggests in Count III – but does not explicitly say – that ERISA's general fiduciary duty provision, 29 U.S.C. § 1104, creates an obligation on the part of HMOs to disclose their contractual arrangements with physicians. (*See, e.g.*, Compl. ¶ 96.) Section 404 of ERISA does not, however, supplant ERISA's express disclosure provisions and cannot be read to impose additional disclosure obligations. To the extent Ms. Lewinsohn's complaint could be read to raise this claim, it must be dismissed.[30]

The Fifth Circuit recently rejected this identical claim in *Ehlmann v. Kaiser Found. Health Plan of Tex.*, 198 F.3d 552, 2000 WL 359 (5th Cir. 2000), finding no support in ERISA's text, structure or legislative history for the imposition of a broad duty to disclose

---

ERISA simply because it deprives her of her right to receive 'medical opinions and referrals unsullied by mixed motives,' . . . is tantamount to a claim that risk-sharing arrangements in managed care are inherently illegal, a position that is refuted by federal and New York law . . . . Moreover, plaintiff's concern about the soundness of managed care policy is best suited for resolution by branches of government other than the judiciary.") (citation omitted).

[30]    Even if it were appropriate to read into ERISA § 404 a requirement that Humana disclose its internal cost-containment practices, Ms. Lewinsohn's oblique pleading of such a fraud-based ERISA theory would require dismissal under Fed. R. Civ. P. 9(b). *See, e.g., J. Geils Band Employee Benefit Plan v. Smith Barney* (cont'd)

physician compensation plans. *Id.* at *2. Relying on the basic canon of statutory construction that "the specific language in a statute rules the general," the court refused to "add to the specific disclosure requirements that ERISA already provides." *Id.* (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). The court also invoked the teaching of the Supreme Court in *Curtiss-Wright Corporation v. Schoonejongen*, 514 U.S. 73, 84 (1995), heeding the Supreme Court's warning that "where ERISA provides a section specifically dealing with a particular information scheme, courts should not supplement that scheme by reference to a far away provision in another part of the statute." *Ehlmann*, 2000 WL 359 at *2. Finally, the Fifth Circuit repudiated Ehlmann's characterization of ERISA's underlying purposes, which interpreted ERISA Section 404's incorporation of the common law of trusts as an invitation to sweep in disclosure requirements above and beyond ERISA's extensive statutory obligations. The court held that "the legislative history of ERISA . . . runs against Ehlmann's overly broad construction of Section 404." *Id.* at *3.

This analysis is in accord with the decisions of many other courts. For example, in *Weiss v. CIGNA HealthCare, Inc.*, 972 F. Supp. 748 (S.D.N.Y. 1997), the plaintiff asserted that the defendant HMO breached its fiduciary duty by failing to disclose the nature of its physician compensation arrangements, information that was alleged to be material because it "affect[ed] the ability of current Plan participants to 'make an intelligent assessment of whether their physicians' medical recommendations should be questioned.'" *Id.* at 753 (quoting plaintiff's memorandum). The district court dismissed the claim under Rule 12(b)(6).

> Had Congress seen fit to require the affirmative disclosure of physician
> compensation arrangements, it could certainly have done so in ERISA §§ 101-

---

*Shearson, Inc.*, 76 F.3d 1245, 1255 (1st Cir. 1996) (affirming summary judgment against plaintiffs' ERISA fiduciary nondisclosure claim in part on Rule 9(b) grounds)).

111. The general fiduciary obligations set forth in ERISA § 404 do not refer to the disclosure of information to Plan participants, and it would be "inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing" about such duties.

*Id.* at 754 (quoting *Bd. of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 147 (2d Cir. 1997)).[31]

In sum, Humana has no duty to disclose its cost containment practices either under ERISA's carefully crafted disclosure provisions or under its general fiduciary duty provisions. "It is for Congress to determine whether to impose such a duty to disclose under ERISA and this court will not encroach on that authority by imposing a duty which Congress had not chosen to impose.." *Ehlmann*, 2000 WL 359, at *2. There is no question that this claim – which Ms. Lewinsohn inadequately pleads if she pleads it at all – must be dismissed.

---

[31]    Consistent with this approach, several appellate courts have held that Congress's failure to impose an express duty of disclosure such as the one Ms. Lewinsohn (perhaps) alleges argues against implying such a duty through strained interpretation of ERISA's general fiduciary duties. *See Schoonejongen*, 514 U.S. at 79-86; *Hughes Salaried Retirees Action Comm. v. Admin. of the Hughes Non-Bargaining Retirement Plan*, 72 F.3d 686, 689 (9th Cir. 1995) (*en banc*); *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 657 (4th Cir. 1996) (ERISA's disclosure provisions provide the exclusive disclosure obligations of fiduciaries); *see also Sprague v. General Motors Corp.*, 133 F.3d 388, 405 n.15 (6th Cir.) (*en banc*) ("It would be strange indeed if ERISA's fiduciary standards could be used to imply a duty to disclose information that ERISA's detailed disclosure provisions do not require to be disclosed. . . . [W]hen Congress and the Department of Labor have carefully prescribed a detailed list of matters that must be disclosed to plan participants and beneficiaries, it ill-behooves federal judges to add to that list."), *cert. denied*, 523 U.S. 923 (1998).

In contrast to these decisions, in one appellate decision, *Shea v. Esensten*, 107 F.3d 625, 629 (8th Cir.), *cert. denied*, 522 U.S. 914 (1997), an Eighth Circuit panel concluded that an HMO's alleged failure to disclose certain financial incentives could state a claim for breach of the HMO's fiduciary duty under ERISA. Even if *Shea* were controlling in this circuit, it is inapposite to this case. The plaintiff in *Shea*, unlike plaintiff here, alleged serious injury — the death of her husband — directly arising from an alleged failure to disclose. Finding the beneficiary's wrongful death claim under Minnesota law to be preempted by ERISA, the court of appeals held that ERISA created a duty to disclose the financial arrangements between the HMO and the doctor under the circumstances of the case.

Moreover, just this year, the Eighth Circuit signaled a lack of confidence in the *Shea* analysis and ruling in *Ince v. Aetna Health Management*, 173 F.3d 672 (8th Cir. 1999). In that case, the court of appeals characterized *Shea* as involving only "a breach of the plan administrator's duty [in ERISA § 102] to publish an accurate description of plan benefits to participants and beneficiaries." *Id.* at 676. Thus, as revised by *Ince*, the *Shea* decision says nothing more than that a plan administrator might violate ERISA § 102 by failing to include in the SPD a description of the HMO's compensation arrangements with physicians. In this respect, of course, the Eighth Circuit's revised *Shea* analysis is an anomaly; ERISA § 102, and the Department of Labor regulations that implement it, contain a long series of express disclosure requirements for plan administrators, but they do not include disclosure of physician contractual arrangements.

**D.    THE RELIEF MS. LEWINSOHN REQUESTS TO REDRESS THE ASSERTED BREACHES OF FIDUCIARY DUTY IS NOT AVAILABLE UNDER ERISA.**

*1.    The Relief Ms. Lewinsohn Seeks Is Not Authorized.*

Ms. Lewinsohn claims that she is entitled to "equitable relief" under ERISA § 502(a)(3)[32] – namely, money – to redress the purported breaches of fiduciary duty, discussed above. (Compl. ¶ 97.) She is mistaken. At best, her fiduciary duty claims are merely disguised claims for benefits (and meritless ones at that) for which ERISA provides a separate and appropriate remedy.

In *Varity Corp. v. Howe*, 516 U.S. 489 (1996), the Supreme Court set out the circumstances under which an individual plan participant or beneficiary may seek equitable relief under § 502(a)(3) for a fiduciary's breach of its obligations. In *Varity*, the defendant employer intentionally tricked the plaintiff employees into withdrawing from their benefit plan. In assessing whether § 502(a)(3) relief was available to the plaintiffs, the Supreme Court reviewed each of the causes of action under § 502 and concluded that § 502(a)(3) creates a "'catchall[]' providing 'appropriate equitable relief' for 'any' statutory violation." *Id.* at 512. The Court reasoned that this "'catchall' provision[] act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Id.* The Court cautioned, however, that

> the statute authorizes "*appropriate*" equitable relief. We should
> expect that courts, in fashioning "appropriate" equitable relief,
> will keep in mind the "special nature and purpose of employee
> benefit plans," and will respect the "policy choices reflected in
> the inclusion of certain remedies and the exclusion of others."
> Thus, we should expect that where Congress elsewhere
> provided adequate relief for a beneficiary's injury, there will

---

[32]    Section 502(a)(3) provides that: "A civil action may be brought by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." 29 U.S.C. 1132(a)(3).

> likely be no need for further equitable relief, in which case such
> relief normally would not be "appropriate."

*Id.* at 515 (citations omitted).

Thus, although *Varity* held that ERISA plan participants harmed by a breach of

fiduciary duty may obtain individual equitable relief against the breaching fiduciary under

ERISA § 502(a)(3), the Court also foresaw that some plaintiffs would – as plaintiffs have here

– "complicate claims about ordinary benefits by dressing them up in 'fiduciary duty'

clothing." *Id.* at 514. The Court noted that where an alleged breach of fiduciary duty relates,

as it does in this case, to "the interpretation of plan documents and the payment of claims,"

§ 502(a)(1)(B) already provides a remedy "that runs directly to the injured beneficiary," and

that a remedy under § 502(a)(3) is thus not "appropriate." *Id.* at 512.

The Eleventh Circuit recently had occasion to apply this logic. *In Harrison v.*

*Digital Health Plan,* 183 F.3d 1235, 1236 n.1 (11th Cir. 1999), the court upheld a district

court's dismissal of a "plaintiff's claim for breach of fiduciary duty as duplicative of [a claim]

for recovery of medical benefits under 29 U.S.C. § 1132(a)(1)(B)." The district court cited

*Varity* with approval, holding:

> Plaintiff's claim for a breach of fiduciary duty essentially
> restates her claim that defendants wrongfully refused to pay her
> medical benefits, a claim for which ERISA elsewhere provides
> an adequate remedy. 28 [*sic*] U.S.C. § 1132(a)(1)(B).
> Therefore, the breach of fiduciary duty claim fails to state a
> claim on which relief can be granted.

*Harrison v. Digital Health Plan,* No. 1:98-CV-348-MHS, 1998 WL 1157098, at *3 (N.D. Ga.

June 24, 1998), *aff'd in relevant part*, 183 F.3d 1235 (11th Cir. 1999). Other courts in the

Eleventh Circuit have reached the same conclusion,[33] and the Fifth, Sixth, Eighth and Ninth

---

[33]    *Short v. American Cast Iron Pipe Co.*, 961 F. Supp. 261, 266 (N.D. Ala. 1997); *Katz v. Alltel Corp.*, 985
F. Supp. 1157 (N.D. Ga. 1997), *appeal docketed*, No. 98-9251 (11th Cir. 1999).

Circuits have adopted this principle.[34]

   The same analysis should apply here. Despite Ms. Lewinsohn's fancy characterization of her breach of fiduciary duty claim, her complaint alleges nothing more than that Humana promised a level of coverage that has not been delivered. According to the complaint, defendant failed "to use the Humana Medical Necessity Definition and appropriate criteria to evaluate the medical necessity of Plaintiff's Sub-Class's ***claims*** for medical services." (Compl. ¶ 93 (emphasis added).) As a consequence, "Defendants . . . did provide coverage of lesser value than that represented to and purchased by Sub-Class members." (*Id.* ¶ 96.)

   Plainly, these allegations, if believed, would invite a benefits claim under § 502(a)(1)(B) from a participant who actually was denied coverage for medically necessary care, or who was given less coverage than promised by Humana. Under the teaching of *Varity*, however, a supplemental equitable remedy under § 502(a)(3) is inappropriate because ERISA makes available a § 502(a)(1)(B) benefits claim to – among other individuals – participants who have personally and individually been denied health care provided by the plan documents.[35] It is of no moment that the Ms. Lewinsohn cannot factually make out a benefits claim since she, personally, has not been denied coverage for any "medically

---

[34] In *Tolson v. Avondale Industries, Inc.*, 141 F.3d 604 (5th Cir. 1998) (holding where a participant "'had standing to sue and did sue'" under § 502(a)(1)(B), "'it would be inappropriate for the Court to fashion any further equitable relief under [§ 502](a)(3)'".); *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 615 (6th Cir. 1998) ("Because § 1132(a)(1)(B) provides a remedy for [plaintiff's] alleged injury that allows him to bring a lawsuit . . . he does not have a right to a cause of action for breach of fiduciary duty pursuant to § 1132(a)(3)."); *Wald v. Southwestern Bell Corp. Customcare Medical Plan*, 83 F.3d 1002, 1006 (8th Cir. 1996) ("Because Wald is provided adequate relief by her right to bring a claim for benefits under section 502(a)(1)(B), . . . equitable relief would not be appropriate in her case. Thus, she does not have a cause of action under section 502(a)(3).") (citation omitted); *Forsyth v. Humana Inc.*, 114 F.3d 1467, 1475 (9th Cir. 1997) ("[i]n these circumstances, *Varity Corp.* does not authorize equitable relief under the catchall provision of section 1132(a)(3)"), *aff'd on other grounds*, 119 S. Ct. 710 (1999).

[35] Section 502(a)(1) provides in relevant part: "A civil action may be brought (1) by a participant or beneficiary — . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1).

necessary" health care procedures. *Short*, 961 F. Supp. at 266 ("[t]he fact that plaintiff has voluntarily dismissed his claim for benefits under § 502(a)(1)(B) is not enough to make relief under § 502(a)(3) appropriate."). The important point is that, if her allegations are believed, other participants *may* have valid claims for benefits under § 502(a)(1)(B). As a consequence, *Varity* precludes any supplemental equitable remedy under § 502(a)(3).

<div align="center">

2. **The Relief Ms. Lewinsohn Requests For Her Fiduciary
   Claims Is Not "Equitable," And Thus Is Not Permitted.**

</div>

Even if *Varity* did not bar Ms. Lewinsohn's ERISA § 502(a)(3) claim, her demand for money does not seek "equitable relief" that may be recovered under that section. Although she describes her prayer in terms of an "unjust enrichment" (Compl. ¶¶ 95-98), her true intentions are betrayed in the next sentences. Plaintiffs allege that defendant "receiv[ed] unearned premium revenues" (*id.* ¶ 95), and "intended to retain and did retain the difference in value between the coverage described in [the] Health Policies . . . and the coverage actually provided to the Sub-Class." (*Id.* ¶ 96.) Plainly this request for damages – compensation for services promised to unspecified plan members but allegedly not delivered – sounds in contract. *See, e.g.*, Dobbs, *The Law of Remedies*, § 12.2 (1993) (discussing contractual remedies). As the Supreme Court and other courts have recognized, this is classic *legal* relief that is unavailable under ERISA § 502(a)(3).

In *Mertens v. Hewitt Associates*, 508 U.S. 248 (1993), plaintiff plan participants sought recovery under § 502(a)(3) for losses suffered by their employee benefit plan as a result of a breach of fiduciary duty. *Id.* at 249-50. The Supreme Court held that the "other appropriate equitable relief" authorized under § 502(a)(3) is limited to only those types of relief that were typically available in equity, such as injunction, mandamus, and restitution. *Id.* at 255. Because the *Mertens* plaintiffs sought money damages rather than a remedy

traditionally viewed as equitable, the Court held that their requested relief was not available and stated:

> Although they often dance around the word, what petitioners in fact seek is nothing other than compensatory *damages* — monetary relief for all losses their plan sustained as a result of the alleged breach of fiduciary duties. Money damages are, of course, the classic form of *legal* relief.

*Id.* Here, Ms. Lewinsohn seeks an identical remedy, specifically, recovery for "unearned premium revenues." (Compl. ¶ 95.) As it was for the *Mertens* plaintiffs, such a remedy is unavailable here. *See also McLeod v. Oregon Lithoprint Inc.*, 102 F.3d 376, 378 (9th Cir. 1996) (holding "'equitable relief' in the form of the recovery of compensatory damages is not an available remedy under § 502(a)(3)"); *Slice v. Sons of Norway*, 34 F.3d 630 (8th Cir. 1994) (money damages are not available under ERISA § 502(a)(3) even if the plaintiff characterizes claim as equitable).[36]

### E.    MS. LEWINSOHN'S ERISA CLAIM FOR BENEFITS IS MERITLESS AS WELL.

Ms. Lewinsohn's claim for "benefits" under ERISA § 502(a)(1)(B) in Count IV cannot proceed for two reasons. To begin with, she fails to identify the plan and plan

---

[36]    Perhaps recognizing the futility of her claim under ERISA § 502(a)(3), Ms. Lewinsohn invokes another civil enforcement provision, ERISA § 502(a)(2), in an attempt to justify her remedial prayer. (Compl. ¶ 98.) Yet in *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 140 (1985), the Supreme Court held that § 502(a)(2) permits recoveries on behalf of the plans alone, and does not permit individual participants to recover damages for a breach of fiduciary duty. As the Supreme Court reasoned,

> A fair contextual reading of the statute makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary.

*Id.* at 142. This rule has been applied in the Eleventh Circuit. *See Simmons v. Southern Bell Tel. and Tel. Co.*, 940 F.2d 614, 617 (11th Cir. 1991) (holding that ERISA § 502(a)(2) "does not permit an individual beneficiary to recover damages for a breach of fiduciary duties"). Since Ms. Lewinsohn has filed this suit in her individual (cont'd)

administrators involved.  In *Response Oncology, Inc. v. Metrahealth Ins. Co.*, 978 F. Supp.

1052 (S.D. Fla. 1997), the plaintiffs failed to identify, for 27 separate benefit claims under

ERISA, the plans, plan administrators, and whether the plans were self-insured or fully

insured.  In dismissing the claims under Rule 12, Judge Graham observed that:

> The basic requirements of ERISA, mandate that a plaintiff
> allege in its Complaint (and not by reference to a later filed
> affidavit or arguments in an opposition memorandum) the
> identity of the ERISA plan, the plan administrator or fiduciary
> of that plan, and the basis for liability of the defendant sued
> pursuant to ERISA.

*Id.* at 1065.  On this basis alone, Ms. Lewinsohn has failed to meet her threshold pleading

requirements and her claim should be dismissed.  *See Gendron v. Franklin Life Ins. Co.*, 980

F. Supp. 1233 (M.D. Fla. 1997) (granting insurance company's motion to dismiss because it

was not the plan administrator and therefore could not be liable under ERISA).

Moreover, this pleading defect is symptomatic of the deeper problem with Ms.

Lewinsohn's attempted assertion of an ERISA benefits claim.  Contrary to her contention that

she is entitled to a distribution of the withheld "coverage-benefits," an entitlement to a

payment of benefits under an ERISA plan does not arise unless benefits are first sought and

denied, and only after she has exhausted administrative remedies under the plan.  (*See* pp. 30-

33 *supra*.)  Here, Ms. Lewinsohn's demand is not a claim for "benefits" at all, but rather for a

refund of premiums paid.  While a plaintiff may recover under Section 502(a)(1)(B) the actual

benefit payments to which he or she is entitled, the courts have uniformly held that a plaintiff

may not recover other monetary relief such as the premium refund that plaintiffs seek here.

*See, e.g., Godfrey v. Bell South Telecommunications, Inc.*, 89 F.3d 755, 761 (11th Cir. 1996);

*Medina v. Anthem Life Ins. Co.*, 983 F.2d 29, 32 (5th Cir. 1993).  Where, as here, there is no

---

capacity (Compl. ¶¶ 4-5), and not on behalf of her employee benefit plan, no relief is available under §
(cont'd)

claim of a specific benefit denial, there is no ERISA claim to recover benefits, and Ms.

Lewinsohn's attempt to manufacture such a claim should be rejected.

## CONCLUSION

For the foregoing reasons, Ms. Lewinsohn's complaint should be dismissed for

failure to state a claim upon which relief can be granted.

*Of counsel:*                                    Respectfully submitted,

O'MELVENY & MYERS LLP
555 13th Street, N.W.                            Peter A. Sachs
Suite 500 West                                   Florida Bar No. 349062
Washington, D.C. 20004                           JONES, FOSTER, JOHNSTON
(202) 383-5300                                       & STUBBS, P.A.
                                                 505 South Flagler Drive, Suite 1100
                                                 Post Office Box 3475
                                                 West Palm Beach, Florida  33402-3475

                                                 Counsel for Defendant Humana Inc.

---

502(a)(2).

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via U.S. mail on James Fox Miller, Esquire, Charles Fox Miller, Esquire, Greg A. Lewen, Esquire, 2435 Hollywood Boulevard, Hollywood, FL 33020 on this 22nd day of February, 2000.


Of Counsel:
O'MELVENY & MYERS LLP
555 13th Street, N.W.
Suite 500 West
Washington, D.C.
(202) 383-5300

JONES, FOSTER, JOHNSTON & STUBBS, P.A.
Attorneys for Defendant
505 South Flagler Drive, Suite 1100
Post Office Box 3475
West Palm Beach, Florida 33402-3475
(561) 659-3000

By: _____
Peter A. Sachs
Florida Bar No. 349062

N:\PAS\humanageneral\certservice4.wpd

ANNUAL REPORT OF HUMANA INC. ON FORM 10-K FOR

THE PERIOD ENDED DECEMBER 31, 1998

# HUMANA INC

**Filing Type:** 10-K405
**Description:** Annual Report
**Filing Date:** Mar 31, 1999
**Period End:** Dec 31, 1998

**Primary Exchange:** New York Stock Exchange
**Ticker:** HUM

# Table of Contents

*To jump to a section, double-click on the section name.*

## 10-K405

| | |
|---|---|
| PART I | 2 |
| ITEM 1 | 2 |
| Table1 | 8 |
| Table2 | 14 |
| ITEM 2 | 17 |
| Table3 | 17 |
| ITEM 3 | 18 |
| ITEM 4 | 19 |
| Table4 | 19 |
| PART II | 21 |
| PART III | 21 |
| ITEM 10 | 21 |
| ITEM 11 | 21 |
| ITEM 12 | 21 |
| ITEM 13 | 22 |
| PART IV | 22 |
| ITEM 14 | 22 |
| Balance Sheet | 26 |
| Income Statement | 27 |
| Cash Flow Statement | 28 |
| Table8 | 29 |

## EX-10.Q

| | |
|---|---|
| EX-10.Q | 29 |

## EX-12

| | |
|---|---|
| Table9 | 38 |

## EX-13

| | |
|---|---|
| Cash Flow Statement2 | 39 |
| Table11 | 45 |
| Table12 | 47 |
| Table13 | 48 |
| Table14 | 49 |
| Balance Sheet2 | 53 |
| Income Statement2 | 54 |
| Income Statement3 | 55 |

| | |
|---|---|
| Cash Flow Statement3 | 56 |
| Table19 | 58 |
| Table20 | 59 |
| Table21 | 61 |
| Table22 | 61 |
| Table23 | 62 |
| Table24 | 62 |
| Table25 | 62 |
| Balance Sheet3 | 62 |
| Table27 | 63 |
| Table28 | 65 |
| Table29 | 65 |
| Table30 | 66 |
| Table31 | 66 |
| Table32 | 67 |
| Table33 | 68 |
| Table34 | 70 |
| Table35 | 70 |

# EX-21

| | |
|---|---|
| EX-21 | 73 |

# EX-23

| | |
|---|---|
| EX-23 | 77 |

# EX-27

| | |
|---|---|
| Exhibit 27 Table | 77 |

---

---

```
                           UNITED STATES
                 SECURITIES AND EXCHANGE COMMISSION
                       Washington, D.C. 20549

                         ----------------

                            Form 10-K

       [X]ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
                    SECURITIES EXCHANGE ACT OF 1934

            For the fiscal year ended December 31, 1998

                               OR

       [_]TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
                    SECURITIES EXCHANGE ACT OF 1934

             For the transition period from      to

                   Commission File Number 1-5975

                           HUMANA INC.
          (Exact Name of registrant as specified in its charter)


       Delaware                              61-0647538

   (State of incorporation)               (I.R.S. Employer
                                         Identification Number)



        500 West Main Street

        Louisville, Kentucky                    40202
   (Address of principal executive offices)   (Zip Code)


       Registrant's telephone number, including area code: 502-580-1000

       Securities registered pursuant to Section 12(b) of the Act:
```

| Title of each class | Name of each exchange on which registered |
| --- | --- |
| Common Stock, $.16 2/3 par value | New York Stock Exchange |

```
       Securities registered pursuant to Section 12(g) of the Act:

                              None

   Indicate by check mark whether the Registrant (1) has filed all reports
required to be filed by Sections 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
```

Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes  [X] No [_]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of the Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in the Registrant's definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

The aggregate market value of voting stock held by non-affiliates of the Registrant as of March 1, 1999 was $2,817,113,416 calculated using the average price on such date of $17.75. The number of shares outstanding of the Registrant's Common Stock as of March 1, 1999 was 167,575,889.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of Part II and Part IV incorporate herein by reference the Registrant's 1998 Annual Report to Stockholders; Part III incorporates herein by reference portions of the Registrant's Proxy Statement filed pursuant to Regulation 14A covering the Annual Meeting of Stockholders scheduled to be held May 6, 1999.

The Exhibit Index begins on page 20.

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

PART I

ITEM 1. BUSINESS

General

Humana Inc. is a Delaware corporation organized in 1961. Its principal executive offices are located at 500 West Main Street, Louisville, Kentucky 40202 and its telephone number at that address is (502) 580-1000. As used herein, the terms "the Company" or "Humana" include Humana Inc. and its subsidiaries. This Annual Report on Form 10-K contains both historical and forward-looking information. The forward-looking statements may be significantly impacted by risks and uncertainties and are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. There can be no assurance that anticipated future results will be achieved because actual results may differ materially from those projected in the forward-looking statements. Readers are cautioned that a number of factors, which are described herein, could adversely affect the Company's ability to obtain these results. These include the effects of either federal or state health care reform or other legislation, changes in the Medicare reimbursement system, renewal of the Company's Medicare contracts with the federal government, renewal of the Company's contract with the federal government to administer the TRICARE program and renewal of the Company's Medicaid contracts with various state governments. Such factors also include the effects of other general business conditions, including but not limited to, the Company's ability to integrate its acquisitions, the Company's ability to appropriately address the "Year 2000" computer system issue, government regulation, competition, premium rate and yield changes, retrospective premium adjustments relating to federal government contracts, medical and pharmacy cost trends, changes in Commercial and Medicare HMO membership, operating subsidiary capital requirements, the ability of health care providers (including physician practice management companies) to comply with current contract terms, the effect of provider contract rate negotiations, general economic conditions and the retention of key employees. In addition, past financial performance is not necessarily a reliable indicator of future performance and investors should not use historical performance to anticipate results or future period trends.

Since 1983, the Company has been a health services company that facilitates the delivery of health care services through networks of providers to its approximately 6.2 million medical members. The Company's products are marketed primarily through health maintenance organizations ("HMOs") and preferred provider organizations ("PPOs") that encourage or require the use of contracted providers. HMOs and PPOs control health care costs by various means, including

pre-admission approval for hospital inpatient services, pre-authorization of outpatient surgical procedures and risk-sharing arrangements with providers. These providers may share medical cost risk or have other incentives to deliver quality medical services in a cost-effective manner. During 1998, the Company began an initiative to increase the amount of medical cost risk assumed by certain of its provider partners related primarily to its HMO products. As a result, at December 31, 1998, approximately 50 percent and 70 percent of its Commercial and Medicare HMO membership, respectively, were under various forms of risk-sharing arrangements. The Company also offers various specialty products to employers, including dental, group life and workers' compensation, and administrative services ("ASO") to those who self-insure their employee health plans.

The Company markets and distributes its products to three distinct customer groups and, therefore, reports operations in three business segments. Results of each segment are measured based on premium revenues and underwriting margin (premium revenues less medical expenses). The Company does not allocate assets or administrative costs to the segments and, therefore, does not measure results based on segment assets or pretax profits. Members from all three segments generally utilize the same medical provider networks, enabling the Company to obtain more favorable contract terms with providers. As a result, the profitability of each segment is somewhat interdependent.

In the Commercial segment, the Company markets and distributes its fully-insured HMO, PPO, specialty and ASO products to large group employers (over 100 employees) and small group employers. Premium revenue pricing to large group employers has historically been more competitive than that to small group

1

employers, resulting in less favorable underwriting margins for large groups. At December 31, 1998, the Company had a total of 3,261,500 fully-insured Commercial members and provided claims processing, utilization review and other administrative services to 646,200 ASO members.

In the Public Sector segment, the Company markets and distributes its Medicare and Medicaid products to individuals eligible for these government-sponsored programs. The products marketed to Medicare-eligible individuals are either HMO products ("Medicare HMO") or indemnity insurance policies that supplement Medicare benefits ("Medicare supplement"). At December 31, 1998, the Company had 502,000 Medicare HMO members and 56,600 Medicare supplement members. The Company facilitates the delivery of health care services to Medicaid-eligible individuals under contracts generally renewable annually with various states except for a two-year contract with the Commonwealth of Puerto Rico. The Puerto Rico contract, previously scheduled to expire on March 31, 1999, has been extended one month to April 30, 1999. The Company does not expect to be able to renew the contract in Puerto Rico under favorable terms and, therefore, has announced its intention to close this market when the contract expires. At December 31, 1998, the Company had 643,800 Medicaid members, approximately 442,000 of which were in Puerto Rico.

The Company's third segment is TRICARE. In this segment, the Company facilitates the delivery of health care services to the dependents of active military personnel and retired military personnel and their dependents located in the Southeastern United States. The Company is in the third year of its contract with the United States Department of Defense, which is renewable annually for up to two additional years. As encouraged by government regulation, TRICARE is managed by a separate management team and is more autonomous than the Company's Commercial and Public Sector segments, which generally share sales, marketing, customer service, medical management and claims processing functions of the Company. Three health benefit options are available to TRICARE beneficiaries. In addition to a traditional indemnity option, participants may enroll in an HMO-like plan with a point-of-service option or take advantage of reduced co-payments by using a network of preferred providers. The Company has subcontracted with third parties to provide certain administration and specialty services under the contract. At December 31, 1998, the Company had 1,085,700 TRICARE members.

On February 28, 1997, the Company acquired Health Direct, Inc. ("Health Direct") from Advocate Health Care for $23 million in cash. This transaction

added approximately 50,000 medical members to the Company's Chicago, Illinois,
membership.

On September 8, 1997, the Company acquired Physician Corporation of America
("PCA") for total consideration of $411 million in cash, consisting primarily
of $7 per share for PCA's outstanding common stock and the assumption of $121
million in debt. The purchase was funded with borrowings under the Company's
commercial paper program. PCA served approximately 1.1 million medical members
and provided comprehensive health services through its HMOs in Florida, Texas
and Puerto Rico. In addition, PCA provided workers' compensation third-party
administrative management services. Prior to November 1996, PCA also was a
direct writer of workers' compensation insurance in Florida.

On October 17, 1997, the Company acquired ChoiceCare Corporation
("ChoiceCare") for approximately $250 million in cash. The purchase was funded
with borrowings under the Company's commercial paper program. ChoiceCare
provided health services products to approximately 250,000 medical members in
the Greater Cincinnati, Ohio, area.

On January 31, 1997, the Company completed the sale of its Washington, D.C.,
health plan to Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.
Effective April 1, 1997, the Company also completed the sale of its Alabama
operations, exclusive of its small group business and Alabama TRICARE
operations, to PrimeHealth of Alabama, Inc. On October 31, 1997, the Company
also sold The Lexington Hospital in Lexington, Kentucky, to Jewish Hospital
Healthcare Services, Inc. These sale transactions did not have a material
impact on the Company's financial position, results of operations or cash
flows.

2

Commercial Products

HMO

An HMO provides prepaid health care services to its members through a
network of independent primary care physicians, specialty physicians and other
health care providers who contract with the HMO to furnish such services.
Primary care physicians generally include internists, family practitioners and
pediatricians. Generally, access to specialty physicians and other health care
providers must be approved by the member's primary care physician. These other
health care providers include, among others, hospitals, nursing homes, home
health agencies, pharmacies, mental health and substance abuse centers,
diagnostic centers, optometrists, outpatient surgery centers, dentists, urgent
care centers and durable medical equipment suppliers. Because access to these
other health care providers must generally be approved by the primary care
physician, the HMO product is the most restrictive form of managed care.

At December 31, 1998, the Company owned and operated 14 actively licensed
HMOs, which contracted with approximately 78,300 physicians (including
approximately 22,200 primary care physicians) and approximately 1,060
hospitals. In addition, the Company had approximately 8,100 contracts with
other providers to provide services to HMO members.

An HMO member, typically through the member's employer, pays a monthly fee
which generally covers, with minimal co-payments, health care services received
from or approved by the member's primary care physician. For the year ended
December 31, 1998, Commercial HMO premium revenues totaled approximately $2.3
billion or 24 percent of the Company's total premium revenues. Approximately
$182 million of the Company's Commercial HMO premium revenues for the year
ended December 31, 1998 were derived from contracts with the United States
Office of Personnel Management ("OPM"), under which the Company facilitates the
delivery of health care services to approximately 117,000 federal civilian
employees and their dependents. Pursuant to these contracts, payments made by
OPM may be retrospectively adjusted downward by OPM if an audit discloses that
a comparable product was offered by the Company to a similar size subscriber
group at a lower premium rate than that offered to OPM. Management believes
that any retrospective adjustments as a result of OPM audits will not have a
material impact on the Company's financial position, results of operations or

cash flows.

PPO

PPO products include many elements of managed health care. PPOs are also similar to traditional health insurance because they provide a member with the freedom to choose a physician or other health care provider. In a PPO, the member is encouraged, through financial incentives, to use participating health care providers which have contracted with the PPO to provide services at favorable rates. In the event a member chooses not to use a participating health care provider, the member may be required to pay a greater portion of the provider's fees.

At December 31, 1998, approximately 85,300 physicians and approximately 1,020 hospitals contracted directly with the Company to provide services to PPO members. The Company also had approximately 6,200 contracts (including certain contracts which also service the Company's HMOs) with other providers to provide services to PPO members. In addition, the Company had access to 28 leased provider networks throughout the country.

For the year ended December 31, 1998, Commercial PPO premium revenues totaled approximately $2.7 billion or 28 percent of the Company's total premium revenues.

The Company expects that 1999 Commercial HMO and PPO premium rates will increase approximately 5 to 7 percent from 1998 levels. Over the last four years, changes in the Company's Commercial HMO and PPO premium rates have ranged between an approximate 2 percent decrease for the year ended December 31, 1995, to an approximate 4 percent increase for the year ended December 31, 1998, with an average increase of approximately 1 percent.

3

Medicare Products

Medicare is a federal program that provides persons age 65 and over and some disabled persons certain hospital and medical insurance benefits, which include hospitalization benefits for up to 90 days per incident of illness plus a lifetime reserve aggregating 60 days. Each Medicare-eligible individual is entitled to receive inpatient hospital care ("Part A") without the payment of any premium, but is required to pay a premium to the federal government, which is adjusted annually, to be eligible for physician care and other services ("Part B").

Even though participating in both Part A and Part B of the traditional Medicare program, beneficiaries are still required to pay certain deductible and coinsurance amounts. They may, if they choose, supplement their Medicare coverage by purchasing Medicare supplement policies which pay these deductibles and coinsurance amounts. Many of these policies also cover other services (such as prescription drugs) which are not included in Medicare coverage.

Humana contracts with the federal government's Health Care Financing Administration ("HCFA") to facilitate the delivery of medical benefits in exchange for a fixed monthly payment per member to Medicare-eligible individuals residing in the geographic areas in which its HMOs operate. Individuals who elect to participate in these Medicare programs are relieved of the obligation to pay some or all of the deductible or coinsurance amounts but are generally required to use exclusively the services provided by the HMO and are required to pay a Part B premium to the Medicare program. In 1998, the enrollee paid the HMO a premium only in cases where the HMO facilitates the delivery of additional benefits and where competitive market conditions permit. At December 31, 1998, approximately 73,000 members in 16 markets were paying premiums which totaled approximately $22 million in 1998.

Medicare HMO

A Medicare HMO product involves a contract between an HMO and HCFA pursuant to which HCFA makes a fixed monthly payment to the HMO on behalf of each Medicare-eligible individual who chooses to enroll for coverage in the HMO. Membership may be terminated by the member at any time during the month. The

fixed monthly payment is determined by formula established by federal law.

As of January 1, 1999, the Company facilitates the delivery of Medicare HMO services under 10 contracts with HCFA in 11 states. Management believes that additional Medicare HMO growth opportunities exist because only approximately 15 percent of the country's Medicare-eligible beneficiaries are enrolled in managed care programs similar to those offered by the Company. The Company intends to pursue those opportunities in markets which meet the Company's long-term growth strategies.

At December 31, 1998, HCFA contracts covered approximately 502,000 Medicare HMO members for which the Company received premium revenues of approximately $2.9 billion or 30 percent of the Company's total premium revenues for 1998. At December 31, 1998, one such HCFA contract covered approximately 264,000 members in Florida and accounted for premium revenues of approximately $1.5 billion, which represented 52 percent of the Company's HCFA premium revenues or 16 percent of the Company's total premium revenues for 1998. HCFA contracts are renewed for a one-year term each December 31 unless terminated 90 days prior thereto. Management believes termination of the HCFA contract covering the members in Florida would have a material adverse effect on the revenues, profitability and business prospects of the Company.

As more fully discussed in the "Health Care Reform-National" section, the Balanced Budget Act of 1997 ("BBA") included provisions that altered the methodology for payment effective January 1, 1998 in the Medicare program. The Company's 1999 average rate of statutory increase under the HCFA contracts is approximately 2 percent. Over the last five years, annual increases have ranged from as low as the January 1998 and 1999 increases of 2 percent to as high as 10 percent in January 1996, with an average of approximately 5 percent, including the January 1999 increase. Cost saving initiatives and continuation of risk-sharing strategies are necessary to mitigate the effect of lower Medicare reimbursement rates.

4

The loss of the Company's HCFA contracts or significant changes in the Medicare HMO program as a result of legislative action, including reductions in payments or increases in benefits without corresponding increases in payments, would have a material adverse effect on the revenues, profitability and business prospects of the Company.

Medicare Supplement

The Company's Medicare supplement product is an insurance policy which pays for hospital deductibles, co-payments and coinsurance for which an individual enrolled in the traditional Medicare program is responsible.

Under the terms of existing Medicare supplement policies, the Company may not reduce or cancel the benefits contracted for by policyholders. These policies are renewable annually by the insured at the Company's prevailing rates, which may increase subject to approval by appropriate state insurance regulators.

At December 31, 1998, the Company facilitated the delivery of Medicare supplement benefits for approximately 56,600 members. For the year ended December 31, 1998, Medicare supplement premium revenues totaled approximately $68 million or 1 percent of the Company's total premium revenues.

Medicaid Products

Medicaid is a federal program that is state-operated to facilitate the delivery of health care services to low-income residents. Each state which chooses to do so develops, through a state specific regulatory agency, a Medicaid managed care initiative which must be approved by HCFA. HCFA requires that Medicaid managed care plans meet federal standards and cost no more than the amount that would have been spent on a comparable fee-for-service basis. States currently use either a formal proposal process reviewing many bidders or award individual contracts to qualified bidders which apply for entry to the program. In either case, the contractual relationship with the state is generally for a one-year period. Management believes that the risks associated

with participation in a state Medicaid managed care program are similar to the risks associated with the Medicare HMO product discussed previously. In both instances, the Company receives a fixed monthly payment from a government agency for which it is required to facilitate the delivery of managed health care services to enrolled members. Due to the increased emphasis on state health care reform and budgetary constraints, more states are utilizing a managed care product in their Medicaid programs.

The Company also maintains a two-year contract with the Commonwealth of Puerto Rico to facilitate the delivery of health care services to Medicaid-eligible individuals. The Puerto Rico contract, previously scheduled to expire March 31, 1999, has been extended one month to April 30, 1999. The Company does not expect to be able to renew the contract with the Commonwealth of Puerto Rico under favorable terms and, therefore, has announced its intention to close this market when the contract expires. For the year ended December 31, 1998, premium revenues from the Company's Medicaid products totaled approximately $554 million or 6 percent of the Company's total premium revenues. It is anticipated that Medicaid premium revenues will approximate 3 percent of the Company's total 1999 premium revenues. At December 31, 1998, the Company had approximately 201,800 and 442,000 Medicaid members in four states and the Commonwealth of Puerto Rico, respectively.

TRICARE

In 1993, the Company established Humana Military Healthcare Services, Inc. (a wholly-owned subsidiary of the Company), to enter into contracts to facilitate the delivery of managed care services to the dependents of active military personnel and retired military personnel and their dependents. In November 1995, the United States Department of Defense awarded the Company its first TRICARE contract covering approximately 1.1 million eligible beneficiaries in Florida, Georgia, South Carolina, Mississippi, Alabama, Tennessee and Eastern Louisiana.

5

On July 1, 1996, the Company began facilitating the delivery of managed health care services to these approximate 1.1 million eligible beneficiaries under a potential five-year contract (a one-year contract renewable annually for up to two additional years). The government exercised its option to extend the contract for one additional year effective July 1, 1998. The Company has subcontracted with third parties to provide certain administration and specialty services under the contract. Three health benefit options are available to TRICARE beneficiaries. In addition to a traditional indemnity option, participants may enroll in an HMO-like plan with a point-of-service option or take advantage of reduced co-payments by using a network of preferred providers. TRICARE premium revenues were approximately $800 million or 8 percent of the Company's total premium revenues for the year ended December 31, 1998.

The Company will actively seek opportunities to facilitate the delivery of managed care services to beneficiaries of federal and state programs, including other TRICARE contracts.

Other Related Products

The Company offers various specialty products to employers, including dental, group life and workers' compensation, and administrative services ("ASO") to those who self-insure their employee health plans. Specialty and administrative services membership at December 31, 1998 totaled approximately 2.6 million members and 646,200 members, respectively. Specialty product premium revenues were approximately $239 million or 3 percent of the Company's total premiums for the year ended December 31, 1998.

The following table lists the Company's premium revenue for the year ended December 31, 1998, by product and segment:

PREMIUM REVENUE
(In millions)

*HUMANA INC – 10-K405 – Annual Report*                    *Date Filed: 3/31/1999*

| | Commercial | Public Sector | TRICARE | Total | Percent of Total |
|---|---|---|---|---|---|
| HMO.............................. | $2,330 | -- | -- | $2,330 | 24.3% |
| PPO.............................. | 2,688 | -- | -- | 2,688 | 28.0 |
| Medicare HMO..................... | -- | $2,918 | -- | 2,918 | 30.4 |
| Medicare supplement.............. | -- | 68 | -- | 68 | 0.7 |
| Medicaid......................... | -- | 554 | -- | 554 | 5.8 |
| TRICARE.......................... | -- | -- | $800 | 800 | 8.3 |
| Specialty........................ | 239 | -- | -- | 239 | 2.5 |
| | ------ | ------ | ------ | ------ | ------ |
| Total......................... | $5,257 | $3,540 | $800 | $9,597 | 100.0% |
| | ====== | ====== | ====== | ====== | ===== |
| Percent of total............... | 54.8% | 36.9% | 8.3% | 100.0% | |
| | ====== | ====== | ==== | ====== | |

Provider Arrangements

    In certain situations the Company's HMOs contract with individual or groups
of primary care physicians, generally for an actuarially determined, fixed,
per-member-per-month fee called a "capitation" payment. Under these
arrangements, physicians are paid a fixed amount to provide services to their
members. These contracts typically obligate primary care physicians to provide
or make referrals to specialty physicians and other providers for the provision
of all covered managed health care services to HMO members. The capitation
payment does not vary with the nature or extent of services to the member and
is generally designed to shift a portion of the HMOs' financial risk to the
primary care physician. The degree to which the Company uses capitation
arrangements varies by provider.

    The Company also contracts with medical specialists and other providers to
which a primary care physician may refer a member. The contracts with
specialists may be capitation arrangements or may provide for payment on a fee-
for-service basis based on negotiated fees. Typically, payments by the Company
to these

                                      6

specialists and other providers reduce the ultimate payment that otherwise
would be made to primary care physicians. The Company's HMOs also have
arrangements under which physicians can earn bonuses when certain target goals
relating to quality and cost effectiveness in the provision of patient care are
met. The Company's contracts with capitated physicians generally provide for
stop-loss coverage so that a physician's financial risk for any single member
is limited to a certain amount on an annual basis.

    The focal point for cost control in the Company's HMOs is the primary care
physician who, under contract, provides services and controls utilization of
appropriate services by directing or approving hospitalization and referrals to
specialists and other providers. Cost control is further achieved by directly
negotiating provider discounts. Cost control in the Company's PPOs is achieved
primarily by establishing a cost-effective network of participating health care
providers and providing incentives for members to use such providers. These
providers are generally paid on a negotiated fee-for-service basis. With
respect to both HMO and PPO products, cost control is further achieved through
the use of a utilization review system designed to allow only necessary
hospital admissions, lengths of stay and necessary or appropriate medical
procedures. The Company's HMOs and PPOs generally contract for hospital
services under per-diem arrangements for inpatient hospital services and
discounted fee-for-service arrangements for outpatient services. During the
year ended December 31, 1998, approximately 35 percent of the Company's total
medical costs were for services provided to its members in hospitals or related
facilities.

    The Company has certain other risk-sharing contracts whereby providers also

assume a specified level of risk for covered managed care services to its members. Under these risk-sharing arrangements called global capitation contracts, providers are paid a monthly capitation payment per covered member to assume risk for all managed care services including professional and institutional (i.e. hospital) costs. The capitation payments are based on a specified percentage of premiums (typically 78 to 88 percent).

During 1998, the Company began an initiative to increase the amount of HMO product medical cost risk assumed by certain of its provider partners. As a result, at December 31, 1998, approximately 50 percent and 70 percent of its Commercial and Medicare HMO membership, respectively, were under some form of risk sharing arrangements. Under all of its risk-sharing arrangements, the Company remains financially responsible for the provision of covered medical services if its contractors fail to perform their obligations under the contract.

Prior to 1998, the Company employed physicians providing services to members in markets where it operated health centers or staff model HMOs. As part of its ongoing strategy of identifying and assessing non-strategic assets, the Company reached separate agreements during 1998 whereby certain provider groups or systems assumed the operations of most of Humana's health centers. The agreements relate to approximately 440 physicians formerly employed by Humana and approximately 361,000 members of the Company's health centers.

The Company continually contracts and seeks to renew contracts with providers at rates designed to ensure adequate profitability. To the extent the Company is unable to obtain such rates, its financial position, results of operations and cash flows could be adversely impacted. Currently, the Company is in negotiations with a major provider and is unable to predict the impact of these negotiations on future contract rates.

During 1998, the Company continued its Hospital Inpatient Management System ("HIMS") which allows specially trained physicians to manage the entire range of medical care while an HMO member is in the hospital, and coordinate the member's discharge and care after discharge. The Company also continues to implement several disease management programs in various markets. Under these arrangements, the Company provides financial incentives for contractors to provide the full range of care to members with respect to a particular high risk or chronic disease in a quality, cost-effective manner. These programs include congestive heart failure, prenatal and premature infant care, asthma related illness, end stage renal disease, diabetes and breast cancer screening.

7

Quality Assessment and Customer Service

Access to high quality health care services is an important element of the Company's business. All of the Company's contracts require that the provider participate in the Company's quality assurance program. Physician participation in the Company's HMOs and PPOs is conditioned upon the physician meeting the Company's requirements concerning the physician's professional qualifications. When considering whether to contract with a physician for HMO participation, the Company performs or contracts for on-going credentialing verifications and peer review that meet both regulatory and accrediting agency standards.

The Company has a program in place to monitor important aspects of HMO plan-wide service and quality indicators with oversight by a board and senior management committee. Such indicators as credentialing, quality concerns, customer service, disenrollment and satisfaction are measured against standards. Another measure of quality is the reporting of Health Plan Employer Data Information Sets ("HEDIS"), which the Company has been reporting since June 1994. HEDIS is useful to purchasers of managed health care services to measure individual health plan quality and service. Each HMO has in place a peer review procedure which is implemented by a quality management committee ("QMC"). This committee is headed by the HMO's medical director and is composed of physicians and physician group representatives. The QMC performs an initial evaluation of applicants for credentialing and reviews all providers on a periodic basis to monitor the appropriateness of members' care.

Health Maintenance Organization Accreditation

    With the increasing significance of managed care in the health care
industry, several independent organizations have been formed for the purpose of
responding to external demands for accountability over the managed care
industry. The organizations utilized by the Company are the National Committee
for Quality Assurance ("NCQA") and the Joint Commission on Accreditation of
Healthcare Organizations ("JCAHO"). In the states of Kansas and Florida,
accreditation or external review by an accrediting organization is mandatory
and generally required for licensure.

    NCQA performs site reviews of standards for quality improvement,
credentialing, utilization management, medical records, preventive health
services and member rights and responsibilities. As of January 31, 1999, eight
of Humana's HMOs have achieved full accreditation from NCQA. Humana Medical
Plan, Inc., in its South Florida and Tampa Bay markets, Humana Health Plan,
Inc., in its Chicago market, Humana Health Plan, Inc. and Humana Kansas City,
Inc., in the Kansas City market, Humana Health Plan of Ohio, Inc. dba
ChoiceCare in the Cincinnati market and Humana Health Plan, Inc., HMPK, Inc.
and HPlan, Inc. in the Louisville market. In addition, Humana Medical Plan,
Inc. in its North Florida (Jacksonville) and Central Florida (includes Daytona
and Orlando areas) are fully accredited by NCQA pending limited merger reviews.
The limited merger reviews will assess the integration of the fully accredited
PCA Health Plans that Humana acquired during 1997. Humana also has an NCQA
accreditation survey scheduled for the Texas market in July 1999. This survey
will include Humana Health Plan of Texas, Inc., Humana HMO Texas, Inc. and PCA
Health Plans of Texas, Inc., located in the San Antonio, Austin, Corpus
Christi, Dallas and Houston markets.

    JCAHO reviews rights, responsibilities and ethics, continuum of care,
education and communication, leadership, management of information and human
resources, and network performance. JCAHO also evaluates the mechanisms the
organization has established to ensure continuous quality improvement. Humana
Medical Plan, Inc., in Humana's Ft. Walton market received a three-year
accreditation from JCAHO during 1998.

The Company's Y2K Readiness Disclosure Statement

    The Company operates one of the largest managed care data centers in the
nation. The primary computing facility is located in Louisville, Kentucky with
a satellite operation in Green Bay, Wisconsin. In 1998, Humana's Information
Systems organization included 950 associates with an annual operating budget of
$135 million. The Company's application systems are largely developed and
maintained in-house by a staff of 400

                                        8

application programmers who are versed in the use of state-of-the-art
technology. All application systems are fully integrated and automatically pass
data through various system processes. The information systems support
marketing, sales, underwriting, contract administration, billing, financial,
and other administrative functions as well as customer service, authorization
and referral management, concurrent review, physician capitation and claims
administration, provider management, quality management and utilization review.

    The Company internally develops most of its own application systems
software. All application systems must comply with strict standards for data
integrity, file compatibility and architectural requirements. The Company
maintains a central project coordination function and an architectural review
function that ensure consistency across the application portfolio. The Company
has subscribed to automated file processes and integrated data architectures
for over twenty-five years.

    The Year 2000 issue is the result of two potential malfunctions that may
have an impact on the Company's systems and equipment. The first potential
malfunction is the result of computers being programmed to use two rather than
four digits to define the applicable year. The second potential malfunction
arises where embedded microchips and micro-controllers have been designed using
two rather than four digits to define the applicable year. As a result, certain
of the Company's date-sensitive computer programs, building infrastructure

components and medical devices, may recognize a date using "00" as the year
1900 rather than the year 2000. If uncorrected, the problem may result in
computer system and program failures or equipment malfunctions that could
result in a disruption of business operations (such as the payment of medical
claims, premium billing and collection, and membership enrollment verification
as well as the use of medical equipment such as heart defibrillators).

Humana's Information Systems organization operates in a centralized manner.
The Company's data center and the majority of its programming and support staff
are located at its corporate offices in Louisville, Kentucky. A Year 2000
project management office is in place to oversee the progress made in the
assessment and correction of the Company's Year 2000 exposures.

In general, the Company's Year 2000 project consists of four phases--
assessment, remediation, validation, and implementation--and is categorized
into the following four components:

Information Technology (IT)--software essential for day-to-day
operations including both internally developed software and third party
software which interfaces therewith.

IT Infrastructure--mainframe, network, telecommunications interfaces and
self-contained operating systems.

Third party business partners and intermediaries--entities on which the
Company relies for transmission and receipt of claims, and encounter,
membership and payment information, including federal and state
governmental agencies such as the Health Care Financing Administration.

Non-IT Infrastructure--telecommunications equipment, elevators, public
safety equipment (i.e., security and fire), medical equipment and HVAC
systems.

The Company commenced the assessment of its Year 2000 exposures in 1996.
Remediation efforts of internally developed software and third party software
applications have also begun. The Company's plan is to have modified all
critical mainframe systems and components in time for such systems and
components to utilize the updated Year 2000 logic during the second quarter of
1999. Modifying all critical systems and components by the second quarter of
1999 will enable the majority of the modified programs to run in a production
environment for a considerable period of time before encountering Year 2000
data. Of the Company's 98 mainframe systems identified in the assessment, 92
have been renovated, validated and are currently operating using the updated
Year 2000 logic. During 1999, the remaining 6 systems will be modified,
upgraded, or replaced and all systems will continue to be monitored and tested
to ensure that they will function properly after December 31, 1999. In
addition, the Company is in the process of contacting vendors, third party

<div align="center">9</div>

business partners and intermediaries in an effort to obtain the information
necessary to address Year 2000 issues. The Company anticipates completing, in
all material respects, its Year 2000 project by the end of the third quarter
1999. The Company's efforts are currently progressing on plan.

The Year 2000 project is currently estimated to have a minimum total cost of
approximately $25 million. Project to date costs total $19.5 million, including
$18.5 million during the year ended December 31, 1998. Year 2000 expenses
represented less than 15 percent of the Information Systems budget during 1998.
Year 2000 costs are expensed as incurred and funded through operating cash
flow.

The extent and magnitude of the Year 2000 project, as it will affect the
Company both before and for some period after January 1, 2000, are difficult to
predict or quantify. As a result, the Company has recently undertaken the
development of contingency plans in the event that its Year 2000 project is not
completed in an accurate or timely manner. The Company has identified five
major functional areas, covering 20 operational subdivisions, that will require
contingency plans. The five major functional areas are: providers, service
centers, suppliers and vendors, customers and brokers, and banking and finance.

The Company is in the process of developing and refining alternative operating procedures for each functional area. Additionally, a tracking system is being developed to monitor the implementation of these procedures.

While the Company presently believes that the timely completion of its Year 2000 project will limit exposure so that the Year 2000 will not pose material operational problems, the Company does not control third party systems. Although the Company is contacting third parties, the Company has not received assurances that all third party interfaces will be converted in a timely manner. Additionally, if Year 2000 modifications or upgrades are not accomplished in a timely manner or proper contingency plans are not implemented, Year 2000 failures which may result could have a material adverse impact on the Company's results of operations or its financial position.

The costs of the Year 2000 project and the date on which the Company plans to complete Year 2000 modifications are based on management's best estimates, considering assumptions of future events including the continued availability of certain resources and other factors. There can be no guarantee that these estimates will be achieved and actual results could differ materially from plan. Specific factors that might cause such material differences include, but are not limited to, the availability and cost of personnel trained in this area, the ability to locate and correct all relevant computer codes, and the ability of the Company's significant suppliers, customers and others with which it conducts business, including federal and state governmental agencies, to identify and resolve their own Year 2000 issues.

Sales and Marketing

Individuals become members of the Company's Commercial HMOs and PPOs through their employer or other groups which typically offer employees or members a selection of managed health care products, pay for all or part of the premiums and make payroll deductions for any premiums payable by the employees. The Company attempts to become an employer's or group's exclusive source of managed health care benefits by offering HMO and PPO products that facilitate the delivery of cost-effective quality care consistent with the needs and expectations of the employees or members.

The Company uses various methods to market its Commercial and Public Sector products, including television, radio, telemarketing and mailings. At December 31, 1998, the Company used approximately 47,800 licensed independent brokers and agents and approximately 500 licensed employees to sell the Company's Commercial products. Many of the Company's employer group customers are represented by insurance brokers and consultants who assist these groups in the design and purchase of health care products. The Company generally pays brokers a commission based on premiums, with commissions varying by market and premium volume.

At December 31, 1998, the Company used approximately 6,200 licensed independent brokers for referrals and approximately 1,100 employed sales representatives, who are each paid a salary and/or per member

10

commission, to market the Company's Medicaid and Medicare products. The Company also used approximately 500 telemarketing representatives who assisted in the marketing of Medicaid and Medicare products by making appointments for broker/sales representatives with prospective members.

The following table lists the Company's medical membership at December 31, 1998, by state and product:

MEDICAL MEMBERSHIP
(In thousands)

| Commercial | | | | Public Sector | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| PPO | HMO | ASO | Total Commercial | Medicare HMO | Medicaid | Medicare Supplement | Total Public Sector | TRICARE | Total | Percent of Total |
|  |  |  |  |  |  |  |  |  |  |  |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Florida | 203.7 | 307.3 | 5.9 | 516.9 | 264.1 | 129.3 | 5.0 | 398.4 | 414.6 1,329.9 | 21.4% |
| Texas | 314.1 | 318.0 | 18.4 | 651.3 | 79.2 | 38.4 | 5.7 | 123.3 | 0.0 774.6 | 12.5% |
| Illinois | 255.5 | 292.2 | 75.8 | 623.5 | 70.4 | 13.7 | 0.1 | 84.2 | 0.0 707.7 | 11.4% |
| Puerto Rico | 28.8 | 25.2 | 0.0 | 54.0 | 0.0 | 441.9 | 0.0 | 441.9 | 0.0 495.9 | 8.0% |
| Wisconsin | 82.0 | 39.4 274.0 | | 475.2 | 2.3 | 20.5 | 0.0 | 22.8 | 0.0 493.0 | 8.0% |
| Kentucky | 257.4 | 131.3 18.3 | | 127.0 | 0.1 | 0.0 | 30.1 | 43.2 | 0.0 370.2 | 6.0% |
| Georgia | 58.1 | 0.0 13.4 | | 58.9 | 0.0 | 0.0 | 3.2 | 3.2 258.8 | 370.0 | 6.0% |
| Ohio | 150.0 | 219.0 49.2 | | 340.0 | 15.2 | 0.0 | 0.0 | 15.2 | 0.0 383.3 | 6.2% |
| Missouri/Kansas | 41.1 | 131.3 14.5 | | 156.9 | 24.6 | 0.0 | 5.7 | 30.3 | 0.0 187.2 | 3.5% |
| Indiana | 91.0 | 0.0 27.5 | | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 124.5 | 3.0% |
| South Carolina | 0.0 | 0.0 0.0 | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 135.5 | 135.5 | 2.2% |
| Tennessee | 58.4 | 0.0 16.2 | | 34.6 | 33.1 | 0.0 | 0.0 | 33.1 | 0.0 197.9 | 3.3% |
| Other | 254.5 | 4.0 120.5 | | 427.9 | 0.0 | 0.0 | 6.8 | 6.8 | 226.0 941.4 | 13.4% |
| Total | 1,774.8 1,486.7 646.2 | | | 3,937.7 | 532.3 | 643.8 | 56.6 | 1,232.6 1,285.7 6,195.9 | | 100.0% |

### Risk Management

Through the use of internally developed underwriting criteria, the Company determines the risk it is willing to assume and the amount of premium to charge for its Commercial products. In most instances, employers and other groups must meet the Company's underwriting standards in order to qualify to contract with the Company for coverage. Small group reform laws in some states have imposed regulations which provide for guaranteed issue of certain health insurance products and prescribe certain limitations on the variation in rates charged based upon assessment of health conditions.

Underwriting techniques are not employed in connection with Medicare HMO products because HCFA regulations require the Company to accept all eligible Medicare applicants regardless of their health or prior medical history. The Company also is not permitted to employ underwriting criteria for the Medicaid product but rather follows HCFA and state requirements. In addition, with respect to the TRICARE contract, no underwriting techniques are employed because the Company must accept all eligible beneficiaries who choose to participate.

### Competition

The managed health care industry is highly competitive and contracts for the sale of Commercial products are generally bid or renewed annually. The Company's competitors vary by local market and include Blue Cross/Blue Shield (including HMOs and PPOs owned by Blue Cross/Blue Shield plans), national insurance companies and other HMOs and PPOs. Many of the Company's competitors have more membership in local markets or greater financial resources. The Company's ability to sell its products and to retain customers is or may be influenced by such factors as benefits, pricing, contract terms, number and quality of participating physicians and other managed health care providers, utilization review, claims processing, administrative efficiency, relationships with agents, quality of customer service and accreditation results.

11

### Government Regulation

Of the Company's 14 actively licensed HMO subsidiaries, nine are qualified under the Federal Health Maintenance Organization Act of 1973, as amended. To obtain federal qualification, an HMO must meet certain requirements, including conformance with benefit, rating and financial reporting standards. In certain markets, and for certain products, the Company operates HMOs that are not federally qualified because this provides greater flexibility with respect to product design and pricing than is possible for federally qualified HMOs.

Six subsidiaries (Humana Medical Plan, Inc., Humana Health Plan of Texas, Inc., Humana Health Plan, Inc., Humana Kansas City, Inc., Humana Health Plan of Ohio, Inc. and Humana Wisconsin Health Organization Insurance Corporation) are qualified under HCFA's Medicare+Choice program to sell Medicare HMO products in 11 states.

HCFA conducts audits of HMOs qualified under its Medicare+Choice program at least biannually and may perform other reviews more frequently to determine

compliance with federal regulations and contractual obligations. These audits include review of the HMO's administration and management (including management information and data collection systems), fiscal stability, utilization management and physician incentive arrangements, health services delivery, quality assurance, marketing, enrollment and disenrollment activity, claims processing and complaint systems.

HCFA requires an independent review of medical records and quality of care and all denied claims and service complaints which are not resolved in favor of a member. All advertising and member communication materials require review and approval by HCFA.

HCFA regulations require quarterly and annual submission of financial statements. In addition, HCFA requires certain disclosures to HCFA and to Medicare beneficiaries concerning operations of a health plan qualified under the Medicare+Choice program. Financial arrangements and incentive plans between an HMO and physicians in the HMO's networks are an important area within the HCFA regulations for qualified HMOs. These rules also require certain levels of stop-loss coverage to protect contracted physicians against major losses relating to patient care, depending on the amount of financial risk they assume. The reporting of certain health care data contained in HEDIS is another important HCFA disclosure requirement.

The Company's Medicaid products are regulated by the applicable state agency in the state in which the Company sells a Medicaid product and the Commonwealth of Puerto Rico, in conformance with federal approval of the applicable state plan, and are subject to periodic reviews by these agencies. The reviews are similar in nature to those performed by HCFA.

Laws in each of the states and the Commonwealth of Puerto Rico in which the Company operates its HMOs, PPOs and other health insurance-related services regulate the Company's operations, including the scope of benefits, rate formulas, delivery systems, utilization review procedures, quality assurance, complaint systems, enrollment requirements, claim payments, marketing and advertising. The HMO, PPO and other health insurance-related products offered by the Company are sold under licenses issued by the applicable insurance regulators and are required to be in compliance with certain minimum capital requirements. These requirements must be satisfied by investing in approved investments that generally cannot be used for other purposes. Under state laws, the Company's HMOs and health insurance companies are audited by state departments of insurance for financial and contractual compliance, and its HMOs are audited for compliance with health services standards by respective state departments of health. Most states' laws require such audits to be performed at least triennially.

The Company and its licensed subsidiaries are subject to regulation under state insurance holding company and Commonwealth of Puerto Rico regulations. These regulations require, among other things, prior approval and/or notice of certain material transactions, including dividend payments, intercompany agreements and the filing of various financial and operational reports.

12

The National Association of Insurance Commissioners has recommended that states adopt a risk-based capital ("RBC") formula for companies established as HMO entities. The RBC provisions may require new minimum capital and surplus levels for some of the Company's HMO subsidiaries. The Company does not expect that the RBC provisions will have a material impact on its financial position, results of operations or cash flows.

Management works proactively to ensure compliance with all governmental laws and regulations affecting the Company's business.

Health Care Reform

There continue to be diverse legislative and regulatory initiatives at both the federal and state levels to address aspects of the nation's health care system.

National

In 1997, Congress passed the Balanced Budget Act, including the establishment of the Medicare+Choice program, which revised the structure of and reimbursement for private health plan options for Medicare enrollees. The BBA sought to expand the options available to Medicare enrollees by permitting HCFA to contract with many types of managed care plans, including provider sponsored organizations ("PSO"), and creating a new private fee-for-service option. Few PSOs have applied for participation in the Medicare+Choice programs. Federal reimbursement was also modified so that the premiums paid by HCFA will be adjusted to take into account, on an increasing basis, a blend of national and local health care cost factors, rather than only local costs-- starting with a 10% national factor in 1998 and moving to a 50% national factor by 2003. In addition, starting in January 1999, the Company's Medicare reimbursement will be reduced through the assessment of .355 percent of premium (approximately $11 million), designed to fund a national senior education program. The 1998 assessment was .428 percent.

In addition, the BBA also required that HCFA modify Medicare reimbursement by developing health-risk premium adjustments to better estimate the actual cost for individual beneficiaries. In January 1999, HCFA released the preliminary Year 2000 premium rates and the risk adjusted payment amounts with a phased-in approach, moving to a 100% health-risk adjusted premium by the year 2004. Congress is evaluating the impact the methodology will have on Medicare+Choice plans relative to current and future enrollment. Congress also is evaluating the impact of other BBA provisions in light of the withdrawals of several health plans, including those operated by Humana, from certain Medicare markets characterized by high medical costs, inadequate reimbursement rates and/or unsatisfactory provider contract arrangements. The Company is in the process of preparing Medicare rate and benefit filings for Year 2000 and is considering benefit reductions, increased member premiums and out-of-pocket expenses to mitigate the effect of the lower Medicare reimbursement established by the BBA.

Other proposals under consideration by Congress include greater government oversight over private health insurance. In addition, the President and the President's Advisory Commission on Consumer Protection and Quality in the Health Care Industry have made recommendations for enhancing certain consumer health insurance rights. It is expected that both the House and the Senate will consider specific legislation authorizing certain patient protections in private health insurance during 1999.

State

A number of states have enacted some form of managed care reform. Issues relating to managed care consumer protection standards, including increased plan information disclosure, expedited grievance and

13

appeals procedures, third party review of certain medical decisions, health plan liability, access to specialists and confidentiality of medical records continue to be under discussion. Further, proposals that place restrictions on the selection and termination of participating health care providers also are receiving review. A few states are also expected to consider small group purchasing alliance legislation.

Management believes that managed care and health care in general will continue to be scrutinized and may lead to additional legislative health care reform initiatives. Management is unable to predict how existing federal or state laws and regulations may be changed or interpreted, what additional laws or regulations affecting the Company's businesses may be enacted or proposed, when and which of the proposed laws will be adopted or what effect any such new laws and regulations will have on the revenues, profitability and business prospects of the Company.

Other

Captive Insurance Company

The Company insures substantially all professional liability risks through a

wholly-owned subsidiary (the"Subsidiary"). The annual premiums paid to the
Subsidiary are determined by independent actuaries. The Subsidiary reinsures
levels of coverage for losses in excess of its retained limits with unrelated
insurance carriers.

Centralized Management Services

   Centralized management services are provided to each health plan from the
Company's headquarters and service centers. These services include management
information systems, product administration, financing, personnel, development,
accounting, legal advice, public relations, marketing, insurance, purchasing,
risk management, actuarial, underwriting and claims processing.

Employees

   As of December 31, 1998, the Company had approximately 16,300 employees,
including approximately 300 employees covered by collective bargaining
agreements. The Company has not experienced any work stoppages and believes it
has good relations with its employees.

                                    14


ITEM 2. PROPERTIES

   The Company owns its principal executive office, which is the Humana
Building, located at 500 West Main Street, Louisville, Kentucky 40202.

   The Company owns or leases medical centers ranging in size from
approximately 1,500 to 80,000 square feet. Most of the medical centers are
leased or subleased to providers within Humana's network. The Company's
administrative market offices are generally leased, with square footage ranging
from approximately 700 to 89,000. The following chart lists the location of
properties used in the operation of the Company at December 31, 1998:

|  | Medical Centers | | Administrative Offices | | |
|---|---|---|---|---|---|
|  | Owned | Leased | Owned | Leased | Total |
| Florida..................................... | 6 | 82 | 3 | 22 | 113 |
| Illinois.................................... | 8 | 18 | -- | 10 | 36 |
| Puerto Rico................................. | -- | -- | -- | 21 | 21 |
| Texas....................................... | 5 | 4 | 8 | 2 | 19 |
| Kentucky.................................... | 8 | 5 | 3 | 2 | 18 |
| Missouri/Kansas............................. | 3 | 5 | 2 | 0 | 10 |
| Wisconsin................................... | -- | -- | 1 | 8 | 9 |
| California.................................. | -- | -- | -- | 7 | 7 |
| Ohio........................................ | -- | -- | -- | 6 | 6 |
| Other....................................... | 1 | 3 | 1 | 46 | 51 |
| Total....................................... | 31 | 117 | 18 | 124 | 290 |

   In addition, the Company owns buildings in Louisville, Kentucky, San
Antonio, Texas, Green Bay, Wisconsin and Jacksonville, Florida, and leases
facilities in Madison, Wisconsin, all of which are used for customer service
and claims processing. The Louisville and Green Bay facilities also perform
enrollment processing and other corporate functions.

ITEM 3. LEGAL PROCEEDINGS

   A class action lawsuit styled Mary Forsyth, et al v. Humana Inc., et al,
Case #CV-5-89-249-PMP (L.R.L.), was filed on March 29, 1989, in the United
States District Court for the District of Nevada. On August 18, 1997, the
Company filed a Petition for Writ of Certiorari in the United States Supreme

Court ("Petition") requesting the Supreme Court to reverse the Ninth Circuit's decision to reinstate the claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO") on behalf of a class of insureds who paid coinsurance at Humana hospitals (the "Co-Payer Class"). The petition was granted by the Supreme Court on June 22, 1998. Oral arguments on the Company's Petition were heard on November 30, 1998. In a decision issued on January 20, 1999, the Supreme Court upheld the decision of the Ninth Circuit and reinstated the RICO claim of the Co-Payer Class. The Ninth Circuit also reinstated an antitrust claim that had been dismissed by the District Court. The Company requested summary judgment in the District Court on that Claim on October 6, 1997. That request was denied on September 21, 1998. The Company has requested the District Court to reconsider its decision. The plaintiffs have filed their Fourth Amended Complaint and a motion for leave to file a Fifth Amended Complaint reasserting an ERISA claim and adding new RICO and antitrust claims. The company filed a motion to dismiss the Fourth Amended Complaint and a motion opposing the plaintiffs' request to file the Fifth Amended Complaint. The motions are pending before the District Court. The trial on the claims, which was scheduled to begin on February 23, 1998, has been postponed.

On April 22, 1993, an alleged stockholder of the Company filed a purported shareholder derivative action in the Court of Chancery of the State of Delaware, County of New Castle, styled Lewis v. Austen, et al, Civil Action No. 12937. The action was purportedly brought on behalf of the Company and Galen Health Care, Inc.

15

("Galen") against all of the directors of both companies at the time Galen was spun off from the Company alleging, among other things, that the defendants had improperly amended the Company's existing stock option plans to bifurcate their existing options to allow employees of each company to receive options in the stock of the other company. The challenged amendment to the plan was approved by the Company's stockholders at the 1993 Annual Meeting of Stockholders. The defendants filed a motion to dismiss the case in October 1995. A hearing on this motion was held on January 26, 1999. The decision is still pending. The Company believes that the complaint is without merit.

Between November 19, 1997 and December 11, 1997, three related, purported class action complaints entitled (i) Medhat Reiser v. PCA, et al, Civil Action No. 97-3678 (S.D. Fla.) (Middlebrooks, J.), (ii) Janice Wells and Stewart Colton v. PCA, et al, Civil Action No. 97-3832 (King, J.), and (iii) David Applestein v. PCA, et al, Civil Action No. 97-4030 (Nesbitt, J.), were filed in the United States District Court for the Southern District of Florida by purported former stockholders of Physician Corporation of America ("PCA") against PCA and certain of its former directors and officers. By order entered February 13, 1998, the three actions were consolidated into a single action entitled In re Physician Corporation of America Securities Litigation, Civil Action No. 97-3678 (S.D. Fla.) (Middlebrooks, J.). The Reiser, Wells and Applestein complaints contain the same or substantially similar allegations; namely, that PCA and the individual defendants knowingly or recklessly made false and misleading statements in press releases and public filings with respect to the financial and regulatory difficulties of PCA's workers' compensation business. Count I of all three complaints is premised on alleged violations of Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and SEC Rule 10b-5, and Count II on alleged violations of Section 20(a) of the 1934 Act. All three complaints seek certification of a class of stockholders who purchased shares of PCA common stock from May 1996 through March 1997, as well as money damages plus prejudgment interest in an unspecified amount, and costs and expenses including attorneys fees. On February 19, 1999, the U.S. District Court denied PCA's motion to dismiss. The Company believes that the allegations in the above complaints are without merit and intends to pursue the defense of the consolidated action vigorously.

Damages for claims for personal injuries and medical benefit denials are usual in the Company's business. Personal injury claims are covered by insurance from the Subsidiary and excess carriers, except punitive damages generally are not paid where claims are settled and generally are awarded only where a court determines there has been a willful act or omission to act.

Government regulators conduct reviews from time to time to audit compliance

with government regulations and statutes, and those reviews may result in fines
or other payments. Management does not believe that any pending and threatened
legal actions and audits by agencies that regulate the Company will have a
material adverse effect on the Company's financial position, results of
operations or cash flows.

ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

   Not applicable.

16

EXECUTIVE OFFICERS OF THE COMPANY

   Set forth below are names and ages of all of the current executive officers
of the Company as of March 1, 1999, their positions, date of election to such
position and the date first elected an officer of the Company:

| Name | Age | Position | First Elected Officer |
| ---- | --- | -------- | ------------- |
| Gregory H. Wolf......... | 42 | President and Chief Executive Officer and Director | 10/95(1) |
| Kenneth J. Fasola....... | 39 | Senior Vice President--Sales, Marketing and Business Development | 05/96(2) |
| Michael B. McCallister.. | 46 | Senior Vice President--Health System Management | 09/89(3) |
| James E. Murray......... | 45 | Senior Vice President and Chief Financial Officer | 08/90(4) |
| David R. Nelson......... | 44 | Vice President and Chief Actuary | 09/96(5) |
| Bruce D. Perkins........ | 44 | Senior Vice President--National Contracting | 09/94(6) |
| Jerry D. Reeves, M.D.... | 54 | Senior Vice President and Chief Medical Officer | 01/97(7) |
| Gregory K. Rotherham.... | 42 | Vice President--Customer Service and Operations | 09/96(8) |
| Kirk E. Rothrock........ | 40 | Senior Vice President--Specialty Products and Services and International Businesses | 05/96(9) |
| George W. Vieth, Jr..... | 43 | Senior Vice President--Market Segment Management | 12/95(10) |

--------
(1) Mr. Wolf currently serves as President, Chief Executive Officer and
    Director of the Company having been elected to this position December 1997.
    Mr. Wolf previously served as President and Chief Operating Officer from
    September 1996 until December 1997 and served as Chief Operating Officer of
    the Company since July 1996. Mr. Wolf was initially elected an officer of
    the Company at the time of the acquisition of EMPHESYS in 1995. Mr. Wolf
    had been President and Chief Operating Officer of EMPHESYS (now a wholly-
    owned subsidiary of the Company) since November 1994. Mr. Wolf was named
    Executive Vice President for Employers Health Insurance Company ("EHIC") (a
    wholly owned subsidiary of EMPHESYS) in 1993 and was named Senior Vice
    President for EHIC in 1990 for Marketing, Sales and Business Development.
(2) Mr. Fasola currently serves as Senior Vice President--Sales, Marketing and
    Business Development and was elected to this position November 1998. Prior
    to that, Mr. Fasola served as Vice President--Sales & Marketing from May
    1996 to November 1998. Mr. Fasola served in a similar capacity as Vice
    President and National Sales Manager of EHIC since 1989.
(3) Mr. McCallister currently serves as Senior Vice President--Health System
    Management and was elected to this position January 1998. Prior to that,
    Mr. McCallister served as Division I President from July 1996 to January
    1998. Mr. McCallister joined the Company in June 1974 as a Financial
    Specialist and served in several positions throughout the Company.
(4) Mr. Murray currently serves as Senior Vice President and Chief Financial

Quarterly financial information (unaudited) ...........    54
ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON
        ACCOUNTING AND FINANCIAL DISCLOSURE

        Not applicable.

                              PART III

ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

    The information required by this Item other than the information set forth
in Part I under the Section entitled "Executive Officers of the Company," is
herein incorporated by reference from the Registrant's Proxy Statement for the
Annual Meeting of Stockholders scheduled to be held on May 6, 1999 appearing
under the caption "Election of Directors" of such Proxy Statement.

ITEM 11. EXECUTIVE COMPENSATION

    The information required by this Item is herein incorporated by reference
from the Registrant's Proxy Statement for the Annual Meeting of Stockholders
scheduled to be held on May 6, 1999, appearing under the caption "Executive
Compensation of the Company" of such Proxy Statement.

ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

    The information required by this Item is herein incorporated by reference
from the Registrant's Proxy Statement for the Annual Meeting of Stockholders
scheduled to be held on May 6, 1999, appearing under the caption "Security
Ownership of Certain Beneficial Owners of Company Common Stock" of such Proxy
Statement.

ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

    The information required by this Item is herein incorporated by reference
from the Registrant's Proxy Statement for the Annual Meeting of Stockholders
scheduled to be held on May 6, 1999 appearing under the caption "Certain
Transactions with Management and Others" of such Proxy Statement.

                                19


                              PART IV

ITEM 14. EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K

(a) The financial statements, financial statement schedules and exhibits set
    forth below are filed as part of this report.

    (1) Financial Statements--The response to this portion of Item 14 is
submitted as Item 8 of this report.

    (2) Index to Consolidated Financial Statement Schedules:

        Consolidated Schedules as of and for the years ended December 31, 1998,
    1997 and 1996:

        I Parent Company Financial Information

        II Valuation and Qualifying Accounts

        All other schedules have been omitted because they are not applicable.

    (3) Exhibits:


    3(a)  Restated Certificate of Incorporation filed with the Secretary of State
          of Delaware on November 9, 1989, as restated to incorporate the
          amendment of January 9, 1992, and the correction of March 23, 1992.
          Exhibit 4(i) to the Company's Post-Effective Amendment to the

Registration Statement on Form S-8 (Reg. No. 33-49305) filed February 2, 1994, is incorporated by reference herein.

(b) By-laws, as amended. Exhibit 3(b) to the Company's Annual Report for the fiscal year ended December 31, 1997, is incorporated by reference herein.

4(a) Form of Amended and Restated Rights Agreement dated February 14, 1996, between Humana Inc. and Mid-America Bank of Louisville and Trust Company. Exhibit 1.3 to the Registration Statement (File No. 1-5975) on Form 8-A/A dated February 14, 1996, is incorporated by reference herein.

(b) Amendment No. 2 to the Rights Agreement. Exhibit 4.3 to the Registration Statement (File No. 1-5975) on Form 8-A/A dated March 1, 1999, is incorporated by reference herein.

(c) There are no instruments defining the rights of holders with respect to long-term debt in excess of 10 percent of the total assets of the Company on a consolidated basis. Other long-term indebtedness of the Company is described in Note 6 of Notes to Consolidated Financial Statements in the Company's 1998 Annual Report to Stockholders. The Company agrees to furnish copies of all such instruments defining the rights of the holders of such indebtedness to the Commission upon request.

10(a)* 1981 Non-Qualified Stock Option Plan, as amended. Exhibit 10(c) to the Company's Form SE filed on November 25, 1987, is incorporated by reference herein.

(b)* Amendment No. 2 to the 1981 Non-Qualified Stock Option Plan, as amended. Annex A to the Company's Proxy Statement covering the Annual Meeting of Stockholders held on February 18, 1993, is incorporated by reference herein.

(c)* 1989 Stock Option Plan for Employees. Exhibit A to the Company's Proxy Statement covering the Annual Meeting of Stockholders held on January 11, 1990, is incorporated by reference herein.

(d)* Amendment No. 1 to the 1989 Stock Option Plan for Employees. Annex B to the Company's Proxy Statement covering the Annual Meeting of Stockholders held on February 18, 1993, is incorporated by reference herein.

(e)* Amendment No. 2 to the 1989 Stock Option Plan for Employees. Exhibit 10(e) to the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 1993, is incorporated by reference herein.

--------

* Exhibits 10(a) through and including 10(u) are compensatory plans or management contracts.

20

10(f)* 1989 Stock Option Plan for Non-Employee Directors. Exhibit B to the Company's Proxy Statement covering the Annual Meeting of Stockholders held on January 11, 1990, is incorporated by reference herein.

(g)* Amendment No. 1 to the 1989 Stock Option Plan for Non-Employee Directors. Annex C to the Company's Proxy Statement covering the Annual Meeting of Stockholders held on February 18, 1993, is incorporated by reference herein.

(h)* Amendment No. 2 to the 1989 Stock Option Plan for Non-Employee Directors. Exhibit 10(h) to the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 1993, is incorporated by reference herein.

(i)* 1989 Stock Option Plan for Non-Employee Directors, as amended and restated in 1998. Exhibit A to the Company's Proxy Statement covering the Annual Meeting of Stockholders held on May 14, 1998, is incorporated by reference herein.

(j)* 1996 Stock Incentive Plan for Employees. Annex A to the Company's Proxy Statement covering the Annual Meeting of Stockholders held on May 9, 1996, is incorporated by reference herein.

(k)* 1996 Stock Incentive Plan for Employees as amended in 1998. Exhibit C to the Company's Proxy Statement covering the Annual Meeting of Stockholders held on May 14, 1998, is incorporated by reference herein.

(1)* Executive Management Incentive Compensation Plan--Group A, Corporate.
Exhibit C to the Company's Proxy Statement covering the Annual Meeting
of Stockholders held on May 26, 1994, is incorporated by reference
herein.

(m)* Humana Inc. 1998 Executive Management Incentive Compensation Plan.
Exhibit B to the Company's Proxy Statement covering the Annual Meeting
of Stockholders held on May 14, 1998, is incorporated by reference
herein.

(n)* Restated agreement providing for termination benefits in the event of a
change of control. Exhibit 10(m) to the Company's Annual Report on Form
10-K for the fiscal year ended December 31, 1997, is incorporated by
reference herein.

(o)* Humana Inc. 1998 Management Incentive Compensation Plan. Exhibit 10(n)
to the Company's Annual Report on Form 10-K for the fiscal year ended
December 31, 1997, is incorporated by reference herein.

(p)* Employment Agreement--Gregory H. Wolf, dated December 1, 1997. Exhibit
10(o) to the Company's Annual Report on Form 10-K for the year ended
December 31, 1997, is incorporated by reference herein.

(q)* Employment Agreement--Gregory H. Wolf, dated December 1, 1998, filed
herewith.

(r)* Humana Officers' Target Retirement Plan, as amended. Exhibit 10(p) to
the Company's Annual Report on From 10-K for the fiscal year ended
December 31, 1997, is incorporated by reference herein.

(s)* Humana Thrift Excess Plan as amended. Exhibit 10(s) to the Company's
Annual Report on Form 10-K for the fiscal year ended December 31, 1994,
is incorporated by reference herein.

(t)* Humana Supplemental Executive Retirement Plan as amended. Exhibit 10(t)
to the Company's Annual Report on Form 10-K for the fiscal year ended
December 31, 1994, is incorporated by reference herein.

(u)* Letter agreement with Company officers concerning health insurance
availability. Exhibit 10(mm) to the Company's Annual Report on Form 10-
K for the fiscal year ended December 31, 1994, is incorporated by
reference herein.

(v)  Indemnity Agreement. Appendix B to the Company's Proxy Statement
covering the Annual Meeting of Stockholders held on January 8, 1987, is
incorporated by reference herein.

--------

* Exhibits 10(a) through and including 10(u) are compensatory plans or
management contracts.

21

10(w) Agreement between the Secretary of the Department of Health and Human
Services and Humana Medical Plan, Inc. Exhibit 10(w) to the Company's
Annual Report on Form 10-K for the fiscal year ended December 31, 1993,
is incorporated by reference herein.

(x)  The $1.5 Billion Credit Facility between the Company and Chase Manhattan
Bank. Exhibit 10 to the Company's Current Report on Form 8-K filed on
September 23, 1997, is incorporated by reference herein.

(y)  The $1.5 Billion Commercial Paper Private Placement Memorandum between
the Company and Chase Securities, Inc. Exhibit 4a to the Company's
Current Report on Form 8-K filed on September 23, 1997, is incorporated
by reference herein.

(z)  The $1.5 Billlion Commercial Paper Private Placement Memorandum between
the Company and Merrill Lynch Money Markets, Inc. Exhibit 4b to the
Company's Current Report on Form 8-K filed on September 23, 1997, is
incorporated by reference herein.

(aa) Assumption of Liabilities and Indemnification Agreement between the
Company and Galen Health Care, Inc. ("Galen"). Exhibit 10(g) to the
Company's Current Report on Form 8-K filed on March 5, 1993, is
incorporated by reference herein.

(bb) Agreement between the United States Department of Defense and Humana
Military Healthcare Services, Inc., a wholly owned subsidiary of the
Company. Exhibit 10(dd) to the Company's Annual Report on Form 10-K for
the fiscal year ended December 31, 1995, is incorporated by reference
herein.

12   Statement re: Computation of Ratio of Earnings to Fixed Charges, filed

```
        herewith.
13      1998 Annual Report to Stockholders, filed herewith. The Annual Report
        shall not be deemed to be filed with the Commission except to the extent
        that information is specifically incorporated by reference herein.
21      List of Subsidiaries, filed herewith.
23      Consent of PricewaterhouseCoopers LLP, filed herewith.
27      Financial Data Schedule, filed herewith.
--------
(b) Reports on Form 8-K:

    No reports on Form 8-K were filed by the Company during the last quarter of
    the period covered by this report.
```

<div align="center">22</div>

<div align="center">SIGNATURES</div>

Pursuant to the requirements of Sections 13 or 15(d) of the Securities
Exchange Act of 1934, the Company has duly caused this report to be signed on
its behalf by the undersigned, thereto duly authorized.

<div align="center">Humana Inc.</div>

```
                              /s/ James E. Murray
                   By: _____
                              James E. Murray
                           Chief Financial Officer

                   Date: March 31, 1999
```

Pursuant to the requirements of the Securities Exchange Act of 1934, this
report has been signed below by the following persons on behalf of the Company
and in the capacities and on the date indicated.

| Signature | Title | Date |
| --------- | ----- | ---- |
| /s/  James E. Murray <br> _____ <br> James E. Murray | Chief Financial Officer (Principal Accounting Officer) | March 31, 1999 |
| /s/  David A. Jones <br> _____ <br> David A. Jones | Chairman of the Board | March 31, 1999 |
| /s/  David A. Jones, Jr. <br> _____ <br> David A. Jones, Jr. | Vice Chairman of the Board | March 31, 1999 |
| /s/ K. Frank Austen, M.D. <br> _____ <br> K. Frank Austen, M.D. | Director | March 31, 1999 |
| /s/ Michael E. Gellert <br> _____ <br> Michael E. Gellert | Director | March 31, 1999 |
| /s/ John R. Hall <br> _____ <br> John R. Hall | Director | March 31, 1999 |
| /s/ Irwin Lerner <br> _____ <br> Irwin Lerner | Director | March 31, 1999 |

```
    /s/ W. Ann Reynolds, Ph.D.      Director                    March 31, 1999
    ─────────────────────────
    W. Ann Reynolds, Ph.D.

    /s/ Gregory H. Wolf             Director, President and     March 31, 1999
    ─────────────────────────       Chief Executive Officer
    Gregory H. Wolf
```

23

REPORT OF INDEPENDENT ACCOUNTANTS

To the Board of Directors
Humana Inc.

    Our report on our audits of the consolidated financial statements of Humana
Inc. dated February 9, 1999 has been incorporated by reference in this Form 10-
K from page 53 of the 1998 Annual Report to Stockholders of Humana Inc. In
connection with our audits of such financial statements, we have also audited
the related financial statement schedules listed in the index in Item 14(a)(2)
of this Form 10-K.

    In our opinion, the financial statement schedules referred to above, when
considered in relation to the basic financial statements taken as a whole
present fairly, in all material respects, the information required to be
included therein.

PricewaterhouseCoopers LLP

Louisville, Kentucky
February 9, 1999

24

HUMANA INC.

SCHEDULE I--PARENT COMPANY FINANCIAL INFORMATION (a)
CONDENSED BALANCE SHEETS
December 31, 1998 and 1997
(Dollars in millions, except per share amounts)

| | December 31, | |
|---|---|---|
| | 1998 | 1997 |
| **ASSETS** | | |
| Receivables from operating subsidiaries (b) | $ 168 | $ 162 |
| Other current assets | 39 | 11 |
| Property and equipment, net | 181 | 167 |
| Investments in subsidiaries | 2,380 | 2,251 |
| Other | 35 | 60 |
| TOTAL ASSETS | $2,803 | $2,651 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities (c) | $ 513 | $ 229 |
| Long-term debt | 573 | 889 |
| Other | 29 | 32 |
| Total liabilities | 1,115 | 1,150 |

```
Contingencies (b)
Preferred stock, $1 par; authorized 10,000,000 shares; none
  issued...............................................    --     --
Common stock, $.16-2/3 par; authorized 300,000,000 shares;
  issued and outstanding 167,515,362 shares--1998, 164,058,225
  shares--1997........................................    28     27
Other stockholders' equity............................  1,660  1,474
                                                        -----  -----
  Total stockholders' equity..........................  1,688  1,501
                                                        -----  -----
  TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY.......... $2,803 $2,651
                                                       ====== ======
```

--------

(a) Parent company financial information has been derived from the consolidated
    financial statements of the Company and excludes the accounts of all
    operating subsidiaries. This information should be read in conjunction with
    the consolidated financial statements of the Company.

(b) In the normal course of business, the parent company indemnifies certain of
    its subsidiaries for health plan obligations its subsidiaries may be unable
    to meet.

(c) At December 31, 1998 current liabilities include $250 million of debt
    classified as short-term.

                                25


                            HUMANA INC.

            SCHEDULE I--PARENT COMPANY FINANCIAL INFORMATION (a)
                    CONDENSED STATEMENTS OF INCOME
            For the Years Ended December 31, 1998, 1997 and 1996
                        (Dollars in millions)

|                                                    | Years Ended December 31, | | |
|----------------------------------------------------|------|----------|------|
|                                                    | 1998 | 1997 (b) | 1996 |
| Revenues:                                          |      |          |      |
| Management fees charged to operating subsidiaries  | $297 | $228     | $170 |
| Interest income                                    | 1    | 5        | 3    |
|                                                    | 298  | 233      | 173  |
| Expenses:                                          |      |          |      |
| Selling, general and administrative                | 293  | 201      | 189  |
| Depreciation and amortization                      | 33   | 26       | 21   |
| Interest expense                                   | 40   | 17       | 9    |
|                                                    | 366  | 244      | 219  |
| Loss before income taxes and equity in income of subsidiaries | (68) | (11) | (46) |
| Income tax benefit                                 | 38   | 9        | 18   |
| Loss before equity in income of subsidiaries      | (30) | (2)      | (28) |
| Equity in income of subsidiaries                   | 159  | 175      | 40   |
| Net income                                         | $129 | $173     | $ 12 |

--------

(a) Parent company financial information has been derived from the consolidated
    financial statements of the Company and excludes the accounts of all
    operating subsidiaries. This information should be read in conjunction with

the consolidated financial statements of the Company.
(b) Includes the operations of Health Direct, Inc., Physician Corporation of
    America and ChoiceCare Corporation since their dates of acquisition,
    February 28, 1997, September 8, 1997 and October 17, 1997, respectively.

26

HUMANA INC.

SCHEDULE I--PARENT COMPANY FINANCIAL INFORMATION (a)
CONDENSED STATEMENTS OF CASH FLOWS
For the Years Ended December 31, 1998, 1997 and 1996
(Dollars in millions)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 1998 | 1997 | 1996 |
| Net cash provided by operating activities (b)... | $ 105 | $ 191 | $ 57 |
| Cash flows from investing activities: | | | |
| Purchases of property and equipment........... | (43) | (38) | (32) |
| Purchases of marketable securities............ | (1) | (6) | (6) |
| Maturities and sales of marketable securities.................................. | 7 | 1 | 5 |
| Parent funding of operating subsidiaries...... | (59) | (209) | (46) |
| Acquisitions of health plans.................. | -- | (656) | -- |
| Other......................................... | (11) | 17 | (8) |
| Net cash used in investing activities....... | (107) | (891) | (87) |
| Cash flows from financing activities: | | | |
| Issuance of long-term debt.................... | 123 | 300 | -- |
| Repayment of long-term debt................... | (330) | -- | (250) |
| Net commercial paper borrowings............... | 141 | 367 | 222 |
| Other......................................... | 68 | 33 | 58 |
| Net cash provided by financing activities... | 2 | 700 | 30 |
| Change in cash and cash equivalents............ | -- | -- | -- |
| Cash and cash equivalents at beginning of period........................................ | -- | -- | -- |
| Cash and cash equivalents at end of period...... | $ -- | $ -- | $ -- |

--------

(a) Parent company financial information has been derived from the consolidated
    financial statements of the Company and excludes the accounts of all
    operating subsidiaries. This information should be read in conjunction with
    the consolidated financial statements of the Company.
(b) During the years ended December 31, 1998, 1997 and 1996, the Company
    received dividends from its operating subsidiaries totaling $93, $146 and
    $140, respectively.

27

HUMANA INC.

SCHEDULE II--VALUATION AND QUALIFYING ACCOUNTS
For the years ended December 31, 1998, 1997 and 1996
(Dollars in millions)

| | | Additions | | | |
|---|---|---|---|---|---|
| | Balance at Beginning of Period | Acquired Balances | Charged to Costs and Expenses | Charged to Other Accounts (a) | Deductions or Write-offs | Balance at End of Period |
| Allowance for loss on premiums receivable: | | | | | | |
| Year ended December 31, 1998 . . . . . . | $48 | -- | $11 | $14 | $(11) | $62 |
| Year ended December 31, 1997 . . . . . . . . . . . | 38 | $9 | 10 | 3 | (12) | 48 |
| Year ended December 31, 1996 . . . . . . . . . . . | 36 | -- | 11 | (1) | (8) | 38 |

--------
(a) Represents retroactive membership adjustments recorded in premium income.

28

EX-10.Q
2
EMPLOYMENT AGREEMENT

Exhibit 10(q)

EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT made as of December 1, 1998 by and between HUMANA INC. (hereinafter "Company"), a Delaware corporation having its principal place of business in Louisville, Kentucky, and Gregory H. Wolf (hereinafter "Employee"):

WITNESSETH:

WHEREAS, Employee desires to render faithful and efficient service to the Company; and

WHEREAS, the Company desires to receive the benefit of Employee's service; and

WHEREAS, Employee is willing to be employed by the Company; and

WHEREAS, both Company and Employee desire to formalize the conditions of Employee's employment by written agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties agree as follows:

   1. Office.  The Company hereby employs Employee and as President and
      ------
      Chief Executive Officer and Employee hereby agrees to serve the
      Company in such capacity.

   2. Term of Employment.  Employee's employment shall be for the "Employment
      ------------------
      Period" with the initial term commencing on December 1, 1998 and
      extending through December 31, 2000. The initial term shall be
      automatically renewed and extended upon the expiration thereof for
      successive periods of one (1) year until such time as the Employment
      Period shall terminate pursuant to the terms of this Agreement, or
      until the Company on the one hand, or Employee on the other hand, shall
      terminate the Employment Period by giving written notice to the other
      party on or before sixty (60) days prior to the expiration date of the
      initial or any renewal term. The renewal and extension of this

Agreement shall also be referred to as the "Employment Period." The effective date of Employee's termination of employment for whatever reason under this Agreement shall be the "Termination Date."

3.  Responsibilities.  During the Employment Period, Employee shall devote his entire business time and attention, except during reasonable vacation periods, to, and exert his best efforts to promote, the affairs of the Company, and shall render such services to the Company as may be required by the Board of Directors of the Company

("Board") consistent with his employment as Chief Executive Officer. Nothing herein contained shall preclude service by Employee on a reasonable number of boards of directors or trustees of other entities not engaged in any business competitive with the business of the Company, provided that Employee shall discuss any such board service in advance with the Company's Board.

4.  Incapacity.  If, during the Employment Period, Employee should be prevented from performing his duties or fulfilling his responsibilities by reason of any incapacity or disability for a continuous period of six (6) months, then the Company's Board, in its sole and absolute discretion, may, based on the opinion of a qualified physician, consider such incapacity or disability to be total and may on ninety (90) days written notice to Employee terminate the Employment Period. Benefits and payments shall be made under this Agreement following incapacity as if it were a termination without Good Cause in accordance with Section 8(a).

5.  Death.  The Employment Period shall automatically terminate upon the death of Employee, and payments will be made to the Employee's estate as if it was a termination without Good Cause in accordance with Section 8(a).

6.  Compensation.  During the Employment Period, Employee shall (i) receive a base salary (hereinafter "Annual Base Salary") that shall be an annual amount of not less than Eight Hundred Thousand Dollars ($800,000) payable in accordance with the payroll practices of the Company, and shall (ii) participate in an incentive plan providing for a target incentive compensation amount of not less than one hundred percent (100%) of his Annual Base Salary.

7.  Benefit Plans and Programs.  During the Employment Period, Employee shall be eligible for participation in all benefit plans and programs, including those for executive employees, made available by the Company to its respective employees.

8.  Severance Payments.

    (a)  In the event that Employee's employment is terminated by (i) the Company while this Agreement is in effect without Good Cause as defined in Sections 8(c)(1), (2) or (3) hereof, (ii) by the Company for Good Cause as defined in Section 8(c)(4) hereof, (iii) because the Company terminates the Employment Period pursuant to Section 2 of this Employment Agreement, (iv) by reason of incapacity or disability in accordance with Section 4, or (v) by reason of death in accordance with Section 5:

2

        (1)  The Company shall pay to Employee or his estate, no later than thirty (30) calendar days after such Termination Date, an amount equal to any unpaid current Annual Base Salary accrued through the Termination Date, his bonus, calculated

at one hundred percent (100%) of his Annual Base Salary
prorated for the current fiscal year through the Termination
Date, plus one (1) times the sum of his then current Annual
Base Salary and bonus, calculated at one hundred percent
(100%) of his Annual Base Salary. The Company shall
continue to keep in full force and effect all plans or
policies of medical, accident and life insurance benefits
with respect to Employee and his dependents with the same
level of coverage available to employees under the terms of
those employee benefit plans for a period of twelve (12)
months, upon the same terms, costs and otherwise to the same
extent as such plans are in effect for employees of the
Company who were similarly situated to Employee as of the
Termination Date.

(2)  All restricted shares previously awarded to Employee but not
yet vested shall become vested and non-forfeitable as of the
Termination Date.

(3)  To the extent stock options granted to Employee have not
become fully vested and exercisable as of the Termination
Date, such options shall become fully vested and all vested
stock options shall be exercisable for two (2) years
commencing on the Termination Date.

(b)  In the event that Employee's employment is terminated by the
Company for Good Cause as defined in Sections 8(c)(1), (2) or
(3):

(1)  The Company shall pay to Employee, no later than thirty (30)
calendar days after the Termination Date, an amount equal to
his then current Annual Base Salary accrued but unpaid
through the Termination Date; and Employee shall have a
period of ninety (90) days after such Termination Date in
which to exercise any exercisable vested stock options,
subject to the provisions of any applicable stock option
agreement.

(2)  Any restricted shares or stock options previously granted
but still subject to restriction or unvested at the
Termination Date shall be forfeited.

3

(c)  Good Cause shall mean the Company's Board has determined in good
faith, without being bound by the Company's progressive
discipline policy for employees:

(1)  that Employee has engaged in acts or omissions against the
Company or any of its subsidiaries constituting dishonesty,
intentional breach of fiduciary obligation or intentional
wrongdoing or misfeasance; or

(2)  that Employee has been arrested or indicted in a possible
criminal violation involving fraud or dishonesty; or

(3)  that Employee has intentionally and in bad faith acted in a
manner which results in a material detriment to the assets,
business or prospects of the Company or any of its
subsidiaries; or

(4)  that Employee has failed to perform on a prolonged basis,
where such failure is considered to be substantial and where
corporate performance expectations have been previously
agreed upon with the Employee on an annual basis. Further,
the failure to perform must be because of things considered
to be within the reasonable control of the Employee,
generally of an operating or strategic nature, and excluding
performance primarily resulting from things clearly beyond
the reasonable control of Employee, such as the following:

(A) a drop in the Company's stock share price as a result of an overall market correction,

(B) severe national economic conditions, or

(C) adverse problems intrinsic to the Company's industry.

d) In the event that Employee's employment is terminated (i) because the Employee terminates the Employment Period pursuant to Section 2 of this Employment Agreement or (ii) because Employee voluntarily leaves the employ of the Company during the Employment Period, then the Company shall pay to Employee, no later than thirty (30) calendar days after such Termination Date, an amount equal to any unpaid current Annual Base Salary accrued through the Termination Date, plus one (1) times his then current Annual Base Salary. Any bonus finally determined to be payable at the end of the fiscal year in which the Termination Date is included shall be prorated for the period up to and including the Termination Date and shall be promptly paid to Employee at the same time any other similar bonuses are paid to any

4

other employee of the Company for such fiscal year. The Company shall continue to keep in full force and effect all plans or policies of medical, accident and life insurance benefits with respect to Employee and his dependents with the same level of coverage available to employees under the terms of those employee benefit plans for a period of twelve (12) months, upon the same terms, costs and otherwise to the same extent as such plans are in effect for employees of the Company who were similarly situated to Employee as of the Termination Date.

(e) Following the Employment Period, Employee shall be eligible for continuation of health and dental insurance coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act (COBRA) for eighteen (18) months. For the first twelve (12) months, Employee's cost will be an amount equal to the normal employee contribution. Thereafter, the cost will be an amount equal to the COBRA cost of such coverage. During the first eighteen (18) months, Employee may elect any of the coverages available to Humana employees. Thereafter, Humana agrees that Employee may elect coverage under any of the insured products offered by Humana's health insurance or HMO subsidiaries for Employee, his spouse as of the date hereof ("Spouse"), and any eligible dependent until the later of Employee's age sixty-five (65) or eligibility for Medicare coverage (hereinafter "Extended Coverage"). At the earlier of Employee attaining Medicare eligibility or death, Employee's Spouse and any now current eligible dependent of Employee and Spouse will be eligible for Extended Coverage until the later of Spouse's age sixty-five (65) or Medicare coverage eligibility. If at any time during which the Extended Coverage is in effect Employee or his Spouse obtains Medicare or becomes eligible for other employee group health insurance coverage which does not exclude a pre-existing condition of Employee, Spouse or dependent, Humana's obligation will cease as to the one who has obtained Medicare or, in the case of other employee group health coverage, as to that person and their eligible dependents. Employee's premium for the Extended Coverage and Spouse's premium, if she retains Extended Coverage, will be amount equal to the COBRA cost of such coverage. If Humana hereafter adopts a retiree health insurance program and Humana still has obligations under this provision, Employee will be offered the option of participating in that program in lieu of the Extended Coverage described herein. The health and dental insurance benefits hereunder shall be administered in conjunction with any other similar benefits which the Employee has from the Company but in no case shall be duplicative.

5

9.  Termination After A Change in Control. In the event of a "Change in
    -------------------------------------
    Control" of the Company (as defined as of the date hereof in the
    Company's 1996 Stock Incentive Plan for Employees), if, within twenty-
    four (24) months following the closing of such a Change in Control (or
    at any time prior thereto but in contemplation thereof):

    i.     There is a material reduction in the Employee's title, authority
           or responsibilities, including reporting responsibilities;

    (ii)   The Employee's Annual Base Salary is reduced;

    (iii)  The Employee's office at which he is to perform his duties is
           relocated to a location more than thirty (30) miles from the
           location at which the Employee performed his duties prior to the
           Change in Control;

    (iv)   The Company fails to continue in effect any incentive, bonus or
           other compensation plan in which the Employee participates,
           unless the Company substitutes a substantially equivalent
           benefit;

    (v)    The Company fails to continue in effect any employee benefit
           plan (including any medical, hospitalization, life insurance,
           dental or disability benefit plan in which the Employee
           participated) or any material fringe benefit or perquisite
           enjoyed by the Employee at the time of the Change in Control,
           unless the Company substitutes benefits which, in the aggregate,
           are substantially equivalent;

    (vi)   The Company breaches any material provision of this Employment
           Agreement; or

    (vii)  The Company fails to obtain a satisfactory agreement from any
           successor or assign of the Company to assume and agree to
           perform this Employment Agreement;

    Then the Employee shall have the option to voluntarily terminate his
    employment and the Company shall:

    (a)    Pay the Employee his full base salary earned but not yet paid
           through the Termination Date at the greater of the rate in effect
           at the time of the Change in Control or the Termination Date
           ("Higher Annual Base Salary"), plus any bonuses or incentive
           compensation which, pursuant to the terms of any compensation or
           benefit plan, have been earned and are payable as of the

                                    6

           Termination Date. For purposes of this Agreement, bonuses and
           incentive compensation shall be considered payable if all
           conditions for earning them have been met and any requirement
           that Employee be actively employed as of the date of payment
           shall be disregarded.

    (b)    Pay the Employee a lump sum in an amount equal to two and one-
           half (2 1/2) times the amount equal to the sum of (1) the
           Employee's Higher Annual Base Salary plus (2) the maximum target
           bonus or incentive compensation which could have been earned by
           the Employee calculated as if all relevant goals had been met
           during the then current fiscal year of the Company pursuant to
           the terms of the incentive compensation plan in which he
           participates. If there is no incentive compensation plan in
           effect as of the Termination Date, then for purposes of this
           Agreement it shall be assumed that the amount of incentive
           compensation to be paid to the Employee shall be the maximum
           target amount under any incentive compensation plan in which he
           participated at the date of the Change in Control or the most

recent plan participated in, whichever would be greater.

(c) Maintain in full force and effect for the benefit of the Employee
and the Employee's dependents and beneficiaries, at the Company's
expense, all life insurance, health insurance, dental insurance,
accidental death and dismemberment insurance and disability
insurance under plans and programs in which the Employee and/or
the Employee's dependents and beneficiaries participated
immediately prior to the Termination Date, provided that
continued participation is possible under the general terms and
provisions of such plans and programs ("Extended Benefits"). The
Extended Benefits shall be continued until the earlier of (A) the
second (2nd) anniversary of the Termination Date, (B) the
effective date of the Employee's coverage under equivalent
benefits from a new employer (provided that no such equivalent
benefits shall be considered effective unless and until all pre-
existing condition limitations and waiting period restrictions
have been waived or have otherwise lapsed), or (C) the death of
the Employee. If participation in any such plan or program is
barred, the Company shall arrange at its own expense to provide
the Employee with benefits substantially similar to those which
he was entitled to receive under such plans and programs. At the
end of the period of coverage, the Employee shall have the right
to have assigned to him, at no cost and with no apportionment of
prepaid premiums, any assignable insurance policy relating
specifically to him. Employee shall be entitled to continuation
coverage as provided by COBRA at the conclusion of the coverage
provided under this Section.

7

The amount of any payment or benefit provided for in this Section 9
shall be offset by any lump sum cash payments due the Employee upon
termination under any other provisions of this Employment Agreement.

(d) To the extent that any amounts or payments in the nature of
compensation (within the meaning of Section 280G of the Internal
Revenue Code of 1986, as amended, and the regulations promulgated
thereunder ("Section 280G")) to or for the benefit of the
Employee under this Employment Agreement or otherwise (or any
part of such amount or other payment) constitutes an "excess
parachute payment" within the meaning of Section 280G and Section
4999 of the Internal Revenue Code, then the Company shall pay to
Employee an additional sum such that, after all taxes applicable
to the receipt of such amount have been subtracted therefrom, the
remaining amount will equal the sum of the amount of tax imposed
with respect to the "excess parachute payment," plus any interest
and penalties thereon (other than those caused solely by
Employee's action or inaction). Therefore, the effect shall be to
maintain the Employee in the same financial position that he
would have been in had no tax under Section 280G been imposed.

10. Restrictive Covenants. Employee shall not during the Employment
Period, directly or indirectly, alone or as a member of a partnership
or association, or as an officer, director, advisor, consultant, agent
or employee of any other company, be engaged in or concerned with any
other duties or pursuits requiring his personal services except with
the prior consent of the Company's Board. Nothing herein contained
shall preclude the ownership by Employee of stocks or other investment
securities.

11. Confidential Information and Trade Secrets.

(a) Employee recognizes that Employee's position with the Company
requires considerable responsibility and trust, and, in reliance
on Employee's loyalty, the Company may entrust Employee with
highly sensitive confidential, restricted and proprietary
information involving Trade Secrets and Confidential Information.

(b)  For purposes of this Agreement, a "Trade Secret" is any
     scientific or technical information, design, process, procedure,
     formula or improvement that is valuable and not generally known
     to competitors of the Company. "Confidential Information" is any
     data or information, other than Trade Secrets, that is important,
     competitively sensitive, and not generally known by the public,
     including, but not limited to, the Company's business plans,
     business prospects, training manuals, product development plans,
     bidding and

8

pricing procedures, market strategies, internal performance
statistics, financial data, confidential personnel information
concerning employees of the Company, supplier data, operational
or administrative plans, policy manuals, and terms and conditions
of contracts and agreements. The terms "Trade Secret" and
"Confidential Information" shall not apply to information which
is (i) already in Employee's possession (unless such information
was used in connection with formulating the Company's business
plans, obtained by Employee from the Company or was obtained by
Employee in the course of Employee's employment by the Company),
or (ii) required to be disclosed by any applicable law.

(c)  Except as required to perform Employee's duties hereunder,
     Employee will not use or disclose any Trade Secrets or
     Confidential Information of the Company during employment, at any
     time after termination of employment and prior to such time as
     they cease to be Trade Secrets or Confidential Information
     through no act of Employee in violation of this Section 11.

(d)  Upon the request of Company and, in any event, upon the
     termination of employment hereunder, Employee shall surrender to
     the Company all memoranda, notes, records, plans, manuals or
     other documents pertaining to the Company's business or
     Employee's employment (including all copies thereof). Employee
     will also leave with the Company all materials involving Trade
     Secrets or Confidential Information of the Company. All such
     information and materials, whether or not made or developed by
     Employee, shall be the sole and exclusive property of the
     Company, and Employee hereby assigns to the Company all of
     Employee's right, title and interest in and to any and all of
     such information and materials.

12.  Covenant Not To Compete.  Employee hereby covenants and agrees that
     ------------------------
     for a period commencing on the date hereof and ending twelve (12)
     months after ceasing employment with the Company for whatever reason,
     he shall not:

     (a)  Compete in any way with the Company without the Company's prior
          written consent.

     (b)  Interfere with the relationship of the Company and any employee,
          agent or representative.

     (c)  Divert, or attempt to cause the diversion from the Company, any
          business with which the Company has been actively engaged in
          during any part of the past two (2) year period preceding the
          Termination Date, nor interfere with

9

relationships of the Company with policyholders, dealers,
distributors, marketers, sources of supply or customers.

Employee further specifically acknowledges that the geographic area to
which the covenants contained in this Section 12 apply is the same

geographic area in which the Company transacted its business during
any part of the twelve (12) month period immediately prior to the
Termination Date. The time period during which the prohibitions set
forth in this Section 12 apply shall be tolled and suspended as to
Employee for a period equal to the aggregate quantity of time during
which Employee violates such prohibitions in any respect.

13. Specific Enforcement. Employee specifically acknowledges and agrees
    --------------------
    that the restrictions set forth in Sections 11 and 12 hereof are
    reasonable and necessary to protect the legitimate interest of the
    Company and that the Company would not have entered into this
    Agreement in the absence of such restrictions. Employee further
    acknowledges and agrees that any violation of the provisions of
    Sections 11 or 12 hereof will result in irreparable injury to the
    Company, that the remedy at law for any violation or threatened
    violation of such Sections will be inadequate and that in the event of
    any such breach, the Company, in addition to any other remedies or
    damages available to it at law or in equity, shall be entitled to
    temporary injunctive relief before trial from any court of competent
    jurisdiction as a matter of course, and to permanent injunctive relief
    without the necessity of proving actual damages.

14. Effect of Termination of the Employment Period. Upon the termination
    --------------------------------------------------
    of the Employment Period, this Agreement shall terminate, and all of
    the parties' obligations hereunder shall forthwith terminate, except
    that rights and remedies accruing prior to such termination or arising
    out of this Agreement shall survive.

15. Notice. Any notice required to be given by the Company hereunder to
    ------
    Employee shall be in proper form and signed by an officer or Director
    of the Board of the Company. Until one party shall advise the other
    in writing to the contrary, notices shall be deemed delivered:

    (a) To the Company if delivered to the Chairman of the Board of the
        Company, or if mailed, certified or registered mail postage
        prepaid, to Humana Inc., 500 West Main Street, Louisville,
        Kentucky 40202; Attention: Chairman of the Board, with a copy to
        the Company's General Counsel.

    (b) To employee if delivered to Employee, or if mailed to him by
        certified or registered mail, postage prepaid, to Gregory H.
        Wolf, 211 Waterleaf Way, Louisville, Kentucky 40207.

                                    10

16. Benefit. This Agreement shall bind and inure to the benefit of the
    -------
    Company and the Employee, their respective heirs, successors and
    assigns.

17. Severability. If a judicial determination is made that any of the
    ------------
    provisions of this Employment Agreement constitutes an unreasonable or
    otherwise unenforceable restriction against Employee, such provision
    shall be rendered void only to the extent that such judicial
    determination finds such provisions to be unreasonable or otherwise
    unenforceable. In this regard, the parties hereto hereby agree that
    any judicial authority construing this Employment Agreement shall be
    empowered to sever any portion of the territory or prohibited business
    activity from the coverage of Sections 11 or 12 and to apply the
    provisions to the remaining portion of the territory or the remaining
    business activities not so severed by such judicial authority.
    Moreover, notwithstanding the fact that any provisions of this
    Employment Agreement are determined not to be specifically
    enforceable, the Company shall nevertheless be entitled to recover
    monetary damages as a result of the breach of such provision by
    Employee.

18. Other. This Employment Agreement shall, as of its effective date, replace and supercede the Employment Agreement dated December 1, 1997 between the parties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

ATTEST:                                                 HUMANA INC.


BY: _____            BY: _____
      Corporate Secretary                                David A. Jones
                                                         Chairman of the Board


WITNESS:                                                "EMPLOYEE"


_____                _____
                                                         Gregory H. Wolf

                                    11


              EX-12
              3
                    RATIO OF EARNINGS



                                                              EXHIBIT 12


                              HUMANA INC.
                    RATIO OF EARNINGS TO FIXED CHARGES
              FOR THE YEARS ENDED DECEMBER 31, 1998, 1997 AND 1996
                                (UNAUDITED)


| (Dollars in millions) | YEARS ENDED DECEMBER 31, | | |
|---|---|---|---|
|  | 1998 | 1997 | 1996 |
| Earnings: |  |  |  |
| Income before income taxes | $ 203 | $ 270 | $ 18 |
| Fixed charges | 58 | 29 | 19 |
|  | $ 261 | $ 299 | $ 37 |
| Fixed charges: |  |  |  |
| Interest charged to expense | $ 47 | $ 20 | $ 11 |
| One-third of rent expense (a) | 11 | 9 | 8 |
|  | $ 58 | $ 29 | $ 19 |
| Ratio of earnings to fixed charges | 4.5(a) | 10.4 | 2.0(b) |


For the purpose of determining earnings in the calculation of the ratio of earnings to fixed charges (the "Ratio"), earnings have been increased by the provision for income taxes and fixed charges. Fixed charges consist of interest

expense on borrowings and one-third (the proportion deemed representative of the
interest portion) of rent expense.

(a) Exclusive of charges associated with certain market closures, merger
dissolution and losses on disposals of non-strategic assets of $34 million
pretax, premium deficiencies of $46 million pretax, a one-time incentive for
non-officer employees of $16 million pretax and other cost of $36 million
pretax, the ratio for the year ended December 31, 1998 would have been 6.8.

(b) Exclusive of charges related to closing of the Washington, D.C. market,
severance and facility costs for workforce reductions and market closures
and product discontinuance cost of $96 million pretax, premium deficiencies
of $105 million pretax and litigation and certain other costs of $14 million
pretax, the ratio for the year ended December 31, 1996 would have been 13.3.


                    EX-13
                      4
                         ANNUAL REPORT



                                                              EXHIBIT 13

Financial Section
===================================================================
Humana Inc.



    1  Selected Financial Data

    2  Management's Discussion and Analysis of Financial
       Condition and Results of Operations

   13  Consolidated Balance Sheets

   14  Consolidated Statements of Income

   15  Consolidated Statements of Stockholders' Equity

   16  Consolidated Statements of Cash Flows

   17  Notes to Consolidated Financial Statements

   27  Report of Independent Accountants

   28  Quarterly Financial Information (Unaudited)

   29  Board of Directors and Officers and Vice Presidents

   31  Additional Information


Selected Financial Data
====================================================================
Humana Inc.

Dollars in millions, except per share results
------------------------------------------------

| For the years ended December 31, | 1998 (a) (b) | 1997 (c) | 1996 (d) (e) | 1995 (e) | 1994 (f) |
|---|---|---|---|---|---|
| Summary of Operations | | | | | |
| Revenues: | | | | | |
| Premiums by segment: | | | | | |
| Commercial | $  5,257 | $  4,367 | $  4,255 | $  2,883 | $  2,054 |
| Public Sector: | | | | | |
| Medicare HMO | 2,918 | 2,426 | 1,907 | 1,369 | 1,406 |
| Medicaid and other | 622 | 503 | 164 | 153 | 116 |

| | | | | | |
|---|---|---|---|---|---|
| | 3,540 | 2,729 | 2,071 | 1,722 | 1,522 |
| TRICARE | 800 | 764 | 351 | - | - |
| Total premiums | 9,597 | 7,880 | 6,677 | 4,605 | 3,576 |
| Interest and other income | 184 | 156 | 111 | 97 | 78 |
| Total revenues | 9,781 | 8,036 | 6,788 | 4,702 | 3,654 |
| Income before income taxes | 203 | 273 | 18 | 288 | 257 |
| Net income | 129 | 173 | 12 | 190 | 176 |
| Earnings per common share | 77 | 1.06 | .07 | 1.17 | 1.13 |
| Earnings per common share - assuming dilution | 77 | 1.05 | .07 | 1.16 | 1.07 |
| Net cash provided by operations | 76 | 209 | 341 | 150 | 298 |
| Financial Position | | | | | |
| Cash and investments | $ 2,812 | $ 2,798 | $ 1,880 | $ 1,496 | $ 1,231 |
| Total assets | 5,496 | 5,600 | 3,108 | 2,356 | 1,957 |
| Medical and other expenses payable | 1,908 | 2,075 | 1,399 | 966 | 527 |
| Debt and other long-term obligations | 977 | 1,257 | 361 | 399 | 93 |
| Stockholders' equity | 1,688 | 1,501 | 1,292 | 1,287 | 1,058 |
| Operating Data | | | | | |
| Medical expense ratio | 83.8 | 82.8% | 84.3% | 81.7% | 81.6% |
| Administrative expense ratio | 15.2 | 15.5% | 15.5% | 13.9% | 13.6% |
| Medical membership by segment: | | | | | |
| Commercial | | | | | |
| Fully-insured | 3,261,500 | 3,258,600 | 2,759,600 | 2,834,900 | 1,500,800 |
| Administrative services | 646,200 | 651,200 | 471,000 | 495,100 | 91,500 |
| | 3,907,700 | 3,909,800 | 3,230,600 | 3,330,000 | 1,594,300 |
| Public Sector: | | | | | |
| Medicare HMO | 502,000 | 480,800 | 364,500 | 310,400 | 287,400 |
| Medicaid and other | 700,400 | 704,000 | 152,900 | 164,000 | 159,200 |
| | 1,202,400 | 1,184,800 | 517,400 | 474,400 | 446,600 |
| TRICARE | 1,085,700 | 1,112,200 | 1,103,000 | - | - |
| Total | 6,195,800 | 6,206,800 | 4,851,000 | 3,804,400 | 2,040,900 |
| Specialty membership: | | | | | |
| Dental | 1,375,500 | 936,400 | 844,800 | 797,000 | |
| Other | 1,257,800 | 1,504,200 | 1,039,400 | 1,063,000 | |
| Total | 2,633,300 | 2,440,600 | 1,884,200 | 1,860,000 | |

(a) Includes charges associated with certain market closures, merger dissolution and losses on disposals of non-strategic assets of $34 million pretax, ($22 million after tax or $.13 per diluted share).

(b) Includes premium deficiencies of $46 million pretax ($29 million after tax or $.17 per diluted share), a one-time incentive for non-officer employees of $16 million pretax ($10 million after tax or $.06 per diluted share) and other costs of $36 million pretax ($23 million after tax or $.14 per diluted share).

(c) Includes the operations of Health Direct, Inc., Physician Corporation of America, ChoiceCare Corporation and EMPHESYS Financial Group since their dates of acquisition, February 28, 1997, September 8, 1997, October 17, 1997 and October 11, 1995, respectively.

(d) Includes charges related to the closing of the Washington, D.C., market, severance and facility costs for workforce reductions and market closures and product discontinuance costs of $96 million pretax ($63 million after tax or $.38 per diluted share).

(e) Includes premium deficiencies of $105 million pretax ($68 million after tax or $.41 per diluted share), litigation and certain other costs of $14 million pretax ($9 million after tax or $.06 per diluted share).

(f) Includes nonrecurring income of $11 million pretax ($17 million after tax or $.10 per diluted share) related to the favorable settlement of income tax disputes with the Internal Revenue Service, partially offset by the write-down of a nonoperational asset.



## Management's Discussion and Analysis of Financial Condition and Results of Operations

Humana Inc.

The consolidated financial statements of Humana Inc. (the "Company") in this Annual Report present the Company's financial position, results of operations and cash flows, and should be read in conjunction with the following discussion and analysis. This discussion and analysis contains both historical and forward-looking information. The forward-looking statements may be significantly impacted by risks and uncertainties and are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. There can be no assurance that anticipated future results will be achieved

because actual results may differ materially from those projected in the
forward-looking statements.  Readers are cautioned that a number of factors,
which are described herein and in the Company's Annual Report on Form 10-K for
the year ended December 31, 1998, could adversely affect the Company's ability
to obtain these results.  These include the effects of either federal or state
health care reform or other legislation, changes in the Medicare reimbursement
system, renewal of the Company's Medicare contracts with the federal government,
renewal of the Company's contract with the federal government to administer the
TRICARE program and renewal of the Company's Medicaid contracts with various
state governments.  Such factors also include the effects of other general
business conditions, including but not limited to, the Company's ability to
integrate its acquisitions, the Company's ability to appropriately address the
"Year 2000" computer system issue, government regulation, competition, premium
rate and yield changes, retrospective premium adjustments relating to federal
government contracts, medical and pharmacy cost trends, changes in Commercial
and Medicare HMO membership, operating subsidiary capital requirements, the
ability of health care providers (including physician practice management
companies) to comply with current contract terms, the effect of provider
contract rate negotiations, general economic conditions and the retention of key
employees.  In addition, past financial performance is not necessarily a
reliable indicator of future performance and investors should not use historical
performance to anticipate results or future period trends.


Introduction

The Company is a health services company that facilitates the delivery of health
care services through networks of providers to its approximately 6.2 million
medical members.  The Company's products are marketed primarily through health
maintenance organizations ("HMOs") and preferred provider organizations ("PPOs")
that encourage or require the use of contracted providers.  HMOs and PPOs
control health care costs by various means, including pre-admission approval for
hospital inpatient services, pre-authorization of outpatient surgical
procedures, and risk-sharing arrangements with providers.  These providers may
share medical cost risk or have other incentives to deliver quality medical
services in a cost-effective manner. During 1998, the Company began an
initiative to increase the amount of medical cost risk assumed by certain of its
provider partners related primarily to its HMO products.  As a result, at
December 31, 1998, approximately 50 percent and 70 percent of its Commercial and
Medicare HMO membership, respectively, were under various forms of risk-sharing
arrangements.  The Company also offers various specialty products to employers,
including dental, group life and workers' compensation, and administrative
services ("ASO") to those who self-insure their employee health plans.  In
total, the Company's products are licensed in 47 states, the District of
Columbia and Puerto Rico, with approximately 21 percent of its membership in the
state of Florida.

The Company markets and distributes its products to three distinct customer
groups and, therefore, reports operations in three business segments.  Results
of each segment are measured based on premium revenues and underwriting margin
(premium revenues less medical expenses).  The Company does not allocate assets
or administrative costs to the segments and, therefore, does not measure results
based on segments assets or pretax profits.  Members from all three segments
generally utilize the same medical provider networks, enabling the Company to
obtain more favorable contract terms with providers.  As a result, the
profitability of each segment is somewhat interdependent.

In the Commercial segment, the Company markets and distributes its fully-insured
HMO, PPO, specialty and ASO products to large group employers (over 100
employees) and small group employers.  Premium revenue pricing to large group
employers has historically been more competitive than that to small group
employers,

2

Management's Discussion and Analysis of
Financial Condition and Results of Operations (continued)

==========================================================================
Humana Inc.

resulting in less favorable underwriting margins for large groups. In the
Public Sector segment, the Company markets and distributes its Medicare and
Medicaid products to individuals eligible for these government-sponsored
programs. The Medicare HMO product provides health care services that include
all Medicare benefits and, in certain circumstances, additional services. The
Company's third segment is TRICARE. In this segment, the Company facilitates
health care services for the dependents of active military personnel and retired
military personnel and their dependents located in the Southeastern United
States. The Company is in the third year of its contract with the United States
Department of Defense, which is renewable annually for up to two additional
years. As encouraged by government regulation, TRICARE is managed by a separate
management team and is more autonomous than the Company's Commercial and Public
Sector segments, which generally share sales, marketing, customer service,
medical management and claims processing functions of the Company.

On February 28, 1997, the Company acquired Health Direct, Inc. ("Health Direct")
from Advocate Health Care for $23 million in cash. This transaction, which was
recorded using the purchase method of accounting, added approximately 50,000
medical members to the Company's Chicago, Illinois, membership.

On September 8, 1997, the Company acquired Physician Corporation of America
("PCA") for total consideration of $411 million in cash, consisting primarily of
$7 per share for PCA's outstanding common stock and the assumption of $121
million in debt. The purchase was funded with borrowings under the Company's
commercial paper program. PCA served approximately 1.1 million medical members
and provided comprehensive health services through its HMOs in Florida, Texas
and Puerto Rico. In addition, PCA provided workers' compensation third-party
administrative management services. Prior to November 1996, PCA also was a
direct writer of workers' compensation insurance in Florida. Long-term medical
and other expenses payable in the accompanying consolidated balance sheets
includes the long-term portion of workers' compensation liabilities related to
this business. This transaction was recorded using the purchase method of
accounting.

On October 17, 1997, the Company acquired ChoiceCare Corporation ("ChoiceCare")
for approximately $250 million in cash. The purchase was funded with borrowings
under the Company's commercial paper program. ChoiceCare provided health
services products to approximately 250,000 medical members in the Greater
Cincinnati, Ohio, area. This transaction was recorded using the purchase method
of accounting.

On January 31, 1997, the Company completed the sale of its Washington, D.C.,
health plan to Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.
Effective April 1, 1997, the Company also completed the sale of its Alabama
operations, exclusive of its small group business and Alabama TRICARE
operations, to PrimeHealth of Alabama, Inc. On October 31, 1997, the Company
also sold The Lexington Hospital in Lexington, Kentucky, to Jewish Hospital
Healthcare Services, Inc. These sale transactions did not have a material
impact on the Company's financial position, results of operations or cash flows.

Asset Write-Downs and Other Charges

On August 10, 1998, the Company and United HealthCare Corporation ("United")
announced their mutual agreement to terminate the previously announced Agreement
and Plan of Merger, dated May 27, 1998. The merger, among other things, was
expected to improve the operating results of certain of the Company's products
and markets. Following the merger's termination, the Company conducted a
strategic evaluation of each of its markets and product offerings. As a result
of this strategic evaluation, which included assessing the Company's competitive
market positions and profit potential, the Company recognized charges of $34
million during the third quarter of 1998. The charges included severance and
lease termination costs associated with closing five markets (Sarasota and
Treasure Coast, Florida, Springfield and Jefferson City, Missouri and Puerto
Rico) and discontinuing products ($5 million), write-downs of certain
receivables and property and equipment associated with closing markets ($10
million), losses on disposals of non-strategic assets ($12 million) and merger
dissolution costs ($7 million). Charges for estimated employee severance costs

were based on the


3


Management's Discussion and Analysis of
Financial Condition and Results of Operations (continued)
================================================================================
Humana Inc.


Company's employee benefit plan arrangements.  Significant market closure
activities are expected to be completed by the end of the second quarter of 1999
as membership lapses or existing contracts expire.

In 1996, the Company recorded asset write-downs and other charges of $96
million.  These charges included write-downs of long-lived assets associated
with the Company's Washington, D.C., health plan ($70 million),  severance and
lease termination costs for workforce reductions undertaken during 1997 ($15
million) and market closure and product discontinuance costs ($11 million).
Substantially all amounts related to the cash portion of these charges were paid
before the end of 1997.


Premium Deficiencies and Other Costs

In addition to the charges discussed above, as a result of management's regular
assessment of the profitability of its contracts for providing health care
services to its members, the Company recorded provisions for probable future
losses (premium deficiencies) of $46 million and $105 million in 1998 and 1996,
respectively.  These premium deficiencies have been included in medical expenses
in the accompanying consolidated statements of income.

After evaluating the recoverability of receivables from certain physician
practice management companies, a write-down of $27 million was recorded in 1998
medical expenses in the accompanying consolidated statements of income.  In
addition, as a result of the dissolved merger with United, a one-time incentive
for each non-officer employee ($16 million) and other costs ($9 million) were
recorded during 1998.  The one-time non-officer employee incentive and other
costs have been included in selling, general and administrative expenses in the
accompanying consolidated statements of income.

During 1996, the Company recorded provisions for litigation and certain other
costs of $14 million which has been included in selling, general and
administrative expenses in the accompanying consolidated statements of income.


Comparison of Results of Operations

In order to enhance comparability, and to present an estimated baseline against
which historical and prospective periods should be measured, the following
discussions comparing the results for the years ended December 31, 1998, 1997
and 1996 exclude the impact of the asset write-downs and other charges, premium
deficiencies, and other costs described previously.

Years Ended December 31, 1998 and 1997

Income before income taxes totaled $335 million for the year ended December 31,
1998, compared to $270 million for the year ended December 31, 1997.  Net income
was $213 million or $1.27 per diluted share in 1998, compared to $173 million or
$1.05 per diluted share in 1997.  The earnings increase was a result of the full
year contribution from the 1997 PCA and ChoiceCare acquisitions, increased
Commercial premium yields, provider risk-sharing initiatives, improved claims
payment accuracy across various product lines, and increased interest and other
income.  These favorable items were partially offset by increased pharmacy costs
system-wide.

The Company's 1998 premium revenues increased 22 percent to a record $9.6

billion, from $7.9 billion for the year ended December 31, 1997. This increase
was attributable to the current year effect of 1997 acquisitions, Commercial and
Medicare HMO same-plan membership growth and increased premium rates for the
Company's Commercial products. PCA and ChoiceCare premium revenues contributed
approximately $1.6 billion, a $1.1 billion increase over 1997. Same-plan
membership growth contributed $120 million and Commercial premium increases
added approximately $186 million, as same-plan Commercial premium yields
increased 4.8 percent. Changes in Medicare HMO premium yield had little effect
on premium revenues as same-plan yields declined .4 percent in 1998. The
Medicare 2 percent statutory rate increase for 1998 was offset by membership
growth in geographic areas with lower reimbursement rates.

4

Management's Discussion and Analysis of
Financial Condition and Results of Operations (continued)
================================================================================
Humana Inc.

During 1998, the Company's medical expense ratio increased to 83.0 percent from
82.8 percent for the year ended December 31, 1997. The year to year increase
was the result of the higher medical expense ratio of acquired plans being
included for a full year during 1998. The same-plan medical expense ratio
improved 20 basis points to 82.2 percent from 82.4 percent in 1997, the result
of the aforementioned premium rate increases, provider risk-sharing initiatives
and improved claim payment accuracy. These improvements were partially offset by
increased year-over-year pharmacy costs of 16 percent and 9 percent for the
Company's Commercial and Medicare HMO products, respectively. As more fully
described above, the medical expense ratio discussion excludes the impact of
premium deficiencies ($46 million) and the write-down of physician practice
management receivables ($27 million). The inclusion of these two items
increases the 1998 medical expense ratio from 83.0 percent to 83.8 percent.

The Company's administrative cost ratio was 14.9 percent and 15.5 percent for
the years ended December 31, 1998 and 1997, respectively. This improvement was
the result of efforts to streamline the organization, as well as synergy savings
from the 1997 acquisitions. Although further synergy savings are expected from
these acquisitions, planned spending during 1999 for information systems and
customer service enhancements will likely offset the beneficial effect of these
savings. This administrative expense ratio discussion excludes the impact of
the one-time non-officer employees incentive ($16 million) and other costs ($9
million) described above. The inclusion of these two items increases the 1998
administrative expense ratio from 14.9 percent to 15.2 percent.

Interest income totaled $150 million for the year ended December 31, 1998,
compared to $131 million for the year ended December 31, 1997. The increase was
attributable to the full year impact of including PCA's and ChoiceCare's
investment portfolios, as well as increased realized investment gains. The tax
equivalent yield on invested assets approximated 7.7 percent and 7.5 percent for
the years ended December 31, 1998 and 1997, respectively. Tax equivalent yield
is the rate earned on invested assets, excluding unrealized gains and losses,
adjusted for the benefit of nontaxable investment income. The weighted average
investment life increased to 2.7 years at December 31, 1998, from 2.6 years at
December 31, 1997.

Business Segment Information for the Years Ended December 31, 1998 and 1997

Commercial premium revenues increased 20 percent in 1998 to $5.3 billion, from
$4.4 billion in 1997. The PCA and ChoiceCare acquisitions contributed $575
million of this increase, while increased premium yields contributed the
remainder. Commercial membership remained stable in 1998, the result of the
Company's commitment to price its Commercial products commensurate with the
underlying risk. For 1999, Commercial premium yield increases are expected to
approximate 5 to 7 percent, while membership is expected to increase
approximately 5 percent. Public Sector premium revenues increased 30 percent to
$3.5 billion in 1998, the result of the 1997 acquisitions and 4.4 percent same-

plan membership growth in the Medicare HMO product. During 1998, the Company
slowed its Medicare HMO membership growth in newer, more costly markets. In
addition, the September 1998 announcement to close two markets by December 31,
1998, resulted in the decrease of 16,000 members. Medicare HMO premium yields
are expected to increase approximately 2 percent in 1999, while membership is
expected to increase approximately 5 percent. Also during 1999, Medicaid
membership is expected to decline approximately 442,000 members, the result of
the expiration of the Puerto Rico Medicaid contract. TRICARE revenues increased
4.7 percent in 1998 on stable membership, due to contract modifications.

The following table depicts segment medical membership balances and activity as
of and for the years ended December 31, 1998 and 1997:

|  | 1998 | | | 1997 | | |
|---|---|---|---|---|---|---|
| In Thousands | Commercial | Public Sector | TRICARE | Commercial | Public Sector | TRICARE |
| Beginning medical membership | 3,910 | 1,185 | 1,112 | 3,231 | 517 | 1,103 |
| Sales | 822 | 359 | - | 703 | 254 | - |
| Cancellations | (824) | (342) | - | (635) | (222) | - |
| Acquisitions | - | - | - | 735 | 659 | - |
| Dispositions | - | - | - | (124) | (23) | - |
| TRICARE change | - | - | (26) | - | - | 9 |
| Ending medical membership | 3,908 | 1,202 | 1,086 | 3,910 | 1,185 | 1,112 |

5

Management's Discussion and Analysis of
Financial Condition and Results of Operations (continued)
================================================================================
Humana Inc.

The Commercial segment medical expense ratio improved 100 basis points to 82.3
percent in 1998, due to increased premium yields and risk-sharing initiatives
previously mentioned. During 1999, the Company believes its Commercial segment
medical expense ratio will be benefitted by its continued focus on pricing its
Commercial products at rates commensurate with the risk assumed and its control
of claims cost trends, including its contractual relationships with providers.
The Company believes that the industry's 1999 Commercial premium pricing
environment will facilitate its Commercial premium rate increases. The Public
Sector medical expense ratio increased to 84.8 percent in 1998 from 82.3 percent
in 1997, primarily from lower Medicare HMO reimbursement rates, the 1997 growth
of Medicare HMO membership in new, more costly markets outside the Company's
base markets and increasing Medicaid costs in Puerto Rico. Although the
expiration of the Puerto Rico Medicaid contract will improve the Public Sector
medical expense ratio, for the Public Sector medical expense ratio to remain
stable, the Company must continue to control its Medicare HMO medical costs
during 1999 in line with the anticipated 2 percent premium yield increases.
TRICARE's medical expense ratio improved 110 basis points in 1998 to 80.1
percent, the result of continuing utilization management, improved networks and
contract price modifications. As previously described, this medical expense
ratio discussion excludes the impact of premium deficiencies ($46 million) and
the write-down of physician practice management receivables ($27 million). The
inclusion of these two items increases the 1998 Commercial and Public Sector
medical expense ratios to 82.9 percent and 86.0 percent, respectively.

Years Ended December 31, 1997 and 1996

Income before income taxes totaled $270 million for the year ended December 31,
1997, compared to $234 million for the year ended December 31, 1996. Net income
was $173 million or $1.05 per diluted share in 1997, compared to $152 million or
$.92 per diluted share in 1996. The earnings increase was primarily a result of
increasing Commercial premium yields, improved hospital utilization and

providing a full year of health care services under the TRICARE contract, which commenced during the third quarter of 1996. These favorable items were partially offset by higher than anticipated medical costs in the Company's new Medicare HMO markets and increased pharmacy costs system-wide. The acquisitions of PCA and ChoiceCare did not significantly impact 1997 earnings.

The Company's premium revenues increased 18 percent to $7.9 billion for the year ended December 31, 1997, from $6.7 billion for the year ended December 31, 1996. The premium revenue increase was primarily attributable to the full year impact of the TRICARE contract, the acquisitions of PCA and ChoiceCare and increased premium yields. TRICARE premium revenues increased $413 million in 1997 and the PCA and ChoiceCare acquisitions contributed premium revenues of approximately $512 million since their dates of acquisition. Premium rate changes contributed the remaining increase, as same-plan Commercial and Medicare HMO premium yields increased 4.2 percent and 4.3 percent, respectively.

During 1997, the Company's medical expense ratio increased to 82.8 percent from 82.7 percent for the year ended December 31, 1996 as a result of the PCA and ChoiceCare acquisitions. Excluding the effect of these acquisitions, the Company's medical expense ratio improved to 82.4 percent, reflecting the aforementioned premium yield increases, favorable physician cost trends (compared to premium yield increases) in the Company's Commercial products and an overall improvement in hospital utilization. These medical cost improvements were partially offset by higher than anticipated medical costs in the Company's new Medicare HMO markets (where a larger portion of membership growth was taking place) and increased pharmacy costs system-wide. As more fully described previously, the medical expense ratio discussion excludes the impact of the premium deficiencies recorded in 1996 of $105 million. The inclusion of these premium deficiencies increases the 1996 medical expense ratio from 82.7 percent to 84.2 percent.

The Company's administrative cost ratio was 15.5 percent and 15.3 percent for the years ended December 31, 1997 and 1996, respectively. Although investment spending in such areas as customer service, information systems and Medicare HMO product growth initiatives resulted in this year-over-year increase, efforts to rationalize the Company's staffing levels and streamline the organizational structure resulted in sequential quarterly improvements in the administrative cost ratio throughout 1997. The administrative expense ratio discussion excludes the impact of provisions in 1996 for litigation and certain other costs ($14 million) described previously. The inclusion of these costs increases the 1996 administrative expense ratio from 15.3 percent to 15.6 percent.

6

Management's Discussion and Analysis of
Financial Condition and Results of Operations (continued)
================================================================================
Humana Inc.

Interest income totaled $131 million for the year ended December 31, 1997, compared to $101 million for the year ended December 31, 1996. The increase is primarily attributable to a larger investment portfolio resulting from the addition of TRICARE, PCA and ChoiceCare. The tax equivalent yield on invested assets approximated 7.5 percent and 8 percent for the years ended December 31, 1997 and 1996, respectively. Tax equivalent yield is the rate earned on invested assets, excluding unrealized gains and losses, adjusted for the benefit of nontaxable investment income. The weighted average investment life decreased to 2.6 years at December 31, 1997, from 3.1 years at December 31, 1996.

Business Segment Information for the Years Ended December 31, 1997 and 1996

Commercial segment premiums increased 3 percent for the year ended December 31, 1997, from $4.3 billion to $4.4 billion. The increase was the result of the 1997 acquisitions and increased premium yields, partially offset by same-plan fully-insured membership reductions. Same-plan fully-insured membership declined 62,500 members, the result of a premium pricing discipline begun during the second half of 1996. Commercial same-plan ASO membership increased 130,000 or 28 percent during 1997. Public Sector premiums increased 32 percent for the

year ended December 31, 1997, from $2.1 billion to $2.7 billion. The increase was the result of the aforementioned acquisitions, same-plan Medicare HMO membership growth in new markets and same-plan Medicare HMO premium yields of 4.4 percent. Same-plan Public Sector membership increased 31,500 or 6 percent in 1997, the result of Medicare HMO product growth of 19 percent, largely offset by a decline in membership for other Public Sector products. TRICARE premium revenues totaled approximately $764 million for the year ended December 31, 1997, compared to approximately $351 million for the period July 1 through December 31, 1996.

The following table depicts segment medical membership balances and activity as of and for the years ended December 31, 1997 and 1996, including the effect of the PCA and ChoiceCare acquisitions:

| In Thousands | 1997 | | | 1996 | | |
|---|---|---|---|---|---|---|
| | Commercial | Public Sector | TRICARE | Commercial | Public Sector | TRICARE |
| Beginning medical membership | 3,231 | 517 | 1,103 | 3,330 | 474 | - |
| Sales | 703 | 254 | - | 587 | 196 | 1083 |
| Cancellations | (635) | (222) | - | (686) | (153) | - |
| Acquisitions | 735 | 659 | - | - | - | - |
| Dispositions | (124) | (23) | - | - | - | - |
| TRICARE change | - | - | 9 | - | - | 20 |
| Ending medical membership | 3,910 | 1,185 | 1,112 | 3,231 | 517 | 1,103 |

The Commercial medical expense ratio improved 50 basis points in 1997 to 83.3 percent. The improvement resulted from same-plan premium yield increases and favorable physician cost trends (compared to premium yield increases), partially offset by the higher medical expense ratio of the acquired plans. The Public Sector medical expense ratio increased from 80.3 percent in 1996 to 82.3 percent in 1997, resulting from higher than anticipated costs in the Company's new Medicare HMO markets. The TRICARE medical expense ratio improved from 83.6 percent during 1996 to 81.2 percent in 1997. This medical expense ratio discussion excludes the impact of premium deficiencies ($105 million). The inclusion of this item increases the 1996 Commercial medical expense ratio to 86.3 percent.


Liquidity

During 1998, cash provided by the Company's operations was $76 million, compared to cash provided by operations in 1997 and 1996 of $289 million and $341 million, respectively. Cash flow in 1998 was negatively impacted by the 1997 PCA acquisition, including paydowns of medical claims backlogs, cash advances to providers and severance payments. Also during 1998, the Company made cash payments of $134 million related to the closed block of PCA workers' compensation business. The 1997 decline in net cash provided by operations was the result of changes in operating assets and liabilities, increased TRICARE receivables and more timely medical claims processing.

7


Management's Discussion and Analysis of
Financial Condition and Results of Operations (continued)
===============================================================================
Humana Inc.

Cash provided by investing activities totaled $7 million in 1998, compared to cash used for investing activities of $664 million in 1997. The use of cash for investing activities during 1997 was primarily the result of the PCA and ChoiceCare acquisitions. Cash provided by financing activities was $51 million in 1998 compared to $679 million in 1997. Cash provided in 1998 was the result

of the timing of book overdrafts, while in 1997 cash provided by financing activities was the result of borrowings to finance acquisitions.

The Company's subsidiaries operate in states which require certain levels of equity and regulate the payment of dividends to the parent company. As a result, the Company's ability to use operating subsidiaries' cash flows is restricted to the extent of the subsidiaries' ability to obtain regulatory approval to pay dividends.

The Company maintains a revolving credit agreement ("Credit Agreement") which provides additional liquidity under a line of credit of up to $1.5 billion. Borrowings under this Credit Agreement were $93 million and $300 million at December 31, 1998 and 1997, respectively. The Company also maintains a commercial paper program and issues debt securities thereunder. The commercial paper program is backed by the Credit Agreement. Commercial paper borrowings averaged $659 million in 1998 at a weighted average interest rate of 5.9 percent. Commercial paper borrowings outstanding at December 31, 1998 and 1997 was $730 million and $589 million, respectively.

The Company intends to repay approximately $250 million of its outstanding debt with the proceeds of operating subsidiary dividends expected to be received during 1999. All borrowings under both the Credit Agreement and commercial paper program, except the planned 1999 repayments, have been classified as long-term debt based on management's ability and intent to refinance borrowings on a long-term basis.

Management believes that existing working capital, future operating cash flows and funds available under the existing revolving Credit Agreement and commercial paper program are sufficient to meet future liquidity needs. Management also believes the aforementioned sources of funds are adequate to allow the Company to pursue strategic acquisition and expansion opportunities, as well as to fund capital requirements.


Risk Sensitive Financial Instruments and Positions

The Company's risk of fluctuation in earnings due to changes in interest income from its fixed income portfolio is partially mitigated by the Company's debt position, as well as the short duration of the fixed income portfolio.

The Company has evaluated the interest income and debt expense impact resulting from a hypothetical change in interest rates of 100, 200 and 300 basis points over the next 12-month period, as reflected in the table below. In the past 10 years, annual changes in commercial paper rates have never exceeded 300 basis points, changed between 200 and 300 basis points twice, and changed between 100 and 200 basis points twice. The modeling technique used to calculate the pro forma net change considered the cash flows related to fixed income investments and debt, including the repayment of $250 million of debt in 1999, which are subject to interest rate changes during a prospective 12-month period.

| Dollars in millions | Increase (decrease) in earnings given an interest rate decrease of X basis points | | | Increase (decrease) in earnings given an interest rate increase of X basis points | | |
|---|---|---|---|---|---|---|
| | (300) | (200) | (100) | 100 | 200 | 300 |
| **1998** | | | | | | |
| Fixed income portfolio | $(11.9) | $(7.9) | $(4.0) | $4.0 | $8.0 | $12.0 |
| Debt | 5.7 | 3.8 | 1.9 | (1.9) | (3.8) | (5.7) |
| Total | $(6.2) | $(4.1) | $(2.1) | $2.1 | $4.2 | $6.3 |
| **1997** | | | | | | |
| Fixed income portfolio | $(15.1) | $(10.0) | $(5.0) | $4.9 | $9.9 | $14.8 |
| Debt | 12.3 | 8.2 | 4.1 | (4.1) | (8.2) | (12.3) |
| Total | $(2.8) | $(1.8) | $(.9) | $.8 | $1.7 | $2.5 |

8

Management's Discussion and Analysis of
Financial Condition and Results of Operations (continued)
===========================================================================

Humana Inc.

The following table presents the hypothetical change in fair market values of
common equity securities held by the Company at December 31, 1998 which are
sensitive to changes in stock market values. These common equity securities are
held for purposes other than trading.
---------------------------------------------------------------------------

| Dollars in millions | Decrease in valuation of security given an 4% increase in each equity security's value | | | Fair value as of December 31, | Increase in valuation of security given an 4% increase in each equity security's value | | |
|---|---|---|---|---|---|---|---|
| | (30%) | (20%) | (10%) | | 10% | 20% | 30% |
| **1998** Common equity securities | $(18.6) | $(12.4) | $(6.2) | $62.1 | $6.2 | $12.4 | $18.6 |
| **1997** Common equity securities | $(15.5) | $(10.4) | $(5.2) | $51.8 | $5.2 | $10.4 | $15.5 |

Changes in equity valuations (based upon the Standard & Poor's 500 stock index)
over the past 10 years which were in excess of 30 percent occurred five times,
between 20 percent and 30 percent occurred two times, and between 10 percent and
20 percent occurred three times.


Capital Resources

The Company's ongoing capital expenditures relate primarily to administrative
facilities and information systems necessary for activities such as claims
processing, billing and collections, medical utilization review and customer
service. Total capital expenditures, excluding acquisitions, were $104 million,
$73 million and $72 million for the years ended December 31, 1998, 1997 and
1996, respectively. Capital expenditures during 1998 included the $32 million
purchase and renovation of a regional customer service center in Jacksonville,
Florida.

Excluding acquisitions, planned capital spending in 1999 will approximate $80 to
$90 million for the expansion and improvement of administrative facilities and
information systems.


Effects of Inflation and Changing Prices

The Company's operations are regulated by various state and federal government
agencies. Actuarially determined premium rate increases for Commercial products
are generally approved by the respective state insurance commissioners, while
increases in premiums for Medicaid and Medicare HMO products are established by
various state governments and the Health Care Financing Administration. Premium
rates under the TRICARE contract with the United States Department of Defense
may be adjusted on a year by year basis to reflect inflation, changes in the
workload volumes of military medical facilities and contract modifications.

The Company's 1999 average rate of statutory increase under the Medicare
contracts is approximately 2 percent. Over the last five years, annual
increases have ranged from as low as the January 1998 increase of 2 percent to
as high as 9 percent in January 1996, with an average of approximately 5
percent. The Company's Medicare contracts with the federal government are
renewed for a one-year term each December 31 unless terminated 90 days prior
thereto.

Legislative proposals are being considered which may revise the Medicare
program's current support of the use of managed health care for Medicare
beneficiaries and the future reimbursement rates thereunder. Management is
unable to predict the outcome of these proposals or the impact they may have on

the Company's financial position, results of operations or cash flows. The
Company's Medicaid contracts are generally annual contracts with various states
except for the two-year contract with the Commonwealth of Puerto Rico. The
Puerto Rico contract, previously scheduled to expire March 31, 1999, has been
extended one month to April 30, 1999. The Company does not expect to be able to
renew the contract in Puerto Rico under favorable terms and, therefore, has
announced its intention to close this market when the contract expires.
Additionally, the Company's TRICARE contract is a one-year contract renewable
annually for up to two additional years. The loss of these contracts (other
than the contract in Puerto Rico) or significant changes in these programs as a
result of legislative action, including reductions in payments or increases in
benefits without corresponding increases in payments, would have a material
adverse effect on the revenues, profitability and business prospects of the
Company.

9

Management's Discussion and Analysis of
Financial Condition and Results of Operations (continued)
=============================================================================
Humana Inc.

In addition, the Company continually contracts and seeks to renew contracts with
providers at rates designed to ensure adequate profitability. To the extent the
Company is unable to obtain such rates, its financial position, results of
operations and cash flows could be adversely impacted. Currently, the Company
is in renegotiations with a major provider and is unable to predict the impact
of these negotiations on future rates.

The Company's Y2K Readiness Disclosure Statement

The Company operates one of the largest managed care data centers in the nation.
The primary computing facility is located in Louisville, Kentucky with a
satellite operation in Green Bay, Wisconsin. In 1998, Humana's Information
Systems organization included 950 associates with an annual operating budget of
$135 million. The Company's application systems are largely developed and
maintained in-house by a staff of 400 application programmers who are versed in
the use of state-of-the-art technology. All application systems are fully
integrated and automatically pass data through various system processes. The
information systems support marketing, sales, underwriting, contract
administration, billing, financial, and other administrative functions as well
as customer service, authorization and referral management, concurrent review,
physician capitation and claims administration, provider management, quality
management and utilization review.

The Company internally develops most of its own application systems software.
All application systems must comply with strict standards for data integrity,
file compatibility and architectural requirements. The Company maintains a
central project coordination function and an architectural review function that
ensure consistency across the application portfolio. The Company has subscribed
to automated file processes and integrated data architectures for over twenty-
five years.

The Year 2000 issue is the result of two potential malfunctions that may have an
impact on the Company's systems and equipment. The first potential malfunction
is the result of computers being programmed to use two rather than four digits
to define the applicable year. The second potential malfunction arises where
embedded microchips and micro-controllers have been designed using two rather
than four digits to define the applicable year. As a result, certain of the
Company's date-sensitive computer programs, building infrastructure components
and medical devices, may recognize a date using "00" as the year 1900 rather
than the year 2000. If uncorrected, the problem may result in computer system
and program failures or equipment malfunctions that could result in a disruption
of business operations (such as the payment of medical claims, premium billing
and collection, and membership enrollment verification as well as the use of
medical equipment such as heart defibrillators).

Humana's Information Systems organization operates in a centralized manner.  The
Company's data center and the majority of its programming and support staff are
located at its corporate offices in Louisville, Kentucky.  A Year 2000 project
management office is in place to oversee the progress made in the assessment and
correction of the Company's Year 2000 exposures.

In general, the Company's Year 2000 project consists of four phases --
assessment, remediation, validation, and implementation -- and is categorized
into the following four components:

    Information Technology (IT) - software essential for day-to-day operations
    ----------------------------
    including both internally developed software and third party software which
    interfaces therewith.

    IT Infrastructure - mainframe, network, telecommunications interfaces and
    -----------------
    self-contained operating systems.

    Third party business partners and intermediaries - entities on which the
    -------------------------------------------------
    Company relies for transmission and receipt of claims, and encounter,
    membership and payment information, including federal and state
    governmental agencies such as the Health Care Financing Administration.

    Non-IT Infrastructure - telecommunications equipment, elevators, public
    ---------------------
    safety equipment (i.e., security and fire), medical equipment and HVAC
    systems.

<center>10</center>

Management's Discussion and Analysis of
Financial Condition and Results of Operations (continued)
========================================================================
Humana Inc.

The Company commenced the assessment of its Year 2000 exposures in 1996.
Remediation efforts of internally developed software and third party software
applications have also begun.  The Company's plan is to have modified all
critical mainframe systems and components in time for such systems and
components to utilize the updated Year 2000 logic during the second quarter of
1999.  Modifying all critical systems and components by the second quarter of
1999 will enable the majority of the modified programs to run in a production
environment for a considerable period of time before encountering Year 2000
data.  Of the Company's 98 mainframe systems identified in the assessment, 92
have been renovated, validated and are currently operating using the updated
Year 2000 logic.  During 1999, the remaining 6 systems will be modified,
upgraded, or replaced and all systems will continue to be monitored and tested
to ensure that they will function properly after December 31, 1999.  In
addition, the Company is in the process of contacting vendors, third party
business partners and intermediaries in an effort to obtain the information
necessary to address Year 2000 issues.  The Company anticipates completing, in
all material respects, its Year 2000 project by the end of the third quarter
1999.  The Company's efforts are currently progressing on plan.

The Year 2000 project is currently estimated to have a minimum total cost of
approximately $25 million.  Project to date costs total $19.5 million, including
$18.5 million during the year ended December 31, 1998.  Year 2000 expenses
represented less than 15 percent of the Information Systems budget during 1998.
Year 2000 costs are expensed as incurred and funded through operating cash flow.

The extent and magnitude of the Year 2000 project, as it will affect the Company
both before and for some period after January 1, 2000, are difficult to predict
or quantify.  As a result, the Company has recently undertaken the development
of contingency plans in the event that its Year 2000 project is not completed in
an accurate or timely manner.  The Company has identified five major functional
areas, covering 20 operational subdivisions, that will require contingency

plans. The five major functional areas are: providers, service centers, suppliers and vendors, customers and brokers, and banking and finance. The Company is in the process of developing and refining alternative operating procedures for each functional area. Additionally, a tracking system is being developed to monitor the implementation of these procedures.

While the Company presently believes that the timely completion of its Year 2000 project will limit exposure so that the Year 2000 will not pose material operational problems, the Company does not control third party systems. Although the Company is contacting third parties, the Company has not received assurances that all third party interfaces will be converted in a timely manner. Additionally, if Year 2000 modifications or upgrades are not accomplished in a timely manner or proper contingency plans are not implemented, Year 2000 failures which may result could have a material adverse impact on the Company's results of operations or its financial position.

The costs of the Year 2000 project and the date on which the Company plans to complete Year 2000 modifications are based on management's best estimates, considering assumptions of future events including the continued availability of certain resources and other factors. There can be no guarantee that these estimates will be achieved and actual results could differ materially from plan. Specific factors that might cause such material differences include, but are not limited to, the availability and cost of personnel trained in this area, the ability to locate and correct all relevant computer codes, and the ability of the Company's significant suppliers, customers and others with which it conducts business, including federal and state governmental agencies, to identify and resolve their own Year 2000 issues.


Impact of Recently Issued Accounting Pronouncements

In June 1998, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("SFAS 133"). In general, SFAS 133 requires that all derivatives be recognized as either assets or liabilities in the balance sheet at their face value, and sets forth the manner in which gains or losses thereon are to be recorded. The treatment of such gains and losses is dependent upon the type of exposure, if any, for which the derivative is designated as a hedge. This statement is effective for periods beginning after June 15, 1999. Management of the Company anticipates that, due to its limited use of derivative instruments, the adoption of SFAS 133 will not have a significant effect on the Company's results of operations or its financial position.


                                   11


Management's Discussion and Analysis of
Financial Condition and Results of Operations (continued)
===============================================================================
Humana Inc.

Other Information

During the ordinary course of business, the Company is subject to pending and threatened legal actions and audits by the agencies that regulate the Company. Management of the Company does not believe that any of these actions will have a material adverse effect on the Company's financial positions, results of operations or cash flows.

12

Consolidated Balance Sheets
================================================================================
Humana Inc.


Dollars in millions, except per share amounts
--------------------------------------------------------------------------------
December 31,                                                      1998      1997
--------------------------------------------------------------------------------

Assets
Current assets:
  Cash and cash equivalents                                     $  913    $  779
  Marketable securities                                          1,594     1,507
  Premiums receivable, less allowance for doubtful
    accounts of $62 in 1998 and $48 in 1997                        276       351
  Deferred income taxes                                            129       164
  Other                                                            207       231
--------------------------------------------------------------------------------
    Total current assets                                         3,119     3,032
--------------------------------------------------------------------------------

Property and equipment, net                                        433       420
Other assets:
  Long-term marketable securities                                  305       512
  Cost in excess of net assets acquired                          1,188     1,224
  Deferred income taxes                                             64        60
  Other                                                            387       352
--------------------------------------------------------------------------------
    Total other assets                                           1,944     2,148
--------------------------------------------------------------------------------
  Total Assets                                                  $5,496    $5,600
--------------------------------------------------------------------------------

Liabilities and Stockholders' Equity
Current liabilities:
  Medical and other expenses payable                            $1,470    $1,478
  Trade accounts payable and accrued expenses                      395       511
  Book overdraft                                                   234       152
  Unearned premium revenues                                        294       304
  Short-term debt                                                  250         -
--------------------------------------------------------------------------------
    Total current liabilities                                    2,643     2,445
--------------------------------------------------------------------------------
Long-term medical and other expenses payable                       438       597
Long-term debt                                                     573       889
Professional liability and other obligations                       154       168
--------------------------------------------------------------------------------
    Total liabilities                                            3,808     4,099
--------------------------------------------------------------------------------
Commitments and contingencies
Stockholders' equity:
  Preferred stock, $1 par; authorized 10,000,000 shares; none issued  -         -
  Common stock, $.16 2/3 par; authorized 300,000,000
    shares; issued and outstanding 167,515,362 shares - 1998
    and 164,058,225 shares - 1997                                   28        27
  Capital in excess of par value                                   894       841
  Retained earnings                                                753       624
  Accumulated other comprehensive income                            13         9
--------------------------------------------------------------------------------
    Total stockholders' equity                                   1,688     1,501
--------------------------------------------------------------------------------
  Total Liabilities and Stockholders' Equity                     5,496    $5,600
--------------------------------------------------------------------------------


The accompanying notes are an integral part of the consolidated financial
statements.

13

Consolidated Statements of Income
================================================================================
Humana Inc.


Dollars in millions, except per share results
--------------------------------------------------------------------------------
Years ended December 31,                        1998      1997     1996
--------------------------------------------------------------------------------


Revenues:
  Premiums                                      $9,597    $7,880   $6,677
  Interest and other income                        184       156      111
--------------------------------------------------------------------------------
    Total revenues                               9,781     8,036    6,788

Operating expenses:
  Medical                                        8,041     6,522    5,625
  Selling, general and administrative            1,328     1,116      940
  Depreciation and amortization                    128       108       98
  Asset write-downs and other charges              34         -        96
--------------------------------------------------------------------------------
    Total operating expenses                     9,531     7,746    6,759
--------------------------------------------------------------------------------

Income from operations                             250       290       29

Interest expense                                    47        20       11
--------------------------------------------------------------------------------

Income before income taxes                         203       270       18

Provision for income taxes                          74        97        6
--------------------------------------------------------------------------------

Net income                                       $ 129  $    173   $ 12
--------------------------------------------------------------------------------

Earnings per common share                        $ .77  $   1.06    $.07
--------------------------------------------------------------------------------

Earnings per common share - assuming dilution    $ .77  $   1.05    $.07
--------------------------------------------------------------------------------


The accompanying notes are an integral part of the consolidated financial
statements.


14

Consolidated Statements of Stockholders' Equity
================================================================================
Humana Inc.


In millions
................................................................................

| | Common Stock | | Capital In Excess of Par Value | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balances, January 1, 1996 | 162 | $27 | $815 | $439 | $ 6 | $1,287 |
| Comprehensive loss: | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Net income | | | 12 | | 12 |
| Other comprehensive loss: | | | | | |
| Net unrealized investment loss, net of tax | | | | (14) | (14) |
| Comprehensive loss | | | | | 2) |
| Other | | | | | 1 |
| Balances, December 31, 1996 | .63 | 27 | 622 | 451 | 81 | 1,292 |
| Comprehensive income | | | | | |
| Net income | | | 173 | | 173 |
| Other comprehensive income: | | | | | |
| Net unrealized investment gain, net of tax | | | | 17 | 17 |
| Comprehensive income | | | | | 190 |
| Other | 1 | | 19 | | | 9 |
| Balances, December 31, 1997 | 164 | 27 | 841 | 624 | 9 | 1,501 |
| Comprehensive income | | | | | |
| Net income | | | 129 | | 129 |
| Other comprehensive income: | | | | | |
| Net unrealized investment gain, net of tax | | | | 4 | 4 |
| Comprehensive income | | | | | 133 |
| Other | 4 | 1 | 53 | | | 54 |
| Balances, December 31, 1998 | 168 | 528 | 1894 | 3753 | 813 | $1,688 |

The accompanying notes are an integral part of the consolidated financial statements.

15

Consolidated Statements of Cash Flows
================================================================================
Humana Inc.

Dollars in millions

--------------------------------------------------------------------------------
| Years Ended December 31, | 1998 | 1997 | 1996 |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| Net income | $ 129 | $ 173 | $ 12 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Asset write-downs and losses on sales of assets | 17 | – | 70 |
| Depreciation and amortization | 128 | 108 | 98 |
| Deferred income taxes | 26 | 40 | (25) |
| Changes in operating assets and liabilities: | | | |
| Premiums receivable | 45 | (102) | (81) |
| Other assets | 32 | (47) | (31) |
| Medical and other expenses payable | (22) | (118) | 215 |
| Workers' compensation liabilities | (134) | (31) | – |
| Other liabilities | (135) | 57 | 84 |
| Unearned premium revenues | (10) | 203 | (3) |
| Other | – | 6 | 2 |
| Net cash provided by operating activities | 76 | 289 | 341 |
| **Cash flows from investing activities** | | | |
| Acquisitions of health plan assets, net of cash acquired | – | (669) | (6) |
| Purchases of property and equipment | (104) | (73) | (72) |
| Dispositions of property and equipment | 12 | 15 | 5 |
| Purchases of marketable securities | (1,037) | (608) | (440) |
| Maturities and sales of marketable securities | 1,174 | 648 | 356 |
| Other | (38) | 23 | (17) |

| | | | |
|---|---|---|---|
| Net cash provided by (used in) investing activities | 7 | (664) | (174) |

| | | | |
|---|---|---|---|
| Cash flows from financing activities | | | |
| Issuance of long-term debt | 123 | 300 | - |
| Repayment of long-term debt | (330) | - | (250) |
| Net commercial paper borrowings | 141 | 367 | 222 |
| Change in book overdraft | 82 | (1) | (25) |
| Other | 35 | 13 | 1 |
| Net cash provided by (used in) financing activities | 51 | 679 | (52) |

| | | | |
|---|---|---|---|
| Increase in cash and cash equivalents | 134 | 304 | 115 |
| Cash and cash equivalents at beginning of period | 779 | 475 | 360 |

| | | | |
|---|---|---|---|
| Cash and cash equivalents at end of period | $913 | $779 | $475 |

| | | | |
|---|---|---|---|
| Supplemental cash flow disclosure: | | | |
| Interest payments | $ 49 | $ 15 | $ 11 |
| Income tax payments | 69 | 8 | 39 |

The accompanying notes are an integral part of the consolidated financial
statements.

16

Notes to Consolidated Financial Statements
================================================================================
Humana Inc.

1. Reporting Entity

Nature of Operations

Humana Inc. ("the Company") is a health services company that facilitates the
delivery of health care services through networks of providers.  The Company's
products are marketed primarily through health maintenance organizations
("HMOs") and preferred provider organizations ("PPOs") that encourage or require
the use of contracted providers. HMOs and PPOs control health care costs by
various means, including pre-admission approval for hospital inpatient services,
pre-authorization of outpatient surgical procedures, and risk-sharing
arrangements with providers.   These providers may share medical cost risk or
have other incentives to deliver quality medical services in a cost-effective
manner.  The Company also offers various specialty products to employers,
including dental, group life and workers' compensation, and administrative
services ("ASO") to those who self-insure their employee health plans.  In
total, the Company's products are licensed in 47 states, the District of
Columbia and Puerto Rico, with approximately 21 percent of its membership in the
state of Florida.

The Company markets and distributes its products to three distinct customer
groups and, therefore, reports operations in three business segments.  Results
of each segment are measured based on premium revenues and underwriting margin
(premium revenues less medical expenses).  The Company does not allocate assets
or administrative costs to the segments and, therefore, does not measure results
based on segment assets or pretax profits.  Members from all three segments
generally utilize the same medical provider networks, enabling the Company to
obtain more favorable contract terms with providers.  As a result, the
profitability of each segment is somewhat interdependent.

Basis of Presentation

The preparation of the Company's consolidated financial statements in conformity
with generally accepted accounting principles requires management to make
estimates and assumptions that affect (a) the reported amounts of assets and
liabilities, (b)  disclosure of contingent assets and liabilities at the date of
the financial statements and (c) reported amounts of revenues and expenditures

during the reporting period. Actual results could differ from those estimates.

2. Summary of Significant Accounting Policies

Consolidation

The consolidated financial statements include all subsidiaries of the Company. All significant intercompany accounts and transactions have been eliminated.

Cash and Cash Equivalents

Cash and cash equivalents include cash, time deposits, money market funds, commercial paper and certain U.S. Government securities with an original maturity of three months or less. Carrying value approximates fair value due to the short-term maturities of the investments.

Marketable Securities

At December 31, 1998 and 1997, marketable debt and equity securities have been categorized as available for sale and, as a result, are stated at fair value based generally on quoted market prices. Commercial mortgage loans are carried at cost. Marketable debt and equity securities available for current operations are classified as current assets. Marketable securities available for the Company's capital spending, professional liability, long-term insurance product requirements and payment of long-term workers' compensation claims are classified as long-term assets. Unrealized holding gains and losses, net of applicable deferred taxes, are included as a component of stockholders' equity until realized.

For the purpose of determining gross realized gains and losses, the cost of securities sold is based upon specific identification.

17

Notes to Consolidated Financial Statements (continued)
================================================================================
Humana Inc.

Long-Lived Assets

Property and equipment is carried at cost and comprises the following at December 31, 1998 and 1997:

| Dollars in millions | 1998 | 1997 |
|---|---|---|
| Land | $ 33 | $ 33 |
| Buildings | 355 | 302 |
| Equipment | 400 | 393 |
| | 788 | 728 |
| Accumulated depreciation | (355) | (308) |
| | $ 433 | $ 420 |

Depreciation is computed using the straight-line method over estimated useful lives ranging from three to 10 years for equipment and 20 years for buildings. Depreciation expense was $75 million, $66 million and $59 million for the years ended December 31, 1998, 1997 and 1996, respectively.

Cost in excess of net assets acquired represents the unamortized excess of cost over the fair value of tangible and identifiable intangible assets acquired and is being amortized on a straight-line basis over varying periods not exceeding 40 years. Accumulated amortization totaled $69 million and $37 million at December 31, 1998 and 1997, respectively.

The carrying values of all long-lived assets are periodically reviewed by management for impairment, based upon undiscounted future cash flows, and appropriate losses are recognized whenever the carrying value of an asset may not be recoverable.

Revenue and Medical Cost Recognition

Premium revenues are recognized as income in the period members are entitled to receive services. Premiums received prior to such period are recorded as unearned premium revenues.

Medical costs include claim payments, capitation payments, physician salaries, allocations of certain centralized expenses and various other costs incurred to provide medical care to members, as well as estimates of future payments to hospitals and others for medical care provided prior to the balance sheet date. Capitation payments represent monthly prepaid fees disbursed to participating primary care physicians and other providers who are responsible for providing medical care to members. The estimates of future medical claim and other expense payments are developed using actuarial methods and assumptions based upon payment patterns, medical inflation, historical development and other relevant factors. Estimates of future payments relating to services incurred in the current and prior periods are continually reviewed by management and adjusted as necessary.

The Company assesses the profitability of its contracts for providing health care services to its members when current operating results or forecasts indicate probable future losses. The Company records a premium deficiency in current operations to the extent that the sum of expected health care costs, claim adjustment expenses and maintenance costs exceeds related future premiums. Anticipated investment income is not considered for purposes of computing the premium deficiency. During the years ended December 31, 1998 and 1996, the Company recorded premium deficiencies approximating $46 million and $105 million, respectively.

Management believes the Company's medical and other expenses payable are adequate to cover future claims payments required, however, such estimates are subject to changes in assumptions, and, therefore, the actual liability could differ from amounts provided.

Book Overdraft

Under the Company's cash management system, checks issued but not presented to banks frequently result in overdraft balances for accounting purposes and are classified as a current liability in the consolidated balance sheets.

Stock Options

The Company has adopted the disclosure-only provisions of Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" ("SFAS 123") and continues to apply Accounting Principles Board.

18

Notes to Consolidated Financial Statements (continued)
=====================================================================
Humana Inc.

Opinion No. 25 and related interpretations in the accounting for its stock option plans. No compensation expense has been recognized in connection with the granting of stock options. See Note 8 for discussion of stock options and the disclosures required by SFAS 123.

Earnings Per Common Share

Detail supporting the computation of earnings per common share and earnings per common share-assuming dilution follows:

Dollars in millions, except per share results

| Year Ended December 31, 1998 | Net Income | Shares | Per Share Results |
|---|---|---|---|
| Earnings per common share | $ 129 | 166,471,924 | $ .77 |
| Effect of dilutive stock options | | 1,792,756 | |
| Earnings per common share - assuming dilution | $ 129 | 168,264,580 | $ .77 |

| Year Ended December 31, 1997 | | | |
|---|---|---|---|
| Earnings per common share | $ 173 | 163,406,460 | $1.06 |
| Effect of dilutive stock options | | 2,436,019 | |
| Earnings per common share - assuming dilution | $ 173 | 165,842,479 | $1.05 |

| Year Ended December 31, 1996 | | | |
|---|---|---|---|
| Earnings per common share | $ 12 | 162,531,524 | $ .07 |
| Effect of dilutive stock options | | 2,747,294 | |
| Earnings per common share - assuming dilution | $ 12 | 165,278,818 | $ .07 |

Options to purchase 1,562,949, 2,414,148 and 1,580,891 shares for the years
ended December 31, 1998, 1997 and 1996, respectively, were not included in the
computation of earnings per common share-assuming dilution because the options'
exercise prices were greater than the average market price of the common shares
during the periods.

Reclassifications

Certain reclassifications have been made to the prior years' consolidated
financial statements to conform with the current year presentation.

Adoption of Recent Accounting Pronouncements

In 1998, the Company adopted Statement of Financial Accounting Standards No.
130, "Reporting Comprehensive Income" ("SFAS 130"). SFAS 130 establishes
standards for reporting and display of changes in equity from non-owner sources
in the financial statements. Non-owner changes in stockholders' equity consists
of unrealized investment gains or losses on marketable securities and, as
permitted under the provisions of SFAS 130, are presented in the Consolidated
Statements of Stockholders' Equity. The adoption of SFAS 130 did not affect
results of operations or financial position but did affect disclosure of
comprehensive income.

In 1998, the Company adopted Statement of Financial Accounting Standards No.
131, "Disclosures About Segments of an Enterprise and Related Information"
("SFAS 131"). SFAS 131 establishes new requirements for the reporting of
segment information under a new framework referred to as the management
approach. The management approach designates the internal organization that is
used by management for making operating decisions and assessing performance as
the source of the Company's reportable segments. The adoption of SFAS 131 did
not affect results of operations or financial position but did affect disclosure
of segment information.

In 1998, the Company also adopted Statement of Position 98-1, "Accounting for
the Costs of Computer Software Developed or Obtained for Internal Use" ("SOP 98-
1"), issued by the AICPA's Accounting Standards Executive Committee in March
1998. SOP 98-1 specifies the costs to be capitalized in connection with
obtaining or developing computer software to be used solely to meet the
Company's internal needs. Computer software costs capitalized in 1998
were approximately $9 million.

19

Notes to Consolidated Financial Statements (continued)
=============================================================================
Humana Inc.

3. Asset Write-Downs and Other Charges

In 1998, the Company recorded asset write-downs and other charges of $34
million. The charges included severance and lease termination costs associated
with closing five markets (Sarasota and Treasure Coast, Florida, Springfield and
Jefferson City, Missouri and Puerto Rico) and discontinuing products ($5
million), write-downs of receivables and certain property and equipment
associated with closing markets ($10 million), losses on disposals of non-
strategic assets ($12 million) and merger dissolution costs ($7 million).
Charges for estimated employee severance costs were based on the Company's
employee benefit plan arrangements. Significant market closure activities are
expected to be completed by the end of the second quarter of 1999 as membership
lapses or existing contracts expire. Total premium revenues and underwriting
profits associated with market closures and discontinued products approximated
$665 million and $50 million, respectively, for the year ended December 31,
1998.

Activity related to these charges for the year ended December 31, 1998 follows
(in millions):

| | |
|---|---|
| Provision for asset write-downs and other charges | $ 34 |
| Usage (non-cash) | (17) |
| Usage (cash) | (10) |
| Balance remaining at December 31, 1998 | $ 7 |

In 1996, the Company recorded asset write-downs and other charges of $96
million. These charges included write-downs of long-lived assets associated
with the Company's Washington, D.C., health plan which was sold in 1997 ($70
million), severance and lease termination costs for workforce reductions
undertaken during 1997 ($15 million) and market closure and product
discontinuance costs ($11 million). Substantially all amounts related to the
cash portion of these charges were paid before the end of 1997.

4. Marketable Securities

Marketable securities classified as current assets at December 31, 1998 and 1997
included the following:

| | 1998 | | | | 1997 | | | |
|---|---|---|---|---|---|---|---|---|
| Dollars in millions | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
| U.S. Government obligations | $ 165 | $ 4 | $ - | $ 169 | $ 178 | $ 1 | $ - | $ 179 |
| Tax exempt municipal bonds | 845 | 6 | - | 851 | 723 | 5 | (2) | 726 |
| Corporate bonds | 250 | 6 | - | 256 | 282 | 6 | - | 288 |
| Redeemable preferred stocks | 124 | 1 | - | 125 | 113 | 1 | (2) | 112 |
| Marketable equity securities | 129 | 2 | (2) | 129 | 114 | 5 | (1) | 118 |
| Other | 59 | 1 | - | 62 | 80 | 4 | - | 84 |
| | $1,572 | $24 | $(2) | $1,594 | $1,490 | $22 | $ (5) | $1,507 |

Marketable securities classified as long-term assets at December 31, 1998 and
1997 included the following:

| | 1998 | | | | 1997 | | | |
|---|---|---|---|---|---|---|---|---|
| Dollars in millions | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
| U.S. Government obligations | $ 5 | $ - | $ - | $ 5 | $ 146 | $ - | $ - | $ 146 |
| Tax exempt municipal bonds | 234 | 6 | (3) | 237 | 284 | 3 | (2) | 285 |
| Redeemable preferred stocks | 31 | - | - | 31 | 16 | - | - | 16 |
| Marketable equity securities | 2 | - | - | 2 | 19 | 1 | - | 20 |
| Other | 10 | - | - | 10 | 45 | - | - | 45 |



Notes to Consolidated Financial Statements (continued)
==============================================================================
Humana Inc.

The contractual maturities of debt securities available for sale at December 31,
1998, regardless of their balance sheet classification, are shown below.
Expected maturities may differ from contractual maturities because borrowers may
have the right to call or prepay obligations with or without call or prepayment
penalties.

| Dollars in millions | Amortized Cost | Fair Value |
|---|---|---|
| Due within one year | $ 178 | $ 180 |
| Due after one year through five years | 579 | 590 |
| Due after five years through ten years | 410 | 420 |
| Due after ten years | 220 | 224 |
| Not due at a single maturity date | 356 | 354 |
| | $1,743 | $1,768 |

Realized gains and losses for the years ended December 31, 1998, 1997 and 1996
were approximately $21 million, $10 million and $2 million, respectively.

5. Income Taxes

The provision for income taxes consisted of the following:

| | Years Ended December 31, | | |
|---|---|---|---|
| Dollars in millions | 1998 | 1997 | 1996 |
| Current provision: | | | |
| Federal | $ 39 | $ 51 | $ 30 |
| State | 9 | 6 | 1 |
| | 48 | 57 | 31 |
| Deferred provision (benefit): | | | |
| Federal | 24 | 36 | (23) |
| State | 2 | 4 | (2) |
| | 26 | 40 | (25) |
| | $ 74 | $ 97 | $ 6 |

The provision for income taxes was different from the amount computed using the
federal statutory rate due to the following:

| | Years Ended December 31, | | |
|---|---|---|---|
| Dollars in millions | 1998 | 1997 | 1996 |
| Income tax provision at federal statutory rate | $ 71 | $ 95 | $ 6 |
| State income taxes, net of federal benefit | 8 | 10 | 1 |
| Tax exempt investment income | (18) | (13) | (12) |
| Amortization | 17 | 10 | 12 |

| Other items, net | (4) | (5) | (1) |
|---|---|---|---|
| | $ 74 | $ 97 | $ 6 |

Cumulative temporary differences which gave rise to deferred tax assets and liabilities at December 31, 1998 and 1997 were as follows:

| | Assets (Liabilities) | |
|---|---|---|
| Dollars in millions | 1998 | 1997 |
| Marketable securities | $ (8) | $ (6) |
| Long-term assets | (46) | (42) |
| Medical and other expenses payable | 95 | 126 |
| Liabilities for charges | 16 | 14 |
| Professional liability risks | 7 | 11 |
| Net operating loss carryforwards | 58 | 77 |
| Other | 71 | 44 |
| | $ 193 | $ 224 |

At December 31, 1998, the Company has available tax net operating loss carryforwards of approximately $150 million related to prior acquisitions. These loss carryforwards, if unused to offset future taxable income of the acquired subsidiaries, will expire in 2002 through 2012.

21

Notes to Consolidated Financial Statements (continued)
================================================================================
Humana Inc.

Based on the Company's historical taxable income record and estimates of future profitability, management has concluded that operating income will more likely than not be sufficient to give rise to tax expense to cover all deferred tax assets.

6. Long-Term Debt

The Company maintains a revolving credit agreement ("Credit Agreement") which provides a line of credit of up to $1.5 billion. Principal amounts outstanding under the Credit Agreement bear interest at either a fixed rate or a floating rate, ranging from LIBOR plus 12 basis points to LIBOR plus 30 basis points, depending on the ratio of debt to debt plus net worth. The Credit Agreement contains customary covenants and events of default and expires in August 2002. The Company also maintains and issues debt securities under a commercial paper program, which is backed by the Credit Agreement.

The Company intends to repay approximately $250 million of its outstanding debt with the proceeds from operating subsidiary dividends expected to be received during 1999. All borrowings under both the Credit Agreement and commercial paper program, except $250 million, have been classified as long-term debt based on management's ability and intent to refinance borrowings on a long-term basis.

Borrowings and the weighted average interest rate on those borrowings as of December 31, 1998 and 1997 were as follows:

| | 1998 | | 1997 | |
|---|---|---|---|---|
| | | Weighted Average Interest | | Weighted Average Interest |
| Dollars in millions | Amount | Rate | Amount | Rate |

| | | | | |
|---|---|---|---|---|
| Credit Agreement | $ 93 | 5.9% | $ 300 | 6.2% |
| Commercial paper program | 730 | 5.9% | 589 | 5.9% |
| Total debt | 823 | | 889 | |
| Less: short-term debt | 250 | | - | |
| Total long-term debt | $ 573 | | $ 889 | |

7. Professional Liability and Other Obligations

The Company insures substantially all professional liability risks through a wholly-owned subsidiary (the "Subsidiary"). Provisions for such risks, including expenses incident to claim settlements, were $27 million, $32 million and $31 million for the years ended December 31, 1998, 1997 and 1996, respectively. The Subsidiary reinsures levels of coverage for losses in excess of its retained limits with unrelated insurance carriers. Allowance for professional liability risks and the equivalent amounts of marketable securities and reinsurance recoverables related to the funding thereof included in the accompanying consolidated balance sheets were $123 million and $111 million at December 31, 1998 and 1997, respectively.

In addition to the long-term portion of the allowance for professional liability risks, professional liability and other obligations in the accompanying consolidated balance sheets consist primarily of liabilities for disability and other long-term insurance products, leases and the Company's employee retirement and benefit plans. These liabilities totaled $53 million and $77 million at December 31, 1998 and 1997, respectively.

8. Stockholders' Equity

The Company has adopted a stockholders' rights plan designed to deter takeover initiatives not considered to be in the best interests of the Company's stockholders. The rights are redeemable by action of the Company's Board of Directors at a price of $.01 per right at any time prior to their becoming exercisable. Pursuant to the plan, under certain conditions, each share of stock has a right to acquire 1/100th of a share of Series A Participating Preferred Stock at a price of $145 per share. The plan expires in 2006.

22

Notes to Consolidated Financial Statements (continued)
--------------------------------------------------------------------------------
Humana Inc.

The Company has plans under which restricted stock awards and options to purchase common stock have been granted to officers, directors and key employees. In 1998, the Company awarded 400,000 shares at $14.38 of performance-based restricted stock to officers and key employees. The shares vest in equal one-third installments beginning January 1, 2000, provided the Company meets certain earnings goals. Unearned compensation under the restricted stock awards plan is amortized over the vesting period. Compensation expense recognized related to the restricted stock award plans was $3 million in 1998.

Options are granted at the market price on the date of grant. Exercise provisions vary, but most options vest in whole or in part one to five years after grant and expire 10 years after grant. At December 31, 1998, there were 15,883,609 shares reserved for employee and director stock option plans. At December 31, 1998, there were 4,043,385 shares of common stock available for future grants. In January 1999, a total of 1,861,500 options were granted and 6,000 shares were awarded to directors in lieu of director fees.

On September 17, 1998, the Company repriced 5,503,491 of its stock options with

original exercise prices ranging from $18.31 to $26.31 to the market price of the Company's common stock on that date of $15.59. Outstanding stock options with an exercise price in excess of $18.13 per share could be exchanged in return for a reduced number of options, with a deferred vesting date of one year after the exchange date. The repricing resulted in the cancellation of 5,603,491 options and the granting of 4,559,438 options.

The Company's option plan activity for the years ended December 31, 1998, 1997 and 1996 is summarized below:

| | Shares Under Option | Exercise Price Per Share | | | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| Balance, January 1, 1996 | 9,835,855 | $ 4.32 | to | $ 23.06 | $ 12.37 |
| Granted | 1,888,500 | 15.63 | to | 27.56 | 19.74 |
| Exercised | (454,044) | 4.32 | to | 23.06 | 8.11 |
| Canceled or lapsed | (348,424) | 6.56 | to | 27.56 | 15.87 |
| Balance, December 31, 1996 | 10,921,887 | 4.32 | to | 26.94 | 13.71 |
| Granted | 2,819,000 | 18.31 | to | 23.69 | 19.79 |
| Exercised | (1,247,793) | 4.32 | to | 23.06 | 8.67 |
| Canceled or lapsed | (270,830) | 6.56 | to | 23.06 | 17.32 |
| Balance, December 31, 1997 | 12,222,264 | 5.80 | to | 26.94 | 15.54 |
| Granted | 6,403,788 | 15.59 | to | 26.22 | 17.04 |
| Exercised | (3,067,202) | 5.80 | to | 26.31 | 11.72 |
| Canceled or lapsed | (6,753,198) | 6.56 | to | 26.31 | 20.03 |
| Balance, December 31, 1998 | 8,805,652 | $ 6.56 | to | $ 26.94 | $ 14.52 |

A summary of stock options outstanding and exercisable at December 31, 1998 follows:

| Range of Exercise Prices | | | Stock Options Outstanding | | | Stock Options Exercisable | |
|---|---|---|---|---|---|---|---|
| | | | Shares | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | Shares | Weighted Average Exercise Price |
| $ 6.56 | to | $ 9.64 | 2,032,160 | 4.0 years | $ 6.97 | 2,032,160 | $ 6.97 |
| 10.54 | to | 14.44 | 104,700 | 2.7 years | 11.38 | 104,700 | 11.38 |
| 15.59 | to | 19.31 | 6,036,658 | 7.8 years | 16.29 | 1,112,551 | 18.40 |
| 20.16 | to | 22.97 | 304,800 | 7.8 years | 21.16 | 81,402 | 22.20 |
| 23.06 | to | 26.94 | 327,334 | 4.9 years | 23.50 | 305,668 | 23.46 |
| $ 6.56 | to | $ 26.94 | 8,805,652 | 6.7 years | $ 14.52 | 3,636,481 | $ 12.32 |

As of December 31, 1997 and 1996, there were 6,215,776 and 4,786,969 options exercisable, respectively. The weighted average exercise price of options exercisable during 1997 and 1996 was $13.32 and $11.05, respectively.

23

Notes to Consolidated Financial Statements (continued)
-------------------------------------------------------------------------------
Humana Inc.

If the Company had adopted the expense recognition provisions of SFAS 123 for purposes of determining compensation expense related to stock options granted during the years ended December 31, 1998, 1997 and 1996, net income and earnings

per common share would have been changed to the pro forma amounts shown below:

|  |  | Years Ended December 31, | | |
|---|---|---|---|---|
| Dollars in millions, except per share results |  | 1998 | 1997 | 1996 |
| Net Income | As reported | $ 129 | $ 173 | $ 12 |
|  | Pro forma | 116 | 159 | 4 |
| Earnings per common share | As reported | $ .77 | $1.06 | $.07 |
|  | Pro forma | .69 | .97 | .02 |
| Earnings per common share – assuming dilution | As reported | $ .77 | $1.05 | $.07 |
|  | Pro forma | .69 | .96 | .02 |

The fair value of each option granted during 1998, 1997 and 1996 was estimated
on the date of grant using the Black-Scholes pricing model with the following
weighted average assumptions:

|  | 1998 | 1997 | 1996 |
|---|---|---|---|
| Dividend yield | None | None | None |
| Expected volatility | 40.9% | 38.5% | 40.2% |
| Risk-free interest rate | 4.9% | 6.1% | 7.0% |
| Expected option life (years) | 6.8 | 5.4 | 5.8 |
| Weighted average fair value at grant date | $8.59 | $8.88 | $8.92 |

The effects of applying SFAS 123 in the pro forma disclosures are not likely to
be representative of the effects on pro forma net income for future years
because variables such as option grants, exercises and stock price volatility
included in the disclosures may not be indicative of future activity.

9. Commitments and Contingencies

The Company's Medicare contracts with the federal government are renewed for a
one-year term each December 31 unless terminated 90 days prior thereto.
Legislative proposals are being considered which may revise the Medicare
program's current support of the use of managed health care for Medicare
beneficiaries and the future reimbursement rates thereunder.  Management is
unable to predict the outcome of these proposals or the impact they may have on
the Company's financial position, results of operations or cash flows.  The
Company's Medicaid contracts are generally annual contracts with various states
except for the two-year contract with the Commonwealth of Puerto Rico.  The
Puerto Rico contract, previously scheduled to expire March 31, 1999, has been
extended one month to April 30, 1999.  The Company does not expect to be able to
renew the contract in Puerto Rico under favorable terms and, therefore, has
announced its intention to close this market when the contract expires.
Additionally, the Company's TRICARE contract is a one-year contract renewable
annually for up to two additional years.  The loss of these contracts (other
than the contract in Puerto Rico) or significant changes in these programs as a
result of legislative action, including reductions in payments or increases in
benefits without corresponding increases in payments, would have a material
adverse effect on the revenues, profitability and business prospects of the
Company.  In addition, the Company continually contracts and seeks to renew
contracts with providers at rates designed to ensure adequate profitability.  To
the extent the Company is unable to obtain such rates, its financial position,
results of operations and cash flows could be adversely impacted.  Currently,
the Company is in renegotiations with a major provider and is unable to predict
the impact of these negotiations on future contract rates.

During the ordinary course of business, the Company is subject to pending and
threatened legal actions and audits by the agencies that regulate the Company.
Management of the Company does not believe that any of these actions will have a
material adverse effect on the Company's financial positions, results of
operations or cash flows.

10. Acquisitions

On October 17, 1997, the Company acquired ChoiceCare Corporation ("ChoiceCare")
for approximately $250 million in cash. The purchase was funded with borrowings
under the Company's commercial paper program. ChoiceCare

24

Notes to Consolidated Financial Statements (continued)
--------------------------------------------------------------------------------
Humana Inc.

provided health services products to members in the Greater Cincinnati, Ohio,
area.

On September 8, 1997, the Company acquired Physician Corporation of America
("PCA") for total consideration of $411 million in cash, consisting primarily of
$7 per share for PCA's outstanding common stock and the assumption of $121
million in debt. The purchase was funded with borrowings under the Company's
commercial paper program. PCA provided comprehensive health services through its
HMOs in Florida, Texas and Puerto Rico. In addition, PCA provided workers'
compensation third-party administrative management services. Prior to November
1996, PCA also was a direct writer of workers' compensation insurance in
Florida. Long-term medical and other expenses payable in the accompanying
consolidated balance sheets includes the long-term portion of workers'
compensation liabilities related to this business.

On February 28, 1997, the Company acquired Health Direct, Inc. ("Health Direct")
from Advocate Health Care for $23 million in cash.

The above acquisitions were accounted for under the purchase method of
accounting. In connection with these acquisitions, the Company allocated the
acquisition costs to tangible and identifiable intangible assets based upon
their fair values. Identifiable intangible assets, which are included in other
long-term assets in the accompanying consolidated balance sheets, primarily
relate to subscriber and provider contracts. Any remaining value not assigned
to tangible or identifiable intangible assets was then allocated to cost in
excess of net assets acquired. Cost in excess of net tangible and identifiable
intangible assets acquired, recorded in connection with the acquisitions, was
$754 million in 1997. Subscriber and provider contracts are amortized over their
estimated useful lives (seven to 14 years), while cost in excess of net assets
acquired is amortized over periods not exceeding 40 years.

The results of operations for the previously mentioned acquisitions have been
included in the accompanying consolidated statements of income since the date of
acquisition. The following unaudited pro forma consolidated results of
operations give effect to those acquisitions as if they had occurred at the
beginning of the year preceding the year of acquisition:

|                                                          | Years Ended December 31, | |
| --- | --- | --- |
| Dollars in millions, except per share results           | 1997   | 1996    |
| Revenues                                                 | $9,272 | $8,581  |
| Net income (loss)                                        | 64     | (271)   |
| Earnings (loss) per common share                         | $ .39  | $(1.67) |
| Earnings (loss) per common share - assuming dilution     | .39    | (1.67)  |

The unaudited pro forma information may not necessarily reflect future results of operations or what the results of operations would have been had the acquisitions actually been consummated at the beginning of the year preceding the year of acquisition.

11. Segment Information

The Company markets and distributes its products to three distinct customer groups and, therefore, reports operations in three business segments. Results of each segment are measured based on premium revenues and underwriting margin (premium revenues less medical expenses). The Company does not allocate assets or administrative costs to the segments and, therefore, does not measure results based on segment assets or pretax profits. Members from all three segments generally utilize the same medical provider networks, enabling the Company to obtain more favorable contract terms with providers. As a result, the profitability of each segment is somewhat interdependent. The accounting policies of each segment are similar and are described in Note 2 to the consolidated financial statements.

   Commercial Segment
   ------------------
   Facilitates delivery of health care services to the employees of Commercial enterprises with which the Company has negotiated actuarially determined premium rates.

   Public Sector Segment
   ---------------------
   Facilitates delivery of health care services to Medicaid- and Medicare-eligible individuals at premium rates generally established by the various state governments and the Health Care Financing Administration.

                                          25

Notes to Consolidated Financial Statements (continued)
--------------------------------------------------------------------------------
Humana Inc.

   TRICARE Segment
   ---------------
   Facilitates delivery of health care services for the dependents of active military personnel and retired military personnel and their dependents located in the Southeastern United States, under a managed care support contract awarded through a competitive bid process conducted by the United States Department of Defense.

The segment results are as follows:

| Dollars in millions | 1998 | 1997 | 1996 |
|---|---|---|---|
| **Premium revenues:** | | | |
| Commercial | $ 5,257 | $ 4,387 | $4,255 |
| Public Sector | 3,540 | 2,729 | 2,071 |
| TRICARE | 800 | 764 | 351 |
| Total for reportable segments | 9,597 | 7,880 | 6,677 |
| Non-allocated revenues - interest and other income | 184 | 156 | 111 |
| Total consolidated revenues | $ 9,781 | $ 8,036 | $6,788 |
| **Underwriting margin:** | | | |
| Commercial | $   900 | $   732 | $   585 |
| Public Sector | 497 | 482 | 409 |
| TRICARE | 159 | 144 | 58 |

| | | | |
|---|---|---|---|
| Total for reportable segments | 1,556 | 1,358 | 1,052 |
| Other, non-allocated revenue and expense: | | | |
| Interest and other income | 184 | 156 | 111 |
| Selling, general and administrative expenses | (1,328) | (1,116) | (940) |
| Depreciation and amortization | (128) | (108) | (98) |
| Asset write-downs and other charges | (34) | - | (96) |
| Interest expense | (47) | (20) | (11) |
| Total consolidated income before income tax | $ 203 | $ 270 | $ 18 |

The Company's product offerings include managed health care products and
specialty products. Managed health care products facilitate the delivery of
health care services through networks of providers and consist primarily of HMO,
PPO and Medicare HMO products. Managed health care product premiums were
approximately $9,358 million, $7,650 million and $6,483 million for the years
ended December 31, 1998, 1997 and 1996, respectively. The Company markets
various specialty products to its Commercial segment including dental, group
life, workers' compensation and ASO. Specialty product premiums were
approximately $239 million, $230 million, and $194 million for the years ended
December 31, 1998, 1997 and 1996, respectively.

Premium revenues derived from contracts with the federal government in 1998,
1997 and 1996 represent approximately 41 percent, 43 percent and 38 percent,
respectively, of total premium revenues.

26

Report of Independent Accountants

To the Board of Directors
Humana Inc.

In our opinion, the accompanying consolidated balance sheets and the related
consolidated statements of income, stockholders' equity and cash flows present
fairly, in all material respects, the consolidated financial position of Humana
Inc. and its subsidiaries at December 31, 1998 and 1997, and the results of
their operations and their cash flows for each of the three years in the period
ended December 31, 1998, in conformity with generally accepted accounting
principles. These financial statements are the responsibility of the Company's
management; our responsibility is to express an opinion on these financial
statements based on our audits. We conducted our audits of these statements in
accordance with generally accepted auditing standards which require that we plan
and perform the audit to obtain reasonable assurance about whether the financial
statements are free of material misstatement. An audit includes examining, on a
test basis, evidence supporting the amounts and disclosures in the financial
statements, assessing the accounting principles used and significant estimates
made by management, and evaluating the overall financial statement presentation.
We believe that our audits provide a reasonable basis for the opinion expressed
above.

PricewaterhouseCoopers LLP
Louisville, Kentucky
February 9, 1999

27

Quarterly Financial Information (Unaudited)
--------------------------------------------------------------------------
Humana Inc.

A summary of the Company's quarterly results of operations follows:

| Dollars in millions, except per share results | | 1998 | | |
| --- | --- | --- | --- | --- |
| | First | Second | Third (a) (b) | Fourth |
| Revenues | $2,402 | $2,446 | $2,464 | $2,469 |
| Income (loss) before income taxes | 79 | 82 | (47) | 89 |
| Net income (loss) | 50 | 52 | (30) | 57 |
| Earnings (loss) per common share | .30 | .31 | (.18) | .34 |
| Earnings (loss) per common share – assuming dilution | .30 | .31 | (.18) | .34 |

| Dollars in millions, except per share results | | 1997 (c) | | |
| --- | --- | --- | --- | --- |
| | First | Second | Third | Fourth |
| Revenues | $1,832 | $1,836 | $1,968 | $2,400 |
| Income before income taxes | 60 | 65 | 69 | 76 |
| Net income | 39 | 42 | 44 | 48 |
| Earnings per common share | .24 | .26 | .27 | .29 |
| Earnings per common share – assuming dilution | .24 | .25 | .27 | .29 |

(a) Includes charges associated with certain market closures, merger dissolution
    and losses on disposals of non-strategic assets of $34 million pretax ($22
    million after tax or $.13 per diluted share).
(b) Includes premium deficiencies of $46 million pretax ($29 million after tax
    or $.17 per diluted share), a one-time incentive for non-officer employees
    of $16 million pretax ($10 million after tax or $.06 per diluted share) and
    other costs of $36 million pretax ($23 million after tax or $.14 per diluted
    share).
(c) Includes the operations of Health Direct, Inc., Physician Corporation of
    America and ChoiceCare Corporation since their dates of acquisition,
    February 28, 1997, September 8, 1997 and October 17, 1997, respectively.

28

Board of Directors
-------------------------------------------------------------------------------
-------------------------------------------------

K. Frank Austen, M.D.                         Michael E. Gellert
John R. Hall
Theodore B. Bayles Professor of Medicine,     General Partner, Windcrest
Partners,        Retired Chairman of the Board
Harvard Medical School and the                private investment partnership
and Chief Executive Officer,
Brigham and Women's Hospital
Ashland Inc.

David A. Jones                                David A. Jones, Jr.
Irwin Lerner
Chairman of the Board, Humana Inc.            Vice Chairman, Humana Inc.
Retired Chairman of the Board
                                              Chairman and Managing Director,
and Executive Committee,
                                              Chrysalis Ventures, L.L.C.
Hoffmann-La Roche Inc.

venture capital firm

W. Ann Reynolds, Ph.D.                        Gregory H. Wolf
President, University of Alabama at           President and Chief Executive
Birmingham                .                   Officer, Humana Inc.


Board Committees
---------------------------------------------------------------------------------
-------------------------------------------------------

Executive Committee                           Audit Committee
Investment Committee
David A. Jones, Chairman                       Michael E. Gellert, Chairman
W. Ann Reynolds, Ph.D., Chairwoman
Michael E. Gellert                             K. Frank Austen, M.D.
K. Frank Austen, M.D.
David A. Jones, Jr.                            John R. Hall
Michael E. Gellert
Gregory H. Wolf                                David A. Jones, Jr.
David A. Jones, Jr.
                                               Irwin Lerner

Medical Affairs Committee                      Nominating and Corporate
Organization and Compensation
K. Frank Austen, M.D., Chairman                Governance Committee
Committee
Irwin Lerner                                   John R. Hall, Chairman
Irwin Lerner, Chairman
W. Ann Reynolds, Ph.D.                         David A. Jones, Jr.
K. Frank Austen, M.D.
                                               W. Ann Reynolds, Ph.D.
Michael E. Gellert

John R. Hall


Officers and Vice Presidents
---------------------------------------------------------------------------------
-------------------------------------------------------
                                                      .

Gregory H. Wolf
President and Chief Executive
Officer

Barry W. Averill                               George G. Bauernfeind
R. Joseph Berding
Regional Vice President                        Vice President - Tax
Regional Vice President

Jeffrey B. Bringardner                         Douglas R. Carlisle
Gerald R. Cowan
Vice President - National                      Regional Vice President
Vice President - Commercial
and Major Accounts
Large Group Segment

James W. Doucette                              Kenneth J. Fasola
Gerald L. Ganoni
Vice President - Investment                    Senior Vice President - Sales,
Vice President - Dental
Management and Treasurer                       Marketing and Business
Development

Lois E. Gargotto                               David K. George
David M. Krebs
Vice President - Systems                       Vice President - Medicare

```
Vice President - Finance and
Development                              Sales
Controller
```

```
Officers and Vice Presidents (continued)
----------------------------------------------------------------------------
-------------------------------------------------
```

```
Mitzi R. Krockover, M.D.                 Joan O. Lenahan
Thomas J. Liston
Vice President - Women's Health          Corporate Secretary
Vice President - Corporate

Development

Heidi  S. Margulis                       Carol J. McCall
Michael B. McCallister
Vice President - Government Affairs      Vice President - Pharmacy
Senior Vice President - Health
                                         Operations
System Management

Sheri E. Mitchell                        James E. Murray
Walter E. Neely
Vice President - Accreditation and       Senior Vice President and
Vice President and Associate General
Compliance                               Chief Financial Officer
Counsel

David R. Nelson                          Thomas T. Noland, Jr.
Theresa R. Ostert
Vice President and Chief Actuary         Vice President - Corporate
Vice President - Underwriting
                                         Communications

Mark W. Owen                             John R. Peques
Kathleen Pellegrino
Vice President - Public Sector Programs  Vice President - Strategy and
Vice President and Associate
                                         Corporate Development
General Counsel

Bruce D. Perkins                         Jerry D. Reeves, M.D.
Thomas C. Rekart
Senior Vice President - National         Senior Vice President and Chief
Vice President - Operations
Contracting                              Medical Officer
Services

Gregory K. Rotherham                     Kirk E. Rothrock
Michael A. Seltzer
Vice President - Customer Service        Senior Vice President - Specialty
Regional Vice President
Operations                               Products and Services and
                                         International Businesses

L. Bryan Shaul                           R. Eugene Shields
John T. Terry
Vice President - Mergers and             President - Humana Military
Vice President - Telemarketing Sales
Acquisitions                             Healthcare Services

Diana L. Tortelli                        Richard P. Vance, M.D.
George W. Vieth, Jr.
Vice President - Commercial Sales        Vice President and Medical
```

```
Director,         Senior Vice President - Market
                                            Population Health Improvement
Segment Management

Melissa D. Weaver, M.D.                     David W. Wille
Teo J. Zacharias
Vice President - Health Resource            Vice President - Actuarial
Services          Vice President - Commercial
Effectiveness and Corporate
Small Group Segment
Medical Director

Thomas G. Zielinski
Vice President - Wisconsin Service
Center Operations
```

```
Additional Information
---------------------------------------------------------------------------
```

```
Transfer Agent
  National City Bank
  Stock Transfer Department
  Post Office Box 92301
  Cleveland, Ohio 44193-0900
  (800) 622-6757
```

Form 10-K
Copies of the Company's Form 10-K filed with the Securities and Exchange
Commission may be obtained, without charge, by writing:

```
  Investor Relations
  Humana Inc.
  Post Office Box 1438
  Louisville, Kentucky  40201-1438
```

Copies of the Company's Form 10-K and other Company information can also be
obtained through the Internet at the following address:

```
  http://www.humana.com
```

Stock Listing
The Company's common stock trades on the New York Stock Exchange under the
symbol HUM.  The following table shows the range of high and low closing sales
prices as reported on the New York Stock Exchange Composite Tape.

| 1998 | High | Low |
|---|---|---|
| First Quarter | 26-3/8 | 19-1/2 |
| Second Quarter | 31-11/16 | 24-15/16 |
| Third Quarter | 31-7/8 | 12-7/8 |
| Fourth Quarter | 21-9/16 | 14-3/8 |
| 1997 | High | Low |
| First Quarter | 23 | 17-3/4 |
| Second Quarter | 24-1/4 | 20-1/8 |
| Third Quarter | 24-15/16 | 22-13/16 |
| Fourth Quarter | 24-5/8 | 18-7/8 |

```
Corporate Headquarters
  Humana Inc.
  The Humana Building
  500 West Main Street
  Louisville, Kentucky  40202
```

```
(502) 580-1000
(800) 486-2620


Annual Meeting
The Company's Annual Meeting of Stockholders will be held
on Thursday, May 6, 1999, at 10:00 a.m. in the Auditorium
on the 25th floor of the Humana Building.



     EX-21
       5
          SUBSIDIARY LIST
```

```
                              HUMANA INC.        .              EXHIBIT 21
                             SUBSIDIARY LIST
```

ALABAMA
-------
1.  Humana Health Plan of Alabama, Inc.
2.  QuestCare, Inc.

CALIFORNIA
----------
1.  Centerstone Insurance and Financial Services (Marketpoint is a Division of
CFS) - Doing Business As:
        a.  Centerstone Insurance Agency and Financial Services, Inc.
        b.  West Coast Multiple Servs, Inc.

DELAWARE
--------
1.  Centerstone Holding Corporation
2.  EMPHESYS Financial Group, Inc.
3.  Health Value Management, Inc.
4.  Humana Compensation Management Source, Inc.
5.  Humana HealthChicago, Inc
6.  Humana Inc.  - Doing Business As:
        a.  H.A.C. Inc.
        b.  Humana of Delaware, Inc.
7.  Humana Military Healthcare Services, Inc.  - Doing Business As:
        a.  Humana Military Health Services, Inc.
8.  Humrealty, Inc.
9.  Medstep, Inc.
10. Physician Corporation of America

FLORIDA
-------
1.  Delray Beach Health Management Associates, Inc. - Doing Business As:
        a.  Humana Health Care Plans-Delray
2.  Family Health Plan Administrators, Inc.
3.  Health Inclusive Plan of Florida, Inc. - Doing Business As:
        a.  Humana Health Care Plans-Century Village Palm Beach
4.  Humana Health Care Plans - Davie, Inc. f/k/a Coastal Physician Group of
    South Davie, Inc.
5.  Humana Health Care Plans - Palm Springs, Inc. f/k/a Coastal Managed Care of
    Lake Worth, Inc.
6.  Humana Health Care Plans - Rolling Hills, Inc. f/k/a Coastal Physician Group
    of North Davie, Inc.
7.  Humana Health Care Plans - South Pembroke Pines, Inc. f/k/a Coastal
    Physician Group of Pembroke Pines, Inc.
8.  Humana Health Care Plans - West Palm Beach, Inc. f/k/a Coastal Managed Care
    of West Palm Beach, Inc.
9.  Humana Internal Medicine Associates, Inc. f/k/a Coastal Internal Medicine
    Associates of Dade, Inc. - Doing Business As:
        a.  Humana Health Care Plans-Hialeah f/k/a Coastal Internal Medicine
            Associates of Hialeah
```

```
        b.  Humana Health Care Plans-South Miami f/k/a Coastal Internal Medicine
            Associates of Larkin
        c.  Humana Health Care Plans-Miami f/k/a Coastal Internal Medicine
            Associates of Miami
        d.  Humana Health Care Plans-Miami Beach f/k/a Coastal Internal Medicine
            Associates of Miami Beach
        e.  Humana Health Care Plans-Royal Oaks f/k/a Coastal Internal Medicine
            Associates of Miami Lakes
        f.  Humana Health Care Plans-Miami Springs f/k/a Coastal Internal Medicine
            Associates of Miami Springs
        g.  Humana Health Care Plans-Midway f/k/a Coastal Internal Medicine
            Associates of Midway
        h.  Humana Health Care Plans-Boca Raton
        i.  Humana Health Care Plans-Delray Harbor
        j.  Humana Health Care Plans-Lantana
        k.  Humana Health Care Plans-Palm Beach Gardens
        l.  Humana Health Care Plans-Tamarac
        m.  Humana Health Care Plans-West Boca

    (FL-Cont. Next Page)


    FLORIDA Cont.
    -------------

    10. Humana Internal Medicine Associates of the Palm Beaches, Inc. f/k/a Coastal
        Internal Medicine Associates of the Palm Beaches, Inc.

        Doing Business As:

        a.  Humana Health Care Plans-Lake Worth f/k/a Coastal Internal Medicine
            Associates of JFK Circle
        b.  Humana Health Care Plans-Flagler f/k/a Coastal Internal Medicine
            Associates of North Dixie Highway
        c.  Humana Health Care Plans-Riverbridge f/k/a Coastal Internal Medicine
            Associates at Riverbridge
        d.  Humana Health Care Plans-Palm Beach f/k/a Coastal Internal Medicine
            Associates of South Dixie Highway
        e.  Humana Health Care Plans-Boynton Beach
    11. Humana Health Insurance Company of Florida, Inc.
    12. Humana Medical Plan, Inc. - Doing Business As:
        a.  Coastal Pediatrics-Daytona
        b.  Coastal Pediatrics-Port Orange
        c.  Coastal Pediatric-Ormond
        d.  Daytona Gastroenterology
        e.  Flagler Family Practice
        f.  Florida Dermatology Center
        g.  Humana Medical Plan-West Palm Beach
        h.  Internal Medicine of Daytona
        i.  Orange Park Family Health Care
        j.  St. Augustine Family Health Center
        k.  Suncoast Medical Associates
    13. Humana Workers' Compensation Services, Inc.  - Doing Business As:
        a.  Humana Workers' Compensation Insurance Services
    14. Lakeside Medical Center Management, Inc. - Doing Business As:
        a.  University Medical Center
    15. PCA Options, Inc.
    16. PCA Property & Casualty Insurance Co.

    GEORGIA
    -------
    1.  Humana Employers Health Plan of Georgia, Inc. f/k/a Emphesys Healthcare of
        Georgia, Inc.

    ILLINOIS
    --------
    1.  Humana Health Direct, Inc. - Doing Business As:
        a.  Behavioral Health Direct (IL)
    2.  Humana HealthChicago Insurance Company - Doing Business As:
        a.  Goldcare 65
    3.  The Dental Concern, Ltd.  - Doing Business As:
```

            a.  TDC (MO)

KENTUCKY
--------
1.  HMPK, INC.
2.  HPLAN, INC.
3.  Humana Health Plan, Inc. - Doing Business As:
        a.  Central Kentucky Family Practice
        b.  Franklin Medical Center
        c.  Humana Health Care Plans of Indiana
        d.  Madison Family and Industrial Medicine (KY)
        e.  Humana Health Care Plans-Somerset (KY)
4.  Humco, Inc. (shell corporation-keep active until 12/31/99 per Escrow Agmt.)
5.  The Dental Concern, Inc. (f/k/a Randmark, Inc.) - Doing Business As:
        a.  The Dental Concern/KY, Inc. (IN)
        b.  The Dental Concern/KY, Inc. (MO)
6.  The Dental Concern Insurance Company


LOUISIANA
---------
1.  Humana Workers' Compensation Services of Louisiana, Inc.

MISSOURI
--------

1.  Humana Kansas City, Inc. - Doing Business As:
        a. Humana Prime Health Plan

2.  Humana Insurance Company - Doing Business As:
        a. Dental Care Affiliates (GA)

NEVADA
------
1.  Humana Health Insurance of Nevada, Inc.

OHIO
----
1.  Humana Health Plan of Ohio, Inc. f/k/a ChoiceCare Health Plans, Inc. - Doing
    Business As:

        a.  ChoiceCare/Humana (IL, IN, KY, OH)

OKLAHOMA
--------
1.  Commonwealth Management, Inc.

PUERTO RICO
-----------
1.  Humana Health Plans of Puerto Rico, Inc.
2.  Humana Insurance of Puerto Rico, Inc.

TEXAS
-----
1.  Humana HMO Texas, Inc.
2.  Humana Health Plan of Texas, Inc. - Doing Business As:
        a.  Humana Health Plan of San Antonio
        b.  Humana Regional Service Center
        c.  Leon Valley Health Center
        d.  Lincoln Heights Medical Center
        e.  MedCentre Plaza Health Center
        f.  Perrin Oaks Health Center
        g.  Val Verde Health Center
        h.  West Lakes Health Center
        i.  Wurzbach Family Medical Center
3.  Humana Workers' Compensation Services of Texas, Inc. f/k/a Lomas General
    Insurance Services, Inc.
4.  PCA Health Plans of Texas, Inc.
5.  PCA Life Insurance Company of Texas, Inc.
6.  PCA Provider Organization, Inc.

```
VERMONT
-------
1.  Managed Care Indemnity, Inc.  - Doing Business As:
       a.  Witherspoon Parking Garage (KY)

VIRGINIA
--------
1.  Humana Group Health Plan, Inc.   Note: Assets sold to Kaiser Permanente
       1 31 97)


WISCONSIN
---------
1.  CareNetwork, Inc. - Doing Business As:
       a.  CARENETWORK
2.  EMPHESYS Wisconsin Insurance Company
3.  Employers Health Insurance Company
4.  Humana Wisconsin Health Organization Insurance Corporation - Doing Business
    As:
       a.  WHOIC
       b.  WHO
5.  Independent Care, Inc.
6.  Network EPO, Inc.
7.  Wisconsin Employers Group, Inc.

FOREIGN
-------

BERMUDA
-------
1.  Hallmark RE Ltd.



        EX-23
           6
              CONSENT OF PRICEWATERHOUSECOOPERS LLP




                                                            EXHIBIT 23

                    CONSENT OF INDEPENDENT ACCOUNTANTS


    We consent to the incorporation by reference in the registration statements of
    Humana Inc. on Form S-8 (Registration No. 2-39061, No. 2-79239, No. 2-96154, No.
    33-33072, No. 33-49305, No. 33-52593, No. 33-54455, No. 33-04435 and No. 333-
    57095) of our report dated February 9, 1999, on our audits of the consolidated
    financial statements of Humana Inc. as of December 31, 1998 and 1997 and for
    each of the three years in the period ended December 31, 1998, which report is
    incorporated by reference in this Annual Report on Form 10-K.  We further
    consent to the incorporation by reference of our report on our audits of the
    financial statement schedules of Humana Inc. as of December 31, 1998 and 1997
    and for each of the three years in the period ended December 31, 1998, which
    report is included in this Annual Report on Form 10-K.



    PricewaterhouseCoopers LLP
    Louisville, Kentucky
    February 9, 1999



    <TYPE>EX-27
    <SEQUENCE>7
    <DESCRIPTION>FINANCIAL DATA SCHEDULE
    <TEXT>
```

```
<TABLE> <S> <C>


<PAGE>
<ARTICLE> 5
<LEGEND>
THIS SCHEDULE CONTAINS SUMMARY FINANCIAL INFORMATION EXTRACTED FROM HUMANA
INC.'S FORM 10-K FOR THE TWELVE MONTHS ENDED DECEMBER 31, 1998, AND IS QUALIFIED
IN ITS REFERENCE TO SUCH FINANCIAL STATEMENT.
</LEGEND>
<MULTIPLIER> 1,000,000

<S>                                   <C>
<PERIOD-TYPE>                         12-MOS
<FISCAL-YEAR-END>                               DEC-31-1998
<PERIOD-START>                                  JAN-01-1998
<PERIOD-END>                                    DEC-31-1998
<CASH>                                                  913
<SECURITIES>                                          1,594
<RECEIVABLES>                                           338
<ALLOWANCES>                                             62
<INVENTORY>                                               5
<CURRENT-ASSETS>                                      3,119
<PP&E>                                                  788
<DEPRECIATION>                                          355
<TOTAL-ASSETS>                                        5,496
<CURRENT-LIABILITIES>                                 2,643
<BONDS>                                                 573
<PREFERRED-MANDATORY>                                     0
<PREFERRED>                                               0
<COMMON>                                                 28
<OTHER-SE>                                            1,660
<TOTAL-LIABILITY-AND-EQUITY>                          5,496
<SALES>                                               9,497
<TOTAL-REVENUES>                                      9,781
<CGS>                                                 8,041
<TOTAL-COSTS>                                         9,531
<OTHER-EXPENSES>                                          0
<LOSS-PROVISION>                                          0
<INTEREST-EXPENSE>                                       47
<INCOME-PRETAX>                                         203
<INCOME-TAX>                                             74
<INCOME-CONTINUING>                                     129
<DISCONTINUED>                                            0
<EXTRAORDINARY>                                           0
<CHANGES>                                                 0
<NET-INCOME>                                            129
<EPS-PRIMARY>                                           .77
<EPS-DILUTED>                                           .77
```

# QUARTERLY REPORT OF HUMANA INC. ON FORM 10-Q

# FOR THE PERIOD ENDED MARCH 31, 1999

# HUMANA INC

**Filing Type:** 10-Q
**Description:** Quarterly Report
**Filing Date:** May 17, 1999
**Period End:** Mar 31, 1999


**Primary Exchange:** New York Stock Exchange
**Ticker:** HUM

*Data provided by EDGAR Online, Inc. (http://www.FreeEDGAR.com)*

# Table of Contents

*To jump to a section, double-click on the section name.*

## 10-Q

| | |
|---|---:|
| Part I | 3 |
| Item 1 | 3 |
| Income Statement | 3 |
| Balance Sheet | 3 |
| Cash Flow Statement | 4 |
| Table4 | 6 |
| Table5 | 7 |
| Item 2 | 8 |
| Table6 | 12 |
| Table7 | 15 |
| Item 3 | 16 |
| Part II | 16 |
| Item 1 | 17 |
| Item 4 | 17 |
| Table8 | 18 |
| Item 5: | 18 |
| Item 6 | 18 |

## EX-10

| | |
|---|---:|
| Table9 | 19 |
| Table10 | 28 |

## EX-27

| | |
|---|---:|
| Exhibit 27 Table | 29 |

10-Q
  1

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-Q

[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE
SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended March 31, 1999

OR

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE
SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number 1-5975

HUMANA INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 61-0647538 |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

| | |
|---|---|
| 500 West Main Street | |
| Louisville, Kentucky | 40202 |
| (Address of principal executive offices) | (Zip Code) |

(502) 580-1000
(Registrants' telephone number, including area code)

Not Applicable
(Former name, former address and former fiscal year,
if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15 (d) of the Securities Exchange Act
of 1934 during the preceding 12 months, and (2) has been subject to such
filing requirements for the past 90 days.

YES    X                    NO _____

Indicate the number of shares outstanding of each of the issuer's classes of
common stock as of the latest practicable date.

| Class of Common Stock | Outstanding at April 30, 1999 |
|---|---|
| $.16 2/3 par value | 167,569,138 shares |

1 of 24

Humana Inc.
March 31, 1999
Form 10-Q

Page of
Form 10-Q

Part I:      Financial Information

Item 1.        Financial Statements

        Condensed Consolidated Statements of Operations for
        the quarters ended March 31, 1999 and 1998                    3

        Condensed Consolidated Balance Sheets at March 31, 1999
        and December 31, 1998                                         4

        Condensed Consolidated Statements of Cash Flows for the
        quarters ended March 31, 1999 and 1998                        5

        Notes to Condensed Consolidated Financial Statements          6-10

Item 2.     Management's Discussion and Analysis of Financial
        Condition and Results of Operations                           11-20

Item 3. Quantitative and Qualitative Disclosures about Market Risk    21

Part II:    Other Information

Items 1 to 6                                                          22-24

Exhibits:

Exhibit 10 - Employment Agreement - Kenneth J. Fasola
Exhibit 12 - Ratio of Earnings to Fixed Charges
Exhibit 27 - Financial Data Schedule

2

Humana Inc.
Condensed Consolidated Statements of Operations
For the quarters ended March 31, 1999 and 1998
Unaudited
(Dollars in millions, except per share results)

|                                              | 1999      | 1998      |
|----------------------------------------------|-----------|-----------|
| Revenues:                                    |           |           |
| Premiums                                     | $ 2,428   | $ 2,352   |
| Interest and other income                    | 49        | 50        |
| Total revenues                               | 2,477     | 2,402     |
| Operating expenses:                          |           |           |
| Medical                                      | 2,136     | 1,955     |
| Selling, general and administrative          | 325       | 324       |
| Depreciation and amortization                | 31        | 32        |
| Total operating expenses                     | 2,492     | 2,311     |
| (Loss) income from operations                | (15)      | 91        |
| Interest expense                             | 10        | 12        |
| (Loss) income before income taxes            | (25)      | 79        |
| (Benefit) provision for income taxes         | (9)       | 29        |
| Net (loss) income                            | $   (16)  | $   50    |
| (Loss) earnings per common share             | $  (.10)  | $  .30    |
| (Loss) earnings per common share<br> - assuming dilution | $  (.10)  | $  .30    |

See accompanying notes.

3

Humana Inc.
Condensed Consolidated Balance Sheets
Unaudited
(Dollars in millions, except per share amounts)

|  | March 31, 1999 | December 31, 1998 |
|---|---|---|
| **Assets** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 636 | $ 913 |
| Marketable securities | 1,555 | 1,594 |
| Premiums receivable, less allowance for doubtful accounts $59 - March 31, 1999 and $62 - December 31, 1998 | 278 | 276 |
| Other | 338 | 336 |
| Total current assets | 2,807 | 3,119 |
| Long-term marketable securities | 337 | 305 |
| Property and equipment, net | 430 | 433 |
| Cost in excess of net assets acquired | 1,180 | 1,188 |
| Other | 436 | 451 |
| Total assets | $ 5,190 | $ 5,496 |
| **Liabilities and Stockholders' Equity** | | |
| **Current liabilities:** | | |
| Medical and other expenses payable | $ 1,513 | $ 1,470 |
| Trade accounts payable and accrued expenses | 433 | 395 |
| Book overdraft | 197 | 234 |
| Unearned premium revenues | 66 | 294 |
| Short-term debt | 200 | 250 |
| Total current liabilities | 2,409 | 2,643 |
| Long-term medical and other expenses payable | 413 | 438 |
| Long-term debt | 579 | 573 |
| Professional liability and other obligations | 121 | 154 |
| Total liabilities | 3,522 | 3,808 |
| Commitments and contingencies | | |
| **Stockholders' equity:** | | |
| Preferred stock, $1 par; authorized 10,000,000 shares; none issued | | |
| Common stock, $.16 2/3 par; authorized 300,000,000 shares; issues and outstanding 167,578,638 shares - March 31, 1999 and 167,515,362 shares - December 31, 1998 | 28 | 28 |
| Other | 1,640 | 1,660 |
| Total stockholders' equity | 1,668 | 1,688 |
| Total liabilities and stockholders' equity | $ 5,190 | $ 5,496 |

See accompanying notes.

4

Humana Inc.
Condensed Consolidated Statements of Cash Flows
For the quarters ended March 31, 1999 and 1998
Unaudited
(Dollars in millions)

|  | 1999 | 1998 |
|---|---|---|
| Net cash flows from operating activities | $ (192) | $ (310) |
| **Cash flows from investing activities:** | | |
| Purchases of marketable securities | (167) | (198) |

| | | |
|---|---|---|
| Maturities and sales of marketable securities | 169 | 271 |
| Purchases of property and equipment | (30) | (21) |
| Dispositions of property and equipment | 25 | |
| Other | (2) | 2 |
| Net cash (used in) provided by investing activities | (5) | 54 |

| | | |
|---|---|---|
| Cash flows from financing activities: | | |
| Repayment of line of credit | (93) | (300) |
| Net commercial paper borrowings | 49 | 258 |
| Change in book overdraft | (37) | 52 |
| Other | 1 | 23 |
| Net cash (used in) provided by financing activities | (80) | 33 |

| | | |
|---|---|---|
| Decrease in cash and cash equivalents | (277) | (223) |
| Cash and cash equivalents at beginning of period | 913 | 779 |
| Cash and cash equivalents at end of period | $ 636 | $ 556 |
| Interest payments | $ 10 | $ 11 |
| Income tax refunds, net | $ 39 | |

See accompanying notes.
5

Humana Inc.
Notes to Condensed Consolidated Financial Statements
Unaudited

(A) Basis of Presentation

The accompanying condensed consolidated financial statements are presented in accordance with the requirements of Form 10-Q and consequently do not include all of the disclosures normally required by generally accepted accounting principles or those normally made in an annual report on Form 10-K. Accordingly, for further information, the reader of this Form 10-Q may wish to refer to the Form 10-K of Humana Inc. (the "Company") for the year ended December 31, 1998.

The preparation of the Company's condensed consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect (a) the reported amounts of assets and liabilities, (b) disclosure of contingent assets and liabilities at the date of the financial statements and (c) reported amounts of revenues and expenditures during the reporting period. Actual results could differ from those estimates.

The financial information has been prepared in accordance with the Company's customary accounting practices and has not been audited. In the opinion of management, the information presented reflects all adjustments necessary for a fair statement of interim results. All such adjustments are of a normal and recurring nature.

(B) Additional Medical Claims Expense and Tangible Asset Gain

The Company recorded $90 million ($57 million after tax, or $.34 per share) in additional medical claims expense during the first quarter of 1999. Included in this expense were approximately $50 million related to a provision for probable future losses (premium deficiencies), $35 million to strengthen medical claims payable and $5 million for a payment to Columbia/HCA Healthcare Corporation ("Columbia/HCA") to resolve certain contractual issues. The premium deficiency was the result of management's regular assessment of the profitability of its contracts for providing health care services to its members. Contributing to the premium deficiency was the impact from a March 31, 1999, Columbia/HCA contract for hospital services in certain Florida markets, as well as increasing medical costs in markets where the Company had been sharing medical cost risk with providers. The $35 million medical claims payable strengthening resulted from higher than expected medical cost trends in the Company's preferred provider organization ("PPO") products and Medicare business identified by the Company's analysis of February and

March, 1999, claims payments, concluded in April 1999. Partially offsetting these additional medical costs was a $5 million ($3 million after tax, or $.02 per share) favorable claim liability development in the Company's run-off workers' compensation business. Also during the first quarter of 1999, the Company recorded a $12 million ($8 million after tax, or $.04 per share) gain on the sale of a tangible asset which has been included in interest and other income in the accompanying condensed consolidated statements of operations.

6

Humana Inc.
Notes to Condensed Consolidated Financial Statements, continued
Unaudited

(C) Contingencies

The Company's Medicare HMO contracts with the federal government are renewed for a one-year term each December 31 unless terminated 90 days prior thereto. Legislative proposals are being considered which may revise the Medicare program's current support of the use of managed health care for Medicare beneficiaries and future reimbursement rates thereunder. Management is unable to predict the outcome of these proposals or the impact they may have on the Company's financial position, results of operations or cash flows. The Company's Medicaid contracts are generally annual contracts with various states except for the two-year contract with the Commonwealth of Puerto Rico. The Company previously announced its intention to close this market when the contract expired on April 30, 1999, because it did not expect to be able to renew the contract under favorable terms. The Company is currently in discussion with the Puerto Rico Health Insurance Administration regarding maintaining its presence in Puerto Rico at premium rates which would allow a reasonable margin. Although an agreement has not been reached, the Company is continuing to provide services for its Puerto Rico members under the existing agreement. Additionally, the Company's TRICARE contract is a one-year contract renewable annually for up to two additional years. The loss of these contracts (other than the contract in Puerto Rico) or significant changes in these programs as a result of legislative action, including reductions in payments or increases in benefits without corresponding increases in payments, would have a material adverse effect on the revenues, profitability and business prospects of the Company. In addition, the Company continually contracts and seeks to renew contracts with providers at rates designed to ensure adequate profitability. To the extent the Company is unable to obtain such rates, its financial position, results of operations and cash flows could be adversely impacted.

The Company reached an agreement in principle with the United States Justice Department and the Department of Health and Human Services on a settlement relating to Medicare premium overpayments. The settlement, totaling $15 million, arises out of the erroneous designation of certain Medicare enrollees as eligible for Medicaid, resulting in higher payments to the Company by the federal government related in large part to the years 1991 and 1992. The Company had established adequate liabilities for the resolution of this issue and, therefore, the settlement did not have a material impact on the Company's financial position or its results of operations.

During the ordinary course of business, the Company is subject to pending and threatened legal actions and audits by the agencies that regulate the Company. Management of the Company does not believe that any of these actions will have a material adverse effect on the Company's financial position, results of operations or cash flows.

7

Humana Inc.
Notes to Condensed Consolidated Financial Statements, continued
Unaudited

(D) Earnings Per Common Share

Detail supporting the computation of earnings or loss per common share

follows:

Dollars in millions, except per share results

|  | Net (Loss) Income | Shares | Per Share Results |
|---|---|---|---|
| **Quarter Ended March 31, 1999** |  |  |  |
| Loss per common share | $ (16) | 167,559,428 | $ (.10) |
| Effect of dilutive stock options |  | – |  |
| Loss per common share – assuming dilution | $ (16) | 167,559,428 | $ (.10) |
| **Quarter Ended March 31, 1998** |  |  |  |
| Earnings per common share | $ 50 | 164,857,526 | $ .30 |
| Effect of dilutive stock options |  | 2,331,930 |  |
| Earnings per common share – assuming dilution | $ 50 | 167,189,456 | $ .30 |

For the quarter ended March 31, 1999, all outstanding options to purchase shares of 10,473,660 were excluded from the computation given the Company's net loss for the quarter.  Options to purchase 2,015,160 shares for the quarter ended March 31, 1998 were excluded in the computation of earnings per common share-assuming dilution because the options' exercise prices were greater than the average market price of the common shares.

(E) Comprehensive Income or Loss

Comprehensive loss totaled $22 million for the quarter ended March 31, 1999 and was comprised of net loss of $16 million and net unrealized investment losses of $6 million.  Comprehensive income totaled $51 million for the quarter ended March 31, 1998 and was comprised of net income of $50 million and net unrealized investment gains of $1 million.

(F) Long-Term Debt

The Company maintains a revolving credit agreement ("Credit Agreement") which provides liquidity under a line of credit of up to $1.5 billion.  The Company also maintains a commercial paper program and issues debt securities thereunder.  Commercial paper borrowings outstanding at March 31, 1999, were $779 million and are backed by the Credit Agreement.  The Credit Agreement contains usual and customary covenants including, but not limited to, financial tests for interest coverage and leverage ratios.  As of March 31, 1999, the Company was in compliance with these covenants.  The average interest rate on commercial paper borrowings was 5.5 percent for the quarter ended March 31, 1999.

8

Humana Inc.
Notes to Condensed Consolidated Financial Statements, continued
Unaudited

The Company intends to pay an additional $200 million of its outstanding debt with proceeds from operating subsidiary dividends expected to be received during 1999.  Borrowings under the commercial paper program, except the planned 1999 payments, have been classified as long-term debt based on management's ability and intent to refinance borrowings on a long-term basis.

(G) Segment Information

The segment results for the quarters ended March 31, 1999 and 1998 are as follows:

| Dollars in millions | 1999 | 1998 |
|---|---|---|
| Premium revenues: |  |  |
| Commercial | $ 1,351 | $ 1,290 |
| Public sector | 877 | 877 |

| | | |
|---|---:|---:|
| TRICARE | 200 | 185 |
| Total for reportable segments | 2,428 | 2,352 |
| Non-allocated revenues - interest and other income | 49 | 50 |
| Total consolidated revenues | $ 2,477 | $ 2,402 |
| Underwriting margin: | | |
| Commercial | $ 180 | $ 235 |
| Public sector | 72 | 125 |
| TRICARE | 40 | 37 |
| Total for reportable segments | 292 | 397 |
| Other, non-allocated revenues and expenses: | | |
| Interest and other income | 49 | 50 |
| Selling, general and administrative | (325) | (324) |
| Depreciation and amortization | (31) | (32) |
| Interest expense | (10) | (12) |
| Total consolidated (loss) income before income taxes | $ (25) | $ 79 |

Commercial and Public Sector underwriting margin include $49 million and
$41 million of additional medical claims expense recorded during the quarter
ended March 31, 1999, respectively.

9

Humana Inc.
Notes to Condensed Consolidated Financial Statements, continued
Unaudited

(H) Impact of Recently Issued Accounting Pronouncements

In June 1998, the Financial Accounting Standards Board ("FASB") issued
Statement of Financial Accounting Standards No. 133, "Accounting for
Derivative Instruments and Hedging Activities" ("SFAS 133"). In general,
SFAS 133 requires that all derivatives be recognized as either assets or
liabilities in the balance sheet at their fair value, and sets forth the
manner in which gains or losses thereon are to be recorded. The treatment
of such gains or losses is dependent upon the type of exposure, if any, for
which the derivative is designated as a hedge. This statement is effective
for periods beginning after June 15, 1999. Management of the Company
anticipates that, due to its limited use of derivative instruments, the
adoption of SFAS 133 will not have a significant effect on the Company's
results of operations or its financial position.

(I) Reclassifications

Certain reclassifications have been made to the prior year's condensed
consolidated financial statements to conform with the current year
presentation.

10

Humana Inc.
Item 2. Management's Discussion and Analysis of Financial Condition
and Results of Operations

This discussion and analysis contains both historical and forward-looking
information. The forward-looking statements may be significantly impacted by
risks and uncertainties, and are made pursuant to the safe harbor provisions
of the Private Securities Litigation Reform Act of 1995. There can be no
assurance that anticipated future results will be achieved because actual
results may differ materially from those projected in the forward-looking
statements. Readers are cautioned that a number of factors, which are
described herein and in the Company's Annual Report on Form 10-K for the
year ended December 31, 1998, could adversely affect the Company's ability
to obtain these results. These include the effects of either federal or
state health care reform or other legislation, changes in the Medicare
reimbursement system, medical and pharmacy cost trends, the ability of health
care providers (including physician practice management companies) to comply
with current contract terms, renewal of the Company's Medicare contracts with
the federal government, renewal of the Company's contract with the federal
government to administer the TRICARE program and renewal of the Company's

Medicaid contracts with various state governments. Such factors also
include the effects of other general business conditions, including but not
limited to, the Company's ability to integrate its acquisitions, the
Company's ability to appropriately address the "Year 2000" computer system
issue, government regulation, competition, premium rate and yield changes,
retrospective premium adjustments relating to federal government contracts,
changes in commercial and Medicare HMO membership, operating subsidiary
capital requirements, the effect of provider contract rate negotiations,
compliance with debt covenants, general economic conditions and the
retention of key employees. In addition, past financial performance is
not necessarily a reliable indicator of future performance and investors
should not use historical performance to anticipate results or future
period trends.


Introduction

The Company is a health services company that facilitates the delivery of
health care services through networks of providers to its approximately 6.1
million medical members. The Company's products are marketed primarily
through health maintenance organizations ("HMOs") and preferred provider
organizations ("PPOs") that encourage or require the use of contracted
providers. HMOs and PPOs control health care costs by various means,
including pre-admission approval for hospital inpatient services,
pre-authorization of outpatient surgical procedures, and risk-sharing
arrangements with providers. These providers may share medical cost risk or
have other incentives to deliver quality medical services in a cost-effective
manner. The Company also offers various specialty products to employers,
including dental, group life and workers' compensation, and administrative
services ("ASO") to those who self-insure their employee health plans. In
total, the Company's products are licensed in 47 states, the District of
Columbia and Puerto Rico, with approximately 21 percent of its membership in
the state of Florida.

The Company markets and distributes its products to three distinct customer
groups and, therefore, reports operations in three business segments.
Results of each segment are measured based on premium revenues and
underwriting margin (premium revenues less medical expenses). The

11

Humana Inc.
Item 2. Management's Discussion and Analysis of Financial Condition
and Results of Operations, continued

Company does not allocate assets or administrative costs to the segments and,
therefore, does not measure results based on segment assets or pretax profits.
Members from all three segments generally utilize the same medical provider
networks, enabling the Company to obtain more favorable contract terms with
providers. As a result, the profitability of each segment is somewhat
interdependent. In the Commercial segment, the Company markets and
distributes its fully-insured HMO, PPO, and specialty and its ASO products
to large group employers (over 100 employees) and small group employers.
Premium revenue pricing to large group employers has historically been
more competitive than that to small group employers, resulting in less
favorable underwriting margins for large groups. In the Public Sector
segment, the Company markets and distributes its Medicare and Medicaid
products to individuals eligible for these government-sponsored programs.
The Medicare HMO product provides health care services that include all
Medicare benefits and, in certain circumstances, additional services. The
Company's third segment is TRICARE. In this segment, the Company facilitates
health care services for the dependents of active military personnel and
retired military personnel and their dependents located in the Southeastern
United States. The Company is in the third year of its contract with the
United States Department of Defense, which is renewable annually for up to
two additional years. As encouraged by government regulation, TRICARE is
managed by a separate management team and is more autonomous than the
Company's Commercial and Public Sector segments, which generally share sales,
marketing, customer service, medical management and claims processing
functions of the Company.

Additional Medical Claims Expense and Tangible Asset Gain

The Company recorded $90 million ($57 million after tax, or $.34 per share) in additional medical claims expense during the first quarter of 1999. Included in this expense were approximately $50 million related to a provision for probable future losses (premium deficiencies), $35 million to strengthen medical claims payable and $5 million for a payment to Columbia/HCA to resolve certain contractual issues.  The premium deficiency was the result of management's regular assessment of the profitability of its contracts for providing health care services to its members.  Contributing to the premium deficiency was the impact from a March 31, 1999, Columbia/HCA contract for hospital services in certain Florida markets, as well as increasing medical costs in markets where the Company had been sharing medical cost risk with providers.  The $35 million medical claims payable strengthening resulted from higher than expected medical cost trends in the Company's PPO products and Medicare business identified by the Company's analysis of February and March, 1999, claims payments, concluded in April 1999. Partially offsetting these additional medical costs was a $5 million ($3 million after tax, or $.02 per share) favorable claim liability development in the Company's run-off workers' compensation business.  Also during the first quarter of 1999, the Company recorded a $12 million ($8 million after tax, or $.04 per share) gain on the sale of a tangible asset which has been included in interest and other income in the accompanying condensed consolidated statements of operations.

12

Humana Inc.
Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations, continued

Comparison of Results of Operations

In order to enhance comparability, and to present an estimated baseline against which historical and prospective periods should be measured, the following discussion comparing results for the quarters ended March 31, 1999, and March 31, 1998, excludes the impact of the $90 million additional medical claims expense and a tangible asset gain discussed previously, but includes the beneficial effect of the premium deficiency included therein and the $5 million run-off workers' compensation reserve adjustment.  The beneficial effect from the premium deficiency for the quarter ended March 31, 1999, was approximately $6 million ($4 million after tax, or $.02 per share).

Income before income taxes totaled $53 million for the quarter ended March 31, 1999 (the "1999 quarter"), compared to $79 million for the quarter ended March 31, 1998 (the "1998 quarter").  Net income was $33 million or $.20 per share in the 1999 quarter, compared to $50 million or $.30 per share in the 1998 quarter.  The decrease in earnings was primarily the result of medical cost increases exceeding the related premium increases for the Company's commercial and Medicare lines of business and lower realized investment gains and other income.  Partially offsetting these items was lower administrative cost spending.

The Company's premium revenues grew $76 million or 3 percent from the 1998 quarter.  Combined commercial and Medicare premium yield resulted in a 4 percent increase which was partially offset by a decline in membership in both lines of business.  Commercial premium yields increased 6.3 percent while Medicare HMO premium yields increased 2.1 percent.  The Company's fully-insured commercial membership declined 89,800 members during the 1999 quarter, reflecting the effects of the Company's premium pricing discipline intended to maintain profitability. Medicare HMO membership declined 21,300 during the 1999 quarter, the result of closing the Treasure Coast and Sarasota, Florida, markets.  For the remainder of 1999, commercial membership is expected to increase 3 percent to 5 percent, while Medicare membership is expected to be flat to slightly down. Medicaid membership was about flat with year-end.  The Company is currently in discussions with the Puerto Rico Health Insurance Administration regarding maintaining its presence in Puerto Rico at premium rates which would allow a reasonable margin.  Although a new contract has not been renegotiated, the Company has agreed to continue to provide services to its members under the existing agreement.

The Company's medical expense ratio for the 1999 quarter was 84.3 percent, increasing from 83.1 percent from the same period in 1998. The higher medical expense ratio was the result of medical cost trends exceeding premium yield increases in the Company's commercial and Medicare lines of business. Commercial cost trends of 8.3 percent primarily result from higher hospital outpatient and pharmacy costs which have increased 11 percent and 21 percent, respectively. Increased inpatient hospital cost per day and increased pharmacy costs have caused a 3.1 percent increase in Medicare medical costs. Also contributing to the medical expense ratio increase was the inability of certain capitated risk-sharing providers to manage medical costs within their contractual obligations.

13

Humana Inc.
Item 2. Management's Discussion and Analysis of Financial Condition
and Results of Operations, continued

As a result, the higher actual claim costs incurred by these risk-sharing providers has been recognized as expense by the Company rather than the capitated contract amount. There can be no assurance that the medical cost trends will not continue to increase.

Partially offsetting the increasing medical cost trends is a favorable claim liability development in the Company's run-off workers' compensation business acquired in connection with its acquisition of Physician Corporation of America ("PCA") in 1997. After evaluating the workers' compensation claim liabilities against claim payments and file closings, the Company reduced these liabilities by $5 million ($3 million after tax, or $.02 per share) during the quarter.

As more fully described previously, the medical expense ratio discussion excludes the impact of the additional $90 million medical claims expense. Including this item increases the 1999 quarter medical expense ratio from 84.3 percent to 88.0 percent.

During the 1999 quarter, the Company's administrative cost ratio improved to 14.7 percent from 15.2 percent in the 1998 quarter. This year-over-year improvement in the administrative cost ratio reflects efforts to streamline the organization, as well as synergy savings from the acquisition of PCA and ChoiceCare Corporation in 1997.

Interest income totaled $34 million and $41 million for the 1999 and 1998 quarters, respectively. The decrease is primarily attributable to realized investment gains included in the 1998 quarter. The tax equivalent yield on invested assets approximated 6.7 percent and 8.5 percent for the 1999 and 1998 quarters, respectively.

Business Segment Information

Commercial premium revenues increased 4.7 percent for the 1999 quarter as a result of premium yield increases of 6.3 percent partially offset by a 89,800 decline in fully-insured membership. The membership decline was the result of the Company's commitment to price its commercial products commensurate with the underlying risk. The Commercial segment medical expense ratio for the 1999 quarter was 83.0 percent, increasing from 81.8 percent in the 1998 quarter. The medical expense ratio increase was the result of premium yield increases being insufficient to offset medical cost trend increases. Increased medical costs were noted in hospital outpatient and pharmacy costs. As more fully discussed previously, the medical expense ratio discussion excludes a portion of the $90 million additional medical claims expense. Including $49 million of the additional medical expense related to the Commercial segment results in a medical expense ratio of 86.7 percent for the 1999 quarter.

Public Sector premium revenues for the 1999 quarter were generally flat with the 1998 quarter. A 2.1 percent Medicare HMO premium yield increase was offset by a decline in membership. The premium yield increase was slightly higher than the 2 percent statutory increase as a result of the

14

Humana Inc.
Item 2. Management's Discussion and Analysis of Financial Condition
and Results of Operations, continued

changing geographic mix of membership toward higher reimbursement areas.
This change was due in large part to closing the Treasure Coast and Sarasota,
Florida, markets. Medicare HMO membership declined 21,300 during the quarter
primarily from closing these under-performing markets in Florida. The Public
Sector medical expense ratio for the 1999 quarter was 87.1 percent,
increasing from 85.7 percent for the 1998 quarter. The medical expense ratio
increase was primarily the result of Medicare HMO premium yield increases
being insufficient to offset medical cost trend increases. Increased medical
costs were noted in inpatient hospital rates and pharmacy costs. As more
fully discussed previously, the medical expense ratio discussion excludes a
portion of the $90 million additional medical claims expense. Including $41
million of the additional medical expense related to the Public Sector
segment results in a medical expense ratio of 91.8 percent for the 1999
quarter.

TRICARE premiums increased 8.1 percent for the 1999 quarter on stable
membership due to contract modifications. TRICARE's medical expense ratio
did not change significantly from the 1998 quarter.

Liquidity

During the 1999 quarter, $192 million was used in the Company's operating
activities, compared to $310 million being used in operations in the 1998
quarter. This net cash used in operations during the 1999 and 1998 quarters
can be attributed to the following:

|  | 1999 | 1998 |
|---|---|---|
| Cash used in operating activities | $ (192) | $ (310) |
| Timing of Medicare premium receipts | 234 | 235 |
| Workers' compensation claim payments | 28 | 30 |
| Paydown of medical claim backlogs | | |
| related to acquired companies | | 50 |
| Severance payments related to acquired companies | | 25 |
| Pro forma operating cash flows | $ 70 | $ 30 |

The Company's subsidiaries operate in states which require certain levels of
equity and regulate the payment of dividends to the parent company. As a
result, the Company's ability to use operating subsidiaries' cash flows is
restricted to the extent of the subsidiaries' abilities to obtain regulatory
approval to pay dividends.

The National Association of Insurance Commissioners has recommended that
states adopt a risk-based capital ("RBC") formula for companies established
as HMO entities. The RBC provisions may require new minimum capital and
surplus levels for some of the Company's HMO subsidiaries. The Company does
not expect that the RBC provisions will have a material impact on its
financial position, results of operations or cash flows.

15

Humana Inc.
Item 2. Management's Discussion and Analysis of Financial Condition
and Results of Operations, continued

The Company maintains a revolving credit agreement ("Credit Agreement") which
provides liquidity under a line of credit of up to $1.5 billion. The Company
also maintains a commercial paper program and issues debt securities
thereunder. Commercial paper borrowings outstanding at March 31, 1999, were
$779 million and are backed by the Credit Agreement. The Credit Agreement
contains usual and customary covenants including, but not limited to,

financial tests for interest coverage and leverage ratios. As of
March 31, 1999, the Company was in compliance with these covenants.
The average interest rate on commercial paper borrowings was 5.5 percent for
the quarter ended March 31, 1999.

The Company intends to pay an additional $200 million of its outstanding debt
with the proceeds from operating subsidiary dividends expected to be received
during 1999. Borrowings under the commercial paper program, except the
planned 1999 payments, have been classified as long-term debt based on
management's ability and intent to refinance borrowings on a long-term basis.

Management believes that existing working capital, future operating cash
flows and funds available under the existing revolving Credit Agreement and
commercial paper program are sufficient to meet future liquidity needs.
Management also believes the aforementioned sources of funds are adequate to
allow the Company to fund capital requirements.

Capital Resources

The Company's ongoing capital expenditures relate primarily to administrative
facilities and related information systems necessary for activities such as
claims processing, billing and collections, medical utilization review and
customer service. Planned capital spending in 1999 will approximate $80 to
$90 million for the expansion and improvement of these items.

The Company's Y2K Readiness Disclosure Statement

The Company operates one of the largest managed care data centers in the
nation. The primary computing facility is located in Louisville, Kentucky.
The Company's application systems are largely developed and maintained
in-house by a staff of 400 application programmers who are versed in the use
of state-of-the-art technology. All application systems are fully integrated
and automatically pass data through various system processes. The
information systems support marketing, sales, underwriting, contract
administration, billing, financial, and other administrative functions as
well as customer service, authorization and referral management, concurrent
review, physician capitation and claims administration, provider management,
quality management and utilization review.

The Year 2000 issue is the result of two potential malfunctions that may have
an impact on the Company's systems and equipment. The first potential
malfunction is the result of computers being programmed to use two rather
than four digits to define the applicable year. The second potential

16

Humana Inc.
Item 2. Management's Discussion and Analysis of Financial Condition
and Results of Operations, continued

malfunction arises where embedded microchips and micro-controllers have been
designed using two rather than four digits to define the applicable year. As
a result, certain of the Company's date-sensitive computer programs, building
infrastructure components and medical devices, may recognize a date using
"00" as the year 1900 rather than the year 2000. If uncorrected, the problem
may result in computer system and program failures or equipment malfunctions
that could result in a disruption of business operations (such as the payment
of medical claims, premium billing and collection, and membership enrollment
verification).

Humana's Information Systems organization operates in a centralized manner.
The Company's data center and the majority of its programming and support
staff are located at its corporate offices in Louisville, Kentucky. A Year
2000 project management office is in place to oversee the progress made in
the assessment and correction of the Company's Year 2000 exposures.

In general, the Company's Year 2000 project consists of four phases -
assessment, remediation, validation, and implementation - and is categorized
into the following four components:

Information Technology (IT) - software essential for day-to-day operations

---

including both internally developed software and third party software which
interfaces therewith.

IT Infrastructure – mainframe, network, telecommunications interfaces and
self-contained operating systems.

Third party business partners and intermediaries – entities on which the
Company relies for transmission and receipt of claims, and encounter,
membership and payment information, including federal and state governmental
agencies such as the Health Care Financing Administration.

Non-IT Infrastructure – telecommunications equipment, elevators, public
safety equipment (i.e., security and fire), medical equipment and HVAC
systems.

The Company commenced the assessment of its Year 2000 exposures in 1996.
Remediation efforts of internally developed software and third party software
applications are almost fully complete.  As of March 31, 1999, the Company
had remediated 95% of its core systems identified in the assessment.  These
systems are currently operating in the production environment using the
updated Year 2000 logic.  The Company's plan is to have all production
applications fully remediated by the end of the third quarter of 1999.
In addition, the Company is in the process of contacting vendors, third party
business partners and intermediaries in an effort to ascertain their Year
2000 readiness. The Company anticipates completing, in all material respects,
its Year 2000 project by the end of the third quarter of 1999.  The Company's
efforts are currently progressing on plan.

The Year 2000 project is currently estimated to have a minimum total cost of
approximately $26 million.  Project to date costs total $21.7 million,
including $4.1 million during the quarter ended

17

Humana Inc.
Item 2. Management's Discussion and Analysis of Financial Condition
and Results of Operations, continued

March 31, 1999.  Year 2000 expenses are projected to represent less than
6 percent of the Information Systems budget during 1999.  Year 2000 costs are
expensed as incurred and funded through operating cash flow.

The extent and magnitude of the Year 2000 project, as it will affect the
Company both before and for some period after January 1, 2000, are difficult
to predict or quantify.  As part of the Company's Year 2000 readiness, it has
undertaken the development of business continuity and contingency plans.
These plans will be in place to mitigate issues that arise in the event that
the Year 2000 project is not completed in an accurate or timely manner, or
third party constituents have failures due to the millennium change.  The
Company has identified six major functional areas, covering 22 operational
subdivisions, that will require contingency plans.  The six major functional
areas are: providers, service centers, suppliers and vendors, customers and
brokers, banking and finance, and legal services. The Company's business
continuity and contingency planning efforts, which encompasses alternate
operating procedures, are anticipated to be complete by the end of the third
quarter of 1999.

While the Company presently believes that the timely completion of its
Year 2000 project will limit exposure so that the Year 2000 will not pose
material operational problems, the Company does not control third party
systems.  Although the Company is contacting third parties, the Company has
not received assurances that all third parties and/or their interfaces will
be converted in a timely manner. Additionally, if Year 2000 modifications or
upgrades are not accomplished in a timely manner or proper contingency plans
are not implemented, Year 2000 failures which may result could have a
material adverse impact on the Company's results of operations or its
financial position.

The costs of the Year 2000 project and the date on which the Company plans to
complete Year 2000 modifications are based on management's best estimates,
considering assumptions of future events including the continued availability

of certain resources and other factors.  There can be no guarantee that these
estimates will be achieved and actual results could differ materially from
plan.  Specific factors that might cause such material differences include,
but are not limited to, the availability and cost of personnel trained in
this area, the ability to locate and correct all relevant computer codes, and
the ability of the Company's significant suppliers, customers and others with
which it conducts business, including federal and state governmental agencies,
to identify and resolve their own Year 2000 issues.

Impact of Recently Issued Accounting Pronouncements

In June 1998, the Financial Accounting Standards Board ("FASB") issued
Statement of Financial Accounting Standards No. 133, "Accounting for
Derivative Instruments and Hedging Activities" ("SFAS 133").  In general,
SFAS 133 requires that all derivatives be recognized as either assets or
liabilities in the balance sheet at their fair value, and sets forth the
manner in which gains or losses thereon are to be recorded.  The treatment of
such gains or losses is dependent upon the type of

                                    18

                               Humana Inc.
          Item 2. Management's Discussion and Analysis of Financial Condition
                        and Results of Operations, continued

exposure, if any, for which the derivative is designated as a hedge.  This
statement is effective for periods beginning after June 15, 1999.  Management
of the Company anticipates that, due to its limited use of derivative
instruments, the adoption of SFAS 133 will not have a significant effect on
the Company's results of operations or its financial position.

                                    19

                               Humana Inc.
          Item 2. Management's Discussion and Analysis of Financial Condition
                        and Results of Operations, continued


| Quarterly Membership | 1999 | 1998 |
|---|---|---|
| Commercial: | | |
| Fully-insured members at: | | |
| March 31 | 3,171,700 | 3,249,600 |
| June 30 | | 3,260,700 |
| September 30 | | 3,235,800 |
| December 31 | | 3,261,500 |
| | | |
| Administrative services members at: | | |
| March 31 | 617,900 | 682,200 |
| June 30 | | 693,400 |
| September 30 | | 673,900 |
| December 31 | | 646,200 |
| | | |
| Total Commercial members at: | | |
| March 31 | 3,789,600 | 3,931,800 |
| June 30 | | 3,954,100 |
| September 30 | | 3,909,700 |
| December 31 | | 3,907,700 |
| | | |
| Pubic Sector: | | |
| Medicare HMO members at: | | |
| March 31 | 480,700 | 495,800 |
| June 30 | | 501,000 |
| September 30 | | 502,800 |
| December 31 | | 502,000 |
| | | |
| Medicaid and other members at: | | |
| March 31 | 704,300 | 696,800 |
| June 30 | | 692,000 |

| | | |
|---|---|---|
| September 30 | | 696,500 |
| December 31 | | 700,400 |
| | | |
| Total Public Sector members at: | | |
| March 31 | 1,185,000 | 1,192,600 |
| June 30 | | 1,193,000 |
| September 30 | | 1,199,300 |
| December 31 | | 1,202,400 |
| TRICARE: | | |
| TRICARE eligible members at: | | |
| March 31 | 1,085,700 | 1,103,500 |
| June 30 | | 1,096,300 |
| September 30 | | 1,090,400 |
| December 31 | | 1,085,700 |
| | | |
| Total medical members at: | | |
| March 31 | 6,060,300 | 6,227,900 |
| June 30 | | 6,243,400 |
| September 30 | . | 6,199,400 |
| December 31 | | 6,195,800 |
| | | |
| Specialty members at: | | |
| March 31 | 2,771,900 | 2,647,800 |
| June 30 | | 2,477,800 |
| September 30 | | 2,597,800 |
| December 31 | | 2,633,300 |

20

Humana Inc.
Item 3. Quantitative and Qaulitative Disclosures about Market Risk

Since the date of the Company's Annual Report on Form 10-K for the fiscal
year ended December 31, 1998, no material changes have occurred in the
Company's exposure to market risk associated with the Company's investments
in market risk sensitive financial instruments, as set forth in the
"Management's Discussion and Analysis of Financial Condition and Results of
Operations" included in such Form 10-K.

21

Humana Inc.
Part II: Other Information

Item 1: Legal Proceedings

Between November 19, 1997 and December 11, 1997, three related, purported
class action complaints entitled (i) Medhat Reiser v. PCA, et al, Civil
Action No. 97-3678 (S.D. Fla.)(Middlebrooks, J.), (ii) Janice Wells and
Stewart Colton v. PCA, et al, Civil Action No. 97-3832 (King, J.), and
(iii) David Applestein v. PCA, et al, Civil Action No. 97-4030 (Nesbitt, J.),
were filed in the United States District Court for the Southern District of
Florida by purported former stockholders of Physician Corporation of
America ("PCA") against PCA and certain of its former directors and officers.
By order entered February 13, 1998, the three actions were consolidated into
a single action entitled In re Physician Corporation of America Securities
Litigation, Civil Action No. 97-3678 (S.D. Fla.)(Middlebrooks, J.).  The
Reiser, Wells and Applestein complaints contain the same or substantially
similar allegations; namely, that PCA and the individual defendants
knowingly or recklessly made false and misleading statements in press
releases and public filings with respect to the financial and regulatory
difficulties of PCA's workers' compensation business.  Count I of all three
complaints is premised on alleged violations of Section 10(b) of the
Securities Exchange Act of 1934 (the "1934 Act") and SEC Rule 10b-5, and
Count II on alleged violations of Section 20(a) of the 1934 Act.  All
three complaints seek certification of a class of stockholders who
purchased shares of PCA common stock from May 1996 through March 1997, as
well as money damages plus prejudgment interest in an unspecified amount,
and costs and expenses including attorneys fees.  On February 19, 1999,

the U.S. District Court denied PCA's motion to dismiss.  This matter has
been set for trial beginning January, 2001.  The Company believes that
the allegations in the above complaints are without merit and intends to
pursue the defense of the consolidated action vigorously.

Damages for claims for personal injuries and medical benefit denials are
usual in the Company's business.  Personal injury claims are covered by
insurance from the Company's wholly-owned captive insurance subsidiary and
excess carriers, except punitive damages generally are not paid where claims
are settled and generally are awarded only where a court determines there has
been a willful act or omission to act.

Government regulators conduct reviews from time to time to audit compliance
with government regulations and statutes, and those reviews may result in
fines or other payments.

Management does not believe that any pending and threatened legal actions and
audits by agencies that regulate the Company will have a material adverse
effect on the Company's financial position, results of operations or cash
flows.

Items 2 - 3:

  None.

                                22

                          Humana Inc.
                Part II: Other Information, continued


Item 4: Submission of Matters to a Vote of Security Holders

  (a) The regular annual meeting of stockholders of Humana Inc. was held in
      Louisville, Kentucky on May 6, 1999, for the purpose of electing the
      Board of Directors.

  (b) Proxies for the meeting were solicited pursuant to Section 14(a) of the
      Securities Exchange Act of 1934 and there was no solicitation in
      opposition to management's solicitations. All of management's nominees
      for directors were elected.

  (c) One proposal was submitted to a vote of security holders as follows:

      (1) The stockholders approved the election of the following persons as
          directors of the Company:

| Name | For | Withheld |
|------|-----|----------|
| K. Frank Austen, M.D. | 136,398,798 | 14,868,526 |
| Michael E. Gellert | 136,391,376 | 14,875,948 |
| John R. Hall | 136,394,172 | 14,873,152 |
| David A. Jones | 136,431,940 | 14,835,384 |
| David A. Jones, Jr. | 136,430,260 | 14,837,064 |
| Irwin Lerner | 136,393,668 | 14,873,656 |
| W. Ann Reynolds, Ph.D. | 136,437,727 | 14,829,597 |
| Gregory H. Wolf | 136,400,536 | 14,866,788 |


Item 5:

  None.

Item 6:      Exhibits and Report on Form 8-K

  (a) Exhibits:

Exhibit 10 - Employment Agreement - Kenneth J. Fasola dated
March 29, 1999, filed herewith.

Exhibit 12 - Statement re: Computation of Ratio of Earnings to Fixed
Charges, filed herewith.

Exhibit 27 - Financial Data Schedule

(b) On April 8, 1999, the Company filed a report on Form 8-K regarding its
intention to record $90 million additional medical claims expense
during the first quarter, as discussed in both Items 1 and 2 of this
Form 10-Q.

23

Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the
registrant has duly caused this report to be signed on its behalf by the
undersigned thereunto duly authorized.

HUMANA INC.

Date: May 17, 1999                    /s/  James E. Murray
                                      James E. Murray
                                      Chief Financial Officer
                                      (Principal Accounting Officer)

Date: May 17, 1999                    /s/  Kathleen Pellegrino
                                      Kathleen Pellegrino
                                      Vice President and
                                      Associate General Counsel

24

EX-10
2

EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT made as of March 29, 1999  by
and between HUMANA INC. (hereinafter "Company"), a
Delaware corporation having its principal place of
business in Louisville, Kentucky, and Kenneth J. Fasola
(hereinafter "Employee"):

WITNESSETH:

WHEREAS, Employee desires to render faithful and
efficient service to the Company; and

WHEREAS, the Company desires to receive the
benefit of Employee's service; and

WHEREAS, Employee is willing to be employed by the
Company; and

WHEREAS, both Company and Employee desire to formalize the conditions of Employee's employment by written agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties agree as follows:

1.  Office. The Company hereby employs Employee as Senior Vice President of Company and Employee hereby agrees to serve the Company in such capacity.

2.  Term of Employment. Employee's employment shall be for the "Employment Period" with the initial term commencing on March 29, 1999 and extending through March 29, 2001. The initial term shall be automatically renewed and extended upon the expiration thereof for successive periods of one (1) year until such time as the Employment Period shall terminate pursuant to the terms of this Agreement, or until the Company on the one hand, or Employee on the other hand, shall terminate the Employment Period by giving written notice to the other party on or before sixty (60) days prior to the expiration date of the initial or any renewal term. The renewal and extension of this Agreement shall also be referred to as the "Employment Period." The effective date of Employee's termination of employment for whatever reason under this Agreement shall be the "Termination Date."

3.  Responsibilities. During the Employment Period, Employee shall devote his entire business time and attention, except during reasonable vacation periods, to, and exert his best efforts to promote, the affairs of the Company, and shall render such services to the Company as may be required by the Board of Directors of the Company ("Board") consistent with his employment as Senior Vice President of the Company. Nothing herein contained shall preclude service by Employee on a reasonable number of boards of directors or trustees of other entities not engaged in any business competitive with the business of the Company, provided that Employee shall discuss any such board service in advance with the Company's Board.

4.  Incapacity. If, during the Employment Period, Employee should be prevented from performing his duties or fulfilling his responsibilities by reason of any incapacity or disability for a continuous period of six (6) months, then the Company's Board, in its sole and absolute discretion, may, based on the opinion of a qualified physician, consider such incapacity or disability to be total and may on ninety (90) days written notice to Employee terminate the Employment Period. Benefits and payments shall be made under this Agreement following incapacity as if it were a termination without Good Cause in accordance with Section 8(a).

5.  Death. The Employment Period shall automatically terminate upon the death of Employee, and payments will be made to the Employee's estate as if it was a termination without Good Cause in accordance with Section

8(a).

6.    Compensation.  During the Employment Period, Employee shall (i) receive a base salary (hereinafter "Annual Base Salary") that shall be an annual amount of not less than Four Hundred and Seventy Thousand Dollars ($470,000) payable in accordance with the payroll practices of the Company, and shall (ii) participate in an incentive plan providing for a target incentive compensation amount of not less than seventy-five percent (75%) of his Annual Base Salary.  Employee shall be guaranteed a minimum of fifty percent (50%) of base salary as bonus for the 1999 Performance Year.

7.    Benefit Plans and Programs.  During the Employment Period, Employee shall be eligible for participation in all benefit plans and programs, including those for executive employees, made available by the Company to its respective employees.

8.    Severance Payments.

      (a)  In the event that (i) Employee's employment is terminated by the Company while this Agreement is in effect without Good Cause, (ii) the Employment Period is terminated by reason of incapacity or disability in accordance with Section 4, or  (iii) the Employment Period is terminated by reason of death in accordance with Section 5:

           (1)  The Company shall pay to Employee or his estate, no later than thirty (30) calendar days after such Termination Date, an amount equal to any unpaid current Annual Base Salary accrued through the Termination Date, his bonus, calculated at one hundred percent (100%) of his Annual Base Salary prorated for the current fiscal year through the Termination Date, plus one (1) times the sum of his then current Annual Base Salary, calculated at one hundred percent (100%) of his Annual Base Salary. The Company shall continue to keep in full force and effect all plans or policies of medical, accident and life insurance benefits with respect to Employee and his dependents with the same level of coverage available to employees under the terms of those employee benefit plans for a period of twelve (12) months, upon the same terms, costs and otherwise to the same extent as such plans are in effect for employees of the Company who were similarly situated to Employee as of the Termination Date.

           (2)  All restricted shares previously awarded to Employee but not yet vested shall become vested and non-forfeitable as of the Termination

Date.

    (3)  To the extent stock options granted to Employee have not become fully vested and exercisable as of the Termination Date, such options shall become fully vested and all vested stock options shall be exercisable for two (2) years commencing on the Termination Date.

(b)  In the event that Employee's employment is terminated by the Company with Good Cause or if employee voluntarily terminates his employment:

    (1)  The Company shall pay to Employee, no later than thirty (30) calendar days after the Termination Date, an amount equal to his then current Annual Base Salary accrued but unpaid through the Termination Date; and Employee shall have a period of ninety (90) days after such Termination Date in which to exercise any exercisable vested stock options, subject to the provisions of any applicable stock option agreement.

    (2)  Any restricted shares or stock options previously granted but still subject to restriction or unvested at the Termination Date shall be forfeited.

(c)  Good Cause shall mean the Company's Board has determined in good faith, without being bound by the Company's progressive discipline policy for employees:

    (1)  that Employee has engaged in acts or omissions against the Company or any of its subsidiaries constituting dishonesty, intentional breach of fiduciary obligation or intentional wrongdoing or misfeasance; or

    (2)  that Employee has been arrested or indicted in a possible criminal violation involving fraud or dishonesty; or

    (3)  that Employee has intentionally and in bad faith acted in a manner which results in a material detriment to the assets, business or prospects of the Company or any of its subsidiaries; or

    (4)  that after due consideration and with notice to the Employee, Employee has performed poorly.

(d)  In the event that Employee's employment is terminated (I) by the Company for Good Cause as defined in Section 8(c)(4) above, (ii) because either the Company or Employee terminated the Employment Period pursuant to Section 2 of this Employment Agreement, or (iii) because Employee voluntarily leaves the employ of

the Company during the Employment Period, then the
Company shall pay to Employee, no later than thirty
(30) calendar days after such Termination Date, an
amount equal to any unpaid current Annual Base Salary
accrued through the Termination date, plus one (1)
times his then current Annual Base Salary. Any bonus
finally determined to be payable at the end of the
fiscal year in which the Termination Date is included
shall be prorated for the period up to and including
the Termination Date and shall be promptly paid to
Employee at the same time any other similar bonuses are
paid to any other employee of the Company for such
fiscal year. The Company shall continue to keep in
full force and effect all plans or policies of medical,
accident and life insurance benefits with respect to
Employee and his dependents with the same level of
coverage available to employees under the terms of
those employee benefit plans for a period of twelve
(12) months, upon the same terms, costs and otherwise
to the same extent as such plans are in effect for
employees of the Company who were similarly situated to
Employee as of the Termination Date.

(e)     Following the Employment Period, Employee shall be
        eligible for continuation of health and dental
        insurance coverage pursuant to the Consolidated Omnibus
        Budget Reconciliation Act (COBRA) for eighteen (18)
        months. For the first twelve (12) months, Employee's
        cost will be an amount equal to the normal employee
        contribution. Thereafter, the cost will be an amount
        equal to the COBRA cost of such coverage. During the
        first eighteen (18) months, Employee may elect any of
        the coverages available to Humana employees.
        Thereafter, Humana agrees that Employee may elect
        coverage under any of the insured products offered by
        Humana's health insurance or HMO subsidiaries for
        Employee, his spouse as of the date hereof ("Spouse"),
        and any eligible dependent until the later of
        Employee's age sixty-five (65) or eligibility for
        Medicare coverage (hereinafter "Extended Coverage").
        At the earlier of Employee attaining Medicare
        eligibility or death, Employee's Spouse and any now
        current eligible dependent of Employee and Spouse will
        be eligible for Extended Coverage until the later of
        Spouse's age sixty-five (65) or Medicare coverage
        eligibility. If at any time during which the Extended
        Coverage is in effect Employee or his Spouse obtains
        Medicare or becomes eligible for other employee group
        health insurance coverage which does not exclude a pre-
        existing condition of Employee, Spouse or dependent,
        Humana's obligation will cease as to the one who has
        obtained Medicare or, in the case of other employee
        group health coverage, as to that person and their
        eligible dependents. Employee's premium for the
        Extended Coverage and Spouse's premium, if she retains
        Extended Coverage, will be amount equal to the COBRA
        cost of such coverage. If Humana hereafter adopts a
        retiree health insurance program and Humana still has
        obligations under this provision, Employee will be
        offered the option of participating in that program in
        lieu of the Extended Coverage described herein. The
        health and dental insurance benefits hereunder shall be
        administered in conjunction with any other similar
        benefits which the Employee has from the Company but in
        no case shall be duplicative.

9.      Termination After A Change in Control. In the
        event of a "Change in Control" of the Company (as
        defined as of the date hereof in the Company's 1996
        Stock Incentive Plan for Employees), if, within twenty-

four (24) months following the closing of such a Change
in Control (or at any time prior thereto but in
contemplation thereof):

(i)    There -is-a material reduction in the Employee's
       title, authority or responsibilities, including
       reporting responsibilities;

(ii) The Employee's Annual Base Salary is reduced;

(iii)    The Employee's office at which he is to
        perform his duties is relocated to a location more than
        thirty (30) miles from the location at which the
        Employee performed his duties prior to the Change in
        Control;

(iv) The Company fails to continue in effect any
       incentive, bonus or other compensation plan in which
       the Employee participates, unless the Company
       substitutes a substantially equivalent benefit;

(v)    The Company fails to continue in effect any
       employee benefit plan (including any medical,
       hospitalization, life insurance, dental or disability
       benefit plan in which the Employee participated) or any
       material fringe benefit or perquisite enjoyed by the
       Employee at the time of the Change in Control, unless
       the Company substitutes benefits which, in the
       aggregate, are substantially equivalent;

(vi) The Company breaches any material provision of
       this Employment Agreement; or

(vii)    The Company fails to obtain a satisfactory
        agreement from any successor or assign of the Company
        to assume and agree to perform this Employment
        Agreement;

Then the Employee shall have the option to
voluntarily terminate his employment and the
Company shall:

(a)    Pay the Employee his full base salary earned but
       not yet paid through the Termination Date at the
       greater of the rate in effect at the time of the Change
       in Control or the Termination Date ("Higher Annual Base
       Salary"), plus any bonuses or incentive compensation
       which, pursuant to the terms of any compensation or
       benefit plan, have been earned and are payable as of
       the Termination Date.  For purposes of this Agreement,
       bonuses and incentive compensation shall be considered
       payable if all conditions for earning them have been
       met and any requirement that Employee be actively
       employed as of the date of payment shall be
       disregarded.

(b)    Pay the Employee a lump sum in an amount equal to
       one and one-half (1.5) times the amount equal to the sum
       of (1) the Employee's Annual Base Salary plus (2) the
       maximum target bonus or incentive compensation which
       could have been earned by the Employee calculated as if
       all relevant goals had been met during the then current
       fiscal year of the Company pursuant to the terms of the
       incentive compensation plan in which he participates.
       If there is no incentive compensation plan in effect as
       of the Termination Date, then for purposes of this
       Agreement it shall be assumed that the amount of
       incentive compensation to be paid to the Employee shall
       be the maximum target amount under any incentive
       compensation plan in which he participated at the date
       of the Change in Control or the most recent plan

participated in, whichever would be greater.

(c)   Maintain in full force and effect for the benefit
of the Employee and the Employee's dependents and
beneficiaries, at the Company's expense, all life
insurance, health insurance, dental insurance,
accidental death and dismemberment insurance and
disability insurance under plans and programs in which
the Employee and/or the Employee's dependents and
beneficiaries participated immediately prior to the
Termination Date, provided that continued participation
is possible under the general terms and provisions of
such plans and programs ("Extended Benefits").   The
Extended Benefits shall be continued until the earlier
of (A) the second (2nd) anniversary of the Termination
Date, (B) the effective date of the Employee's coverage
under equivalent benefits from a new employer (provided
that no such equivalent benefits shall be considered
effective unless and until all pre-existing condition
limitations and waiting period restrictions have been
waived or have otherwise lapsed), or (C) the death of
the Employee.   If participation in any such plan or
program is barred, the Company shall arrange at its own
expense to provide the Employee with benefits
substantially similar to those which he was entitled to
receive under such plans and programs.   At the end of
the period of coverage, the Employee shall have the
right to have assigned to him, at no cost and with no
apportionment of prepaid premiums, any assignable
insurance policy relating specifically to him.
Employee shall be entitled to continuation coverage as
provided by COBRA at the conclusion of the coverage
provided under this Section.

The amount of any payment or benefit
provided for in this Section 9 shall be
offset by any lump sum cash payments due the
Employee upon termination under any other
provisions of this Employment Agreement.

10.   Restrictive Covenants.   Employee shall not
during the Employment Period, directly or
indirectly, alone or as a member of a
partnership or association, or as an officer,
director, advisor, consultant, agent or
employee of any other company, be engaged in
or concerned with any other duties or
pursuits requiring his personal services
except with the prior consent of the
Company's Board.   Nothing herein contained
shall preclude the ownership by Employee of
stocks or other investment securities.

11.   Confidential Information and Trade Secrets.

(a)   Employee recognizes that Employee's position with
the Company requires considerable responsibility and
trust, and, in reliance on Employee's loyalty, the
Company may entrust Employee with highly sensitive
confidential, restricted and proprietary information
involving Trade Secrets and Confidential Information.

(b)   For purposes of this Agreement, a "Trade Secret"
is any scientific or technical information, design,
process, procedure, formula or improvement that is
valuable and not generally known to competitors of the
Company.   "Confidential Information" is any data or
information, other than Trade Secrets, that is
important, competitively sensitive, and not generally
known by the public, including, but not limited to, the
Company's business plans, business prospects, training

manuals, product development plans, bidding and pricing procedures, market strategies, internal performance statistics, financial data, confidential personnel information concerning employees of the Company, supplier data, operational or administrative plans, policy manuals, and terms and conditions of contracts and agreements. The terms "Trade Secret" and "Confidential Information" shall not apply to information which is (i) already in Employee's possession (unless such information was used in connection with formulating the Company's business plans, obtained by Employee from the Company or was obtained by Employee in the course of Employee's employment by the Company), or (ii) required to be disclosed by any applicable law.

(c)  Except as required to perform Employee's duties hereunder, Employee will not use or disclose any Trade Secrets or Confidential Information of the Company during employment, at any time after termination of employment and prior to such time as they cease to be Trade Secrets or Confidential Information through no act of Employee in violation of this Section 11.

(d)  Upon the request of Company and, in any event, upon the termination of employment hereunder, Employee shall surrender to the Company all memoranda, notes, records, plans, manuals or other documents pertaining to the Company's business or Employee's employment (including all copies thereof). Employee will also leave with the Company all materials involving Trade Secrets or Confidential Information of the Company. All such information and materials, whether or not made or developed by Employee, shall be the sole and exclusive property of the Company, and Employee hereby assigns to the Company all of Employee's right, title and interest in and to any and all of such information and materials.

12.  Covenant Not To Compete.

Employee hereby covenants and agrees that for a period commencing on the date hereof and ending twelve (12) months after ceasing employment with the Company for whatever reason, he shall not:

(a)  Compete in any way with the Company without the Company's prior written consent.

(b)  Interfere with the relationship of the Company and any employee, agent, broker, or representative.

(c)  Divert, or attempt to cause the diversion from the Company, any business with which the Company has been actively engaged in during any part of the past two (2) year period preceding the Termination Date, nor interfere with relationships of the Company with policyholders, dealers, distributors, marketers, sources of supply or customers.

Employee further specifically acknowledges that the geographic area to which the covenants contained in this Section 12 apply is the same geographic area in which the Company transacted its business during any part of the twelve (12) month period immediately prior to the Termination Date. The time period during which the prohibitions set forth in this Section 12 apply shall be tolled and suspended as to Employee for a

period equal to the aggregate quantity of time during which Employee violates such prohibitions in any respect.

13.  Specific Enforcement.  Employee specifically acknowledges and agrees that the restrictions set forth in Sections 11 and 12 hereof are reasonable and necessary to protect the legitimate interest of the Company and that the Company would not have entered into this Agreement in the absence of such restrictions.  Employee further acknowledges and agrees that any violation of the provisions of Sections 11 or 12 hereof will result in irreparable injury to the Company, that the remedy at law for any violation or threatened violation of such Section(s) will be inadequate and that in the event of any such breach, the Company, in addition to any other remedies or damages available to it at law or in equity, shall be entitled to temporary injunctive relief before trial from any court of competent jurisdiction as a matter of course, and to permanent injunctive relief without the necessity of proving actual damages.

14.  Effect of Termination of the Employment Period.  Upon the termination of the Employment Period, this Agreement shall terminate, and all of the parties' obligations hereunder shall forthwith terminate, except that rights and remedies accruing prior to such termination or arising out of this Agreement shall survive.

15.  Notice.  Any notice required to be given by the Company hereunder to Employee shall be in proper form and signed by an officer or Director of the Board of the Company.  Until one party shall advise the other in writing to the contrary, notices shall be deemed delivered:

(a)  To the Company if delivered to the Chief Executive Officer of Humana Inc., or if mailed, certified or registered mail postage prepaid, to Humana Inc., 500 West Main Street, Louisville, Kentucky 40202; Attention: Chairman of the Board, with a copy to the Company's General Counsel.

(b)  To employee if delivered to Employee, or if mailed to him by certified or registered mail, postage prepaid, to Kenneth J. Fasola at 7407 Pine Knoll Circle, Prospect, Kentucky 40059.

16.  Benefit.  This Agreement shall bind and inure to the benefit of the Company and the Employee, their respective heirs, successors and assigns.

17.  Severability.  If a judicial determination is made that any of the provisions of this Employment Agreement constitutes an unreasonable or otherwise unenforceable restriction against Employee, such provision shall be rendered void only to the extent that such judicial determination finds such provisions to be unreasonable or otherwise unenforceable.  In this regard, the

parties hereto hereby agree that any judicial authority construing this Employment Agreement shall be empowered to sever any portion of the territory or prohibited business activity from the coverage of Sections 11 or 12 and to apply the provisions to the remaining portion of the territory or the remaining business activities not so severed by such judicial authority. Moreover, notwithstanding the fact that any provisions of this Employment Agreement are determined not to be specifically enforceable, the Company shall nevertheless be entitled to recover monetary damages as a result of the breach of such provision by Employee.

18.  Conditions.  This Agreement shall become effective upon approval by the Compensation Committee of the Board of Directors of the Company.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Attest:                                    HUMANA INC.


/s/Kathleen Pellegrino                     BY:/s/Gregory H. Wolf
  Kathleen Pellegrino                        Gregory H. Wolf
  Vice President and                         Chief Executive Officer
  Assistant Secretary                        Humana Inc.



/s/Kathleen Pellegrino                     /s/Kenneth J. Fasola
  Kathleen Pellegrino                        Kenneth J. Fasola
  Witness                                    "EMPLOYEE"


EX-12
3


                                              Exhibit 12

                      Humana Inc.
              Ratio of Earnings to Fixed Charges
        For the quarters ended March 31, 1999 and 1998
                      Unaudited
                (Dollars in millions)

|                                      | 1999      | 1998    |
|--------------------------------------|-----------|---------|
| Earnings (Loss):                     |           |         |
| (Loss) income before income taxes    | $ (25)    | $ 79    |
| Fixed charges                        | 13        | 15      |
|                                      | $ (12)    | $ 94    |
|                                      |           |         |
| Fixed charges:                       |           |         |

| | | |
|---|---:|---:|
| Interest charged to expense | $ 10 | $ 12 |
| One-third of rent expense | 3 | 3 |
| | $ 13 | $ 15 |
| Ratio of earnings to fixed charges | (a) | 6.1 |

The one-third of rent expense included in fixed charges is that proportion deemed representative of the interest portion.

(a) Earnings (loss) for the quarter ended March 31, 1999 were not adequate to cover fixed charges. Exclusive of the additional medical claims expense of $90 million ($57 million after tax, or $.34 per share) and a $12 million ($8 million after tax, or $.04 per share) gain on the sale of a tangible asset, the ratio of earnings to fixed charges for the quarter would have been 5.0.

25

```
<TYPE>EX-27
<SEQUENCE>4
<DESCRIPTION>ARTICLE 5 FIN DATA SCHEDULE FOR 3/31/99 QUARTER
<TEXT>

<TABLE> <S> <C>


<ARTICLE>  5
<MULTIPLIER> 1,000,000
<S>                                       <C>
<PERIOD-START>                            JAN-01-1999
<PERIOD-TYPE>                             3-MOS
<FISCAL-YEAR-END>                         DEC-31-1999
<PERIOD-END>                              MAR-31-1999
<CASH>                                    636
<SECURITIES>                              1,555
<RECEIVABLES>                             337
<ALLOWANCES>                              59
<INVENTORY>                               6
<CURRENT-ASSETS>                          2,807
<PP&E>                                    802
<DEPRECIATION>                            372
<TOTAL-ASSETS>                            5,190
<CURRENT-LIABILITIES>                     2,409
<BONDS>                                   579
<PREFERRED-MANDATORY>                     0
<PREFERRED>                               0
<COMMON>                                  28
<OTHER-SE>                                1,640
<TOTAL-LIABILITY-AND-EQUITY>             5,190
<SALES>                                   2,428
<TOTAL-REVENUES>                          2,477
<CGS>                                     2,136
<TOTAL-COSTS>                             2,492
<OTHER-EXPENSES>                          0
<LOSS-PROVISION>                          0
<INTEREST-EXPENSE>                        10
<INCOME-PRETAX>                           (25)
<INCOME-TAX>                              (9)
<INCOME-CONTINUING>                       (16)
<DISCONTINUED>                            0
<EXTRAORDINARY>                           0
<CHANGES>                                 0
<NET-INCOME>                              (16)
<EPS-PRIMARY>                             (.10)
<EPS-DILUTED>                             (.10)
```

HUMANA INC. WEBSITE

HELP   SEARCH   LEGAL DISCLAIMER                    PHYSICIAN FINDER   PRODUCTS & SERVICES   LOCAL OFFICES

HOME

# members                                         HUMANA.

  

SERVICES                                HUMANA
                                        BEGINNINGS

RESOURCES

HumanaFirst

Humana Formulary

Glossary

# Glossary

**Ancillary Services**
Services other than hospital room and board, nursing, and physician services. (e.g. lab and x-ray work)

**Capitation**
A monthly payment to providers based on membership rather than services provided.  The payment covers contracted services and is paid in advance of care being provide.  Capitation is expressed as a "per member per month" amount.

**Case Management**
Review of a patient's treatment plan to manage the care and it's costs by coordinating the services needed by the patient.

**Closed Panel System (Concept)**
A medical system in which admission of other doctors is limited by the group.  Membes can only use doctors in the group for their medical care.

**Community Rating**
A rating method required of federally qualified HMOs and a method required of some HMOs under state laws where the HMO must collect the same amount of money per member for all members in the plan.

**Concurrent Review**
The ongoing review of the hospital care to determine whether or not the patient is still in need of acute care or whether they can be discharged soon.

**Cost Containment**
The control or reduction of inefficiencies in the consumption, allocation or production of health care services which contribute to higher than necessary costs.

**Credentialing**
A review process of potential medical providers to assess their standing and qualifications.

**Diagnostic Related Group (DRG)**
A hospital payment methodology developed by Medicare that categorizes diagnoses into 468 classifications.  The hospital is paid the amount assigned to the classification regardless of costs incurred.

**Discharge Planning**
A program to facilitate early, safe release from the hospital by planning and providing the needed medical services upon hospital discharge.

**Dual Choice Mandate**
Employers with 25 or more employees are required to offer a federally qualified HMO if the HMO requests to be included in the company's health benefits program.

**Encounter Data**
Claims which are not paid fee-for-service because they are the responsibility of the provider under the capitation agreement.

**Exclusive Provider Organization (EPO)**
Similar to and HMO except it is regulated under insurance statutes instead of HMO regulation.

**Experience Rating**
A rating method where the premium is based upon the group's claims experience, age, sex, and /or health status.

**Federally Qualified HMO**
An HMO which has met strict federal standards and has been granted qualification status.

**Fee-For-Service**
Payment for service after the service is provided based on billed charges

**Fee Schedule**
A listing of accepted fees or established allowances for specified medical procedures.

**Gatekeeper**
The primary care physician who must provide or authorize all medical services for the member.

**Group Model HMO**
An HMO model where the HMO contracts with a multi-specialty physician group to provide medical care to its members.

**HMO Act of 1973**
Federal legislation which facilitated the growth and developed of HMOs by providing HMO definitional requirements, federal grants and loans for HMO development and legislative mandates for HMO growth where previously prohibited.

**Health maintenance Organization (HMO)**
An organization that provides comprehensive health care for members who prepay a premium. Providers share the risk of the cost of care with the HMO.

**Hold Harmless Clause**
A contract stipulation that does not allow the physician to bill members for services which they are under contract to provide.

**Independent Practice Association (IPA) Model**
An HMO model where the HMO contracts with individual physicians or their association to see the HMO members in their own private offices.

**Managed Care**

Case 0:00-cv-06138-FAM     Document 8     Entered on FLSD Docket 02/29/2000     Page 163 of 220

Humana: Members. Resource Ce...: Insurance terms, HMO terms, etc   Page 3 of 4

An approach to health care where the patient receives medical services in a coordinated manner to eliminate unnecessary and inappropriate services while still assuring quality by use of incentives for members and providers.

**Mandated Benefits**
Benefits which are required by law to be included in a contract.

**Network**
A group of hospitals, clinics, and physicians contracted in a geographical area to provide services at a reduced rate in return for certain volume of patients.

**Network Model HMO**
An HMO model where the HMO contracts with one or more group practices to provide medical care.

**Participating Providers**
Providers who are under contract to provide medical care.

**Per Diem**
A negotiated per day charge, uniform for all admissions within the per diem category. Most often, categories are based on the level/type of service (e.g. medical/surgical, OB, etc.)

**Per Member Per Month**
Refers to a revenue or cost of service for each member each month.

**Point of Service Plan**
Also known as open-ended HMO, opt-out, or leaky HMO. These plans operate like an HMO with the exception that it pays some benefits if members use non-HMO providers.

**Preferred Provider Organization (PPO)**
A plan that contracts with medical providers who agree to provide medical care on a discounted basis. When members use the contracted (network) providers they receive higher benefits.

**Precertification**
A program designed to eliminate unnecessary days in the hospital by reviewing elective hospitalization prior to the patient's admission. It ensures that the services are necessary and an inpatient setting is appropriate.

**Prepaid Medical Care**
Payment for services at agreed upon rates, before illness or injury.

**Primary Care Provider (PCP)**
Usually a general practitioner, family practitioner, internist, Obstetrician, or pediatritian who provides basic health care. In managed care settings, the PCP is seen when the patient seeks medical care. The PCP then provides the care directly or refers the patient to the appropriate specialist.

**Quality Assurance**
Programs to assess the quality of care being provided and develop and Programs to assess the quality of care being provided and develop and maintain

Case 0:00-cv-06138-FAM    Document 8    Entered on FLSD Docket 02/29/2000    Page 164 of 220

Humana: Members. Resource Ce...: Insurance terms, HMO terms, etc   Page 4 of 4

programs to keep the quality at an acceptable level and institute improvements when the opportunity arises or the care does not meet standards. May also be referred to as Quality Management.

**Resource Based Relative Value Scale (RBRVS)**
Medicare's physician payment methodology which assigns a value or rate to physician services based on the relative physician resource input.

**Referral**
A form authorizing services to any provider other than the patient's primary care provider.

**Reinsurance**
A type of protection wher a portion of risk is underwritten by another insurer.

**Risk Pool**
A fund set up as a reserve for unexpected expenses.

**Salary**
Type of physician's compensation in a Staff Model HMO.

**Second Surgical Opinion**
The opinion of Another Physician of the same specialty to review the necessity of the surgery.

**Staff Model HMO**
An organization model for HMOs where the HMO employs the medical staff to provide medical care.

**Stop Loss**
A type of protection which limits the physician's risk to an expressed dollar amount or percentage of capitation.

**Usual and Customary**
Establishment of a maximum amount to pay for a specific procedure based on prevailing fees in a geographical area.

**Utilization Review/Utilization Mangement**
A review/evaluation of an admission, the use of ancillary services, and/or the length of a hospital stay using objective medical criteria to ensure that the services are medically reasonable, necessary and provided in the most appropriate setting.

**Withhold**
The portion of the monthly capitation payment to physicians withheld by the managed care organization until the end of the year or another time period to create an incentive for lower utilization.



# Who's Afraid of Dickie Scruggs?

Answer: corporate America. With powerful friends and a novel legal strategy, this smooth Southern litigator helped bring Big Tobacco to its knees. Now he's going after HMOs. Critics say he's abusing the system to get rich. But Scruggs says he's simply doing well by doing good. BY ADAM BRYANT



**A FREQUENT FLIER ON 'AIR SCRUGGS':** *Scruggs logs a lot of miles on his private jet. Left to right: At the Jefferson Military College in 1954; aboard the Franklin D. Roosevelt aircraft carrier in 1972; with his wife, Diane, near their vacation home in Key West, Fla.*

lead-paint makers and, most recently, Microsoft, after the Justice Department's recent antitrust action against the company. Scruggs is not involved in those suits. For him to take on a case, he declares, the issue has to offend "my fundamental sense of fairness."

Critics say there also has to be a fair amount of cash at stake before his conscience kicks in. Scruggs has become a lightning rod in the highly charged debate over the role of trial lawyers and the fat fees many of them have earned. In the tobacco case, lawyers are expected to rake in a stunning $12 billion in fees. The take for Scruggs's firm alone? Close to $900 million, with about one third of that going to Scruggs personally.

For his efforts, Scruggs is attracting some powerful enemies, particularly in the health-insurance industry, which is now squirming uncomfortably in the lawyer's cross hairs. The suits have spooked investors, putting pressure on industry stocks, some of which fell almost 20 percent when news of the suits first surfaced. One of his most outspoken critics, Richard L. Huber, chief executive of Aetna, has referred publicly to Scruggs as "Slugs," and recently said,

"What he does for personal enrichment is to make vital services and goods more expensive." The insurance industry, which has vowed to fight the lawsuits vigorously, has also sponsored a TV spot showing sharks in a feeding frenzy, warning that "America's richest trial lawyers are circling, and your health plan is the bait."

Aetna has called Scruggs's accusations "outrageous," and promised to defend itself aggressively. It claims the suit represents an attack on managed care, which it says has "reduced the rise of medical costs, increased preventive care and made quality health care affordable to more people."

One of Scruggs's favorite sayings—he uses it when something's got him all charged up—is, "My hair's on fire." His hair is aflame these days over the financial incentives he says

health insurers give doctors to undertreat patients. "It's like paying a lawyer more if he loses for his client," he says. The lawsuits are just a starting point, Scruggs says, part of an ambitious plan to restructure the way health care is delivered in this country. He's using them to get the attention of big institutional investors. Scruggs wants them to pressure the industry to work with Congress, which is now considering new patients' rights legislation. Any overarching solution, he adds, should include a capped industry fund to pay out damages arising from lawsuits. By capping the annual damages, he says, one or two ruinous judgments won't bankrupt the industry (and leave companies unable to settle with trial lawyers).

The legal playbook that Scruggs is deploying against managed care is one he refined during his long battles against the as-

> **❝It's an abusive process to sue a company for one purpose when your real purpose is to get them to agree to some kind of political agenda. This is not a legitimate end of litigation.❞**
>
> —JAMES WOOTTON, *Institute for Legal Reform*



**LEVELING THE PLAYING FIELD AGAINST CORPORATE AMERICA:** *Scruggs and Charlene Bosarge, his assistant, sit amid documents used to battle Big Tobacco. James Wootton (below), of the U.S. Chamber Institute for Legal Reform, say Scruggs is abusing the courts to pursue his agenda.*

bestos and tobacco industries. Raise the stakes so high that neither side can afford to lose, because that's when compromises are made. Take your message directly to Wall Street. Prepare the ground in Washington for a legislative resolution. (Sen. Trent Lott and Scruggs are brothers-in-law, and they affectionately call each other "my no-good, scum-sucking brother-in-law.") Scruggs didn't invent these approaches, and class actions have been around for decades. Silicone breast implants, the Dalkon shield, Agent Orange, plane crashes and even civil-rights violations have been the subjects of these kinds of joint lawsuits, which bring together the power and resources of many individual plaintiffs. But Scruggs has broadened their scope by drawing in other lawyers, Washington policymakers and investors. "We understand how to play this game now in ways that haven't been played before," he says. It's part big business, part "cause-lawyering," a combination that legal experts say is unusual. "Here we have a new animal," says Deborah Hensler, a Stanford University law professor.

Scruggs is a familiar enough animal around the sleepy Gulf Coast town of Pascagoula, Miss., where he has lived most of

his life. Scruggs's stately Colonial along "The Beach," a two-mile-long row of gracious homes by the water, is now recognizable to many as the setting for a number of scenes in "The Insider." Scruggs himself never made it into the movie, though it wasn't for lack of trying. He spent an hour reading lines in Washington with Mann and Pacino. They then went to dinner, and after Scruggs picked up the check, Mann told him he was going to hire a professional actor for the part.

Scruggs didn't always travel in such tony company and was a bit wild as a boy. Once, to get back at some kids who were picking on him, he and a friend decided to burn down their cardboard playhouse. There was just one problem. The playhouse was inside a garage and the building itself nearly burned to the ground. Scruggs's mother eventually sent him off to a military academy to finish high school. He then attended the University of Mississippi—Ole Miss—where he made connections that would pay off again and again. After working for some large law firms in Jackson, Miss., he moved his family back to Pascagoula in 1980 to hang out his own shingle, and settled into a prosperous but unremarkable career handling a variety of cases. That changed one evening in early

1984, when he received a call at home from a shipyard worker who had been having breathing problems. He wondered if Scruggs would take his case. Scruggs paid to get him tested by a pulmonologist, and the tests suggested the culprit was asbestos. When word spread that Scruggs was willing to front the money for medical evaluations, he soon had hundreds of clients. By taking advantage of a recent change in the law, Scruggs maneuvered his cases from federal court to state court, and was suddenly first in line to deal with the asbestos industry. Scruggs ultimately settled cases on behalf of 4,200 direct clients (and was co-counsel for an additional 6,000), winning about $300 million for them and about $25 million for himself.

It was an Ole Miss connection that drew Scruggs into the historic plan to take on Big Tobacco. In 1993, Michael Moore, the telegenic state attorney general in Mississippi (he plays himself in "The Insider"), was mulling over a strategy for going after tobacco companies. He called Scruggs, a classmate in law school. Scruggs quickly warmed to a new legal tactic: suing tobacco companies on behalf of states seeking reimbursement of Medicaid costs from treating smoking-related illnesses.

rather than suing on behalf of the individuals. The case was more than a long shot, though. The tobacco industry was spending hundreds of millions of dollars a year to defend itself in court. Scruggs reached out to lawyers he knew from his days of suing asbestos companies. Many passed, not liking the odds, though Scruggs did win some recruits. He emerged as the chief executive of the case, assigning lawyers to handle research, write briefs or prepare arguments. Scruggs and Moore—"Scro" and "Mo," as they call each other—flew around the country on Scruggs's jet, persuading other states to file tobacco suits.

The Mississippi case gained momentum when it attracted a crucial whistle-blower, Jeffrey Wigand, the former research director at the Brown & Williamson tobacco company. "The Insider" details Wigand's troubles with his former employer once he tried to publicize industry secrets. Scruggs was at the center of the storm, even acting as Wigand's personal attorney. He says the movie accurately depicts a key moment at Scruggs's house when Wigand was deciding whether to agree to be deposed and risk getting thrown in jail. "This is a lot to ask of you," Scruggs recalls telling him. "You don't have to do this thing, and nobody is going to think less of you if you don't." Wigand agreed to go forward. Wigand says that whenever a crisis hit, Scruggs was the first person he called. "Dickie was definitely like a brother," he says.

The tobacco industry's unified front started to crack in 1996, and with the Mississippi case moving to trial, the industry, after months of negotiations, decided to settle. On June 20, 1997, a triumphant Scruggs and Moore announced the landmark settlement. The tobacco companies had agreed to sharply limit their marketing and pay a staggering $368.5 billion over 25 years (the tail number on Scruggs's jet is 368). Scruggs was ecstatic. "We wanted to do something that

# Money, Guns & Lawyers

Class-action lawsuits have become the weapon of choice against corporate America. The payouts can be breathtaking.

## $20 billion
**LEAD PAINT**
A new Maryland case could force paint manufacturers to clean up 1 million toxic homes. Liability could hit $20 billion.

## 95%
**MICROSOFT**
Eight civil cases against Mr. Bill have been filed. About 95 percent of all PCs use Windows.

**WHOOPS**
In 1983, the Washington Public Power Supply System (WPPSS) defaulted on $2.25 billion in bonds. A lawsuit got $900 million back.

## 170,000
**SILICONE IMPLANTS**
Last year Dow Corning settled the claims of roughly 170,000 women. The price tag: $3.2 billion.

**THE GUN INDUSTRY**
The NAACP has two cases against gunmakers. The claim: minorities are more often victims. Courts have yet to rule on class-action status.

we could forever be proud of," he said that day. "It's a ticket to heaven."

The settlement, however, immediately came under attack in Congress from politicians and public-health advocates who said it didn't go far enough. The tobacco agreement ultimately collapsed, and the industry turned to settling with the states. The industry's bill would reach $240 billion.

Scruggs had bet just about everything he had on the tobacco litigation. But the immense fees Scruggs and others earned from the tobacco settlement left many people sputtering with incredulity, and proposals marched through Congress to cap the fees at a fraction of what they actually earned. Some judges declared the payments would lower respect for the profession. Scruggs's motivations were called into question. If the suit was about public health and not money, many people asked, why not give more of it to the states or voluntarily cap his fees at a more

modest amount? Scruggs recognizes the public-relations problems the money has caused. "It's hard to say I didn't do it for the money when I made a lot of money," he says.

But Scruggs maintains financial incentives are necessary for other lawyers to take on tough cases. Then why not reduce his own fees? "Then we wouldn't have anything for the next round," he says. "The war chest that resulted from asbestos litigation enabled us to successfully pursue tobacco litigation." Still, he clearly enjoys his winnings. Besides his private jet, he owns a 120-foot yacht, a 40-foot sailboat and two vacation homes. He has also pledged $30 million to charities and endowments. Scruggs says the current litigation is also a way to give something back. "If our case against HMOs was just about greed, I'd be on my boat in the South Pacific now," he says. "Lawyers who have made these sorts of fees have an obligation to invest them and create a resource for fighting against other wrongs in future litigation."

But critics say Scruggs is grossly overstepping his role as a trial lawyer by suing a company as a means to changing the way health care is delivered. "It's an abusive process to sue a company for one purpose when your real purpose is to get them to agree to some kind of political agenda," said James Wootton, president of the U.S. Chamber Institute for Legal Reform. "This is not a legitimate end of litigation."

Scruggs dismisses such charges, preferring to focus on the next procedural chess moves in the legal war with the HMOs. The first step is to get the aggrieved patients certified as a class, which Scruggs expects will occur sometime after January. A trial is not expected for at least a year.

Sitting in his family room in Pascagoula on a recent Sunday afternoon, Scruggs appears confident that he will prevail in this latest litigation. In fact, in an expansive moment, he takes to mulling over future targets. After seeing what Wal-Mart has done to once thriving downtowns, Scruggs is toying with the idea of going after the giant retailer on antitrust grounds. "They've damaged the fabric of American life," he says. "It offends me." For the moment, Wal-Mart refuses to comment. But Scruggs's short-list isn't one any business wants to find itself on. ▪

> **"** Lawyers who have made these sorts of fees [from the tobacco settlements] have an obligation to invest them and create a resource for fighting against other wrongs in future litigation **"**
>
> —RICHARD SCRUGGS

# FLORIDA LEGISLATIVE AND REGULATORY MATERIALS

## WEST'S FLORIDA STATUTES ANNOTATED
### TITLE XXXVII. INSURANCE
### CHAPTER 627. INSURANCE RATES AND CONTRACTS
### PART II. THE INSURANCE CONTRACT

1999 Electronic Pocket Part Update

Current through End of 1999 1st Reg. Sess.

627.410. Filing, approval of forms

(1) No basic insurance policy or annuity contract form, or application form where written application is required and is to be made a part of the policy or contract, or group certificates issued under a master contract delivered in this state, or printed rider or endorsement form or form of renewal certificate, shall be delivered or issued for delivery in this state, unless the form has been filed with the department at its offices in Tallahassee by or in behalf of the insurer which proposes to use such form and has been approved by the department. This provision does not apply to surety bonds or to policies, riders, endorsements, or forms of unique character which are designed for and used with relation to insurance upon a particular subject (other than as to health insurance), or which relate to the manner of distribution of benefits or to the reservation of rights and benefits under life or health insurance policies and are used at the request of the individual policyholder, contract holder, or certificateholder. As to group insurance policies effectuated and delivered outside this state but covering persons resident in this state, the group certificates to be delivered or issued for delivery in this state shall be filed with the department for information purposes only.

(2) Every such filing must be made not less than 30 days in advance of any such use or delivery. At the expiration of such 30 days, the form so filed will be deemed approved unless prior thereto it has been affirmatively approved or disapproved by order of the department. The approval of any such form by the department constitutes a waiver of any unexpired portion of such waiting period. The department may extend by not more than an additional 15 days the period within which it may so affirmatively approve or disapprove any such form, by giving notice of such extension before expiration of the initial 30- day period. At the expiration of any such period as so extended, and in the absence of such prior affirmative approval or disapproval, any such form shall be deemed approved.

(3) The department may, for cause, withdraw a previous approval. No insurer shall issue or use any form disapproved by the department, or as to which the department has withdrawn approval, after the effective date of the order of the department.

(4) The department may, by order, exempt from the requirements of this section for so long as it deems proper any insurance document or form or type thereof as specified in such order, to which, in its opinion, this section may not practicably be applied, or the filing and approval of which are, in its opinion, not desirable or necessary for the protection of the public.

(5) This section also applies to any such form used by domestic insurers for delivery in a jurisdiction outside this state if the insurance supervisory official of such jurisdiction informs the department that such form is not subject to approval or disapproval by such official, and upon the order of the department requiring the form to be submitted to it for the purpose. The applicable same standards apply to such forms as apply to forms for domestic use.

(6)(a) An insurer shall not deliver or issue for delivery or renew in this state any health insurance policy form until it has filed with the department a copy of every applicable rating manual, rating

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

schedule, change in rating manual, and change in rating schedule; if rating manuals and rating schedules are not applicable, the insurer must file with the department applicable premium rates and any change in applicable premium rates.

(b) The department may establish by rule, for each type of health insurance form, procedures to be used in ascertaining the reasonableness of benefits in relation to premium rates and may, by rule, exempt from any requirement of paragraph (a) any health insurance policy form or type thereof (as specified in such rule) to which form or type such requirements may not be practically applied or to which form or type the application of such requirements is not desirable or necessary for the protection of the public. With respect to any health insurance policy form or type thereof which is exempted by rule from any requirement of paragraph (a), premium rates filed pursuant to ss. 627.640 and 627.662 shall be for informational purposes.

(c) Every filing made pursuant to this subsection shall be made within the same time period provided in, and shall be deemed to be approved under the same conditions as those provided in, subsection (2).

(d) Every filing made pursuant to this subsection, except disability income policies and accidental death policies, shall be prohibited from applying the following rating practices:

1. Select and ultimate premium schedules.

2. Premium class definitions which classify insured based on year of issue or duration since issue.

3. Attained age premium structures on policy forms under which more than 50 percent of the policies are issued to persons age 65 or over.

(e) Except as provided in subparagraph 1., an insurer shall continue to make available for purchase any individual policy form issued on or after October 1, 1993. A policy form shall not be considered to be available for purchase unless the insurer has actively offered it for sale in the previous 12 months.

1. An insurer may discontinue the availability of a policy form if the insurer provides to the department in writing its decision at least 30 days prior to discontinuing the availability of the form of the policy or certificate. After receipt of the notice by the department, the insurer shall no longer offer for sale the policy form or certificate form in this state.

2. An insurer that discontinues the availability of a policy form pursuant to subparagraph 1. shall not file for approval a new policy form providing similar benefits as the discontinued form for a period of 5 years after the insurer provides notice to the department of the discontinuance. The period of discontinuance may be reduced if the department determines that a shorter period is appropriate.

3. The experience of all policy forms providing similar benefits shall be combined for all rating purposes.

(7)(a) Each insurer subject to the requirements of subsection (6) shall make an annual filing with the department no later than 12 months after its previous filing, demonstrating the reasonableness of benefits in relation to premium rates. The department, after receiving a request to be exempted from the provisions of this section, may, for good cause due to insignificant numbers of policies in force or insignificant premium volume, exempt a company, by line of coverage, from filing rates or rate certification as required by this section.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

(b) The filing required by this subsection shall be satisfied by one of the following methods:

1. A rate filing prepared by an actuary which contains documentation demonstrating the reasonableness of benefits in relation to premiums charged in accordance with the applicable rating laws and rules promulgated by the department.

2. If no rate change is proposed, a filing which consists of a certification by an actuary that benefits are reasonable in relation to premiums currently charged in accordance with applicable laws and rules promulgated by the department.

(c) As used in this section, "actuary" means an individual who is a member of the Society of Actuaries or the American Academy of Actuaries. If an insurer does not employ or otherwise retain the services of an actuary, the insurer's certification shall be prepared by insurer personnel or consultants with a minimum of 5 years' experience in insurance ratemaking. The chief executive officer of the insurer shall review and sign the certification indicating his or her agreement with its conclusions.

(d) If at the time a filing is required under this section an insurer is in the process of completing a rate review, the insurer may apply to the department for an extension of up to an additional 30 days in which to make the filing. The request for extension must be received by the department in its offices in Tallahassee no later than the date the filing is due.

(e) If an insurer fails to meet the filing requirements of this subsection and does not submit the filing within 60 days following the date the filing is due, the department may, in addition to any other penalty authorized by law, order the insurer to discontinue the issuance of policies for which the required filing was not made, until such time as the department determines that the required filing is properly submitted.

(8)(a) For the purposes of subsections (6) and (7), benefits of an individual accident and health insurance policy form, including Medicare supplement policies as defined in s. 627.672, when authorized by rules adopted by the department, and excluding long-term care insurance policies as defined in s. 627.9404, and other policy forms under which more than 50 percent of the policies are issued to individuals age 65 and over, are deemed to be reasonable in relation to premium rates if the rates are filed pursuant to a loss ratio guarantee and both the initial rates and the durational and lifetime loss ratios have been approved by the department, and such benefits shall continue to be deemed reasonable for renewal rates while the insurer complies with such guarantee, provided the currently expected lifetime loss ratio is not more than 5 percent less than the filed lifetime loss ratio as certified to by an actuary. The department shall have the right to bring an administrative action should it deem that the lifetime loss ratio will not be met. For Medicare supplement filings, the department may withdraw a previously approved filing which was made pursuant to a loss ratio guarantee if it determines that the filing is not in compliance with ss. 627.671-627.675 or the currently expected lifetime loss ratio is less than the filed lifetime loss ratio as certified by an actuary in the initial guaranteed loss ratio filing. If this section conflicts with ss. 627.671-627.675, ss. 627.671-627.675 shall control.

(b) The renewal premium rates shall be deemed to be approved upon filing with the department if the filing is accompanied by the most current approved loss ratio guarantee. The loss ratio guarantee shall be in writing, shall be signed by an officer of the insurer, and shall contain at least:

1. A recitation of the anticipated lifetime and durational target loss ratios contained in the actuarial memorandum filed with the policy form when it was originally approved. The durational target loss ratios shall be calculated for 1-year experience periods. If statutory changes have rendered any portion of such actuarial memorandum obsolete, the loss ratio guarantee shall also include an

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 627.410                                                                                      **Page    4**

amendment to the actuarial memorandum reflecting current law and containing new lifetime and durational loss ratio targets.

2. A guarantee that the applicable loss ratios for the experience period in which the new rates will take effect, and for each experience period thereafter until new rates are filed, will meet the loss ratios referred to in subparagraph 1.

3. A guarantee that the applicable loss ratio results for the experience period will be independently audited at the insurer's expense. The audit shall be performed in the second calendar quarter of the year following the end of the experience period, and the audited results shall be reported to the department no later than the end of such quarter. The department shall establish by rule the minimum information reasonably necessary to be included in the report. The audit shall be done in accordance with accepted accounting and actuarial principles.

4. A guarantee that affected policyholders in this state shall be issued a proportional refund, based on the premium earned, of the amount necessary to bring the applicable experience period loss ratio up to the durational target loss ratio referred to in subparagraph 1. The refund shall be made to all policyholders in this state who are insured under the applicable policy form as of the last day of the experience period, except that no refund need be made to a policyholder in an amount less than $10. Refunds less than $10 shall be aggregated and paid pro rata to the policyholders receiving refunds. The refund shall include interest at the then-current variable loan interest rate for life insurance policies established by the National Association of Insurance Commissioners, from the end of the experience period until the date of payment. Payments shall be made during the third calendar quarter of the year following the experience period for which a refund is determined to be due. However, no refunds shall be made until 60 days after the filing of the audit report in order that the department has adequate time to review the report.

5. A guarantee that if the applicable loss ratio exceeds the durational target loss ratio for that experience period by more than 20 percent, provided there are at least 2,000 policyholders on the form nationwide or, if not, then accumulated each calendar year until 2,000 policyholder years is reached, the insurer, if directed by the department, shall withdraw the policy form for the purposes of issuing new policies.

(c) As used in this subsection:

1. "Loss ratio" means the ratio of incurred claims to earned premium.

2. "Applicable loss ratio" means the loss ratio attributable solely to this state if there are 2,000 or more policyholders in the state. If there are 500 or more policyholders in this state but less than 2,000, it is the linear interpolation of the nationwide loss ratio and the loss ratio for this state. If there are less than 500 policyholders in this state, it is the nationwide loss ratio.

3. "Experience period" means the period, ordinarily a calendar year, for which a loss ratio guarantee is calculated.

### CREDIT(S)

1999 Electronic Update

Amended by Laws 1997, c. 97-102, § 325, eff. July 1, 1997;  Laws 1998, c. 98- 159, § 3, eff. Jan. 1, 1999;  Laws 1998, c. 98-173, § 4, eff. July 1, 1998.

< General Materials (GM) - References, Annotations, or Tables >

Copr. ℃ West 1999 No Claim to Orig. U.S. Govt. Works

# WEST'S FLORIDA STATUTES ANNOTATED
## TITLE XXXVII. INSURANCE
## CHAPTER 627. INSURANCE RATES AND CONTRACTS
## PART VII. GROUP, BLANKET, AND FRANCHISE HEALTH INSURANCE POLICIES

1999 Electronic Pocket Part Update

Current through End of 1999 1st Reg. Sess.

627.6699. Employee Health Care Access Act

(1) **Short title.**–This section may be cited as the "Employee Health Care Access Act."

(2) **Purpose and intent.**–The purpose and intent of this section is to promote the availability of health insurance coverage to small employers regardless of their claims experience or their employees' health status, to establish rules regarding renewability of that coverage, to establish limitations on the use of exclusions for preexisting conditions, to provide for development of a standard health benefit plan and a basic health benefit plan to be offered to all small employers, to provide for establishment of a reinsurance program for coverage of small employers, and to improve the overall fairness and efficiency of the small group health insurance market.

(3) **Definitions.**–As used in this section, the term:

(a) "Actuarial certification" means a written statement, by a member of the American Academy of Actuaries or another person acceptable to the department, that a small employer carrier is in compliance with subsection (6), based upon the person's examination, including a review of the appropriate records and of the actuarial assumptions and methods used by the carrier in establishing premium rates for applicable health benefit plans.

(b) "Basic health benefit plan" and "standard health benefit plan" mean low- cost health care plans developed pursuant to subsection (12).

(c) "Board" means the board of directors of the program.

(d) "Carrier" means a person who provides health benefit plans in this state, including an authorized insurer, a health maintenance organization, a multiple- employer welfare arrangement, or any other person providing a health benefit plan that is subject to insurance regulation in this state. However, the term does not include a multiple-employer welfare arrangement, which multiple- employer welfare arrangement operates solely for the benefit of the members or the members and the employees of such members, and was in existence on January 1, 1992.

(e) "Case management program" means the specific supervision and management of the medical care provided or prescribed for a specific individual, which may include the use of health care providers designated by the carrier.

(f) "Creditable coverage" has the same meaning ascribed in s. 627.6561.

(g) "Dependent" means the spouse or child of an eligible employee, subject to the applicable terms of the health benefit plan covering that employee.

(h) "Eligible employee" means an employee who works full time, having a normal workweek of 25 or more hours, and who has met any applicable waiting-period requirements or other requirements of

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

this act. The term includes a self- employed individual, a sole proprietor, a partner of a partnership, or an independent contractor, if the sole proprietor, partner, or independent contractor is included as an employee under a health benefit plan of a small employer, but does not include a part-time, temporary, or substitute employee.

(i) "Established geographic area" means the county or counties, or any portion of a county or counties, within which the carrier provides or arranges for health care services to be available to its insureds, members, or subscribers.

(j) "Guaranteed-issue basis" means an insurance policy that must be offered to an employer, employee, or dependent of the employee, regardless of health status, preexisting conditions, or claims history.

(k) "Health benefit plan" means any hospital or medical policy or certificate, hospital or medical service plan contract, or health maintenance organization subscriber contract. The term does not include accident-only, specified disease, individual hospital indemnity, credit, dental-only, vision-only, Medicare supplement, long-term care, or disability income insurance; similar supplemental plans provided under a separate policy, certificate, or contract of insurance, which cannot duplicate coverage under an underlying health plan and are specifically designed to fill gaps in the underlying health plan, coinsurance, or deductibles; coverage issued as a supplement to liability insurance; workers' compensation or similar insurance; or automobile medical- payment insurance.

(l) "Late enrollee" means an eligible employee or dependent as defined under s. 627.6561(1)(b).

(m) "Limited benefit policy or contract" means a policy or contract that provides coverage for each person insured under the policy for a specifically named disease or diseases, a specifically named accident, or a specifically named limited market that fulfills an experimental or reasonable need, such as the small group market.

(n) "Modified community rating" means a method used to develop carrier premiums which spreads financial risk across a large population and allows adjustments for age, gender, family composition, tobacco usage, and geographic area as determined under paragraph (5)(j).

(o) "Participating carrier" means any carrier that issues health benefit plans in this state except a small employer carrier that elects to be a risk-assuming carrier.

(p) "Plan of operation" means the plan of operation of the program, including articles, bylaws, and operating rules, adopted by the board under subsection (11).

(q) "Program" means the Florida Small Employer Carrier Reinsurance Program created under subsection (11).

(r) "Rating period" means the calendar period for which premium rates established by a small employer carrier are assumed to be in effect.

(s) "Reinsuring carrier" means a small employer carrier that elects to comply with the requirements set forth in subsection (11).

(t) "Risk-assuming carrier" means a small employer carrier that elects to comply with the requirements set forth in subsection (10).

(u) "Self-employed individual" means an individual or sole proprietor who derives his or her income from a trade or business carried on by the individual or sole proprietor which results in taxable

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 627.6699                                                                         **Page   3**

income as indicated on IRS Form 1040, schedule C or F, and which generated taxable income in one of the 2 previous years.

(v) "Small employer" means, in connection with a health benefit plan with respect to a calendar year and a plan year, any person, sole proprietor, self- employed individual, independent contractor, firm, corporation, partnership, or association that is actively engaged in business, has its principal place of business in this state, employed an average of at least 1 but not more than 50 eligible employees on business days during the preceding calendar year, and employs at least 1 employee on the first day of the plan year. For purposes of this section, a sole proprietor, an independent contractor, or a self-employed individual is considered a small employer only if all of the conditions and criteria established in this section are met.

(w) "Small employer carrier" means a carrier that offers health benefit plans covering eligible employees of one or more small employers.

**(4) Applicability and scope.–**

(a) This section applies to a health benefit plan that provides coverage to a small employer in this state, unless the policy is marketed directly to the individual employee, and the employer does not participate in the collection or distribution of premiums or facilitate the administration of the policy in any manner.

(b) With respect to a group of affiliated carriers or a group of carriers that is eligible to file a consolidated tax return, any restrictions, limitations, or requirements of this section that apply to one of the carriers applies to all of the carriers as if they were one carrier. However, with respect to affiliated companies, all of which are in existence and affiliated on January 1, 1992, the group of affiliated companies is considered one carrier only after one member of the group transfers any small employer business to another member of the group.

(c) An affiliated carrier that is a health maintenance organization having a certificate of authority under part I of chapter 641 may be considered a separate carrier for the purposes of this section.

(d) This section shall not apply to a carrier that does not issue new health benefit plans to small employers on or after January 1, 1994, except that it shall apply to any such carrier that renews a health benefit plan on or after January 1, 1995.

**(5) Availability of coverage.–**

(a) Beginning January 1, 1993, every small employer carrier issuing new health benefit plans to small employers in this state must, as a condition of transacting business in this state, offer to eligible small employers a standard health benefit plan and a basic health benefit plan. Such a small employer carrier shall issue a standard health benefit plan or a basic health benefit plan to every eligible small employer that elects to be covered under such plan, agrees to make the required premium payments under such plan, and to satisfy the other provisions of the plan.

(b) In the case of a small employer carrier which does not, on or after January 1, 1993, offer coverage but which does, on or after January 1, 1993, renew or continue coverage in force, such carrier shall be required to provide coverage to newly eligible employees and dependents on the same basis as small employer carriers which are offering coverage on or after January 1, 1993.

(c) Every small employer carrier must, as a condition of transacting business in this state:

1. Beginning January 1, 1994, offer and issue all small employer health benefit plans on a

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 627.6699                                                                Page   4

guaranteed-issue basis to every eligible small employer, with 3 to 50 eligible employees, that elects to be covered under such plan, agrees to make the required premium payments, and satisfies the other provisions of the plan.   A rider for additional or increased benefits may be medically underwritten and may only be added to the standard health benefit plan.  The increased rate charged for the additional or increased benefit must be rated in accordance with this section.

2. Beginning April 15, 1994, offer and issue basic and standard small employer health benefit plans on a guaranteed-issue basis to every eligible small employer, with one or two eligible employees, which elects to be covered under such plan, agrees to make the required premium payments, and satisfies the other provisions of the plan.   A rider for additional or increased benefits may be medically underwritten and may only be added to the standard health benefit plan.  The increased rate charged for the additional or increased benefit must be rated in accordance with this section.

3. Offer to eligible small employers the standard and basic health benefit plans.  This subparagraph does not limit a carrier's ability to offer other health benefit plans to small employers if the standard and basic health benefit plans are offered and rejected.

(d) A small employer carrier must file with the department, in a format and manner prescribed by the committee, a standard health care plan and a basic health care plan to be used by the carrier.

(e) The department at any time may, after providing notice and an opportunity for a hearing, disapprove the continued use by the small employer carrier of the standard or basic health benefit plan on the grounds that such plan does not meet the requirements of this section.

(f) Except as provided in paragraph (g), a health benefit plan covering small employers must comply with preexisting condition provisions specified in s. 627.6561 or, for health maintenance contracts, in s. 641.31071.

(g) A health benefit plan covering small employers, issued or renewed on or after January 1, 1994, must comply with the following conditions:

1. All health benefit plans must be offered and issued on a guaranteed-issue basis, except that benefits purchased through riders as provided in paragraph (c) may be medically underwritten for the group, but may not be individually underwritten as to the employees or the dependents of such employees. Additional or increased benefits may only be offered by riders.

2. The provisions of paragraph (f) apply to health benefit plans issued to a small employer who has two or more eligible employees, and to health benefit plans that are issued to a small employer who has fewer than two eligible employees and that cover an employee who has had creditable coverage continually to a date not more than 63 days before the effective date of the new coverage.

3. For health benefit plans that are issued to a small employer who has fewer than two employees and that cover an employee who has not been continually covered by creditable coverage within 63 days before the effective date of the new coverage, preexisting condition provisions must not exclude coverage for a period beyond 24 months following the employee's effective date of coverage and may relate only to:

a. Conditions that, during the 24-month period immediately preceding the effective date of coverage, had manifested themselves in such a manner as would cause an ordinarily prudent person to seek medical advice, diagnosis, care, or treatment or for which medical advice, diagnosis, care, or treatment was recommended or received; or

b. A pregnancy existing on the effective date of coverage.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

(h) All health benefit plans issued under this section must comply with the following conditions:

1. For employers who have fewer than two employees, a late enrollee may be excluded from coverage for no longer than 24 months if he or she was not covered by creditable coverage continually to a date not more than 63 days before the effective date of his or her new coverage.

2. Any requirement used by a small employer carrier in determining whether to provide coverage to a small employer group, including requirements for minimum participation of eligible employees and minimum employer contributions, must be applied uniformly among all small employer groups having the same number of eligible employees applying for coverage or receiving coverage from the small employer carrier, except that a small employer carrier that participates in, administers, or issues health benefits pursuant to s. 381.0406 which do not include a preexisting condition exclusion may require as a condition of offering such benefits that the employer has had no health insurance coverage for its employees for a period of at least 6 months.   A small employer carrier may vary application of minimum participation requirements and minimum employer contribution requirements only by the size of the small employer group.

3. In applying minimum participation requirements with respect to a small employer, a small employer carrier shall not consider as an eligible employee employees or dependents who have qualifying existing coverage in an employer- based group insurance plan or an ERISA qualified self-insurance plan in determining whether the applicable percentage of participation is met. However, a small employer carrier may count eligible employees and dependents who have coverage under another health plan that is sponsored by that employer except if such plan is offered pursuant to s. 408.706.

4. A small employer carrier shall not increase any requirement for minimum employee participation or any requirement for minimum employer contribution applicable to a small employer at any time after the small employer has been accepted for coverage, unless the employer size has changed, in which case the small employer carrier may apply the requirements that are applicable to the new group size.

5. If a small employer carrier offers coverage to a small employer, it must offer coverage to all the small employer's eligible employees and their dependents.   A small employer carrier may not offer coverage limited to certain persons in a group or to part of a group, except with respect to late enrollees.

6. A small employer carrier may not modify any health benefit plan issued to a small employer with respect to a small employer or any eligible employee or dependent through riders, endorsements, or otherwise to restrict or exclude coverage for certain diseases or medical conditions otherwise covered by the health benefit plan.

7. An initial enrollment period of at least 30 days must be provided.   An annual 30-day open enrollment period must be offered to each small employer's eligible employees and their dependents. A small employer carrier must provide special enrollment periods as required by s. 627.65615.

(i) 1. A small employer carrier need not offer coverage or accept applications pursuant to paragraph (a):

a. To a small employer if the small employer is not physically located in an established geographic service area of the small employer carrier, provided such geographic service area shall not be less than a county;

b. To an employee if the employee does not work or reside within an established geographic service

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

area of the small employer carrier; or

c. To a small employer group within an area in which the small employer carrier reasonably anticipates, and demonstrates to the satisfaction of the department, that it cannot, within its network of providers, deliver service adequately to the members of such groups because of obligations to existing group contract holders and enrollees.

2. A small employer carrier that cannot offer coverage pursuant to sub- subparagraph 1.c. may not offer coverage in the applicable area to new cases of employer groups having more than 50 eligible employees or small employer groups until the later of 180 days following each such refusal or the date on which the carrier notifies the department that it has regained its ability to deliver services to small employer groups.

3. a. A small employer carrier may deny health insurance coverage in the small-group market if the carrier has demonstrated to the department that:

(I) It does not have the financial reserves necessary to underwrite additional coverage; and

(II) It is applying this sub-subparagraph uniformly to all employers in the small-group market in this state consistent with this section and without regard to the claims experience of those employers and their employees and their dependents or any health-status-related factor that relates to such employees and dependents.

b. A small employer carrier, upon denying health insurance coverage in connection with health benefit plans in accordance with sub-subparagraph a., may not offer coverage in connection with group health benefit plans in the small-group market in this state for a period of 180 days after the date such coverage is denied or until the insurer has demonstrated to the department that the insurer has sufficient financial reserves to underwrite additional coverage, whichever is later. The department may provide for the application of this sub-subparagraph on a service-area-specific basis.

4. Beginning in 1994, the department shall, by rule, require each small employer carrier to report, on or before March 1 of each year, its gross annual premiums for all health benefit plans issued to small employers during the previous calendar year, and also to report its gross annual premiums for new, but not renewal, standard and basic health benefit plans subject to this section issued during the previous calendar year. No later than May 1 of each year, the department shall calculate each carrier's percentage of all small employer group health premiums for the previous calendar year and shall calculate the aggregate gross annual premiums for new, but not renewal, standard and basic health benefit plans for the previous calendar year.

(j) The boundaries of geographic areas used by a small employer carrier must coincide with county lines. A carrier may not apply different geographic rating factors to the rates of small employers located within the same county.

**(6) Restrictions relating to premium rates.—**

(a) The department may, by rule, establish regulations to administer this section and to assure that rating practices used by small employer carriers are consistent with the purpose of this section, including assuring that differences in rates charged for health benefit plans by small employer carriers are reasonable and reflect objective differences in plan design, not including differences due to the nature of the groups assumed to select particular health benefit plans.

(b) For all small employer health benefit plans that are subject to this section and are issued by small employer carriers on or after January 1, 1994, premium rates for health benefit plans subject

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

to this section are subject to the following:

1. Small employer carriers must use a modified community rating methodology in which the premium for each small employer must be determined solely on the basis of the eligible employee's and eligible dependent's gender, age, family composition, tobacco use, or geographic area as determined under paragraph (5)(j).

2. Rating factors related to age, gender, family composition, tobacco use, or geographic location may be developed by each carrier to reflect the carrier's experience.  The factors used by carriers are subject to department review and approval.

3. Small employer carriers may not modify the rate for a small employer for 12 months from the initial issue date or renewal date, unless the composition of the group changes or benefits are changed.

4. Carriers participating in the alliance program, in accordance with ss. 408.70-408.706, may apply a different community rate to business written in that program.

(c) For all small employer health benefit plans that are subject to this section, that are issued by small employer carriers before January 1, 1994, and that are renewed on or after January 1, 1995, renewal rates must be based on the same modified community rating standard applied to new business.

(d) Notwithstanding s. 627.401(2), this section and ss. 627.410 and 627.411 apply to any health benefit plan provided by a small employer carrier that provides coverage to one or more employees of a small employer regardless of where the policy, certificate, or contract is issued or delivered, if the health benefit plan covers employees or their covered dependents who are residents of this state.

(7) **Renewability of coverage.**–A health benefit plan that is subject to this section is renewable for all eligible employees and dependents pursuant to s. 627.6571.

(8) **Maintenance of records.**–

(a) Each small employer carrier must maintain at its principal place of business a complete and detailed description of its rating practices and renewal practices, including information and documentation that demonstrate that its rating methods and practices are based upon commonly accepted actuarial assumptions and are in accordance with sound actuarial principles.

(b) Each small employer carrier must file with the department on or before March 15 of each year an actuarial certification that the carrier is in compliance with this section and that the rating methods of the carrier are actuarially sound.  The certification must be in a form and manner and contain the information prescribed by the department.  The carrier must retain a copy of the certification at its principal place of business.

(c) A small employer carrier must make the information and documentation described in paragraph (a) available to the department upon request.  The information constitutes proprietary and trade secret information and may not be disclosed by the department to persons outside the department, except as agreed to by the carrier or as ordered by a court of competent jurisdiction.

(d) Each small employer carrier must file with the department quarterly an enrollment report as directed by the department.  Such report shall not constitute proprietary or trade secret information.

(9) **Small employer carrier's election to become a risk-assuming carrier or a** reinsuring

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 627.6699                                                              **Page  8**

carrier.--

(a) A small employer carrier must elect to become either a risk-assuming carrier or a reinsuring carrier. Each small employer carrier must make an initial election, binding through January 1, 1994. The carrier's initial election must be made no later than October 31, 1992. By October 31, 1993, all small employer carriers must file a final election, which is binding for 2 years, from January 1, 1994, through December 31, 1995, after which an election shall be binding for a period of 5 years. Any carrier that is not a small employer carrier on October 31, 1992, and intends to become a small employer carrier after October 31, 1992, must file its designation when it files the forms and rates it intends to use for small employer group health insurance; such designation shall be binding for 2 years after the date of approval of the forms and rates, and any subsequent designation is binding for 5 years. The department may permit a carrier to modify its election at any time for good cause shown, after a hearing.

(b) The department shall establish an application process for small employer carriers seeking to change their status under this subsection.

(c) An election to become a risk-assuming carrier is subject to approval under subsection (10).

(d) A small employer carrier that elects to cease participating as a reinsuring carrier and to become a risk-assuming carrier is prohibited from reinsuring or continuing to reinsure any small employer health benefits plan under subsection (11) as soon as the carrier becomes a risk-assuming carrier and must pay a prorated assessment based upon business issued as a reinsuring carrier for any portion of the year that the business was reinsured. A small employer carrier that elects to cease participating as a risk-assuming carrier and to become a reinsuring carrier is permitted to reinsure small employer health benefit plans under the terms set forth in subsection (11) and must pay a prorated assessment based upon business issued as a reinsuring carrier for any portion of the year that the business was reinsured.

**(10) Election process to become a risk-assuming carrier.--**

(a)1. A small employer carrier may become a risk-assuming carrier by filing with the department a designation of election under subsection (9) in a format and manner prescribed by the department. The department shall approve the election of a small employer carrier to become a risk-assuming carrier if the department finds that the carrier is capable of assuming that status pursuant to the criteria set forth in paragraph (b).

2. The department must approve or disapprove any designation as a risk- assuming carrier within 60 days after filing.

(b) In determining whether to approve an application by a small employer carrier to become a risk-assuming carrier, the department shall consider:

1. The carrier's financial ability to support the assumption of the risk of small employer groups.

2. The carrier's history of rating and underwriting small employer groups.

3. The carrier's commitment to market fairly to all small employers in the state or its service area, as applicable.

4. The carrier's ability to assume and manage the risk of enrolling small employer groups without the protection of the reinsurance program provided in subsection (11).

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

(c) A small employer carrier that becomes a risk-assuming carrier pursuant to this subsection is not subject to the assessment provisions of subsection (11).

(d) The department shall provide public notice of a small employer carrier's designation of election under subsection (9) to become a risk-assuming carrier and shall provide at least a 21-day period for public comment prior to making a decision on the election. The department shall hold a hearing on the election at the request of the carrier.

(e) The department may rescind the approval granted to a risk-assuming carrier under this subsection if the department finds that the carrier no longer meets the criteria of paragraph (b).

(11) **Small employer health reinsurance program.–**

(a) There is created a nonprofit entity to be known as the "Florida Small Employer Health Reinsurance Program."

(b) 1. The program shall operate subject to the supervision and control of the board.

2. Effective upon this act becoming a law, the board shall consist of the commissioner or his or her designee, who shall serve as the chairperson, and 13 additional members who are representatives of carriers and insurance agents and are appointed by the commissioner and serve as follows:

a. The commissioner shall include representatives of small employer carriers subject to assessment under this subsection. If two or more carriers elect to be risk-assuming carriers, the membership must include at least two representatives of risk-assuming carriers; if one carrier is risk-assuming, one member must be a representative of such carrier. At least one member must be a carrier who is subject to the assessments, but is not a small employer carrier. Subject to such restrictions, at least five members shall be selected from individuals recommended by small employer carriers pursuant to procedures provided by rule of the department. Three members shall be selected from a list of health insurance carriers that issue individual health insurance policies. At least two of the three members selected must be reinsuring carriers. Two members shall be selected from a list of insurance agents who are actively engaged in the sale of health insurance.

b. A member appointed under this subparagraph shall serve a term of 4 years and shall continue in office until the member's successor takes office, except that, in order to provide for staggered terms, the commissioner shall designate two of the initial appointees under this subparagraph to serve terms of 2 years and shall designate three of the initial appointees under this subparagraph to serve terms of 3 years.

3. The commissioner may remove a member for cause.

4. Vacancies on the board shall be filled in the same manner as the original appointment for the unexpired portion of the term.

5. The commissioner may require an entity that recommends persons for appointment to submit additional lists of recommended appointees.

(c)1. a. No later than August 15, 1992, the board shall submit to the department a plan of operation to assure the fair, reasonable, and equitable administration of the program. The board may at any time submit to the department any amendments to the plan that the board finds to be necessary or suitable.

b. No later than September 15, 1992, the department shall, after notice and hearing, approve the

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

plan of operation if it determines that the plan submitted by the board is suitable to assure the fair, reasonable, and equitable administration of the program and provides for the sharing of program gains and losses equitably and proportionately in accordance with paragraph (j).

c. The plan of operation, or any amendment thereto, becomes effective upon written approval of the department.

2. If the board fails to submit a suitable plan of operation by August 15, 1992, the department shall, after notice and hearing, adopt a temporary plan of operation by September 15, 1992.  The department shall amend or rescind the temporary plan of operation, as appropriate, after it approves a suitable plan of operation submitted by the board.

(d) The plan of operation must, among other things:

1. Establish procedures for handling and accounting for program assets and moneys and for an annual fiscal reporting to the department.

2. Establish procedures for selecting an administering carrier and set forth the powers and duties of the administering carrier.

3. Establish procedures for reinsuring risks.

4. Establish procedures for collecting assessments from participating carriers to provide for claims reinsured by the program and for administrative expenses, other than amounts payable to the administrative carrier, incurred or estimated to be incurred during the period for which the assessment is made.

5. Provide for any additional matters at the discretion of the board.

(e) The board shall:

1. Recommend to the department market conduct requirements and other requirements for carriers and agents, including requirements relating to:

a. Registration by each carrier with the department of its intention to be a small employer carrier under this section;

b. Publication by the department of a list of all small employer carriers, including a requirement applicable to agents and carriers that a health benefit plan may not be sold by a carrier that is not identified as a small employer carrier;

c. The availability of a broadly publicized, toll-free telephone number for access by small employers to information concerning this section;

d. Periodic reports by carriers and agents concerning health benefit plans issued;  and

e. Methods concerning periodic demonstration by small employer carriers and agents that they are marketing or issuing health benefit plans to small employers.

2. By January 1, 1995, the board shall conduct a study of the effectiveness of this section and may recommend, to the department, improvements to achieve greater rate stability, accessibility, and affordability in the small employer marketplace.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

(f) The program has the general powers and authority granted under the laws of this state to insurance companies and health maintenance organizations licensed to transact business, except the power to issue health benefit plans directly to groups or individuals. In addition thereto, the program has specific authority to:

1. Enter into contracts as necessary or proper to carry out the provisions and purposes of this act, including the authority to enter into contracts with similar programs of other states for the joint performance of common functions or with persons or other organizations for the performance of administrative functions.

2. Sue or be sued, including taking any legal action necessary or proper for recovering any assessments and penalties for, on behalf of, or against the program or any carrier.

3. Take any legal action necessary to avoid the payment of improper claims against the program.

4. Issue reinsurance policies, in accordance with the requirements of this act.

5. Establish rules, conditions, and procedures for reinsurance risks under the program participation.

6. Establish actuarial functions as appropriate for the operation of the program.

7. Assess participating carriers in accordance with paragraph (j), and make advance interim assessments as may be reasonable and necessary for organizational and interim operating expenses. Interim assessments shall be credited as offsets against any regular assessments due following the close of the calendar year.

8. Appoint appropriate legal, actuarial, and other committees as necessary to provide technical assistance in the operation of the program, and in any other function within the authority of the program.

9. Borrow money to effect the purposes of the program. Any notes or other evidences of indebtedness of the program which are not in default constitute legal investments for carriers and may be carried as admitted assets.

10. To the extent necessary, increase the $5,000 deductible reinsurance requirement to adjust for the effects of inflation.

(g) A reinsuring carrier may reinsure with the program coverage of an eligible employee of a small employer, or any dependent of such an employee, subject to each of the following provisions:

1. With respect to a standard and basic health care plan, the program must reinsure the level of coverage provided; and, with respect to any other plan, the program must reinsure the coverage up to, but not exceeding, the level of coverage provided under the standard and basic health care plan.

2. Except in the case of a late enrollee, a reinsuring carrier may reinsure an eligible employee or dependent within 60 days after the commencement of the coverage of the small employer. A newly employed eligible employee or dependent of a small employer may be reinsured within 60 days after the commencement of his or her coverage.

3. A small employer carrier may reinsure an entire employer group within 60 days after the commencement of the group's coverage under the plan. The carrier may choose to reinsure newly eligible employees and dependents of the reinsured group pursuant to subparagraph 1.

Copr. ᶜ West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 627.6699                                                                                      **Page  12**

4. The program may not reimburse a participating carrier with respect to the claims of a reinsured employee or dependent until the carrier has paid incurred claims of at least $5,000 in a calendar year for benefits covered by the program. In addition, the reinsuring carrier shall be responsible for 10 percent of the next $50,000 and 5 percent of the next $100,000 of incurred claims during a calendar year and the program shall reinsure the remainder.

5. The board annually shall adjust the initial level of claims and the maximum limit to be retained by the carrier to reflect increases in costs and utilization within the standard market for health benefit plans within the state. The adjustment shall not be less than the annual change in the medical component of the "Consumer Price Index for All Urban Consumers" of the Bureau of Labor Statistics of the Department of Labor, unless the board proposes and the department approves a lower adjustment factor.

6. A small employer carrier may terminate reinsurance for all reinsured employees or dependents on any plan anniversary.

7. The premium rate charged for reinsurance by the program to a health maintenance organization that is approved by the Secretary of Health and Human Services as a federally qualified health maintenance organization pursuant to 42 U.S.C. s. 300e(c)(2)(A) and that, as such, is subject to requirements that limit the amount of risk that may be ceded to the program, which requirements are more restrictive than subparagraph 4., shall be reduced by an amount equal to that portion of the risk, if any, which exceeds the amount set forth in subparagraph 4. which may not be ceded to the program.

8. The board may consider adjustments to the premium rates charged for reinsurance by the program for carriers that use effective cost containment measures, including high-cost case management, as defined by the board.

9. A reinsuring carrier shall apply its case-management and claims-handling techniques, including, but not limited to, utilization review, individual case management, preferred provider provisions, other managed care provisions or methods of operation, consistently with both reinsured business and nonreinsured business.

(h)1. The board, as part of the plan of operation, shall establish a methodology for determining premium rates to be charged by the program for reinsuring small employers and individuals pursuant to this section. The methodology shall include a system for classification of small employers that reflects the types of case characteristics commonly used by small employer carriers in the state. The methodology shall provide for the development of basic reinsurance premium rates, which shall be multiplied by the factors set for them in this paragraph to determine the premium rates for the program. The basic reinsurance premium rates shall be established by the board, subject to the approval of the department, and shall be set at levels which reasonably approximate gross premiums charged to small employers by small employer carriers for health benefit plans with benefits similar to the standard and basic health benefit plan. The premium rates set by the board may vary by geographical area, as determined under this section, to reflect differences in cost. The multiplying factors must be established as follows:

a. The entire group may be reinsured for a rate that is 1.5 times the rate established by the board.

b. An eligible employee or dependent may be reinsured for a rate that is 5 times the rate established by the board.

2. The board periodically shall review the methodology established, including the system of classification and any rating factors, to assure that it reasonably reflects the claims experience of the

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

program. The board may propose changes to the rates which shall be subject to the approval of the department.

(i) If a health benefit plan for a small employer issued in accordance with this subsection is entirely or partially reinsured with the program, the premium charged to the small employer for any rating period for the coverage issued must be consistent with the requirements relating to premium rates set forth in s. 627.4106. [FN1]

(j)1. Before March 1 of each calendar year, the board shall determine and report to the department the program net loss for the previous year, including administrative expenses for that year, and the incurred losses for the year, taking into account investment income and other appropriate gains and losses.

2. Any net loss for the year shall be recouped by assessment of the carriers, as follows:

a. The operating losses of the program shall be assessed in the following order subject to the specified limitations. The first tier of assessments shall be made against reinsuring carriers in an amount which shall not exceed 5 percent of each reinsuring carrier's premiums from health benefit plans covering small employers. If such assessments have been collected and additional moneys are needed, the board shall make a second tier of assessments in an amount which shall not exceed 0.5 percent of each carrier's health benefit plan premiums. Except as provided in paragraph (n), risk-assuming carriers are exempt from all assessments authorized pursuant to this section. The amount paid by a reinsuring carrier for the first tier of assessments shall be credited against any additional assessments made.

b. The board shall equitably assess carriers for operating losses of the plan based on market share. The board shall annually assess each carrier a portion of the operating losses of the plan. The first tier of assessments shall be determined by multiplying the operating losses by a fraction, the numerator of which equals the reinsuring carrier's earned premium pertaining to direct writings of small employer health benefit plans in the state during the calendar year for which the assessment is levied, and the denominator of which equals the total of all such premiums earned by reinsuring carriers in the state during that calendar year. The second tier of assessments shall be based on the premiums that all carriers, except risk-assuming carriers, earned on all health benefit plans written in this state. The board may levy interim assessments against carriers to ensure the financial ability of the plan to cover claims expenses and administrative expenses paid or estimated to be paid in the operation of the plan for the calendar year prior to the association's anticipated receipt of annual assessments for that calendar year. Any interim assessment is due and payable within 30 days after receipt by a carrier of the interim assessment notice. Interim assessment payments shall be credited against the carrier's annual assessment. Health benefit plan premiums and benefits paid by a carrier that are less than an amount determined by the board to justify the cost of collection may not be considered for purposes of determining assessments.

c. Subject to the approval of the department, the board shall make an adjustment to the assessment formula for reinsuring carriers that are approved as federally qualified health maintenance organizations by the Secretary of Health and Human Services pursuant to 42 U.S.C. s. 300e(c)(2)(A) to the extent, if any, that restrictions are placed on them that are not imposed on other small employer carriers.

3. Before March 1 of each year, the board shall determine and file with the department an estimate of the assessments needed to fund the losses incurred by the program in the previous calendar year.

4. If the board determines that the assessments needed to fund the losses incurred by the program in the previous calendar year will exceed the amount specified in subparagraph 2., the board shall

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

evaluate the operation of the program and report its findings, including any recommendations for changes to the plan of operation, to the department within 90 days following the end of the calendar year in which the losses were incurred.   The evaluation shall include an estimate of future assessments, the administrative costs of the program, the appropriateness of the premiums charged and the level of carrier retention under the program, and the costs of coverage for small employers. If the board fails to file a report with the department within 90 days following the end of the applicable calendar year, the department may evaluate the operations of the program and implement such amendments to the plan of operation the department deems necessary to reduce future losses and assessments.

5. If assessments exceed the amount of the actual losses and administrative expenses of the program, the excess shall be held as interest and used by the board to offset future losses or to reduce program premiums.  As used in this paragraph, the term "future losses" includes reserves for incurred but not reported claims.

6. Each carrier's proportion of the assessment shall be determined annually by the board, based on annual statements and other reports considered necessary by the board and filed by the carriers with the board.

7. Provision shall be made in the plan of operation for the imposition of an interest penalty for late payment of an assessment.

8. A carrier may seek, from the commissioner, a deferment, in whole or in part, from any assessment made by the board. The department may defer, in whole or in part, the assessment of a carrier if, in the opinion of the department, the payment of the assessment would place the carrier in a financially impaired condition.  If an assessment against a carrier is deferred, in whole or in part, the amount by which the assessment is deferred may be assessed against the other carriers in a manner consistent with the basis for assessment set forth in this section. The carrier receiving such deferment remains liable to the program for the amount deferred and is prohibited from reinsuring any individuals or groups in the program if it fails to pay assessments.

(k) Neither the participation in the program as reinsuring carriers, the establishment of rates, forms, or procedures, nor any other joint or collective action required by this act, may be the basis of any legal action, criminal or civil liability, or penalty against the program or any of its carriers either jointly or separately.

(l) The board, as part of the plan of operation, shall develop standards setting forth the manner and levels of compensation to be paid to agents for the sale of basic and standard health benefit plans.  In establishing such standards, the board shall take into consideration the need to assure the broad availability of coverages, the objectives of the program, the time and effort expended in placing the coverage, the need to provide ongoing service to the small employer, the levels of compensation currently used in the industry, and the overall costs of coverage to small employers selecting these plans.

(m) The board shall monitor compliance with this section, including the market conduct of small employer carriers, and shall report to the department any unfair trade practices and misleading or unfair conduct by a small employer carrier that has been reported to the board by agents, consumers, or any other person.   The department shall investigate all reports and, upon a finding of noncompliance with this section or of unfair or misleading practices, shall take action against the small employer carrier as permitted under the insurance code or chapter 641. The board is not given investigatory or regulatory powers, but must forward all reports of cases or abuse or misrepresentation to the department.

Copr. ℃ West 1999 No Claim to Orig. U.S. Govt. Works

(n) Notwithstanding paragraph (j), the administrative expenses of the program shall be recouped by assessment of risk-assuming carriers and reinsuring carriers and such amounts shall not be considered part of the operating losses of the plan for the purposes of this paragraph. Each carrier's portion of such administrative expenses shall be determined by multiplying the total of such administrative expenses by a fraction, the numerator of which equals the carrier's earned premium pertaining to direct writing of small employer health benefit plans in the state during the calendar year for which the assessment is levied, and the denominator of which equals the total of such premiums earned by all carriers in the state during such calendar year.

**(12) Standard, basic, and limited health benefit plans.–**

(a)1. By May 15, 1993, the commissioner shall appoint a health benefit plan committee composed of four representatives of carriers which shall include at least two representatives of HMOs, at least one of which is a staff model HMO, two representatives of agents, four representatives of small employers, and one employee of a small employer. The carrier members shall be selected from a list of individuals recommended by the board. The commissioner may require the board to submit additional recommendations of individuals for appointment. As alliances are established under s. 408.702, each alliance shall also appoint an additional member to the committee.

2. The committee shall develop changes to the form and level of coverages for the standard health benefit plan and the basic health benefit plan, and shall submit the forms, and levels of coverages to the department by September 30, 1993. The department must approve such forms and levels of coverages by November 30, 1993, and may return the submissions to the committee for modification on a schedule that allows the department to grant final approval by November 30, 1993.

3. The plans shall comply with all of the requirements of this subsection.

4. The plans must be filed with and approved by the department prior to issuance or delivery by any small employer carrier.

5. After approval of the revised health benefit plans, if the department determines that modifications to a plan might be appropriate, the commissioner shall appoint a new health benefit plan committee in the manner provided in subparagraph 1. to submit recommended modifications to the department for approval.

(b)1. Each small employer carrier issuing new health benefit plans shall offer to any small employer, upon request, a standard health benefit plan and a basic health benefit plan that meets the criteria set forth in this section.

2. For purposes of this subsection, the terms "standard health benefit plan" and "basic health benefit plan" mean policies or contracts that a small employer carrier offers to eligible small employers that contain:

a. An exclusion for services that are not medically necessary or that are not covered preventive health services; and

b. A procedure for preauthorization by the small employer carrier, or its designees.

3. A small employer carrier may include the following managed care provisions in the policy or contract to control costs:

a. A preferred provider arrangement or exclusive provider organization or any combination thereof, in which a small employer carrier enters into a written agreement with the provider to provide

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 627.6699                                                                              **Page  16**

services at specified levels of reimbursement or to provide reimbursement to specified providers. Any such written agreement between a provider and a small employer carrier must contain a provision under which the parties agree that the insured individual or covered member has no obligation to make payment for any medical service rendered by the provider which is determined not to be medically necessary.  A carrier may use preferred provider arrangements or exclusive provider arrangements to the same extent as allowed in group products that are not issued to small employers.

b. A procedure for utilization review by the small employer carrier or its designees.

This subparagraph does not prohibit a small employer carrier from including in its policy or contract additional managed care and cost containment provisions, subject to the approval of the department, which have potential for controlling costs in a manner that does not result in inequitable treatment of insureds or subscribers.  The carrier may use such provisions to the same extent as authorized for group products that are not issued to small employers.

4. The standard health benefit plan shall include:

a. Coverage for inpatient hospitalization;

b. Coverage for outpatient services;

c. Coverage for newborn children pursuant to s. 627.6575;

d. Coverage for child care supervision services pursuant to s. 627.6579;

e. Coverage for adopted children upon placement in the residence pursuant to s. 627.6578;

f. Coverage for mammograms pursuant to s. 627.6613;

g. Coverage for handicapped children pursuant to s. 627.6615;

h. Emergency or urgent care out of the geographic service area;  and

i. Coverage for services provided by a hospice licensed under s. 400.602 in cases where such coverage would be the most appropriate and the most cost-effective method for treating a covered illness.

5. The standard health benefit plan and the basic health benefit plan may include a schedule of benefit limitations for specified services and procedures.  If the committee develops such a schedule of benefits limitation for the standard health benefit plan or the basic health benefit plan, a small employer carrier offering the plan must offer the employer an option for increasing the benefit schedule amounts by 4 percent annually.

6. The basic health benefit plan shall include all of the benefits specified in subparagraph 4.; however, the basic health benefit plan shall place additional restrictions on the benefits and utilization and may also impose additional cost containment measures.

7. Sections 627.419(2), (3), and (4), 627.6574, 627.6612, 627.66121, 627.66122, 627.6616, 627.6618, 627.668, and 627.66911 apply to the standard health benefit plan and to the basic health benefit plan.  However, notwithstanding said provisions, the plans may specify limits on the number of authorized treatments, if such limits are reasonable and do not discriminate against any type of provider.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

8. Each small employer carrier that provides for inpatient and outpatient services by allopathic hospitals may provide as an option of the insured similar inpatient and outpatient services by hospitals accredited by the American Osteopathic Association when such services are available and the osteopathic hospital agrees to provide the service.

(c) If a small employer rejects, in writing, the standard health benefit plan and the basic health benefit plan, the small employer carrier may offer the small employer a limited benefit policy or contract.

(d)1. Upon offering coverage under a standard health benefit plan, a basic health benefit plan, or a limited benefit policy or contract for any small employer, the small employer carrier shall provide such employer group with a written statement that contains, at a minimum:

a. An explanation of those mandated benefits and providers that are not covered by the policy or contract;

b. An explanation of the managed care and cost control features of the policy or contract, along with all appropriate mailing addresses and telephone numbers to be used by insureds in seeking information or authorization; and

c. An explanation of the primary and preventive care features of the policy or contract.

Such disclosure statement must be presented in a clear and understandable form and format and must be separate from the policy or certificate or evidence of coverage provided to the employer group.

2. Before a small employer carrier issues a standard health benefit plan, a basic health benefit plan, or a limited benefit policy or contract, it must obtain from the prospective policyholder a signed written statement in which the prospective policyholder:

a. Certifies as to eligibility for coverage under the standard health benefit plan, basic health benefit plan, or limited benefit policy or contract;

b. Acknowledges the limited nature of the coverage and an understanding of the managed care and cost control features of the policy or contract;

c. Acknowledges that if misrepresentations are made regarding eligibility for coverage under a standard health benefit plan, a basic health benefit plan, or a limited benefit policy or contract, the person making such misrepresentations forfeits coverage provided by the policy or contract; and

d. If a limited plan is requested, acknowledges that the prospective policyholder had been offered, at the time of application for the insurance policy or contract, the opportunity to purchase any health benefit plan offered by the carrier and that the prospective policyholder had rejected that coverage.

A copy of such written statement shall be provided to the prospective policyholder no later than at the time of delivery of the policy or contract, and the original of such written statement shall be retained in the files of the small employer carrier for the period of time that the policy or contract remains in effect or for 5 years, whichever period is longer.

3. Any material statement made by an applicant for coverage under a health benefit plan which falsely certifies as to the applicant's eligibility for coverage serves as the basis for terminating coverage under the policy or contract.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

4. Each marketing communication that is intended to be used in the marketing of a health benefit plan in this state must be submitted for review by the department prior to use and must contain the disclosures stated in this subsection.

(e)1. A small employer carrier may not use any policy, contract, form, or rate under this section, including applications, enrollment forms, policies, contracts, certificates, evidences of coverage, riders, amendments, endorsements, and disclosure forms, until the insurer has filed it with the department and the department has approved it under ss. 627.410, 627.4106, [FN1] and 627.411.

2. A small employer carrier must file with the department by December 1, 1993, the standard and basic health benefit plan that it intends to initially use to comply with this subsection during calendar year 1994, together with the rates therefor, and the department must approve the submissions by January 1, 1994.

**(13) Standards to assure fair marketing.–**

(a) Each small employer carrier shall actively market health benefit plan coverage, including the basic and standard health benefit plans, including any subsequent modifications or additions to those plans, to eligible small employers in the state.  Before January 1, 1994, if a small employer carrier denies coverage to a small employer on the basis of the health status or claims experience of the small employer or its employees or dependents, the small employer carrier shall offer the small employer the opportunity to purchase a basic health benefit plan and a standard health benefit plan. Beginning January 1, 1994, small employer carriers must offer and issue all plans on a guaranteed-issue basis.

(b) No small employer carrier or agent shall, directly or indirectly, engage in the following activities:

1. Encouraging or directing small employers to refrain from filing an application for coverage with the small employer carrier because of the health status, claims experience, industry, occupation, or geographic location of the small employer.

2. Encouraging or directing small employers to seek coverage from another carrier because of the health status, claims experience, industry, occupation, or geographic location of the small employer.

(c) The provisions of paragraph (a) shall not apply with respect to information provided by a small employer carrier or agent to a small employer regarding the established geographic service area or a restricted network provision of a small employer carrier.

(d) No small employer carrier shall, directly or indirectly, enter into any contract, agreement, or arrangement with an agent that provides for or results in the compensation paid to an agent for the sale of a health benefit plan to be varied because of the health status, claims experience, industry, occupation, or geographic location of the small employer except if the compensation arrangement provides compensation to an agent on the basis of percentage of premium, provided that the percentage shall not vary because of the health status, claims experience, industry, occupation, or geographic area of the small employer.

(e) A small employer carrier shall provide reasonable compensation, as provided under the plan of operation of the program, to an agent, if any, for the sale of a basic or standard health benefit plan.

(f) No small employer carrier shall terminate, fail to renew, or limit its contract or agreement of representation with an agent for any reason related to the health status, claims experience, occupation, or geographic location of the small employers placed by the agent with the small employer carrier unless the agent consistently engages in practices that violate this section or s.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

626.9541.

(g) No small employer carrier or agent shall induce or otherwise encourage a small employer to separate or otherwise exclude an employee from health coverage or benefits provided in connection with the employee's employment.

(h) Denial by a small employer carrier of an application for coverage from a small employer shall be in writing and shall state the reason or reasons for the denial.

(i) The department may establish regulations setting forth additional standards to provide for the fair marketing and broad availability of health benefit plans to small employers in this state.

(j) A violation of this section by a small employer carrier or an agent shall be an unfair trade practice under s. 626.9541 or ss. 641.3903 and 641.3907.

(k) If a small employer carrier enters into a contract, agreement, or other arrangement with a third-party administrator to provide administrative, marketing, or other services relating to the offering of health benefit plans to small employers in this state, the third-party administrator shall be subject to this section.

**(14) Disclosure of information.–**

(a) In connection with the offering of a health benefit plan to a small employer, a small employer carrier:

1. Shall make a reasonable disclosure to such employer, as part of its solicitation and sales materials, of the availability of information described in paragraph (b); and

2. Upon request of the small employer, provide such information.

(b)1. Subject to subparagraph 3., with respect to a small employer carrier that offers a health benefit plan to a small employer, information described in this paragraph is information that concerns:

a. The provisions of such coverage concerning an insurer's right to change premium rates and the factors that may affect changes in premium rates;

b. The provisions of such coverage that relate to renewability of coverage;

c. The provisions of such coverage that relate to any preexisting condition exclusions; and

d. The benefits and premiums available under all health insurance coverage for which the employer is qualified.

2. Information required under this subsection shall be provided to small employers in a manner determined to be understandable by the average small employer, and shall be sufficient to reasonably inform small employers of their rights and obligations under the health insurance coverage.

3. An insurer is not required under this subsection to disclose any information that is proprietary or a trade secret under state law.

**(15) Applicability of other state laws.–**

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

(a) Except as expressly provided in this section, a law requiring coverage for a specific health care service or benefit, or a law requiring reimbursement, utilization, or consideration of a specific category of licensed health care practitioner, does not apply to a standard or basic health benefit plan policy or contract or a limited benefit policy or contract offered or delivered to a small employer unless that law is made expressly applicable to such policies or contracts.

(b) Except as provided in this section, a standard or basic health benefit plan policy or contract or limited benefit policy or contract offered to a small employer is not subject to any provision of this code which:

1. Inhibits a small employer carrier from contracting with providers or groups of providers with respect to health care services or benefits;

2. Imposes any restriction on a small employer carrier's ability to negotiate with providers regarding the level or method of reimbursing care or services provided under a health benefit plan; or

3. Requires a small employer carrier to either include a specific provider or class of providers when contracting for health care services or benefits or to exclude any class of providers that is generally authorized by statute to provide such care.

(c) Any second tier assessment paid by a carrier pursuant to paragraph (11)(j) may be credited against assessments levied against the carrier pursuant to s. 627.6494.

(d) Notwithstanding chapter 641, a health maintenance organization is authorized to issue contracts providing benefits equal to the standard health benefit plan, the basic health benefit plan, and the limited benefit policy authorized by this section.

**(16) Rulemaking authority.**–The department may adopt rules to administer this section, including rules governing compliance by small employer carriers and small employers.

CREDIT(S)

1999 Electronic Update

Amended by Laws 1996, c. 96-319, § 2, eff. Jan. 1, 1997; Laws 1996, c. 96- 406, § 380, eff. July 3, 1996; Laws 1997, c. 97-48, § 10, eff. Oct. 1, 1997; Laws 1997, c. 97-102, § 1735, eff. July 1, 1997; Laws 1997, c. 97-166, § 3, eff. July 1, 1997; Laws 1997, c. 97-179, § 15, eff. May 30, 1997; Laws 1998, c. 98-66, § 4, eff. Oct. 1, 1998; Laws 1998, c. 98-159, § 13, eff. Jan. 1, 1999; Laws 1999, c. 99-3, § 32, eff. June 29, 1999.

[FN1] Repealed by Laws 1993, c. 93-129, § 83.

< General Materials (GM) - References, Annotations, or Tables >

**HISTORICAL AND STATUTORY NOTES**

1999 Electronic Update

Laws 1997, c. 97-48, § 14, provides:

"This act shall take effect October 1, 1997, and shall apply to policies and contracts issued or renewed after that date."

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 641.23                                                              **Page   1**
West's F.S.A. § 641.23

**WEST'S FLORIDA STATUTES ANNOTATED**
**TITLE XXXVII. INSURANCE**
**CHAPTER 641. HEALTH CARE SERVICE PROGRAMS**
**PART I. HEALTH MAINTENANCE ORGANIZATIONS**

1999 Electronic Pocket Part Update

Current through End of 1999 1st Reg. Sess.

641.23. Revocation or cancellation of certificate of authority;   suspension of enrollment of new
subscribers;  terms of suspension

(1) The maintenance of a valid and current health care provider certificate issued pursuant to part
III of this chapter is a condition of the maintenance of a valid and current certificate of authority
issued by the department to operate a health maintenance organization. Denial or revocation of a
health care provider certificate shall be deemed to be an automatic and immediate cancellation of a
health maintenance organization's certificate of authority. At the discretion of the Department of
Insurance, nonrenewal of a health care provider certificate may be deemed to be an automatic and
immediate cancellation of a health maintenance organization's certificate of authority if the Agency
for Health Care Administration notifies the Department of Insurance, in writing, that the health
care provider certificate will not be renewed.

(2) The department may suspend the authority of a health maintenance organization to enroll new
subscribers or revoke any certificate issued to a health maintenance organization, or order
compliance within 30 days, if it finds that any of the following conditions exists:

(a) The organization is not operating in compliance with this part;

(b) The plan is no longer actuarially sound or the organization does not have the minimum surplus
as required by this part;

(c) The existing contract rates are excessive, inadequate, or unfairly discriminatory;

(d) The organization has advertised, merchandised, or attempted to merchandise its services in such
a manner as to misrepresent its services or capacity for service or has engaged in deceptive,
misleading, or unfair practices with respect to advertising or merchandising;  or

(e) The organization is insolvent.

(3) Whenever the financial condition of the health maintenance organization is such that, if not
modified or corrected, its continued operation would result in impairment or insolvency, the
department may order the health maintenance organization to file with the department and
implement a corrective action plan designed to do one or more of the following:

(a) Reduce the total amount of present potential liability for benefits by reinsurance or other means.

(b) Reduce the volume of new business being accepted.

(c) Reduce the expenses of the health maintenance organization by specified methods.

(d) Suspend or limit the writing of new business for a period of time.

Copr. ᶜ West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 641.23                                                                              **Page    2**

(e) Require an increase in the health maintenance organization's net worth.

If the health maintenance organization fails to submit a plan within 30 days of the department's order or submits a plan which is insufficient to correct the health maintenance organization's financial condition, the department may order the health maintenance organization to implement one or more of the corrective actions listed in this subsection.

(4) The department shall, in its order suspending the authority of a health maintenance organization to enroll new subscribers, specify the period during which the suspension is to be in effect and the conditions, if any, which must be met by the health maintenance organization prior to reinstatement of its authority to enroll new subscribers.   The order of suspension is subject to rescission or modification by further order of the department prior to the expiration of the suspension period. Reinstatement shall not be made unless requested by the health maintenance organization; however, the department shall not grant reinstatement if it finds that the circumstances for which the suspension occurred still exist or are likely to recur.

(5) The department shall promulgate rules establishing an actuarially sound medical loss ratio [FN1] for Medicaid.  In determining the appropriate medical loss ratio, the department shall consider factors, including but not limited to, plan age, plan structure, geographic service area, product mix, provider network, medical inflation, provider services, other professional services, out of network referrals and expenditures, in and out of network emergency room expenditures, inpatient expenditures, other medical expenditures, incentive pool adjustments, copayments, coordination of benefits, subrogation, and any other expenses associated with the delivery of medical benefits.  The department shall utilize assistance from the Agency for Health Care Administration, the State University System, an independent actuary, and representatives from health maintenance organizations in developing the rule for appropriate medical loss ratios.

(6) The department shall calculate and publish at least annually the medical loss ratios of all licensed health maintenance organizations.  The publication shall include an explanation of what the medical loss ratio means and shall disclose that the medical loss ratio is not a direct reflection of quality, but must be looked at along with patient satisfaction and other standards that define quality.

<center>CREDIT(S)</center>

<center>1999 Electronic Update</center>

Amended by Laws 1996, c. 96-199, § 19, eff. July 1, 1996;  Laws 1999, c. 99- 8, § 265, eff. June 29, 1999.

[FN1] The word "ratio" was substituted for the word "ratios" by the division of statutory revision.

<center>< General Materials (GM) - References, Annotations, or Tables ></center>

<center>**HISTORICAL AND STATUTORY NOTES**</center>

<center>1996 Main Volume</center>

**Derivation:**
 Laws 1995, c. 95-211, § 43.
 Laws 1991, c. 91-108, § 115.
 Laws 1988, c. 88-388, § 7.
 Laws 1987, c. 87-236, § 6.

<center>Copr. © West 1999 No Claim to Orig. U.S. Govt. Works</center>

### WEST'S FLORIDA STATUTES ANNOTATED
### TITLE XXXVII. INSURANCE
### CHAPTER 641. HEALTH CARE SERVICE PROGRAMS
### PART I. HEALTH MAINTENANCE ORGANIZATIONS

1999 Electronic Pocket Part Update

Current through End of 1999 1st Reg. Sess.

641.25. Administrative penalty in lieu of suspension or revocation

  If the department finds that one or more grounds exist for the revocation or suspension of a certificate issued under this part, the department may, in lieu of revocation or suspension, impose a fine upon the health maintenance organization. With respect to any nonwillful violation, the fine must not exceed $2,500 per violation. Such fines may not exceed an aggregate amount of $25,000 for all nonwillful violations arising out of the same action. With respect to any knowing and willful violation of a lawful order or rule of the department or a provision of this part, the department may impose upon the organization a fine in an amount not to exceed $20,000 for each such violation. Such fines may not exceed an aggregate amount of $250,000 for all knowing and willful violations arising out of the same action. The department must adopt by rule by January 1, 1997, penalty categories that specify varying ranges of monetary fines for willful violations and for nonwillful violations.

CREDIT(S)

1999 Electronic Update

Amended by Laws 1996, c. 96-199, § 21, eff. July 1, 1996.

< General Materials (GM) - References, Annotations, or Tables >

### HISTORICAL AND STATUTORY NOTES

1996 Main Volume

**Derivation:**
  Laws 1988, c. 88-388, § 10.
  Laws 1987, c. 87-236, § 7.
  Laws 1983, c. 83-198, § 6.
  Laws 1982, c. 82-243, § 786.
  Laws 1978, c. 78-95, § 21.
  Laws 1972, c. 72-264, § 9.

### CROSS REFERENCES

Statewide Provider and Subscriber Assistance Program, fines or sanctions as under this section, see § 408.7056.

### LIBRARY REFERENCES

1996 Main Volume

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 641.31                                                           **Page    1**
West's F.S.A. § 641.31

<div align="center">

**WEST'S FLORIDA STATUTES ANNOTATED**
**TITLE XXXVII. INSURANCE**
**CHAPTER 641. HEALTH CARE SERVICE PROGRAMS**
**PART I. HEALTH MAINTENANCE ORGANIZATIONS**

1999 Electronic Pocket Part Update

Current through End of 1999 1st Reg. Sess.

</div>

641.31. Health maintenance contracts

(1) Any entity issued a certificate and otherwise in compliance with this part may enter into contracts in this state to provide an agreed-upon set of comprehensive health care services to subscribers in exchange for a prepaid per capita sum or a prepaid aggregate fixed sum. Each subscriber shall be given a copy of the applicable health maintenance contract, certificate, or member handbook. Whichever document is provided to a subscriber shall contain all of the provisions and disclosures required by this section.

(2) The rates charged by any health maintenance organization to its subscribers shall not be excessive, inadequate, or unfairly discriminatory or follow a rating methodology that is inconsistent, indeterminate, or ambiguous or encourages misrepresentation or misunderstanding. The department, in accordance with generally accepted actuarial practice as applied to health maintenance organizations, may define by rule what constitutes excessive, inadequate, or unfairly discriminatory rates and may require whatever information it deems necessary to determine that a rate or proposed rate meets the requirements of this subsection.

(3)(a) If a health maintenance organization desires to amend any contract with its subscribers or any certificate or member handbook, or desires to change any basic health maintenance contract, certificate, grievance procedure, or member handbook form, or application form where written application is required and is to be made a part of the contract, or printed amendment, addendum, rider, or endorsement form or form of renewal certificate, it may do so, upon filing with the department the proposed change or amendment. Any proposed change shall be effective immediately, subject to disapproval by the department. Following receipt of notice of such disapproval or withdrawal of approval, no health maintenance organization shall issue or use any form disapproved by the department or as to which the department has withdrawn approval.

(b) Any change in the rate is subject to paragraph (d) and requires at least 30 days' advance written notice to the subscriber. In the case of a group member, there may be a contractual agreement with the health maintenance organization to have the employer provide the required notice to the individual members of the group.

(c) The department shall disapprove any form filed under this subsection, or withdraw any previous approval thereof, if the form:

1. Is in any respect in violation of, or does not comply with, any provision of this part or rule adopted thereunder.

2. Contains or incorporates by reference, where such incorporation is otherwise permissible, any inconsistent, ambiguous, or misleading clauses or exceptions and conditions which deceptively affect the risk purported to be assumed in the general coverage of the contract.

3. Has any title, heading, or other indication of its provisions which is misleading.

<div align="center">

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

</div>

FL ST s 641.31                                                                **Page   2**

4. Is printed or otherwise reproduced in such a manner as to render any material provision of the form substantially illegible.

5. Contains provisions which are unfair, inequitable, or contrary to the public policy of this state or which encourage misrepresentation.

6. Excludes coverage for human immunodeficiency virus infection or acquired immune deficiency syndrome or contains limitations in the benefits payable, or in the terms or conditions of such contract, for human immunodeficiency virus infection or acquired immune deficiency syndrome which are different than those which apply to any other sickness or medical condition.

(d) Any change in rates charged for the contract must be filed with the department not less than 30 days in advance of the effective date.  At the expiration of such 30 days, the rate filing shall be deemed approved unless prior to such time the filing has been affirmatively approved or disapproved by order of the department. The approval of the filing by the department constitutes a waiver of any unexpired portion of such waiting period.  The department may extend by not more than an additional 15 days the period within which it may so affirmatively approve or disapprove any such filing, by giving notice of such extension before expiration of the initial 30-day period.  At the expiration of any such period as so extended, and in the absence of such prior affirmative approval or disapproval, any such filing shall be deemed approved.

(e) It is not the intent of this subsection to restrict unduly the right to modify rates in the exercise of reasonable business judgment.

(4) Every health maintenance contract, certificate, or member handbook shall clearly state all of the services to which a subscriber is entitled under the contract and must include a clear and understandable statement of any limitations on the services or kinds of services to be provided, including any copayment feature or schedule of benefits required by the contract or by any insurer or entity which is underwriting any of the services offered by the health maintenance organization. The contract, certificate, or member handbook shall also state where and in what manner the comprehensive health care services may be obtained.

(5) Every subscriber shall receive a clear and understandable description of the method of the health maintenance organization for resolving subscriber grievances, and the method shall be set forth in the contract, certificate, and member handbook.  The organization shall also furnish, at the time of initial enrollment and when necessary due to substantial changes to the grievance process a separate and additional communication prepared or approved by the department notifying the contract holder of a group contract or subscriber of an individual contract of their rights and responsibilities under the grievance process.

(6) The rate of payment for a health maintenance contract shall be a part of the contract and shall be stated in individual contracts issued to subscribers.

(7) A health maintenance organization is entitled to coordinate benefits on the same basis as an insurer under s. 627.4235.

(8) A health maintenance organization providing medical benefits or payments to a subscriber who suffers injury, disease, or illness by virtue of the negligent act or omission of a third party is entitled to reimbursement from the subscriber in accordance with s. 768.76(4).

(9) All health maintenance contracts that provide coverage, benefits, or services for a member of the family of the subscriber must, as to such family member's coverage, benefits, or services, provide also that the coverage, benefits, or services applicable for children must be provided with respect to a

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

newborn child of the subscriber, or covered family member of the subscriber, from the moment of birth. However, with respect to a newborn child of a covered family member other than the spouse of the insured or subscriber, the coverage for the newborn child terminates 18 months after the birth of the newborn child. The coverage, benefits, or services for newborn children must consist of coverage for injury or sickness, including the necessary care or treatment of medically diagnosed congenital defects, birth abnormalities, or prematurity, and transportation costs of the newborn to and from the nearest appropriate facility appropriately staffed and equipped to treat the newborn's condition, when such transportation is certified by the attending physician as medically necessary to protect the health and safety of the newborn child.

(a) A contract may require the subscriber to notify the plan of the birth of a child within a time period, as specified in the contract, of not less than 30 days after the birth, or a contract may require the preenrollment of a newborn prior to birth. However, if timely notice is given, a plan may not charge an additional premium for additional coverage of the newborn child for not less than 30 days after the birth of the child. If timely notice is not given, the plan may charge an additional premium from the date of birth. If notice is given within 60 days of the birth of the child, the contract may not deny coverage of the child due to failure of the subscriber to timely notify the plan of the birth of the child or to preenroll the child.

(b) If the contract does not require the subscriber to notify the plan of the birth of a child within a specified time period, the plan may not deny coverage of the child nor may it retroactively charge the subscriber an additional premium for the child; however, the contract may prospectively charge the member an additional premium for the child if the plan provides at least 45 days' notice of the additional charge.

(10) No alteration of any written application for any health maintenance contract shall be made by any person other than the applicant without his or her written consent, except that insertions may be made by the health maintenance organization, for administrative purposes only, in such manner as to indicate clearly that such insertions are not to be ascribed to the applicant.

(11) No contract shall contain any waiver of rights or benefits provided to or available to subscribers under the provisions of any law or rule applicable to health maintenance organizations.

(12) Each health maintenance contract, certificate, or member handbook shall state that emergency services and care shall be provided to subscribers in emergency situations not permitting treatment through the health maintenance organization's providers, without prior notification to and approval of the organization. Not less than 75 percent of the reasonable charges for covered services and supplies shall be paid by the organization, up to the subscriber contract benefit limits. Payment also may be subject to additional applicable copayment provisions, not to exceed $100 per claim. The health maintenance contract, certificate, or member handbook shall contain the definitions of "emergency services and care" and "emergency medical condition" as specified in s. 641.19(7) and (8), shall describe procedures for determination by the health maintenance organization of whether the services qualify for reimbursement as emergency services and care, and shall contain specific examples of what does constitute an emergency. In providing for emergency services and care as a covered service, a health maintenance organization shall be governed by s. 641.513.

(13) In addition to the requirements of this section, with respect to a person who is entitled to have payments for health care costs made under Medicare, Title XVIII of the Social Security Act ("Medicare"), Parts A and/or B: [FN1]

(a) The health maintenance organization shall mail or deliver notification to the Medicare beneficiary of the date of enrollment in the health maintenance organization within 10 days after receiving notification of enrollment approval from the United States Department of Health and

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 641.31                                                                                        **Page   4**

Human Services, Health Care Financing Administration. When a Medicare beneficiary who is a subscriber of the health maintenance organization requests disenrollment from the organization, the organization shall mail or deliver to the beneficiary notice of the effective date of the disenrollment within 10 days after receipt of the written disenrollment request. The health maintenance organization shall forward the disenrollment request to the United States Department of Health and Human Services, Health Care Financing Administration, in a timely manner so as to effectuate the next available disenrollment date, as prescribed by such federal agency.

(b) The health maintenance contract, certificate, or member handbook shall be delivered to the subscriber no later than the earlier of 10 working days after the health maintenance organization and the Health Care Financing Administration of the United States Department of Health and Human Services approve the subscriber's enrollment application or the effective date of coverage of the subscriber under the health maintenance contract. However, if notice from the Health Care Financing Administration of its approval of the subscriber's enrollment application is received by the health maintenance organization after the effective coverage date prescribed by the Health Care Financing Administration, the health maintenance organization shall deliver the contract, certificate, or member handbook to the subscriber within 10 days after receiving such notice. When a Medicare recipient is enrolled in a health maintenance organization program, the contract, certificate, or member handbook shall be accompanied by a health maintenance organization identification sticker with instruction to the Medicare beneficiary to place the sticker on the Medicare identification card.

(14) Whenever a subscriber of a health maintenance organization is also a Medicaid recipient, the health maintenance organization's coverage shall be primary to the recipient's Medicaid benefits and the organization shall be a third party subject to the provisions of s. 409.910(4).

(15)(a) All health maintenance contracts, certificates, and member handbooks shall contain the following provision:

"Grace Period: This contract has a (insert a number not less than 10) day grace period. This provision means that if any required premium is not paid on or before the date it is due, it may be paid during the following grace period. During the grace period, the contract will stay in force."

(b) The required provision of paragraph (a) shall not apply to certificates or member handbooks delivered to individual subscribers under a group health maintenance contract when the employer or other person who will hold the contract on behalf of the subscriber group pays the entire premium for the individual subscribers. However, such required provision shall apply to the group health maintenance contract.

(16) The contracts must clearly disclose the intent of the health maintenance organization as to the applicability or nonapplicability of coverage to preexisting conditions. If coverage of the contract is not to be applicable to preexisting conditions, the contract shall specify, in substance, that coverage pertains solely to accidental bodily injuries resulting from accidents occurring after the effective date of coverage and that sicknesses are limited to those which first manifest themselves subsequent to the effective date of coverage.

(17) All health maintenance contracts that provide coverage for a member of the family of the subscriber, shall, as to such family member's coverage, provide that coverage, benefits, or services applicable for children shall be provided with respect to an adopted child of the subscriber, which child is placed in compliance with chapter 63, from the moment of placement in the residence of the subscriber. Such contracts may not exclude coverage for any preexisting condition of the child. In the case of a newborn child, coverage shall begin from the moment of birth if a written agreement to adopt such child has been entered into by the subscriber prior to the birth of the child, whether or not

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

such agreement is enforceable.  However, coverage for such child shall not be required in the event that the child is not ultimately placed in the residence of the subscriber in compliance with chapter 63.

(18)(a) Health maintenance contracts that provide coverage, benefits, or services for maternity care must provide, as an option to the subscriber, the services of nurse-midwives and midwives licensed pursuant to chapter 467, and the services of birth centers licensed pursuant to ss. 383.30-383.335, if such services are available within the service area.

(b) Any health maintenance contract that provides maternity or newborn coverage may not limit coverage for the length of a maternity or newborn stay in a hospital or for followup care outside of a hospital to any time period that is less than that determined to be medically necessary, in accordance with prevailing medical standards and consistent with guidelines for perinatal care of the American Academy of Pediatrics or the American College of Obstetricians and Gynecologists, by the treating obstetrical care provider or the pediatric care provider.

(c) This section does not affect any agreement between a health maintenance organization and a hospital or other health care provider with respect to reimbursement for health care services provided, rate negotiations with providers, or capitation of providers, and this section does not prohibit appropriate utilization review or case management by a health maintenance organization.

(d) Any health maintenance contract that provides coverage, benefits, or services for maternity or newborn care must provide coverage for postdelivery care for a mother and her newborn infant.  The postdelivery care must include a postpartum assessment and newborn assessment and may be provided at the hospital, at the attending physician's office, at an outpatient maternity center, or in the home by a qualified licensed health care professional trained in mother and baby care.  The services must include physical assessment of the newborn and mother, and the performance of any medically necessary clinical tests and immunizations in keeping with prevailing medical standards.

(e) A health maintenance organization subject to paragraph (b) shall communicate active case questions and concerns regarding postdelivery care directly to the treating physician or hospital in written form, in addition to other forms of communication.  Such organization shall also use a process that includes a written protocol for utilization review and quality assurance.

(f) Any health maintenance organization subject to paragraph (b) may not:

1. Deny to a mother or her newborn infant eligibility, or continued eligibility, to enroll or to renew coverage under the terms of the contract for the purpose of avoiding the requirements of this section.

2. Provide monetary payments or rebates to a mother to encourage the mother to accept less than the minimum protections available under this section.

3. Penalize or otherwise reduce or limit the reimbursement of an attending provider solely because the attending provider provided care to an individual participant or beneficiary in accordance with this section.

4. Provide incentives, monetary or otherwise, to an attending provider solely to induce the provider to provide care to an individual participant or beneficiary in a manner inconsistent with this section.

5. Subject to paragraph (i), restrict benefits for any portion of a period within a hospital length of stay required under paragraph (b) in a manner that is less favorable than the benefits provided for any preceding portion of such stay.

Copr. ͨ West 1999 No Claim to Orig. U.S. Govt. Works

(g) This subsection does not require a mother who is a participant or beneficiary to:

1. Give birth in a hospital.

2. Stay in the hospital for a fixed period of time following the birth of her infant.

(h) This subsection does not apply with respect to any coverage offered by a health maintenance organization that does not provide benefits for hospital lengths of stay in connection with childbirth for a mother or her newborn infant.

(i) This subsection does not prevent a health maintenance organization from imposing deductibles, coinsurance, or other cost sharing in relation to benefits for hospital lengths of stay in connection with childbirth for a mother or her newborn infant under the contract or under health insurance coverage offered in connection with a group health plan, except that such coinsurance or other cost sharing for any portion of a period within a hospital length of stay required under paragraph (b) may not be greater than such coinsurance or cost-sharing for any preceding portion of such stay.

(19) Notwithstanding any other provision of law, health maintenance policies or contracts which provide coverage, benefits, or services as described in s. 463.002(5), shall offer to the subscriber the services of an optometrist licensed pursuant to chapter 463.

(20) Notwithstanding any other provision of law, health maintenance policies or contracts which provide coverage, benefits, or services which are performed by physicians who are ophthalmologists, licensed pursuant to chapter 458 or chapter 459, shall offer the subscriber the services of an ophthalmologist. For purposes of this subsection, ophthalmologists are physicians specializing in the diagnosis and treatment of diseases and injuries of the eye.

(21) Notwithstanding any other provision of law, health maintenance policies or contracts which provide anesthesia coverage, benefits, or services shall offer to the subscriber, if requested and available, the services of a certified registered nurse anesthetist licensed pursuant to chapter 464.

(22) Each health maintenance organization that offers a group plan within this state must have at least one open enrollment period of not less than 30 days every 18 months. Such open enrollment periods are required for as long as the group exists unless the health maintenance organization and the employer mutually agree to a shorter period of time than 18 months.

(23) The contract shall include the following provision:

"Time limit on certain defenses: Relative to a misstatement in the application, after 2 years from the issue date, only fraudulent misstatements in the application may be used to void the policy or deny any claim for loss incurred or disability starting after the 2-year period."

(24) Each health maintenance organization that provides for inpatient and outpatient services by allopathic hospitals shall provide as an option of the subscriber similar inpatient and outpatient services by hospitals accredited by the American Osteopathic Association when such services are available in the same service area of the HMO and the osteopathic hospital agrees to provide the services as specified herein. As a condition precedent to providing osteopathic inpatient and outpatient services through an osteopathic hospital that has not entered into a written contract with the HMO, the HMO may require the subscriber or any other person receiving osteopathic services to release the HMO from any liability arising from any act of omission or commission constituting malpractice in the delivery of osteopathic care from that hospital. The osteopathic hospital providing the inpatient and outpatient services for the HMO shall charge rates that do not exceed the osteopathic hospital's usual and customary rates less the average discount provided by allopathic

Copr. ʳ West 1999 No Claim to Orig. U.S. Govt. Works

hospitals providing the HMO services in the same service area of the HMO.

(25) If a subscriber is a resident of a continuing care facility certified under chapter 651 or a retirement facility consisting of a nursing home and residential apartments, the subscriber's primary care physician must refer the subscriber to that facility's skilled nursing unit if the primary care physician finds that it is in the best interest of the patient to do so; if the facility agrees to be reimbursed at the health maintenance organization's contract rate negotiated with similar providers for the same services and supplies; and if the facility meets all guidelines established by the health maintenance organization related to quality of care, utilization, referral authorization, risk assumption, use of the health maintenance organization's network, and other criteria applicable to providers under contract for the same services and supplies.

(26)(a) Each health maintenance organization and prepaid health plan shall provide coverage for all medically appropriate and necessary equipment, supplies, and services used to treat diabetes, including outpatient self- management training and educational services, if the patient's primary care physician, or the physician to whom the patient has been referred who specializes in treating diabetes, certifies that the equipment, supplies, or services are necessary.

(b) The contract may require that diabetes outpatient self-management training and educational services be provided under the direct supervision of a certified diabetes educator or a board-certified endocrinologist under contract with or designated by the health maintenance organization or prepaid health plan.

(c) The Agency for Health Care Administration shall adopt standards for outpatient self-management training and educational services, taking into consideration standards approved by the American Diabetes Association.

(27) Any health maintenance contract that covers a resident of this state and that is issued, amended, delivered, or renewed in this state after October 1, 1996, must provide coverage for the medically necessary diagnosis and treatment of osteoporosis for high-risk individuals, including, but not limited to, estrogen-deficient individuals who are at clinical risk for osteoporosis, individuals who have vertebral abnormalities, individuals who are receiving long-term glucocorticoid (steroid) therapy, individuals who have primary hyperparathyroidism, and individuals who have a family history of osteoporosis. This subsection shall not apply to the state employee health insurance program.

(28) A health maintenance organization may not discriminate against or fail to contract with a hospital, based solely on the fact that the hospital's medical staff is comprised of physicians licensed under chapter 459. Nothing in this subsection shall mandate that a health maintenance organization contract with a hospital.

(29) If a health maintenance contract provides that coverage of a dependent child of the subscriber will terminate upon attainment of the limiting age for dependent children which is specified in the contract, the contract must also provide in substance that attainment of the limiting age does not terminate the coverage of the child while the child continues to be both:

(a) Incapable of self-sustaining employment by reason of mental retardation or physical handicap, and

(b) Chiefly dependent upon the employee or member for support and maintenance.

If the claim is denied under a contract for the stated reason that the child has attained the limiting age for dependent children specified in the contract, the notice or denial must state that the

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 641.31                                                                                    **Page  8**

subscriber has the burden of establishing that the child continues to meet the criteria specified in paragraphs (a) and (b).

(30)(a) All health maintenance contracts which provide coverage, benefits, or services for a member of the family of the subscriber must, as to such family member's coverage, benefits, or services, also provide that the benefits applicable for children include coverage for child health supervision services from the moment of birth to age 16 years.

(b) As used in this subsection, the term "child health supervision services" means physician-delivered or physician-supervised services that include, at a minimum, services delivered at the intervals and scope stated in this subsection.

1. Child health supervision services must include periodic visits which shall include a history, a physical examination, a developmental assessment and anticipatory guidance, and appropriate immunizations and laboratory tests. Such services and periodic visits shall be provided in accordance with prevailing medical standards consistent with the Recommendations for Preventive Pediatric Health Care of the American Academy of Pediatrics.

2. Minimum benefits may be limited to one visit payable to one provider for all of the services provided at each visit cited in this subsection.

(31)(a) Health maintenance contracts that provide coverage, benefits, or services for breast cancer treatment may not limit inpatient hospital coverage for mastectomies to any period that is less than that determined by the treating physician under contract with the health maintenance organization to be medically necessary in accordance with prevailing medical standards and after consultation with the covered patient.  Such contract must also provide coverage for outpatient postsurgical followup care in keeping with prevailing medical standards by a licensed health care professional under contract with the health maintenance organization qualified to provide postsurgical mastectomy care.  The treating physician under contract with the health maintenance organization, after consultation with the covered patient, may choose that the outpatient care be provided at the most medically appropriate setting, which may include the hospital, treating physician's office, outpatient center, or home of the covered patient.

(b) A health maintenance organization subject to this subsection may not:

1. Deny to a covered person eligibility, or continued eligibility, to enroll or to renew coverage under the terms of the contract for the purpose of avoiding the requirements of this subsection;

2. Provide monetary payments or rebates to a covered patient to accept less than the minimum protections available under this subsection;

3. Penalize or otherwise reduce or limit the reimbursement of an attending provider solely because the attending provider provided care to a covered patient under this subsection;

4. Provide incentives, monetary or otherwise, to an attending provider solely to induce the provider to provide care to a covered patient in a manner inconsistent with this subsection; or

5. Subject to the other provisions of this subsection, restrict benefits for any portion of a period within a hospital length of stay or outpatient care as required by this subsection in a manner that is less than favorable than the benefits provided for any preceding portion of such stay.

(c)1. This subsection does not require a covered patient to have the mastectomy in the hospital or stay in the hospital for a fixed period of time following the mastectomy.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

2. This subsection does not prevent a contract from imposing deductibles, coinsurance, or other cost sharing in relation to benefits pursuant to this subsection, except that such cost sharing shall not exceed cost sharing with other benefits.

(d) Except as provided in paragraph (b), this subsection does not affect any agreement between a health maintenance organization and a hospital or other health care provider with respect to reimbursement for health care services provided, rate negotiations with providers, or capitation of providers, and does not prohibit appropriate utilization review or case management by the health maintenance organization.

(e) As used in this subsection, the term "mastectomy" means the removal of all or part of the breast for medically necessary reasons as determined by a licensed physician.

(32) A health maintenance contract that provides coverage for mastectomies must also provide coverage for prosthetic devices and breast reconstructive surgery incident to the mastectomy. As used in this subsection, the term "breast reconstructive surgery" means surgery to reestablish symmetry between the two breasts. Such surgery must be in a manner chosen by the treating physician under contract with the health maintenance organization, consistent with prevailing medical standards, and in consultation with the patient. The health maintenance organization may charge an appropriate additional premium for the coverage required by this subsection. The coverage for prosthetic devices and breast reconstructive surgery shall be subject to any deductible and coinsurance conditions.

(33) Notwithstanding any provision of this section to the contrary, a health maintenance organization which offers dermatological services shall provide direct patient access, for office visits and minor procedures and testing, to a dermatologist who is under contract with the health maintenance organization. The term "direct patient access" means the ability of a subscriber to obtain such services without a referral or other authorization before receiving services. The health maintenance organization shall, by July 1, 1997, develop criteria for compliance with the provisions of this subsection which do not impede or inhibit access to dermatological services for policyholders of the health maintenance organization. The criteria may include a maximum of five office visits to a dermatologist without prior authorization for a dermatologic problem within a 12-month period.

(34) For purposes of this subsection, dental treatment or surgery shall be considered necessary when the dental condition is likely to result in a medical condition if left untreated. Any health maintenance organization contract which provides coverage for general anesthesia and hospitalization services to a covered person shall not preclude such coverage in assuring the safe delivery of necessary dental care provided to a covered person who:

(a) Is under 8 years of age and is determined by a licensed dentist, and the child's physician licensed under chapter 458 or chapter 459, to require necessary dental treatment in a hospital or ambulatory surgical center due to a significantly complex dental condition or a developmental disability in which patient management in the dental office has proved to be ineffective; or

(b) Has one or more medical conditions that would create significant or undue medical risk for the individual in the course of delivery of any necessary dental treatment or surgery if not rendered in a hospital or ambulatory surgical center.

As provided herein, all terms and conditions of the covered person's health maintenance organization contract shall apply to such services, and this section does not require coverage for the diagnosis or treatment of dental disease. A health maintenance organization may require prior authorization for general anesthesia and hospital services required under this section in the same manner the organization requires prior authorization for hospitalization for other covered services. This

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

subsection shall not apply to Medicare supplement, long-term care, disability, limited benefit, accident only, or specified disease policies.

(35) A health maintenance contract that covers a child under the age of 18 must provide coverage for treatment of cleft lip and cleft palate for the child.  The coverage must include medical, dental, speech therapy, audiology, and nutrition services only if such services are prescribed by the primary care physician or physician to whom the child is referred and such physician certifies that such services are medically necessary and consequent to treatment of the cleft lip or cleft palate.  The coverage required by this section is subject to terms and conditions applicable to other benefits.

(36) A health maintenance organization may increase the copayment for any benefit, or delete, amend, or limit any of the benefits to which a subscriber is entitled under the group contract only, upon written notice to the contract holder at least 45 days in advance of the time of coverage renewal.  The health maintenance organization may amend the contract with the contract holder, with such amendment to be effective immediately at the time of coverage renewal. The written notice to the contract holder shall specifically identify any deletions, amendments, or limitations to any of the benefits provided in the group contract during the current contract period which will be included in the group contract upon renewal.  This subsection does not apply to any increases in benefits.  The 45-day notice requirement shall not apply if benefits are amended, deleted, or limited at the request of the contract holder.

(37) All health maintenance contracts that provide coverage for massage must also cover the services of persons licensed to practice massage pursuant to chapter 480 if the massage is prescribed by a contracted physician licensed under chapter 458, chapter 459, chapter 460, or chapter 461 as medically necessary and the prescription specifies the number of treatments.  Such massage services are subject to the same terms, conditions, and limitations as those of other covered services.

(38)(a) Notwithstanding any other provision of this part, a health maintenance organization that meets the requirements of paragraph (b) may, through a point- of-service rider to its contract providing comprehensive health care services, include a point-of-service benefit. Under such a rider, a subscriber or other covered person of the health maintenance organization may choose, at the time of covered service, a provider with whom the health maintenance organization does not have a health maintenance organization provider contract.  The rider may not require a referral from the health maintenance organization for the point-of-service benefits.

(b) A health maintenance organization offering a point-of-service rider under this subsection must have a valid certificate of authority issued under the provisions of the chapter, must have been licensed under this chapter for a minimum of 3 years, and must at all times that it has riders in effect maintain a minimum surplus of $5 million.

(c) Premiums paid in for the point-of-service riders may not exceed 15 percent of total premiums for all health plan products sold by the health maintenance organization offering the rider.  If the premiums paid for point-of-service riders exceed 15 percent, the health maintenance organization must notify the department and, once this fact is known, must immediately cease offering such a rider until it is in compliance with the rider premium cap.

(d) Notwithstanding the limitations of deductibles and copayment provisions in this part, a point-of-service rider may require the subscriber to pay a reasonable copayment for each visit for services provided by a noncontracted provider chosen at the time of the service.  The copayment by the subscriber may either be a specific dollar amount or a percentage of the reimbursable provider charges covered by the contract and must be paid by the subscriber to the noncontracted provider upon receipt of covered services. The point-of- service rider may require that a reasonable annual deductible for the expenses associated with the point-of-service rider be met and may include a

Copr. ☉ West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 641.31

lifetime maximum benefit amount. The rider must include the language required by s. 627.6044 and must comply with copayment limits described in s. 627.6471. Section 641.315(2) and (3) does not apply to a point-of-service rider authorized under this subsection.

(e) The term "point of service" may not be used by a health maintenance organization except with riders permitted under this section or with forms approved by the department in which a point-of-service product is offered with an indemnity carrier.

(f) A point-of-service rider must be filed and approved under ss. 627.410 and 627.411.

CREDIT(S)

1999 Electronic Update

Amended by Laws 1996, c. 96-195, § 3, eff. Oct. 1, 1996; Laws 1996, c. 96- 199, § 25, eff. July 1, 1996; Laws 1996, c. 96-279, §§ 3, 5, eff. May 29, 1996; Laws 1996, c. 96-282, § 4, eff. July 1, 1996; Laws 1997, c. 97-48, § 12, eff. Oct. 1, 1997; Laws 1997, c. 97-102, § 1752, eff. July 1, 1997; Laws 1997, c. 97-166, § 4, eff. July 1, 1997; Laws 1997, c. 97-171, § 2, eff. May 30, 1997; Laws 1997, c. 97-179, § 23, eff. May 30, 1997; Laws 1998, c. 98- 66, § 5, eff. Oct. 1, 1998; Laws 1998, c. 98-159, § 23, eff. Jan. 1, 1999; Laws 1998, c. 98-312, § 4, eff. Oct. 1, 1998; Laws 1999, c. 99-264, § 5, eff. June 8, 1999; Laws 1999, c. 99-275, § 3, eff. July 1, 1999; Laws 1999, c. 99- 393, § 4, eff. June 18, 1999.

[FN1] 42 U.S.C.A. §§ 1395c et seq.; 1395j et seq.

< General Materials (GM) - References, Annotations, or Tables >

HISTORICAL AND STATUTORY NOTES

1999 Electronic Update

Laws 1997. c, 97-48, § 12, provides:

"This act fulfills an important state interest."

Laws 1997, c. 97-48, § 14, provides:

"This act shall take effect October 1, 1997, and shall apply to policies and contracts issued or renewed after that date."

Laws 1998, c. 98-66, §§ 6 and 7, provide:

"Section 6. Pursuant to Section 18, Article VII of the State Constitution, the Legislature determines that this act fulfills an important state interest.

"Section 7. This act shall take effect October 1, 1998, and shall apply to policies and contracts issued or renewed on or after that date."

Laws 1998, c. 98-312, §§ 5 and 6, provide:

"Section 5. The provisions of this act fulfill an important state interest in that they promote the relief, alleviation, and prevention of health, dental, or medical problems associated with inadequate dental care.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

"Section 6. This act shall take effect October 1 of the year in which enacted and shall apply to any policy issued, written, or renewed, or contract entered into, on or after such date."

Laws 1999, c. 99-264, §§ 5 and 6, provide:

"Section 5. [Subsections (2) and (3) of s. 641.31 are effective] ... July 1, 1999, and applicable to policies and contracts issued or renewed on or after that date..."

"Section 6. This act shall take effect upon becoming a law and shall apply only to contracts entered into after the effective date [June 8, 1999]."

Laws 1999, c. 99-275, § 10, provides:

"This act shall take effect July 1, 1999, and shall apply to all contracts renewed or entered into on or after that date."

<center>1996 Main Volume</center>

**Derivation:**
Laws 1995, c. 95-418, § 27.
Laws 1993, c. 93-245, § 2.
Laws 1991, c. 91-282, § 69.
Laws 1991, c. 91-185, § 3.
Laws 1991, c. 91-110, § 61.
Laws 1991, c. 91-108, § 121.
Laws 1990, c. 90-295, § 38.
Laws 1990, c. 90-232, § 9.
Laws 1989, c. 89-357, § 1.
Laws 1989, c. 89-190, § 4.
Laws 1988, c. 88-388, § 14.
Laws 1988, c. 88-380, § 52.
Laws 1988, c. 88-269, § 3.
Laws 1987, c. 87-273, § 2.
Laws 1987, c. 87-236, § 2.
Laws 1985, c. 85-177, § 21.
Laws 1984, c. 84-313.
Laws 1983, c. 83-198, § 11.
Laws 1982, c. 82-243, § 794.
Laws 1978, c. 78-95, § 21.
Laws 1972, c. 72-264, § 15.

Section 4 of Laws 1993, c. 93-245, provides:

"This act shall take effect October 1, 1993, and applies to causes of action accruing on or after such date."

<center>**LIBRARY REFERENCES**</center>

<center>1996 Main Volume</center>

Insurance ⚍ 11.1, 124(1).
WESTLAW Topic No. 217.
C.J.S. Insurance §§ 2, 51 to 64, 253 to 281, 1588, 1648.

<center>Copr. © West 1999 No Claim to Orig. U.S. Govt. Works</center>

FL ST s 641.31                                                                                      **Page  13**

Texts and Treatises
30 Fla Jur 2d, Insurance §§1061, 1062, 1073, 1075, 1086, 1089;  30A Fla Jur
 2d, Insurance §§1999-2001, 2005-2007, 2234, 2257;  31 Fla Jur 2d,
 Insurance §§2510, 2512, 2513, 2515, 2516, 2520, 2524-2526.
31 Fla Jur 2d, Insurance § 1052.

<div align="center">

NOTES OF DECISIONS

</div>

In general 1
Disclaimer of coverage 3
Reimbursement 2

**1. In general**

Evidence that subscriber of health maintenance organization presented his wife to the clinic where she was diagnosed as being dangerously ill, that he was requested to return the next morning for letter of admission to an approved hospital, that it later became necessary to take the wife to a hospital immediately, that she was taken to a nonparticipating hospital, and that, the following morning, the subscriber was still unable to get a certificate precluded determination that the HMO was not liable for costs of hospitalization as a matter of law despite its requirement that the subscriber use services of its doctors and surgeons. Amago v. Cuban Clinic Ass'n of Hialeah, App. 3 Dist., 345 So.2d 1091 (1977).

**2. Reimbursement**

Under statute granting health and maintenance organization (HMO) right to reimbursement for medical expenses from recovery by subscriber from negligent tort-feasor, HMO may recover reimbursement only when subscriber recovers those expenses, and only up to amount of those expenses recovered;   HMO has no right against subscriber's award of attorney's fees, costs and noneconomic damages. Humana Health Plans v. Lawton, App. 5 Dist., 675 So.2d 1382 (1996), rehearing denied.

Health maintenance organization had right to intervene in subscriber's action against negligent tort-feasor in order to assert its statutory right to reimbursement for medical expenses paid and to be heard before distribution of judgment settlement proceeds;

HMO was deprived of due process by being excluded from participation at hearing in which settlement was judicially approved. Humana Health Plans v. Lawton, App. 5 Dist., 675 So.2d 1382 (1996), rehearing denied.

In action by insured against her HMO seeking payment for medical bills incurred by insured as result of automobile accident, in which HMO was directed to make payment to insured's medical care providers, HMO was entitled to reimbursement from insured's recovery from third-party tort-feasor as long as reimbursement did not exceed recovery; inasmuch as statutory law provided for HMO reimbursement, not subrogation, conditions precedent necessary to maintain subrogation remedy were not required to be shown. Riera v. Finlay Medical Centers HMO Corp., App. 3 Dist., 543 So.2d 372 (1989).

**3. Disclaimer of coverage**

Policy issued by health maintenance organization (HMO) covered preexisting medical conditions, since it did not contain statutorily required disclaimer that coverage pertained solely to accidental bodily injuries resulting from accidents occurring after effective date of coverage. Humana Medical Plan, Inc. v. CAC-Ramsay Health Plans, Inc., App. 3 Dist., 714 So.2d 1025 (1997).

West's F. S. A. § 641.31

FL ST § 641.31

END OF DOCUMENT

<div align="center">

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

</div>

FL ST s 641.51                                                              **Page  1**
West's F.S.A. § 641.51

**WEST'S FLORIDA STATUTES ANNOTATED**
**TITLE XXXVII. INSURANCE**
**CHAPTER 641. HEALTH CARE SERVICE PROGRAMS**
**PART III. HEALTH CARE SERVICES**

1999 Electronic Pocket Part Update

Current through End of 1999 1st Reg. Sess.

641.51. Quality assurance program; second medical opinion requirement

(1) The organization shall ensure that the health care services provided to subscribers shall be rendered under reasonable standards of quality of care consistent with the prevailing standards of medical practice in the community.

(2) Each organization shall have an ongoing internal quality assurance program for its health care services. The program shall include, but not be limited to, the following:

(a) A written statement of goals and objectives which stress health outcomes as the principal criteria for the evaluation of the quality of care rendered to subscribers;

(b) A written statement describing how state-of-the-art methodology has been incorporated into an ongoing system for monitoring of care which is individual case oriented and, when implemented, can provide interpretation and analysis of patterns of care rendered to individual patients by individual providers;

(c) Written procedures for taking appropriate remedial action whenever, as determined under the quality assurance program, inappropriate or substandard services have been provided or services which should have been furnished have not been provided;

(d) A written plan for providing review of physicians and other licensed medical providers which includes ongoing review within the organization.

(3) The professional judgment of a physician licensed under chapter 458, chapter 459, chapter 460, or chapter 461 concerning the proper course of treatment of a subscriber shall not be subject to modification by the organization or its board of directors, officers, or administrators, unless the course of treatment prescribed is inconsistent with the prevailing standards of medical practice in the community. However, this subsection shall not be considered to restrict a utilization management program established by an organization.

(4)(a) Each organization shall give the subscriber the right to a second medical opinion in any instance in which the subscriber disputes the organization's or the physician's opinion of the reasonableness or necessity of surgical procedures or is subject to a serious injury or illness.

(b) The second opinion, if requested, is to be provided by a physician chosen by the subscriber who may select:

1. A contract or employed physician listed in a directory that shall be provided by the organization; or

2. A noncontract physician located in the same geographical service area of the organization.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

(c) For second opinions provided by contract physicians the organization is prohibited from charging a fee to the subscriber in an amount in excess of the subscriber fees established by contract for referral contract physicians. The organization shall pay the amount of all charges, which are usual, reasonable, and customary in the community, for second opinion services performed by a physician not under contract with the organization, but may require the subscriber to be responsible for up to 40 percent of such amount. The organization may require that any tests deemed necessary by a noncontract physician shall be conducted by the organization. The organization may deny reimbursement rights granted under this section in the event the subscriber seeks in excess of three such referrals per year if such subsequent referral costs are deemed by the organization to be evidence that the subscriber has unreasonably overutilized the second opinion privilege. A subscriber thus denied reimbursement under this section shall have recourse to grievance procedures as specified in ss. 408.7056, 641.495, and 641.511. The organization's physician's professional judgment concerning the treatment of a subscriber derived after review of a second opinion shall be controlling as to the treatment obligations of the health maintenance organization. Treatment not authorized by the health maintenance organization shall be at the subscriber's expense.

(5) Each organization shall develop and maintain a policy to determine when exceptional referrals to out-of-network specially qualified providers should be provided to address the unique medical needs of a subscriber. All financial arrangements for the provision of these services shall be agreed to prior to the services being rendered.

(6) Each organization shall develop and maintain written policies and procedures for the provision of standing referrals to subscribers with chronic and disabling conditions which require ongoing specialty care.

(7) When a contract between an organization and a treating provider is terminated for any reason other than for cause, each party shall allow subscribers for whom treatment was active to continue coverage and care when medically necessary, through completion of treatment of a condition for which the subscriber was receiving care at the time of the termination, until the subscriber selects another treating provider, or during the next open enrollment period offered by the organization, whichever is longer, but not longer than 6 months after termination of the contract. Each party to the terminated contract shall allow a subscriber who has initiated a course of prenatal care, regardless of the trimester in which care was initiated, to continue care and coverage until completion of postpartum care. This does not prevent a provider from refusing to continue to provide care to a subscriber who is abusive, noncompliant, or in arrears in payments for services provided. For care continued under this subsection, the organization and the provider shall continue to be bound by the terms of the terminated contract. Changes made within 30 days before termination of a contract are effective only if agreed to by both parties.

(8) Each organization shall release to the agency data that are indicators of access and quality of care. The agency shall develop rules specifying data- reporting requirements for these indicators. The indicators shall include the following characteristics:

(a) They must relate to access and quality of care measures.

(b) They must be consistent with data collected pursuant to accreditation activities and standards.

(c) They must be consistent with frequency requirements under the accreditation process.

(d) They must include measures of the management of chronic diseases.

(e) They must include preventive health care for adults and children.

Copr. ᶜ West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 641.51                                                                                    **Page   3**

(f) They must include measures of prenatal care.

(g) They must include measures of health checkups for children.

The agency shall develop by rule a uniform format for publication of the data for the public which shall contain explanations of the data collected and the relevance of such data.  The agency shall publish such data no less frequently than every 2 years.

(9) Each organization shall adopt recommendations for preventive pediatric health care consistent with early periodic screening, diagnosis, and treatment requirements developed for the Medicaid program.  Each organization shall establish goals to achieve 80-percent compliance by July 1, 1998, and 90-percent compliance by July 1, 1999, for their enrolled pediatric population.

(10) Each organization shall allow, without prior authorization, a female subscriber, to visit a contracted obstetrician/gynecologist for one annual visit and for medically necessary followup care detected at that visit. Nothing in this subsection shall prevent an organization from requiring that an obstetrician/gynecologist treating a covered patient coordinate the medical care through the patient's primary care physician, if applicable.

CREDIT(S)

1999 Electronic Update

Amended by Laws 1997, c. 97-159, § 7, eff. July 1, 1997;  Laws 1999, c. 99-3, § 58, eff. June 29, 1999; Laws 1999, c. 99-264, § 3, eff. June 8, 1999;  Laws 1999, c. 99-356, § 14, eff. July 1, 1999;  Laws 1999, c. 99-393, § 7, eff. June 18, 1999.

< General Materials (GM) - References, Annotations, or Tables >

**HISTORICAL AND STATUTORY NOTES**

1999 Electronic Update

Laws 1999, c. 99-264, § 6, provides:

"This act shall take effect upon becoming a law and shall apply only to contracts entered into after the effective date [June 8, 1999]."

Laws 1999, c. 99-356, § 15, provides:

"This act shall take effect July 1, 1999, except that sections 10 and 11 of this act shall take effect October 1, 1999, and shall apply to contracts issued or renewed on or after that date.  The language of s. 15 appears as included in Senate Amendment 1E to H.B. 2231, which became ch. 99-356 (see Journal of the Senate 1999, p. 1433).  This amendment failed to account for the effect of Senate Amendment 1D in adding 3 additional sections to the bill, causing the original ss. 10 and 11 to be renumbered as ss. 13 and 14.  As enacted, ss. 10 and 11, ch. 99-356, appear at ss. 381.001 and 381.102, respectively."

1996 Main Volume

**Derivation:**
Laws 1991, c. 91-282, § 85.
Laws 1987, c. 87-236, § 21.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 395.002                                                          Page   1
West's F.S.A. § 395.002

### WEST'S FLORIDA STATUTES ANNOTATED
### TITLE XXIX. PUBLIC HEALTH
### CHAPTER 395. HOSPITAL LICENSING AND REGULATION
### PART I. HOSPITALS AND OTHER LICENSED FACILITIES

1999 Electronic Pocket Part Update

Current through End of 1999 1st Reg. Sess.

395.002. Definitions

As used in this chapter:

(1) "Accrediting organizations" means the Joint Commission on Accreditation of Healthcare Organizations, the American Osteopathic Association, the Commission on Accreditation of Rehabilitation Facilities, and the Accreditation Association for Ambulatory Health Care, Inc.

(2) "Agency" means the Agency for Health Care Administration.

(3) "Ambulatory surgical center" or "mobile surgical facility" means a facility the primary purpose of which is to provide elective surgical care, in which the patient is admitted to and discharged from such facility within the same working day and is not permitted to stay overnight, and which is not part of a hospital. However, a facility existing for the primary purpose of performing terminations of pregnancy, an office maintained by a physician for the practice of medicine, or an office maintained for the practice of dentistry shall not be construed to be an ambulatory surgical center, provided that any facility or office which is certified or seeks certification as a Medicare ambulatory surgical center shall be licensed as an ambulatory surgical center pursuant to s. 395.003. Any structure or vehicle in which a physician maintains an office and practices surgery, and which can appear to the public to be a mobile office because the structure or vehicle operates at more than one address, shall be construed to be a mobile surgical facility.

(4) "Applicant" means an individual applicant, or any officer, director, or agent, or any partner or shareholder having an ownership interest equal to a 5- percent or greater interest in the corporation, partnership, or other business entity.

(5) "Biomedical waste" means any solid or liquid waste as defined in s. 381.0098(2)(a).

(6) "Clinical privileges" means the privileges granted to a physician or other licensed health care practitioner to render patient care services in a hospital, but does not include the privilege of admitting patients.

(7) "Department" means the Department of Health.

(8) "Director" means any member of the official board of directors as reported in the organization's annual corporate report to the Florida Department of State, or, if no such report is made, any member of the operating board of directors. The term excludes members of separate, restricted boards that serve only in an advisory capacity to the operating board.

(9) "Emergency medical condition" means:

(a) A medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

expected to result in any of the following:

1. Serious jeopardy to patient health, including a pregnant woman or fetus.

2. Serious impairment to bodily functions.

3. Serious dysfunction of any bodily organ or part.

(b) With respect to a pregnant woman:

1. That there is inadequate time to effect safe transfer to another hospital prior to delivery;

2. That a transfer may pose a threat to the health and safety of the patient or fetus;  or

3. That there is evidence of the onset and persistence of uterine contractions or rupture of the membranes.

(10) "Emergency services and care" means medical screening, examination, and evaluation by a physician, or, to the extent permitted by applicable law, by other appropriate personnel under the supervision of a physician, to determine if an emergency medical condition exists and, if it does, the care, treatment, or surgery by a physician necessary to relieve or eliminate the emergency medical condition, within the service capability of the facility.

(11) "General hospital" means any facility which meets the provisions of subsection (13) and which regularly makes its facilities and services available to the general population.

(12) "Governmental unit" means the state or any county, municipality, or other political subdivision, or any department, division, board, or other agency of any of the foregoing.

(13) "Hospital" means any establishment that:

(a) Offers services more intensive than those required for room, board, personal services, and general nursing care, and offers facilities and beds for use beyond 24 hours by individuals requiring diagnosis, treatment, or care for illness, injury, deformity, infirmity, abnormality, disease, or pregnancy;  and

(b) Regularly makes available at least clinical laboratory services, diagnostic X-ray services, and treatment facilities for surgery or obstetrical care, or other definitive medical treatment of similar extent.

However, the provisions of this chapter do not apply to any institution conducted by or for the adherents of any well-recognized church or religious denomination that depends exclusively upon prayer or spiritual means to heal, care for, or treat any person.  For purposes of local zoning matters, the term "hospital" includes a medical office building located on the same premises as a hospital facility, provided the land on which the medical office building is constructed is zoned for use as a hospital;  provided the premises were zoned for hospital purposes on January 1, 1992.

(14) "Hospital bed" means a hospital accommodation which is ready for immediate occupancy, or is capable of being made ready for occupancy within 48 hours, excluding provision of staffing, and which conforms to minimum space, equipment, and furnishings standards as specified by rule of the agency for the provision of services specified in this section to a single patient.

(15) "Initial denial determination" means a determination by a private review agent that the health

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

care services furnished or proposed to be furnished to a patient are inappropriate, not medically necessary, or not reasonable.

(16) "Intensive residential treatment programs for children and adolescents" means a specialty hospital accredited by the Joint Commission on Accreditation of Healthcare Organizations which provides 24-hour care and which has the primary functions of diagnosis and treatment of patients under the age of 18 having psychiatric disorders in order to restore such patients to an optimal level of functioning.

(17) "Licensed facility" means a hospital, ambulatory surgical center, or mobile surgical facility licensed in accordance with this chapter.

(18) "Lifesafety" means the control and prevention of fire and other life- threatening conditions on a premises for the purpose of preserving human life.

(19) "Managing employee" means the administrator or other similarly titled individual who is responsible for the daily operation of the facility.

(20) "Medical staff" means physicians licensed under chapter 458 or chapter 459 with privileges in a licensed facility, as well as other licensed health care practitioners with clinical privileges as approved by a licensed facility's governing board.

(21) "Medically necessary transfer" means a transfer made necessary because the patient is in immediate need of treatment for an emergency medical condition for which the facility lacks service capability or is at service capacity.

(22) "Mobile surgical facility" is a mobile facility in which licensed health care professionals provide elective surgical care under contract with the Department of Corrections or a private correctional facility operating pursuant to chapter 957 and in which inmate patients are admitted to and discharged from said facility within the same working day and are not permitted to stay overnight. However, mobile surgical facilities may only provide health care services to the inmate patients of the Department of Corrections, or inmate patients of a private correctional facility operating pursuant to chapter 957, and not to the general public.

(23) "Person" means any individual, partnership, corporation, association, or governmental unit.

(24) "Premises" means those buildings, beds, and equipment located at the address of the licensed facility and all other buildings, beds, and equipment for the provision of hospital, ambulatory surgical, or mobile surgical care located in such reasonable proximity to the address of the licensed facility as to appear to the public to be under the dominion and control of the licensee.

(25) "Private review agent" means any person or entity which performs utilization review services for third-party payors on a contractual basis for outpatient or inpatient services. However, the term shall not include full- time employees, personnel, or staff of health insurers, health maintenance organizations, or hospitals, or wholly owned subsidiaries thereof or affiliates under common ownership, when performing utilization review for their respective hospitals, health maintenance organizations, or insureds of the same insurance group. For this purpose, health insurers, health maintenance organizations, and hospitals, or wholly owned subsidiaries thereof or affiliates under common ownership, include such entities engaged as administrators of self-insurance as defined in s. 624.031.

(26) "Service capability" means all services offered by the facility where identification of services offered is evidenced by the appearance of the service in a patient's medical record or itemized bill.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 395.002                                                            **Page 4**

(27) "At service capacity" means the temporary inability of a hospital to provide a service which is within the service capability of the hospital, due to maximum use of the service at the time of the request for the service.

(28) "Specialty bed" means a bed, other than a general bed, designated on the face of the hospital license for a dedicated use.

(29) "Specialty hospital" means any facility which meets the provisions of subsection (13), and which regularly makes available either:

(a) The range of medical services offered by general hospitals, but restricted to a defined age or gender group of the population;

(b) A restricted range of services appropriate to the diagnosis, care, and treatment of patients with specific categories of medical or psychiatric illnesses or disorders; or

(c) Intensive residential treatment programs for children and adolescents as defined in subsection (16).

(30) "Stabilized" means, with respect to an emergency medical condition, that no material deterioration of the condition is likely, within reasonable medical probability, to result from the transfer of the patient from a hospital.

(31) "Utilization review" means a system for reviewing the medical necessity or appropriateness in the allocation of health care resources of hospital services given or proposed to be given to a patient or group of patients.

(32) "Utilization review plan" means a description of the policies and procedures governing utilization review activities performed by a private review agent.

(33) "Validation inspection" means an inspection of the premises of a licensed facility by the agency to assess whether a review by an accrediting organization has adequately evaluated the licensed facility according to minimum state standards.

CREDIT(S)

1999 Electronic Update

Amended by Laws 1998, c. 98-89, § 23, eff. July 1, 1998; Laws 1998, c. 98- 171, § 37, eff. July 1, 1998; Laws 1998, c. 98-303, § 2, eff. May 29, 1998; Laws 1999, c. 99-8, § 102, eff. June 29, 1999; Laws 1999, c. 99-13, § 206, eff. June 29, 1999.

< General Materials (GM) - References, Annotations, or Tables >

**HISTORICAL AND STATUTORY NOTES**

1999 Electronic Update

Laws 1998, c. 98-303, § 10, provides:

"Mobile surgical facilities in operation pursuant to a contract with the Department of Corrections entered into prior to the effective date of this act shall continue to operate pursuant to such contract and shall only be subject to the provisions of this act subsequent to the effective date of any rules

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 395.0199                                                                    **Page 1**
West's F.S.A. § 395.0199

**WEST'S FLORIDA STATUTES ANNOTATED**
**TITLE XXIX. PUBLIC HEALTH**
**CHAPTER 395. HOSPITAL LICENSING AND REGULATION**
**PART I. HOSPITALS AND OTHER LICENSED FACILITIES**

1999 Electronic Pocket Part Update

Current through End of 1999 1st Reg. Sess.

395.0199. Private utilization review

(1) The purpose of this section is to:

(a) Promote the delivery of quality health care in a cost-effective manner.

(b) Foster greater coordination between providers and health insurers performing utilization review.

(c) Protect patients and insurance providers by ensuring that private review agents are qualified to perform utilization review activities and to make informed decisions on the appropriateness of medical care.

(d) This section does not regulate the activities of private review agents, health insurers, health maintenance organizations, or hospitals, except as expressly provided herein, or authorize regulation or intervention as to the correctness of utilization review decisions of insurers or private review agents.

(2) A private review agent conducting utilization review as to health care services performed or proposed to be performed in this state shall register with the agency in accordance with this section.

(3) Registration shall be made annually with the agency on forms furnished by the agency and shall be accompanied by the appropriate registration fee as set by the agency. The fee shall be sufficient to pay for the administrative costs of registering the agent, but shall not exceed $250. The agency may also charge reasonable fees, reflecting actual costs, to persons requesting copies of registration.

(4) Each applicant for registration must comply with the following requirements:

(a) Upon receipt of a completed, signed, and dated application, the agency shall require background screening, in accordance with the level 2 standards for screening set forth in chapter 435, of the managing employee or other similarly titled individual who is responsible for the operation of the entity. The applicant must comply with the procedures for level 2 background screening as set forth in chapter 435, as well as the requirements of s. 435.03(3).

(b) The agency may require background screening of any other individual who is an applicant, if the agency has probable cause to believe that he or she has been convicted of a crime or has committed any other offense prohibited under the level 2 standards for screening set forth in chapter 435.

(c) Proof of compliance with the level 2 background screening requirements of chapter 435 which has been submitted within the previous 5 years in compliance with any other health care licensure requirements of this state is acceptable in fulfillment of the requirements of paragraph (a).

(d) A provisional registration may be granted to an applicant when each individual required by this section to undergo background screening has met the standards for the abuse registry background

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

check and the Department of Law Enforcement background check, but the agency has not yet received background screening results from the Federal Bureau of Investigation, or a request for a disqualification exemption has been submitted to the agency as set forth in chapter 435 but a response has not yet been issued. A standard registration may be granted to the applicant upon the agency's receipt of a report of the results of the Federal Bureau of Investigation background screening for each individual required by this section to undergo background screening which confirms that all standards have been met, or upon the granting of a disqualification exemption by the agency as set forth in chapter 435. Any other person who is required to undergo level 2 background screening may serve in his or her capacity pending the agency's receipt of the report from the Federal Bureau of Investigation. However, the person may not continue to serve if the report indicates any violation of background screening standards and a disqualification exemption has not been requested of and granted by the agency as set forth in chapter 435.

(e) Each applicant must submit to the agency, with its application, a description and explanation of any exclusions, permanent suspensions, or terminations of the applicant from the Medicare or Medicaid programs. Proof of compliance with the requirements for disclosure of ownership and control interests under the Medicaid or Medicare programs shall be accepted in lieu of this submission.

(f) Each applicant must submit to the agency a description and explanation of any conviction of an offense prohibited under the level 2 standards of chapter 435 by a member of the board of directors of the applicant, its officers, or any individual owning 5 percent or more of the applicant. This requirement does not apply to a director of a not-for-profit corporation or organization if the director serves solely in a voluntary capacity for the corporation or organization, does not regularly take part in the day-to-day operational decisions of the corporation or organization, receives no remuneration for his or her services on the corporation or organization's board of directors, and has no financial interest and has no family members with a financial interest in the corporation or organization, provided that the director and the not-for- profit corporation or organization include in the application a statement affirming that the director's relationship to the corporation satisfies the requirements of this paragraph.

(g) A registration may not be granted to an applicant if the applicant or managing employee has been found guilty of, regardless of adjudication, or has entered a plea of nolo contendere or guilty to, any offense prohibited under the level 2 standards for screening set forth in chapter 435, unless an exemption from disqualification has been granted by the agency as set forth in chapter 435.

(h) The agency may deny or revoke the registration if any applicant:

1. Has falsely represented a material fact in the application required by paragraph (e) or paragraph (f), or has omitted any material fact from the application required by paragraph (e) or paragraph (f); or

2. Has had prior action taken against the applicant under the Medicaid or Medicare program as set forth in paragraph (e).

(i) An application for registration renewal must contain the information required under paragraphs (e) and (f).

(5) Registration shall include the following:

(a) A description of the review policies and procedures to be used in evaluating proposed or delivered hospital care.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 395.0199                                                                                    **Page   3**

(b) The name, address, and telephone number of the utilization review agent performing utilization review, who shall be at least:

1. A licensed practical nurse or licensed registered nurse, or other similarly qualified medical records or health care professionals, for performing initial review when information is necessary from the physician or hospital to determine the medical necessity or appropriateness of hospital services; or

2. A licensed physician, or a licensed physician practicing in the field of psychiatry for review of mental health services, for an initial denial determination prior to a final denial determination by the health insurer and which shall include the written evaluation and findings of the reviewing physician.

(c) A description of an appeal procedure for patients or health care providers whose services are under review, who may appeal an initial denial determination prior to a final determination by the health insurer with whom the private review agent has contracted. The appeal procedure shall provide for review by a licensed physician, or by a licensed physician practicing in the field of psychiatry for review of mental health services, and shall include the written evaluation and findings of the reviewing physician.

(d) A designation of the times when the staff of the utilization review agent will be available by toll-free telephone, which shall include at least 40 hours per week during the normal business hours of the agent.

(e) An acknowledgment and agreement that any private review agent which, as a general business practice, fails to adhere to the policies, procedures, and representations made in its application for registration shall have its registration revoked.

(f) Disclosure of 'any incentive payment provision or quota provision which is contained in the agent's contract with a health insurer and is based on reduction or denial of services, reduction of length of stay, or selection of treatment setting.

(g) Updates of any material changes to review policies or procedures.

(6) The agency may impose fines or suspend or revoke the registration of any private review agent in violation of this section. Any private review agent failing to register or update registration as required by this section shall be deemed to be within the jurisdiction of the agency and subject to an administrative penalty not to exceed $1,000. The agency may bring actions to enjoin activities of private review agents in violation of this section.

(7) No insurer shall knowingly contract with or utilize a private review agent which has failed to register as required by this section or which has had a registration revoked by the agency.

(8) A private review agent which operates under contract with the federal or state government for utilization review of patients eligible for hospital or other services under Title XVIII or Title XIX of the Social Security Act [FN1] is exempt from the provisions of this section for services provided under such contract. A private review agent which provides utilization review services to the federal or state government and a private insurer shall not be exempt for services provided to nonfederally funded patients. This section shall not apply to persons who perform utilization review services for medically necessary hospital services provided to injured workers pursuant to chapter 440 and shall not apply to self-insurance funds or service companies authorized pursuant to chapter 440 or part VII of chapter 626.

Copr. ᶜ West 1999 No Claim to Orig. U.S. Govt. Works

FL ST s 395.0199                                                                **Page  4**

(9) Facilities licensed under this chapter shall promptly comply with the requests of utilization review agents or insurers which are reasonably necessary to facilitate prompt accomplishment of utilization review activities.

(10) The agency shall adopt rules to implement the provisions of this section.

CREDIT(S)

1999 Electronic Update

Amended by Laws 1998, c. 98-171, § 39, eff. July 1, 1998.

[FN1] 42 U.S.C.A. § 1395 et seq.; 42 U.S.C.A. § 1396 et seq.

<General Materials (GM) - References, Annotations, or Tables>

REPEAL

<Laws 1998, c. 98-171, § 71(1), provides:>

<"The provisions of this act which require an applicant for licensure, certification, or registration to undergo background screening shall stand repealed on June 30, 2001, unless reviewed and saved from repeal through reenactment by this legislature.">

HISTORICAL AND STATUTORY NOTES
1999 Electronic Update

Laws 1998, c. 98-171, § 70, provides:

"The provisions of this act which require an applicant for licensure, certification, or registration to undergo background screening shall apply to any individual or entity that applies, on or after July 1, 1998, for renewal of a license, certificate, or registration that is subject to the background screening required by this act."

1997 Main Volume

**Derivation:**
Laws 1992, c. 92-289, § 17.
Fla.St.1991, § 395.0172.
Laws 1991, c. 91-201, § 6.
Laws 1991, c. 91-108, § 184.
Laws 1990, c. 90-187, § 1.

LIBRARY REFERENCES

1997 Main Volume

**Texts and Treatises**
8 Fla Jur 2d, Businesses and Occupations §§377, 378.

West's F. S. A. § 395.0199

FL ST § 395.0199

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works